**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **And Go Concepts, LLC, *et al.*,** | § | **Case No. 26-90753 (ARP)** |
| | § | |
| **Debtors.[1]** | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |
| | § | |

**DECLARATION OF FRANCIS P. GALLAGHER IN
SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Francis P. Gallagher, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

**Preliminary Statement**

1.     I am the Chief Financial Officer ("**CFO**") of And Go Concepts, LLC ("**Salad and Go**" or the "**Company**"), the principal asset-holding and administrative entity among the above-captioned debtors and debtors in possession (collectively, the "**Debtors**"). I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and the motions and applications filed on the first day (collectively, the "**First Day Motions**")[2] of these chapter 11 cases (the "**Chapter 11 Cases**").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); and Garland New Market LLC (6838). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts.

[2] Capitalized terms that are used but not defined herein shall have the meaning given to them in the applicable First Day Motion.

2.    On August 4, 2026 (the "**Petition Date**"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**"). The Debtors intend to remain in possession of their properties and manage their estates pursuant to sections 1107(a) and 1108 of the Bankruptcy Code to secure and preserve assets, administer these Chapter 11 Cases, monetize the Debtors' assets, including through the sale of unexpired leases and other property, and complete an orderly transition and wind-down of their operations.

3.    I am authorized to submit this Declaration on behalf of each Debtor. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, information provided by the Debtors' employees and advisors, my review of relevant documents, or my opinion based on my experience and knowledge of the Debtors' operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth herein. I am above 18 years of age and competent to testify.

### Declarant Qualifications

4.    I have served as CFO of Salad and Go since June 2025. Prior to my appointment as CFO, I served as Senior Director of Financial Planning, Analysis, and Budgeting at the Company from September 2023 to June 2025. In that capacity, I was responsible for the Company's financial modeling, budgeting, and forecasting.

5.    Before joining Salad and Go, I held investment and advisory roles at Brookfield Asset Management, Man Group, and Prentice Capital, where I focused on fundamental equity research and investment analysis in consumer and restaurant sectors. I previously covered the restaurant industry as an equity research analyst at The Buckingham Research Group. Earlier in my career, I held positions at Lazard and Fitch Ratings. I hold a Bachelor of Arts and a Master of Finance from Tulane University.

6.     In my capacity as CFO, I am responsible for the Company's finances, including accounting, treasury, financial planning, capital allocation, and financial reporting. I have been actively involved in the prepetition restructuring efforts, including cost-reduction initiatives, store-closure decisions, lender negotiations, and the evaluation of strategic alternatives that ultimately led to the filing of these Chapter 11 Cases.

<u>**Company History and Business Overview**</u>

**I.     History and Mission**

7.     Salad and Go was founded in Gilbert, Arizona, in 2013 and operated as a quick-service, drive-through restaurant chain. The Company's mission has been to make fresh, delicious, and nutritious food accessible and affordable to communities across the United States. Salad and Go was conceived as a healthier alternative to traditional fast food, with the goal of pricing menu items at or below the cost of a typical fast-food meal while using high-quality ingredients without preservatives.

8.     The Company operated small-footprint, drive-through-only locations that required minimal square footage, lower build-out costs, and reduced labor relative to traditional quick-service restaurants. This operating model was designed to deliver the Company's products at an accessible price point while maintaining food quality.

**II.     Menu and Vertically Integrated Supply Chain**

9.     Salad and Go's menu featured hand-crafted salads, wraps, soups, breakfast burritos and bowls, lemonades, teas, and other beverages. The Company developed its menu under the direction of an executive chef and emphasized whole ingredients and nutritionally balanced meals at a price point competitive with traditional fast-food offerings.

10.     A core element of the Company's strategy was its vertically integrated supply chain. The Company operated central kitchen and food-production facilities (the "**Central**

**Kitchens**") where ingredients were prepared, portioned, and distributed to individual restaurant locations. This vertical integration eliminated intermediary costs, ensured consistency, and enabled the Company to offer its products at accessible price points. The Central Kitchens are being maintained as necessary to secure and preserve the facility, equipment, intellectual property, records, and other assets for the orderly wind-down of the Debtors' estates.

### III.    Corporate and Organizational Structure

11.     The Debtors in these Chapter 11 Cases are (i) And Go Concepts, LLC; (ii) AGC-Arizona Facilities, LLC; (iii) AGC-North Texas Facilities, LLC; (iv) Garland New Market LLC; and (v) SAG Corporate Services LLC. Certain other entities within the Company's corporate structure are affiliates of the Debtors but are not themselves debtors in these Chapter 11 Cases, including AGC Topco, LLC; AGC Holdco, LLC; And Go Concepts Equity Holdco, LLC; And Go Concepts Team Member Holdco, LLC; and AGC–CA Stores, LLC (collectively, the "**Non-Debtor Affiliates**"). A true and accurate copy of the Debtors' and Non-Debtor Affiliates' organizational chart is attached hereto as **Exhibit A**.

12.     And Go Concepts, LLC ("**AGC OpCo**") is an Arizona limited liability company formed on July 11, 2011, and is a Debtor in these Chapter 11 Cases. AGC OpCo historically served as the primary operating entity that employs most employees and holds most vendor contracts, real property leases, bank accounts, and intellectual property.

13.     AGC-Arizona Facilities, LLC ("**AGC Arizona**") is a Debtor in these Chapter 11 Cases and is a wholly owned subsidiary of AGC OpCo. AGC Arizona holds employees, agreements, and other assets or obligations associated with the Company's Phoenix-area Central Kitchen.

14.     AGC-North Texas Facilities, LLC ("**AGC Texas**") is a Debtor in these Chapter 11 Cases and is a wholly owned subsidiary of AGC OpCo. AGC Texas historically served as the

Company's supply chain entity for Texas and Oklahoma (the "**Central Region**") in connection with the central production facility in Garland, Texas (the "**Garland Facility**") and has been inactive since the Garland Facility ceased operations.

15. Garland New Market LLC is a Debtor in these Chapter 11 Cases and is the special-purpose entity associated with the financing of the Garland Facility.

16. SAG Corporate Services LLC is a Texas limited liability company, is a wholly owned subsidiary of AGC OpCo, and is a Debtor in these Chapter 11 Cases.

17. The remaining entities within the Company's corporate structure are Non-Debtor Affiliates:

   a. AGC Topco, LLC is a Delaware limited liability company formed on December 5, 2025, in connection with a prepetition recapitalization transaction, which sits at the top of the Debtors' organizational structure;

   b. AGC Holdco, LLC is a Delaware limited liability company, wholly owned by AGC Topco, LLC, that serves as the intermediate holding company beneath AGC Topco, LLC and above AGC OpCo;

   c. And Go Concepts Equity Holdco, LLC is wholly owned by AGC Topco, LLC and is an aggregation vehicle for certain current and former Salad and Go management equity investments;

   d. And Go Concepts Team Member Holdco, LLC was formed as an employee equity aggregation vehicle to hold certain team member profits interests; and

   e. AGC–CA Stores, LLC is a wholly owned subsidiary of AGC OpCo and was formed for potential future California store locations and holds no restaurant assets or operations.

**IV.    Prepetition Capitalization**

18. As of the Petition Date, AGC OpCo, the Debtors' main operating entity, has no secured indebtedness. The Debtors' material funded debt obligations are isolated to specific special-purpose entities formed in connection with the Garland Facility financing, as follows:

   a. **NMTC QLICI Loans**. AGC Texas is the borrower under New Markets Tax Credit ("**NMTC**") QLICI loans in the aggregate original principal amount of $25,380,000

from TMF Sub-CDE 57, LLC, Empowerment Reinvestment Fund LIII, LLC, and CCG Sub-CDE 74, LLC (all of which are affiliates of Regions Bank). The NMTC QLICI loans are secured by certain account pledge and control agreements, a negative pledge agreement executed by AGC Texas, and a guaranty of completion and payment executed by AGC OpCo and AGC Holdco, LLC.

b. **Topco Recapitalization**. Between December 2025 and January 2026, existing equity holders provided approximately $27 million in new-money capital to the Company in connection with the AGC Topco, LLC recapitalization (the "**Topco Recapitalization**"). This capital contribution is not secured indebtedness.

19.     The Company's peak valuation was approximately $1.1 billion in 2022.

### **Expansion, Financial Distress, and Prepetition Restructuring Efforts**

### **I.      Rapid Expansion and Operational Challenges**

20.     Beginning in 2021, under prior executive leadership, the Company embarked on an aggressive expansion strategy, entering the Texas and Oklahoma markets. The Company invested heavily in building out the Garland Facility, ultimately spending more than $47.1 million to build out the facility in connection with an investment of approximately $25.4 million from new market tax credit lenders, resulting in a total investment of approximately $72.5 million in the Garland Facility. At its peak, the Company operated 146 total locations across Arizona, Nevada, Texas, and Oklahoma.

21.     The Texas and Oklahoma expansion was hampered by a combination of factors, including (a) sites that were not as accessible to automotive traffic and visible to customers as the Arizona locations; (b) building large numbers of units ahead of consumer awareness; (c) high fixed overhead costs from the Central Kitchen-commissary model (the Garland Facility), resulting in $15–20 million per year in overhead costs; and (d) price increases and food-safety events in the salad industry that impaired customer traffic in addition to company-specific challenges. The Central Region market was significantly cash-flow negative even prior to allocating corporate overhead.

## II. Downsizing Efforts

22. In September 2025, the Company closed approximately 41 underperforming locations in the Central Region. In January 2026, the Company announced the closure of all remaining Texas and Oklahoma stores. The Garland Facility ceased operations on or about January 11, 2026. In total, the Company closed more than 70 Central Region locations and significantly reduced its corporate headcount. These measures proved insufficient to address the Company's liquidity constraints, among other reasons.

## III. Continuing Financial Distress and Liquidity Constraints

23. Despite the downsizing and cost-reduction initiatives, the Company continued to face significant liquidity challenges. The remaining Arizona and Nevada restaurants achieved approximately break-even performance at the store level after the full allocation of Central Kitchen costs. However, the Company's remaining corporate overhead, combined with obligations under closed-store leases ("**dead rent**") and administrative costs, rendered the business in a position of unsustainable cash burn at its reduced scale.

24. The Topco Recapitalization has been substantially consumed by prepetition operating losses, dead rent, and wind-down costs. Additionally, rising gas prices, reduced consumer spending, and the cyclospora outbreak significantly accelerated cash losses over the 90 days immediately preceding the Petition Date. In regard to the negative effects caused by the recent cyclospora outbreak, the Company is not alone in its financial struggles. For example, one news source reported that on July 11, 2026, average foot traffic at some of the Company's most significant competitors was reduced between 3.1–11.5 percent. In the fast-casual dining industry, which operates on very tight margins, a drop in sales by that percentage is devastating.

### IV.     Prepetition Restructuring Efforts and Strategic Alternatives

25.     Prior to the Petition Date, the Debtors' management team and advisors undertook extensive efforts to address the Company's financial distress, including (a) hiring a new Chief Executive Officer, Michael Tattersfield, the former CEO of Caribou Coffee, Krispy Kreme, and Einstein Bros Bagels, with proven turnaround experience, approximately one year before the Petition Date; (b) engaging Douglas Brickley of Stout Risius Ross, LLC as Chief Restructuring Officer to advise on liquidity management, creditor negotiations, and restructuring alternatives; (c) closing more than 70 underperforming stores; (d) reducing corporate headcount; (e) renegotiating vendor contracts; (f) closing the Garland Facility; (g) exploring sale transactions for all or substantially all of the Company's assets; and (h) retaining only the personnel and services needed for security, asset preservation, estate administration, and the wind-down of the Debtors' estates.

26.     The Company explored several potential transaction structures, including the Topco Recapitalization and, more recently, a sale of the Company's assets. Beginning in February 2026, the Company engaged in discussions with a potential purchaser regarding a potential non-bankruptcy acquisition of certain restaurant locations in the Phoenix, Tucson, and Las Vegas markets, the Phoenix-area Central Kitchen, and related infrastructure, and the parties negotiated a non-binding term sheet contemplating an outside date of September 15, 2026, to close such a transaction. The parties were ultimately unable to reach a definitive agreement, and no asset purchase agreement was executed in connection with those discussions.

27.     More recently, the Debtors have engaged in discussions with numerous parties regarding a sale of the Debtors' assets and have entered into an agreement for the sale of certain assets, including a number of unexpired leases. The Debtors are filing a motion to approve the sale of those assets and intend to seek Court approval of that sale.

### V.      Reasons for Chapter 11 Filing

28.      The Debtors commenced these Chapter 11 Cases because (a) the Company's liquidity is insufficient to fund security, asset preservation, estate administration, and the orderly wind-down outside of a court-supervised process; (b) chapter 11 provides the breathing room necessary to secure and preserve those assets, maintain only essential personnel and services, and administer and monetize the estates during the Chapter 11 Cases; (c) the automatic stay will halt creditor collection actions and permit the orderly administration of claims and disposition of assets; and (d) the debtor-in-possession financing facility described herein will provide the liquidity necessary to fund asset preservation, case administration, and the wind-down of the Debtors' estates through closing and thereafter as necessary.

### First Day Motions

29.      Contemporaneously herewith, the Debtors filed the First Day Motions. The First Day Motions seek relief narrowly tailored to secure and preserve the Debtors' assets, maintain only essential personnel and services, administer these Chapter 11 Cases efficiently, and complete an orderly wind-down of the Debtors' estates. I believe that the relief sought in each First Day Motion is necessary and appropriate, will minimize disruption to asset preservation and case administration, and is in the best interests of the Debtors' creditors and the Debtors' estates. The factual bases for the First Day Motions are described below.

### I.      Taxes Motion

30.      The Debtors seek authority to pay certain prepetition taxes and fees (collectively, the "**Taxes and Fees**") owed to various federal, state, and local taxing and regulatory authorities (collectively, the "**Taxing and Regulatory Authorities**"), as well as authority to pay any post-petition Taxes and Fees that become due and owing in the ordinary course.

31.     In the ordinary course of business, the Debtors incurred and remitted various Taxes and Fees, operated in multiple states and local jurisdictions, and remain subject to applicable tax and regulatory requirements in connection with their retained workforce, owned and leased property, asset dispositions, case administration, and wind-down efforts. Failure to remit the Taxes and Fees may expose the Debtors and their officers and directors to personal liability and may result in the assessment of penalties and interest that would constitute additional administrative expense claims against the estates.

32.     Moreover, many of the Taxes and Fees would be entitled to priority status under section 507(a)(8) of the Bankruptcy Code and would need to be paid in full in any plan of reorganization or liquidation. Nonpayment could result in audits, penalties, liens on estate property, personal liability for responsible parties, enforcement actions, and suspension or revocation of permits or licenses that may be necessary for asset preservation and wind-down activities. I believe payment of prepetition Taxes and Fees is necessary to avoid diminution of estate value and facilitate the orderly administration and disposition of the Debtors' assets.

## II.     Insurance Motion

33.     The Debtors seek authority to continue, maintain, renew, and supplement their insurance programs and to pay prepetition obligations related thereto, including insurance premiums, premium-financing obligations, workers' compensation obligations, and brokerage fees. In the ordinary course of business, the Debtors maintain insurance policies (the "**Insurance Policies**") with third-party insurance carriers (the "**Insurance Carriers**"). The Insurance Policies provide coverage for, among other things, property, auto liability, commercial umbrella liability, restaurant recovery, workers' compensation, cyber liability, general liability, directors' and officers' ("**D&O**") and other management liability, fiduciary liability, and multiple layers of excess liability coverage.

34.     Maintaining the Insurance Policies without interruption is required by applicable law, contractual obligations, the Office of the United States Trustee's Operating Guidelines, and sound business practice. Any lapse in coverage could expose the Debtors to uninsured losses at restaurant sites and the Central Kitchens, breach lease requirements, impair worker and third-party protections, void contractual protections, and diminish the value of equipment, leasehold interests, intellectual property, and other assets. I believe the relief requested in the Insurance Motion is necessary and in the best interests of the estates.

**III.    Utilities Motion**

35.     The Debtors seek entry of an order prohibiting utility providers from altering, refusing, or discontinuing utility services, approving the Debtors' proposed form of adequate assurance of payment, and establishing procedures for the resolution of disputes regarding adequate assurance.

36.     The Debtors receive utility services (the "**Utility Services**") from various providers (the "**Utility Providers**"), including electricity, natural gas, water, telephone and telecommunications services, waste disposal, and related services. In certain locations, utility costs are included in or paid through the Debtors' lease obligations to landlords. Continued Utility Services at selected locations, the Central Kitchens, and administrative facilities are essential for security systems, lighting, climate control, fire and life-safety systems, sanitation, telecommunications, records and data access, lease compliance, asset inspections, and the preservation and marketing of equipment and other assets.

37.     An interruption in Utility Services at locations selected for preservation could disable alarms, access-control systems, lighting, climate control, fire and life-safety systems, telecommunications, or other safeguards; damage equipment, records, or facilities; cause lease or regulatory defaults; impede buyer diligence and asset removal; and reduce the value of assets

available for sale. I believe uninterrupted service at the limited locations identified by the Debtors is necessary to prevent immediate and irreparable harm to the Debtors' estates.

### IV. PACA/PASA Motion

38.     The Debtors seek authority, in their discretion, to pay certain prepetition claims held by vendors with claims arising under the Perishable Agricultural Commodities Act ("**PACA**") or the Packers and Stockyards Act ("**PASA**") (collectively, the "**PACA/PASA Claimants**").

39.     In the ordinary course of business, the Debtors purchased produce, proteins, dairy, packaging materials, and other goods, and certain resulting claims may be protected by PACA or PASA statutory trust provisions. Payment of valid PACA/PASA Claims may be necessary because applicable trust assets may not be property of the estates. Addressing these claims in a controlled manner will protect estate value and facilitate the orderly administration of the Debtors' estates.

40.     I believe payment of qualifying PACA/PASA Claims is necessary to maintain the Debtors' supply chain for their remaining restaurant operations, prevent disruption to the Debtors' business, and preserve value for the Debtors' estates.

### V. Employee Wages Motion

41.     The Debtors seek authority to pay prepetition wages, salaries, and other compensation and to continue employee benefits programs for the limited personnel retained to perform security, preservation, administration, and wind-down functions. As of the Petition Date, the Debtors employ a workforce of approximately 1,300 current employees, of whom approximately 521 are employed on a full-time basis and approximately 779 are employed on a part-time basis. Of these employees, approximately 1,163 are hourly wage earners and approximately 137 are salaried personnel. In the twelve months prior to the Petition Date, the Debtors paid, on average, approximately $1,492,291.60 per pay period on account of gross wage obligations to employees.

42.     The Debtors' retained employees are essential to securing and preserving the Debtors' assets, maintaining necessary systems and records, administering these Chapter 11 Cases, supporting buyer diligence and asset transfers, and completing the orderly wind-down of the Debtors' estates. Failure to honor prepetition compensation obligations would harm employee morale, trigger departures, impair security and preservation efforts, delay case administration, and diminish estate value.

### VI.     Cash Management Motion

43.     The Debtors seek authority to continue using their existing cash management system (the "**Cash Management System**"), to maintain their existing bank accounts, to continue using existing business forms, to implement necessary changes in the course of administering the estates, to honor and pay all prepetition and post-petition bank fees, and to obtain an extension of time to comply with section 345(b) of the Bankruptcy Code.

44.     The Debtors utilize an integrated Cash Management System to collect and reconcile cash, receivables, refunds, rebates, deposits, insurance or tax recoveries, and other estate receipts and to transfer and disburse funds for payroll, taxes, rent, utilities, security, asset preservation, professional fees, and wind-down expenses. The Cash Management System enables cash monitoring, forecasting, and reporting and allows the Debtors to maintain centralized control over the administration of nineteen (19) bank accounts (the "**Bank Accounts**") maintained with Bank of America, N.A. and Regions Bank.

45.     In the ordinary course of business, the Cash Management System collected restaurant revenue through point-of-sale systems and card-processing channels. Post-petition, the Debtors need the existing Bank Accounts and related systems to reconcile prepetition sales and settlement activity, process residual refunds and chargebacks, collect receivables and other estate

recoveries, and make authorized payments for asset preservation, case administration, and the wind-down process.

46.     The Debtors also seek authority to maintain their credit card processing arrangements as necessary to complete settlement of prepetition transactions and to pay or permit netting of merchant fees, refunds, and chargebacks, regardless of whether they arose pre- or post-petition. The Debtors do not seek authority to process new restaurant sales or continue customer programs through these arrangements.

47.     The Debtors also seek authority to receive funds from the Topco Account (an account maintained by AGC Topco, LLC, which may or may not become a debtor in these Chapter 11 Cases). The Debtors seek authority to receive such funds either directly to their operating account or to an account maintained by or for the benefit of SAG Corporate Services LLC, and to make subsequent transfers from such account to the Debtors' operating account in the ordinary course, at the direction of myself or the CRO, as needed to fund operations, without the need for further Court order or approval.

48.     The Debtors' personnel are familiar with the Cash Management System, which supports the controlled collection, safeguarding, transfer, and disbursement of estate funds. Requiring the Debtors to establish new bank accounts, obtain new checks and business forms, or implement a new cash-management infrastructure would impose significant costs, delay receipts and authorized payments, complicate reconciliation of prepetition transactions, and impair the Debtors' ability to preserve assets, administer the estates, and complete the wind-down process. I believe the relief requested in the Cash Management Motion is necessary to preserve the value of the Debtors' estates.

## VII.      Rejection Procedures Motion

49.      In connection with these Chapter 11 Cases and the wind-down of the Debtors' business operations, it will be necessary for the Debtors to reject certain executory contracts and/or unexpired leases to which the Debtors are parties. Continuation of these contracts and leases would impose ongoing administrative expense burdens on the estates without providing corresponding benefit, thereby diminishing the value available for distribution to the Debtors' creditors. Therefore, the Debtors seek entry of an order establishing procedures by which the Debtors may reject executory contracts and unexpired leases during these Chapter 11 Cases.

50.      Due to the exigent circumstances of these Chapter 11 Cases, including the need to minimize unnecessary administrative expenses during the wind-down of the Debtors' estates, the Debtors respectfully submit that the Court should approve the Rejection Procedures Motion on an emergency basis. Prompt entry of an order establishing rejection procedures will enable the Debtors to efficiently evaluate and reject executory contracts and unexpired leases that no longer serve the interests of the estates, while also providing creditors an opportunity to object to the rejection of their executory contracts and unexpired leases, thereby preserving liquidity and maximizing value for the benefit of the Debtors' creditors in an orderly manner.

51.      I believe the relief requested in the Rejection Procedures Motion represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' creditors and the Debtors' estates.

## Conclusion

52.      For the reasons set forth herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in each of the First Day Motions. I believe such relief is critical to secure and preserve the Debtors' assets, retain only essential personnel and services, administer these Chapter 11 Cases, monetize leases, equipment, intellectual property, Central

- 16 -

Kitchen assets, claims, and other property, and complete an orderly wind-down in a manner that maximizes value for the Debtors' creditors and the Debtors' estates.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 4, 2026

*/s/ Francis P. Gallagher*
Francis P. Gallagher

**Exhibit A**

**Organizational Chart**

