**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **And Go Concepts, LLC, *et al.*,** | § | **Case No. 26-90753 (ARP)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | **(Emergency Hearing Requested)** |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (II) MODIFYING THE AUTOMATIC STAY, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 2:00 P.M. (CENTRAL TIME) ON AUGUST 18, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER AT 2:00 P.M. (CENTRAL TIME) ON AUGUST 18, 2026, IN COURTROOM 400, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE PEREZ'S CONFERENCE ROOM NUMBER IS 282694. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE PEREZ'S HOME PAGE. THE MEETING CODE IS "JUDGEPEREZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE PEREZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); Garland New Market LLC (6838); AGC Topco, LLC (6845); and AGC Holdco, LLC (0294). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts.

And Go Concepts, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Relief Requested

1. The Debtors seek entry of an order substantially in the form attached hereto (the "**Interim DIP Order**") and a final order (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**") granting the following relief described below. The DIP Term Sheet will be attached as an exhibit to, and incorporated by reference into, the DIP Orders and, upon approval, will constitute the operative and controlling DIP financing document in lieu of a separate long-form DIP credit agreement, subject only to supplemental security agreements, guaranties, UCC financing statements, and other ancillary documentation reasonably required to grant, evidence, and perfect the DIP Liens.[2]

- ***DIP Facility***: Authorizing the Debtors to obtain new-money postpetition financing from Rucio Investment Sarl, as sole DIP Lender, pursuant to a $20,000,000 senior secured, superpriority, delayed-draw term loan facility (the "**DIP Facility**"). The DIP Facility will consist of (a) Tranche A in the principal amount of $10,000,000, available upon entry of the Interim DIP Order [3]and satisfaction of customary conditions precedent, and (b) Tranche B in the principal amount of $10,000,000, available in up to five draws of $2,000,000 each only after entry of the Sale Order and conclusion of the Sale Hearing approving the sale, in each case subject to the terms of the DIP Term Sheet and the DIP Orders;

- ***Superpriority Claims and DIP Liens***: Granting the DIP Lender superpriority administrative claims under section 364(c)(1) and DIP Liens under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, subject to the Carve-Out. The DIP Facility will not prime any valid, perfected, and non-avoidable prepetition lien. The DIP Liens will exclude chapter 5 avoidance actions and their proceeds, D&O Claims and their proceeds, the Debtors' equity interests in Garland New Market LLC and AGC-North Texas Facilities, LLC, escrowed funds held by an escrow agent in connection with the Chapter 11 Cases (including professional fee,

[2]The summaries contained in this Motion are qualified in their entirety by the DIP Term Sheet and the DIP Orders.
[3]Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Term Sheet, the DIP Orders, the APA, or the Brickley Declaration, as applicable.

adequate assurance, and good-faith deposit escrows, until released to a Debtor), and PACA/PASA trust assets to the extent they are not property of the estates, as provided in the DIP Term Sheet and the DIP Orders;

- ***Automatic Stay***: Modifying the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**") only to the extent necessary to implement and effectuate the DIP Facility and the DIP Orders and to permit the DIP Lender to exercise remedies upon an Event of Default, following five (5) business days' prior written notice to the Debtors, any statutory committee, and the U.S. Trustee, after which the automatic stay is automatically modified as to the DIP Lender without further order unless, during that period, a party in interest obtains an order of the Court to the contrary; and

- ***Final Hearing***: Scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility pursuant to a proposed Final DIP Order, with the DIP Term Sheet attached as an exhibit to and incorporated by reference into the DIP Orders.

2. In support of this Motion, the Debtors submit the *Declaration of Douglas Brickley in Support of Debtors' Emergency Motion for Entry of Interim and Final DIP Orders (A) Authorizing the Debtors To Obtain Senior Secured Superpriority Postpetition Financing and (B) Grant Liens and Superpriority Administrative Expense Claims, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "**Brickley Declaration**"). The Brickley Declaration is incorporated herein by reference.

**<u>Jurisdiction and Venue</u>**

3. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "**Amended Standing Order**"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

4. Venue is proper pursuant to 28 U.S.C. § 1408.

5. The statutory bases for the relief requested herein are sections 105, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Procedures**").

## Background

6. On August 4, 2026 and August 5, 2026 (collectively, the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in the Chapter 11 Cases.

7. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules for the Southern District of Texas.

8. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Francis P. Gallagher, Chief Financial Officer, in Support of Chapter 11 Petitions and First-Day Pleadings* (the "**First Day Declaration**"), filed on August 5, 2026 and incorporated herein by reference.

## Concise Statement Pursuant to Bankruptcy Rule 4001

9. In accordance with Bankruptcy Rules 4001(b), 4001(c) and 4001(d), the following is a concise statement and summary of the proposed material terms of the DIP Facility as provided in the DIP Term Sheet and the DIP Orders:[4]

| | **DIP Facility** |
|---|---|
| **DIP Facility**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "DIP Facility"* | A $20,000,000 new-money, senior secured, superpriority, delayed-draw term loan facility. Tranche A is $10,000,000, available upon entry of the Interim DIP Order and satisfaction of customary conditions precedent. Tranche B is $10,000,000, available in up to five draws of $2,000,000 each only following (i) entry of the Sale Order approving a sale of a material portion of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and (ii) conclusion of the Sale Hearing approving the sale, in each case subject to the DIP Term Sheet and the DIP Orders. |
| **Borrower**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Debtor / Borrower"* | And Go Concepts, LLC. |
| **Guarantors**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Guarantors"* | All jointly administered Debtors except Garland New Market LLC and AGC-North Texas Facilities, LLC. |
| **DIP Lender**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "DIP Lender"* | Rucio Investment Sarl, as sole DIP Lender and sole underwriter and initial provider of the Commitment.<br><br>Rucio is an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, as required to be disclosed under Bankruptcy Rule 4001(c)(1)(B). |
| **Term** | The earliest to occur of: (a) January 31, 2027; (b) three business days following the closing date of the Sale; (c) the effective date of any chapter 11 plan with respect to the Chapter 11 Cases; (d) conversion of the Chapter 11 Cases |

[4] This summary is intended only to assist the Court by reference to the DIP Term Sheet and the DIP Orders and is qualified in its entirety by the terms of the DIP Term Sheet and the DIP Orders. Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet or the DIP Orders, as applicable.

| | **DIP Facility** |
|---|---|
| **(Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Maturity"* | to chapter 7; (e) dismissal of the Chapter 11 Cases; or (f) acceleration following an Event of Default. |
| **Material Conditions to Credit Extensions**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Conditions Precedent"* | Customary conditions precedent, including: (a) entry of the Interim DIP Order and, in due course, the Final DIP Order approving the DIP Term Sheet and DIP Facility, with the DIP Term Sheet attached to and incorporated by reference into the DIP Orders; (b) delivery and Court approval of both a 3-week cash flow budget for an initial interim period and, prior to entry of Final DIP Order, a 13-week cash flow budget reasonably acceptable to the DIP Lender (together, the "**Approved Budget**"); (c) execution of supplemental security agreements, guaranties, UCC financing statements, and other ancillary documents reasonably required to grant, evidence, and perfect the DIP Liens, with no separate long-form DIP credit agreement contemplated; (d) no material adverse change in the business, assets, or prospects of the Debtors since entry of the Interim DIP Order; (e) accurate representations and warranties and no continuing default; (f) payment of fees and expenses then due; (g) delivery of a schedule of all deposit and securities accounts of the Loan Parties identifying each account subject to a control agreement, account pledge, or third-party setoff right; and (h) as to each Tranche B draw, the APA remains in full force and effect and no party has delivered a notice of termination or a notice asserting a Material Adverse Effect; as to the first Tranche B draw only, delivery of a certificate confirming that projected net Sale Proceeds, after all Site Adjustment Amounts, Required Cure Costs, and Lease Expenses then known, are not less than 150% of the DIP Obligations that would be outstanding if the full Commitment were funded; and, if aggregate Site Adjustment Amounts increase by more than $5,000,000 after the first Tranche B draw, retesting of that certificate condition once at the next Tranche B draw, in each case subject to any written waiver by the DIP Lender. |
| **Fees and Expenses**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Fees"; "Expenses"* | Residual Fee: A one-time fee equal to 20.00% of the Commitment, or $4,000,000, payable solely and exclusively upon (i) the reserve for all disputed and undisputed unpaid claims and any amounts budgeted under a chapter 11 plan (e.g., administrative expenses, priority claims, and a winddown budget reasonably acceptable to the DIP Lender) or (ii) indefeasible payment in full in cash of all allowed claims against the Debtors' estates (the "**Full Recovery Trigger**"). The Residual Fee is non-recourse to the estates; payable solely from amounts otherwise |

| | **DIP Facility** |
|---|---|
| | distributable to holders of equity or membership interests before any distribution to such holders; junior in right of payment to all allowed administrative expense, priority, secured, and general unsecured claims; not an administrative expense claim and not entitled to priority under sections 503(b), 507(a), or 507(b) of the Bankruptcy Code; and excluded from the mandatory prepayment waterfall. The Residual Fee is payable upon the Full Recovery Trigger whether or not a chapter 11 plan is confirmed or consummated. The DIP Orders provide that this obligation binds the Debtors, their estates, and any successor or estate representative, including any chapter 11 trustee, any chapter 7 trustee, and any plan administrator, liquidating trustee, or disbursing agent; that the Residual Fee is payable within ten business days after the Full Recovery Trigger out of amounts that would otherwise be distributable to holders of equity or membership interests (including, in a case under chapter 7, amounts otherwise distributable under section 726(a)(6) of the Bankruptcy Code); and that an amount equal to the Residual Fee is segregated upon the Full Recovery Trigger until paid.<br><br>No commitment fee, closing fee, underwriting fee, agent fee, upfront fee, exit fee, backstop fee, or MOIC is payable. The DIP Lender's reasonable and documented out-of-pocket fees, costs, and expenses are subject to an aggregate cap of $325,000. |
| **Interest Rate**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Interest Rate"* | The outstanding DIP Obligations will bear interest at a fixed rate of 8.00% per annum, calculated on the basis of a 360-day year for actual days elapsed and payable in kind or in cash monthly in arrears. Upon an Event of Default, interest will accrue at the non-default rate plus 2.00% per annum (the "**Default Rate**"), payable on demand, which may be paid in kind upon demand. All payments in respect of the DIP Obligations will be made free and clear of, and without deduction or withholding for, any taxes; if any deduction or withholding is required by applicable law, the amount payable will be increased as necessary so that the DIP Lender receives the amount it would have received had no deduction or withholding been made. The gross-up does not apply to any withholding tax attributable to the DIP Lender's failure to deliver a properly completed IRS Form W-8BEN-E or other applicable form. |
| **DIP Liens**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))** | Pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, the DIP Lender will be granted continuing, valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests and |

| | **DIP Facility** |
|---|---|
| *DIP Term Sheet, "Priority and Liens"; Interim DIP Order* | liens on cash and all tangible, intangible, real and personal property of the Loan Parties, whether now owned or hereafter acquired or created, prepetition or postpetition, including equity interests owned by any Loan Party other than equity interests in Garland New Market LLC and AGC-North Texas Facilities, LLC, insurance proceeds, and proceeds of the foregoing (collectively, the "**DIP Collateral**"), to secure the DIP Obligations. The DIP Facility will not prime any valid, perfected, and non-avoidable prepetition lien. The DIP Collateral will not include, and there will be no lien or claim of any kind on, (a) causes of action under chapter 5 of the Bankruptcy Code or applicable state law equivalents or the proceeds thereof, (b) claims against present or former directors, officers, or managers of the Debtors for breach of fiduciary duty or similar causes of action (the "**D&O Claims**") or the proceeds thereof, (c) any accounts held by an escrow agent in connection with the Chapter 11 Cases, including the professional fee escrow, adequate assurance escrow, and any escrow account holding good-faith deposits of potential buyers of the Debtors' assets; provided that, upon release of any such escrowed funds to a Debtor, such funds will constitute DIP Collateral, or (d) any assets held in trust for the benefit of claimants under PACA or PASA to the extent such assets are not property of the Debtors' estates, in each case subject to the Carve-Out. Garland New Market LLC and AGC-North Texas Facilities, LLC are not Loan Parties, do not guarantee the DIP Obligations, and grant no DIP Liens on any of their assets. |
| **Modification of Non-Bankruptcy Law Relating to Perfection of Liens on Estate Property**<br><br>*DIP Term Sheet, "Priority and Liens"; DIP Orders* | The Interim DIP Order, the Final DIP Order, and any supplemental security or ancillary documentation will be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording financing statements or taking other perfection actions, subject to the Debtors' obligation to take commercially reasonable steps, including executing and filing UCC financing statements, that the DIP Lender may reasonably request to further evidence and perfect the DIP Liens. |
| **Superpriority Administrative Claims**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))**<br><br>*DIP Term Sheet, "Priority and Liens"; Interim DIP Order* | All DIP Obligations will constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over all other administrative expenses and unsecured claims of any kind and, subject to entry of the Final DIP Order, priority over all other claims and administrative expenses of the kind |

| | **DIP Facility** |
|---|---|
| | specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out. |
| **Adequate Protection**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Adequate Protection"* | None required. Because the DIP Facility does not prime any existing prepetition lien, the term sheet does not contemplate an adequate protection package. |
| **Events of Default**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Events of Default"* | Usual and customary events of default for a facility of this type and purpose, including, among others:<br><br>• nonpayment of DIP Obligations or failure to comply with the mandatory prepayment waterfall,<br><br>• false or misleading representations and warranties,<br><br>• breaches of the Interim DIP Order or Final DIP Order, or reversal, vacatur, or material modification of the DIP Orders without the DIP Lender's consent,<br><br>• termination of the APA, unless concurrently replaced by a definitive agreement for an Alternative Transaction providing for repayment of the DIP Obligations in full in cash at closing,<br><br>• failure to comply with any Milestone, which constitutes an immediate Event of Default unless waived in writing by the DIP Lender,<br><br>• breach of the Approved Budget beyond permitted variances; conversion of the Chapter 11 Cases to chapter 7, appointment of a chapter 11 trustee or examiner with expanded powers, or dismissal of the Chapter 11 Cases; any lien or claim senior to or pari passu with the DIP Liens or superpriority claims (other than the Carve-Out and the Termination Fee payable to the purchaser under the APA); and other customary defaults, subject to applicable notice and cure periods. |
| **Covenants**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Representations & Covenants"* | <u>Affirmative Covenants</u>: Usual and customary for financings of this type, including delivery of financial statements and other reports, maintenance of insurance, compliance with the Approved Budget and Milestones, cooperation with the sale process, preservation of existence, compliance with applicable laws, payment of |

| | **DIP Facility** |
|---|---|
| | postpetition obligations, and further assurances regarding the DIP Collateral and guarantors.<br><br>Negative Covenants: Usual and customary for financings of this type, including limitations on additional indebtedness, liens, investments, asset dispositions outside the ordinary course or approved sale process, distributions, transactions with affiliates, creation of subsidiaries, issuance of equity, negative pledges, compliance with the Approved Budget and Milestones, and payments to critical vendors and prepetition unsecured claims. |
| **Reporting**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Budget / Reporting Covenants"* | The Debtors must deliver the Approved Budget and periodic variance reports in form and substance reasonably satisfactory to the DIP Lender, with permitted variances of 15% on a line-item and cumulative basis, weekly cash flow reports, and other financial and case-status reporting reasonably requested by the DIP Lender, including copies of material pleadings filed in the Chapter 11 Cases. The Debtors must also notify the DIP Lender in writing within two business days of any notice delivered or received under Section 6.3(c) or Section 7.3 of the APA rejecting or excluding any Site, together with the then-applicable aggregate Site Adjustment Amounts. The Debtors must also deliver weekly financial reporting, including open accounts payable aging, open accounts receivable aging, and bank account cash balances with receipts and disbursements; written sales process updates on the Friday of every other week (weekly following an Event of Default); and reasonable access to the Debtors' professionals for periodic calls with the DIP Lender and its professionals. |
| **Use of Proceeds**<br><br>**(Bankruptcy Rule 4001(c)(1)(B), (b)(1)(B)(ii))**<br><br>*DIP Term Sheet, "Use of Proceeds"* | Proceeds may be used solely for (i) working capital and general corporate purposes of the Debtors during the Chapter 11 Cases, (ii) payment of costs and expenses of administering the Chapter 11 Cases, including U.S. Trustee fees, (iii) payment of adequate protection obligations (if any) as approved by the Bankruptcy Court, (iv) other purposes consistent with the Approved Budget and the DIP Orders, in each case subject to the Carve-Out; and (v) any other customary uses in chapter 11 cases of similar size and nature, in each case to the extent set forth in, or not inconsistent with, the Approved Budget. |
| **Milestones**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(vi))** | • Interim DIP Order entered on or before August 21, 2026; |

| | **DIP Facility** |
|---|---|
| *DIP Term Sheet, "Sale Hearing / Milestones"* | • Final DIP Order entered on or before September 15, 2026;<br>• Sale Hearing held and Sale Order entered on or before September 1, 2026; and<br>• Closing of the Sale on or before December 31, 2026.<br><br>Additional Sale Processes:<br>• entry of an order approving bidding procedures for the additional asset sales and lease assignments referenced above, on or before August 28, 2026;<br>• conclusion of any auction, on or before November 1, 2026;<br>• entry of an order approving any such sale or assignment, on or before November 15, 2026; and<br>• closing of any such sale or assignment, on or before December 15, 2026. Each Milestone may be extended only with the prior written consent of the DIP Lender, and email consent is sufficient.<br><br>Each Milestone deadline will be automatically extended day-for-day to the extent it is not satisfied solely because of the Bankruptcy Court's calendar or scheduling. The Sale Hearing/Sale Order Milestone will be satisfied upon entry of the Sale Order, notwithstanding that it has not then become a Final Order. Failure to meet any Milestone constitutes an immediate Event of Default unless waived in writing by the DIP Lender. |
| **Carve-Out**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>*DIP Term Sheet, "Carve-Out"* | The DIP Liens and superpriority claims are subject to a Carve-Out for: (a) all Clerk and U.S. Trustee fees and statutory interest, without regard to delivery of a Carve-Out Trigger Notice; (b) reasonable fees and expenses of a chapter 7 trustee, if any, under section 726(b) of the Bankruptcy Code, up to an aggregate amount of $25,000, also without regard to such notice; and (c) allowed professional fees and expenses, subject to the Approved Budget, incurred on or before the second business day after delivery of a Carve-Out Trigger Notice or incurred thereafter subject to a $500,000 aggregate cap. A Professional Fee Reserve equal to budgeted weekly |

| | **DIP Facility** |
|---|---|
| | professional fees and expenses will be funded from DIP proceeds weekly until delivery of the Carve-Out Trigger Notice. |
| **Waiver/Modification of the Automatic Stay**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(iv))**<br><br>*DIP Term Sheet, "Waivers"; DIP Orders* | The automatic stay is modified only to the extent necessary to implement the DIP Facility and permit the DIP Lender to exercise remedies upon an Event of Default, following five (5) business days' prior written notice to the Debtors, any statutory committee, and the U.S. Trustee, after which the automatic stay is automatically modified as to the DIP Lender without further order unless, during that period, a party in interest obtains an order of the Court to the contrary. |
| **Section 506(c) and 552(b)**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(x))**<br><br>*DIP Term Sheet, "Waivers"* | No waiver of the Debtors' or the estates' rights under section 506(c) or section 552(b) of the Bankruptcy Code is requested or contemplated, and no "no marshaling" provision is requested or contemplated. In connection with the sale of assets to Boersma Bros. LLC d/b/a Dutch Bros. pursuant to the APA, the DIP Lender waives any right to credit bid the DIP Obligations under section 363(k) of the Bankruptcy Code; that waiver automatically terminates and is of no further force or effect upon any termination of the APA or upon the Debtors' pursuit of an Alternative Transaction. For the avoidance of doubt, the DIP Lender does not waive, and expressly reserves, its right to credit bid any outstanding DIP Obligations, except with respect to the Residual Fee, under section 363(k) of the Bankruptcy Code in connection with any other sale or disposition of the Debtors' assets, including any sale conducted pursuant to bidding procedures approved by the Bankruptcy Court. |
| **Release**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(viii))**<br><br>*Interim DIP Order ¶47* | Subject to entry of the Final DIP Order, and effective upon such entry, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its predecessors, successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully release Rucio Investment Sarl, as the sole DIP Lender and in its capacity as such, and its affiliates and its and their respective officers, directors, employees, agents, representatives, advisors, consultants, attorneys, accountants, members, partners, shareholders, managers, assigns, and predecessors and successors in interest, each in such capacity, from any and all claims and causes of action including any so-called lender liability or equitable subordination claims or defenses, in each case solely with respect to or relating to the negotiation and entry into the |

| | **DIP Facility** |
|---|---|
| | DIP Loan Documents, and to waive any defenses as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations; provided, however, that nothing herein shall relieve any party from fulfilling its obligations under the DIP Term Sheet or the DIP Orders. Because Rucio is an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, this release applies to Rucio only in its capacity as DIP Lender and not in any other capacity. All other claims are preserved. |
| **Mandatory Prepayments** | Except for the Residual Fee, all Sale Proceeds equal to the then-outstanding DIP Obligations must be paid directly to the DIP Lender at closing, subject only to the Carve-Out, until the DIP Obligations are indefeasibly paid in full in cash. One hundred percent of net proceeds of other asset dispositions, extraordinary receipts, recapitalizations, or any DIP, exit, recapitalization, or other financing from another lender must be paid within two business days, up to the then-outstanding DIP Obligations. Amounts are applied first to documented expenses, then interest, principal, and other DIP Obligations; amounts prepaid may not be reborrowed, and the Residual Fee is excluded from the waterfall. The Debtors must identify the segregated sale proceeds account to the DIP Lender within two business days of its opening and may not disburse from that account without three business days' prior written notice of the amount, payee, and purpose. |
| **Equity Participation Right** | The DIP Lender will offer each existing member of the Debtors the right, but not the obligation, to participate in the DIP Facility (whether by sub-participation, assignment, or such other mechanic as the parties may agree) on a pro rata basis in accordance with each such member's percentage ownership of the Debtor's outstanding membership interests as of the Petition Date (the "Participation Right"). The Participation Right will be offered on the same economic terms, including the interest rate and Residual Fee, as apply to the DIP Lender's own Commitment, and the mechanics, notice period, and election deadline will be set forth in the DIP Orders, subject to any consent, transfer restriction, or right of first refusal provisions in the Debtors' governing documents. Members who do not elect to participate within the applicable notice period will have no further right to fund any portion of the DIP Facility. |
| **Expenses** | All reasonable and documented out-of-pocket fees, costs, and expenses of the DIP Lender, including counsel fees and expenses, are payable by the Debtors subject to an aggregate cap of $325,000. This cap does not apply to the Debtors' |

| | **DIP Facility** |
|---|---|
| | indemnification obligations to the DIP Lender and related parties described below. Fees and expenses through closing are payable from the first draw; later fees and expenses are payable as they come due up to the cap, subject to the DIP Orders. |
| **Indemnification** (Bankruptcy Rule 4001(c)(1)(B)); *DIP Term Sheet, "Expenses"* | The Debtors shall indemnify and hold harmless the DIP Lender and its affiliates and their respective officers, directors, employees, advisors, and agents from losses, claims, damages, liabilities, and reasonable and documented out-of-pocket expenses arising out of or relating to the DIP Loan Documents and the Debtors' use of the financing provided thereunder, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party as determined by a final, non-appealable order of a court of competent jurisdiction. This indemnification is not subject to the $325,000 expense cap. |
| **Governing Law** | Delaware law, without regard to conflicts principles, subject at all times to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, over the Chapter 11 Cases; provided that, if the Bankruptcy Court does not have, or declines to exercise, jurisdiction over any matter, the parties may bring that matter in the state or federal courts sitting in Wilmington, Delaware. |
| **Amendments**; *DIP Term Sheet, "Amendments"* | No amendment or waiver of any provision of the DIP Term Sheet or DIP Facility will be effective unless in writing and agreed by the DIP Lender and the Debtors; any waiver or consent will be effective only for the specific instance and purpose given. No further order of the Court is required for any amendment, waiver, consent, or other modification that is not material and adverse to the Debtors, and copies of all amendments and modifications will be provided to the U.S. Trustee and any statutory committee. |

## Significant Provisions under the Complex Case Procedures

10. The Interim DIP Order, and the Final DIP Order, as applicable, contain certain of the provisions (the "**Significant Provisions**") identified in paragraph 8 of the Complex Case Procedures as set forth below. In addition to the Debtors' specific justifications for the Significant Provisions, provided in the table below, the Debtors believe that each Significant Provision is

justifiable because the DIP Lender would not have provided the DIP Facility without such provision and the DIP Facility, taken as a whole, is fair and reasonable to the Debtors (particularly in the context of these chapter 11 cases) and is the best financing option available.

| **Provision** | **Status** |
|---|---|
| **Cross-Collateralization**. | The Interim DIP Order and Final DIP Order do not contemplate cross-collateralization. |
| **Roll-Up** | The Interim DIP Order and Final DIP Order do not contemplate a roll-up. |
| **Non-Consensual Priming Liens** | The Interim DIP Order and Final DIP Order do not contemplate any non-consensual priming lien. The DIP Facility is non-priming. |
| **Provisions Limiting the Ability of Estate Fiduciaries to Fulfill Their Duties** | The Interim DIP Order and Final DIP Order require the Debtors to comply with the Milestones and the Approved Budget; provide that conversion of the Chapter 11 Cases to chapter 7, appointment of a chapter 11 trustee or an examiner with expanded powers, or dismissal of the Chapter 11 Cases constitutes an Event of Default; and provide that the Debtors will not seek entry of, or support, any order converting or dismissing the Chapter 11 Cases, or any other distribution scheme, that does not provide for payment of the Residual Fee. No provision of the DIP Orders restricts the Debtors' ability to comply with their fiduciary duties, and the Debtors do not believe these provisions limit the ability of estate fiduciaries to fulfill their duties. |
| **Milestones** | Provision: *DIP Term Sheet, "Sale Hearing / Milestones"*<br><br>The Debtors have entered into a signed asset purchase agreement with Boersma Bros. LLC (d/b/a Dutch Bros.) for a sale of assets (the "APA"), and a Sale Motion seeking approval of the APA has been filed. No bidding procedures or auction process is contemplated with respect to the APA assets. The Milestones, and the extension, tolling, and satisfaction mechanics applicable to them, are set forth in the Concise Statement above.<br><br>Justification:<br><br>Rucio indicated that its commitment to provide the DIP Facility is expressly conditioned on meeting these |

| **Provision** | **Status** |
|---|---|
| | Milestones. The Debtors believe the schedule provides a clear path to the sale process and an efficient wind-down. |
| **DIP Liens and Excluded Property** | Provision:<br><br>*DIP Term Sheet, "Priority and Liens"; Interim DIP Order*<br><br>The DIP Liens, the DIP Collateral, and the property excluded from the DIP Collateral are described in the Concise Statement above.<br><br>Justification:<br><br>The Debtors believe the lien package is appropriate because it provides Rucio with security for new-money financing while preserving chapter 5 avoidance actions, D&O Claims, the expressly excluded equity interests, escrowed funds until release, and non-estate PACA/PASA trust assets for the estates and other parties in interest. The DIP Facility is non-priming and remains subject to the Carve-Out. |
| **Limitations on the Use of DIP Proceeds and Professional Fees** | Provision:<br><br>*DIP Term Sheet, "Use of Proceeds"; "Carve-Out"*<br><br>The Debtors shall use the proceeds of the DIP Facility and the DIP Collateral solely as provided in the DIP Term Sheet and the DIP Orders and in accordance with the Approved Budget. The Professional Fee Reserve will be funded weekly from DIP proceeds until delivery of a Carve-Out Trigger Notice.<br><br>*DIP Term Sheet, "Conditions Precedent"; DIP Orders*<br><br>Justification:<br><br>The Debtors believe these limitations are reasonable because they ensure that DIP proceeds are used for the approved chapter 11 purposes and preserve a weekly reserve for professional fees. |
| **Remedies Upon an Event of Default** | Provisions:<br><br>*DIP Term Sheet, "Remedies"; DIP Orders*<br><br>• Following an Event of Default that is not waived or cured within any applicable cure period, and after five (5) business days' prior written notice to the |

| **Provision** | **Status** |
|---|---|
| | Debtors, any statutory committee, and the U.S. Trustee, the DIP Lender may terminate the Commitment, declare the DIP Obligations immediately due and payable, and exercise remedies with respect to the DIP Collateral, subject to the DIP Orders. Upon expiration of that notice period, the automatic stay is automatically modified as to the DIP Lender without further order unless a party in interest obtains an order of the Court to the contrary, and the only issue that may be raised in any such proceeding is whether an Event of Default has occurred and is continuing.<br><br>Justification:<br><br>The Debtors believe these provisions are justifiable because the DIP Lender cannot exercise remedies without five (5) business days' prior written notice to the Debtors, any statutory committee, and the U.S. Trustee, during which any party in interest may seek an order of the Court continuing the automatic stay. |
| **Releases of Claims** | Provision: The Interim DIP Order releases Rucio Investment Sarl, the sole DIP Lender, only in its capacity as such, subject to entry of the Final DIP Order.<br><br>*Interim DIP Order ¶47*<br><br>Justification:<br><br>The Debtors believe the releases are appropriate because they apply only to Rucio Investment Sarl, the sole DIP Lender, in its capacity as such, and relate only to the DIP Facility, DIP Liens, DIP Obligations, DIP Term Sheet, DIP Orders, and related transactions. Because Rucio is an insider, the release does not extend to any other capacity. All other claims are preserved. |
| **Residual Fee** | Provision: The DIP Term Sheet provides for a one-time Residual Fee payable only upon satisfaction of the Full Recovery Trigger, non-recourse to the estates, payable from amounts otherwise distributable to equity holders before any distribution to them, and junior to all allowed claims. Any chapter 11 plan, structured dismissal order, or other distribution order must provide for payment before distributions to equity holders, and the Plan Administrator must be reasonably acceptable to the DIP Lender and the Debtors. The Residual Fee is payable whether or not a chapter 11 plan is confirmed, and the DIP Orders bind any |

| **Provision** | **Status** |
|---|---|
| | successor or estate representative, including any chapter 11 or chapter 7 trustee, to pay it within ten business days after the Full Recovery Trigger.<br><br>Justification: The Debtors believe the fee is reasonable because it is contingent on full recovery or reserves and paid only from residual equity distributions; no other listed fees are payable. |
| **Equity Participation Right** | Provision: The DIP Lender must offer each existing member of the Debtors the right, but not the obligation, to participate in the DIP Facility on a pro rata basis in accordance with each such member's percentage ownership of the Debtor's outstanding membership interests as of the Petition Date, on the same economic terms, including the interest rate and Residual Fee, as apply to the DIP Lender's own Commitment.<br><br>Justification: The right gives existing members an opportunity to participate on matching economics and addresses the effect of the Residual Fee. |
| **DIP Lender Insider Status** | Provision: Rucio Investment Sarl is an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code.<br><br>Justification: The insider relationship is expressly disclosed, and the DIP Orders will request a finding that Rucio is extending credit in good faith and is entitled to section 364(e) protections. |

11. The DIP Facility is critical to the Debtors' continuing operations and completing their ongoing sale process, and the Debtors have no other alternative financing sources. In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases, and the Significant Provisions in the DIP Orders should be approved.

## I. The Debtors' Prepetition Capital Structure

12. The Debtors' prepetition capital structure includes certain obligations arising under a New Markets Tax Credit financing structure used to construct a food production facility in Garland, Texas. Specifically, AGC-North Texas Facilities, LLC, one of the jointly administered Debtors, is the borrower under qualified low-income community investment loans (the "**QLICI**

**Loans**") in the aggregate principal amount of $25,380,000, made by three community development entities: CCG Sub-CDE 74, LLC, TMF Sub-CDE 57, LLC, and Empowerment Reinvestment Fund LIII, LLC (collectively, the "**CDE Lenders**"), pursuant to a Loan Agreement dated February 6, 2024.

13. The QLICI Loans are secured by a Negative Pledge Agreement recorded against AGC-North Texas Facilities' leasehold interest in the Garland facility and by pledged reserve accounts at Regions Bank pursuant to Account Pledge and Control Agreements dated February 6, 2024. And Go Concepts, LLC and AGC Holdco, LLC are guarantors of AGC-North Texas Facilities' obligations under the QLICI Loans pursuant to a Guaranty of Payment and Completion dated February 6, 2024. In addition, Garland New Market LLC, another jointly administered Debtor, is the leverage lender on an $18,255,200 loan to SG Garland Investment Fund, LLC, the equity investor in the CDE structure, secured by a pledge of 99.99% of the membership interests in the three CDEs.

14. The DIP Facility does not prime any of the foregoing prepetition liens. AGC-North Texas Facilities, LLC and Garland New Market LLC are excluded from the Guarantors under the DIP Facility, and the Debtors' equity interests in those entities are excluded from the DIP Collateral. The DIP Liens are junior to any valid, perfected, and non-avoidable prepetition deposit account control agreement or account pledge granted in connection with the NMTC QLICI Loans, as further described in the DIP Term Sheet.

**<u>The Debtors' Need for the DIP Facility and Development of the Approved Budget</u>**

15. The Debtors need immediate access to liquidity to (i) continue operating in the ordinary course, (ii) continue the ongoing marketing process for a value-maximizing sale of the Debtors' assets, and (iii) effectuate an efficient and orderly wind-down. As described in greater detail in the Brickley Declaration, the Debtors, with the assistance of their advisors, analyzed their

cash needs in order to determine the liquidity levels necessary to stabilize the Debtors' operations and fund the administration of these chapter 11 cases.

16. As part of the Debtors' financial review and analysis, the Debtors, with the assistance of their financial advisor, Stout, developed an initial 3-week budget, a copy of which is attached as **Schedule 1** to the Interim DIP Order (the "**Initial Budget**"). The Initial Budget incorporates a number of factors and reasonable assumptions, including the effect of filing for chapter 11 on the Debtors' operations, material cash disbursements, vendor relationships and required payments, cash flows from the Debtors' ongoing operations, and ongoing payroll. Furthermore, the Initial Budget includes all of the expenditures that the Debtors seek authority to pay under various "first day" pleadings, if approved by the Court.

17. The Debtors' cash on hand is insufficient to fund the costs associated with the Debtors' operations and restructuring. Therefore, the Debtors, with the assistance of their advisors, have determined that the postpetition financing provided by the DIP Facility is immediately necessary to allow the Debtors to pay for costs of these chapter 11 cases while continuing through their ongoing sale process. Accordingly, the Debtors believe the DIP Facility is fundamental to the preservation and maintenance of the Debtors' going-concern value during these chapter 11 cases and critical for the Debtors' orderly and efficient wind-down.

18. Therefore, the Debtors have an immediate need to access the DIP Facility on an interim basis and throughout the pendency of these chapter 11 cases.

**Alternative Sources of Financing Are Not Available on Better Terms**

19. As explained in the Brickley Declaration, despite the efforts by Stout and the Debtors to identify out of court and postpetition financing over the past several weeks, the Debtors have not received any actionable financing proposals that would adequately fund a chapter 11 process other than the proposal provided by the DIP Lender.

20. Stout conducted a robust financing process to ensure that the DIP Facility represented the best available financing terms. Specifically, as detailed in the Brickley Declaration, Stout reached out to a total of thirty-three (33) potential investors seeking proposals for either in-court or out-of-court financing. Eleven (11) did not engage further. Two (2) executed non-disclosure agreements and reviewed diligence materials but declined to submit a proposal. Fifteen (15) declined to pursue a potential transaction and five (5) submitted term sheet proposals. Although the Debtors did receive four (4) proposals for debtor-in-possession financing from third parties other than the DIP Lender, the Debtors and their advisors determined that the proposals were not actionable due to, among other things, significant costs and fees. Furthermore, the DIP Facility was approved by the Debtors' independent board manager. Accordingly, the DIP Facility represents the best option available to address the Debtors' liquidity needs and create a pathway to monetize the Debtors' assets, provide a return to creditors, and wind-down the Debtors' operations.

**The DIP Facility Is Necessary to Preserve the Debtors' Estates**

21. Given the Debtors' current liquidity position, immediate access to the DIP Facility is necessary for continued operations, including to fund wages, salaries, and benefits of the Debtors' employees, finance the costs of these chapter 11 cases, and meet other working capital needs of the Debtors. Without immediate access to the DIP Facility on the terms requested herein, the Debtors will suffer immediate and irreparable harm. Consequently, the DIP Facility is necessary to preserve the value of the Debtors' estates.

## **Basis for Relief**

### II. The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured Basis

22. The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on estate property. Specifically, sections 364(c)(1), 364(c)(2), and 364(c)(3) authorize the Court to approve financing with superpriority administrative status and liens on property of the estate, subject to the requirements of the Bankruptcy Code.

23. Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating its request to incur postpetition credit. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008, Dkt. No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 768 (Bankr. S.D.N.Y. 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment . . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers, or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

24. The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification, and the decision furthers the interests of the debtor and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the

Bankruptcy Code); *see also Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986). Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.

25. The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by the financing. For example, in *In re ION Media Networks, Inc*., the Bankruptcy Court for the Southern District of New York explained that "non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting postpetition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms" due to the importance of those terms. *In re ION Media Networks, Inc*., 2009 Bankr. LEXIS 1700, at *14 (Bankr. S.D.N.Y. July 6, 2009).

26. Here, given all the facts and circumstances present in these chapter 11 cases, the Debtors have amply satisfied the necessary conditions under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for authority to enter into the DIP Facility. The Debtors exercised proper business judgment in securing the DIP Facility on terms that are fair and reasonable and the best available to them under the circumstances. Moreover, given the circumstances described above, the Debtors could not obtain unsecured credit on terms that would adequately address their liquidity needs. For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Facility pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code.

### A. The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter the DIP Facility

27. Based on the facts and circumstances of these chapter 11 cases, the DIP Facility represents a proper exercise of the Debtors' business judgment. As noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity.") (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. Sup. Ct. 1984)); *In re Garrett Motion Inc*., No. 20-12212 (Order dated Oct. 23, 2020, Dkt. No. 281) (Bankr. S.D.N.Y. Oct. 23, 2020) (approving postpetition financing as "a sound and prudent exercise of the Debtors' business judgment"); *In re Metaldyne Corp*., 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009) (noting decisions "emphasizing that the Court should not substitute its business judgment for that of the Debtors'") (citations omitted), *aff'd by BDC Fin., LLC v. Metaldyne Corp.,* 421 B.R. 620 (S.D.N.Y. 2009); *In re Ames Dep't Stores, Inc*., 115 B.R. at 40 ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co.* v. *Capital Bank N.A*., 762 F.2d 1303, 1311 (5th Cir. 1985).

28. Specifically, when evaluating whether a debtor's decision to obtain postpetition financing was an exercise of sound business judgment, courts need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys., Inc*., 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006)). When evaluating whether a debtor's decision to enter into postpetition financing was an exercise of sound business judgment,

bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and the market for financing more generally. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "a 'hard' bargain" to acquire funds for its reorganization).

29. Accordingly, the Debtors submit that the proposed DIP Facility should be approved as a sound exercise of their business judgment. The Debtors have nowhere else to turn for liquidity in this case on terms as favorable as the DIP Facility. However, the Debtors successfully negotiated financing that provides ample liquidity and will give the Debtors the ability to run their sale process and wind-down their operations in an orderly and efficient manner. Moreover, as set forth in the Brickley Declaration, the proposed DIP Facility resulted from vigorous, arm's-length negotiations with Rucio, the DIP Lender, supported by experienced, professional advisors. On this record, the relief requested here is a sound exercise of the Debtors' business judgment and should be approved.

### B. The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

30. The Debtors propose to obtain financing under the DIP Facility by providing superpriority claims and liens pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code. The Debtors propose to provide the DIP Lender with non-priming liens on and security interests in the DIP Collateral, subject to the Carve-Out. The DIP Collateral includes cash and all tangible, intangible, real and personal property of the Loan Parties, whether now owned or hereafter acquired or created, prepetition or postpetition, including equity interests owned by any Loan Party other than equity interests in Garland New Market LLC and AGC-North Texas Facilities, LLC, and insurance proceeds and proceeds of the foregoing. The DIP Collateral excludes chapter 5 avoidance actions and their proceeds D&O Claims and their proceeds, escrow

accounts held in connection with the Chapter 11 Cases until released to a Debtor, and PACA/PASA trust assets that are not property of the estates.

31. In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts act in their "informed discretion." *In re Ames Dep't Stores*, 115 B.R. at 37. Courts perform a qualitative analysis and consider factors including whether (a) the debtor made a reasonable effort to find financing with better terms, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the proposed financing are fair, reasonable, and adequate. *In re Republic Airways Holdings Inc*., 2016 Bankr. LEXIS, at *33-4 (Bankr. S.D.N.Y. May 3, 2016

**a. The Debtors Are Unable to Obtain Financing on More Favorable Terms Than the DIP Facility**

32. Before a bankruptcy court will order superpriority liens, a debtor must demonstrate that it made a reasonable effort to find alternative financing. *See In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 791-2. But, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* (citing *In re Snowshoe Co*., 789 F.2d 1085, 1088 (4th Cir. 1986)); *In re Pearl-Phil GMT (Far East) Ltd*. v. *Caldor Corp.*, 266 B.R. 575, 584−85 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc*., 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after discussing possible postpetition financing with four lenders); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

33. Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom*. *Anchor Sav. Bank FSB* v. *Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

34. Here, the Debtors do not believe that any viable alternative sources of financing are available. As described in the Brickley Declaration, Stout conducted an extensive prepetition and postpetition process to obtain financing on terms more favorable than the DIP Facility but did not receive any viable proposals. Moreover, through negotiations with the DIP Lender, the Debtors improved the terms of the DIP Facility, which is the best financing proposal reasonably available under the circumstances. In sum, the DIP Facility represents the Debtors' best available postpetition financing option.

**C. The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates**

35. The Debtors have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004). The Debtors seek access to the DIP Facility consistent with that duty. Without access to the DIP Facility, the Debtors would be unable to fund critical payments that are essential to the Debtors' operational viability.

**D. The Terms of the DIP Facility Are Fair, Reasonable, and Adequate under the Circumstances**

36. In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc*., 294 B.R. at 886; *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. at 365. Here, the terms of the DIP Facility are fair, appropriate, reasonable, adequate under the circumstances, and in the best interests of the Debtors, their estates, and their creditors.

37. As noted above, the terms of the DIP Facility were actively negotiated by the Debtors' advisors. Under the current circumstances, the 8.00% fixed interest rate, the $325,000 cap on DIP Lender expenses, the absence of commitment, closing, underwriting, agent, upfront,

exit, backstop, and MOIC fees, and the Residual Fee structure are reasonable and in the Debtors' best interests, particularly given the absence of any viable alternatives. The Debtors also negotiated for milestones that provide the Debtors with adequate time to negotiate and implement a value-maximizing transaction such that agreeing to include these milestones as a condition to entering into the DIP Facility was a reasonable and valid exercise of the Debtors' business judgment. The Residual Fee is payable only after the Full Recovery Trigger, is non-recourse to the estates, is junior to all allowed claims, and is not an administrative expense. The Equity Participation Right further addresses the effect of the Residual Fee by offering existing members a pro rata right to participate in the DIP Facility on the same economic terms. The milestones also provide the Debtors with adequate time to pursue the value-maximizing sale process.

### E. The DIP Lender Should Be Deemed a Good-Faith Lender Under Section 364(e)

38. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

39. Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. Rucio Investment Sarl, the DIP Lender, is an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code. As described in the Brickley Declaration, the negotiations of the terms of the DIP Facility with the

DIP Lender were conducted at arm's-length and approved by the Debtors' independent board manager. Under the circumstances, the terms and conditions of the DIP Term Sheet and the DIP Orders are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Orders and the DIP Term Sheet and the Approved Budget. Accordingly, the Court should find that the DIP Lender extended credit in good faith within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all protections afforded by that section.

**III. The Scope of the Carve-Out Is Appropriate**

40. The Interim DIP Order subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out. Such Carve-Outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee appointed can reimburse their professionals in certain circumstances following an event of default under the terms of the debtor's postpetition financing. *See Ames Dep't Stores*, 115 B.R. at 40. Additionally, the Carve-Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the Clerk's and U.S. Trustee's fees, reasonable fees and expenses of a chapter 7 trustee under section 726(b) up to $25,000, and professional fees within the agreed timing and $500,000 aggregate post-trigger cap, notwithstanding the grant of superpriority claims and DIP Liens.

**IV. The Debtors Should Be Authorized to Pay the Residual Fee and DIP Lender Expenses Under the DIP Term Sheet and DIP Orders**

41. In consideration for the DIP Lender's commitment to provide the DIP Facility, the Debtors have agreed, subject to Court approval, to pay the Residual Fee in accordance with the Full Recovery Trigger and the terms summarized above. Any chapter 11 plan shall require payment of the Residual Fee promptly upon the Full Recovery Trigger. The Residual Fee shall be

paid out of amounts otherwise distributable to holders of equity or membership interests before any distribution to such holders, and any chapter 11 plan, structured dismissal order, or other order providing for distributions to such holders shall so provide. The Residual Fee is a fee payable to the DIP Lender in its capacity as such and does not constitute a distribution received by an equity holder on account of an Alternative Transaction for purposes of, and is not subject to turnover under, the Side Letter described in the Debtors' amended motion to approve the sale of certain leasehold assets [Dkt. No. 39] (the "Sale Motion"). The Plan Administrator for any chapter 11 plan shall be reasonably acceptable to the DIP Lender and the Debtors.

42. Because the Residual Fee is payable only after satisfaction of the Full Recovery Trigger, is non-recourse to the estates, and is payable only from residual amounts otherwise distributable to equity or members, it does not burden the estates or reduce recoveries available to creditors. The $325,000 expense cap and the absence of other fees further support the reasonableness of the DIP economics. The Debtors therefore believe that the Residual Fee and capped expenses are reasonable under the circumstances and necessary to obtain the DIP Facility.

**V. The Automatic Stay Should Be Modified on a Limited Basis**

43. The Interim DIP Order contemplates modification of the automatic stay only to (a) permit the Debtors and their affiliates and the DIP Lender to implement and effectuate the terms and provisions of the Interim DIP Order, the Final DIP Order, the DIP Term Sheet, and the DIP Facility and (b) permit the DIP Lender to exercise rights and remedies upon an Event of Default, following five (5) business days' prior written notice to the Debtors, any statutory committee, and the U.S. Trustee, after which the automatic stay is automatically modified as to the DIP Lender without further order unless, during that period, a party in interest obtains an order of the Court to the contrary.

44. The Debtors believe that these provisions are required for the Debtors to obtain the DIP Facility as provided in the Interim DIP Order. Notably, exercise of remedies after an Event of Default that is not waived or cured within any applicable cure period requires five (5) business days' prior written notice to the Debtors, any statutory committee, and the U.S. Trustee, during which any party in interest may seek an order of the Court continuing the automatic stay. In the Debtors' business judgment, these limited stay modifications are reasonable and fair under the circumstances of these chapter 11 cases.

## VI. Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm

45. Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rules 4001(b)(2) and 4001(c)(2) & Complex Case Procedures ¶ 5.

46. As set forth in the Brickley Declaration, the Debtors would be unable to continue as a going concern if they do not obtain approval of the DIP Facility, which would cause immediate and irreparable harm to the Debtors and their stakeholders by dramatically diminishing the value of the Debtors' estates. Furthermore, the Debtors require access to additional liquidity provided under the DIP Facility to pay wages, fund the administration of these chapter 11 cases, and implement the relief requested in the Debtors' other "first day" motions.

47. Accordingly, pursuant to sections 363 and 364 of the Bankruptcy Code, Bankruptcy Rule 4001(c)(2), and paragraph 5 of the Complex Case Procedures, the Debtors request that the Court conduct an expedited hearing on this DIP Motion, and enter the Interim DIP Order

authorizing the Debtors to obtain credit under the DIP Facility, all on an interim basis, pending approval on a final basis after the Final Hearing (if necessary).

**Emergency Consideration**

48. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring. The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

49. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

50. The Debtors will provide notice of this motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Lender; (d) the United States Attorney's Office for the Southern District of Texas; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for states in which the Debtors conduct business; (h) other regulatory agencies having a regulatory or statutory interest in these cases; and (i) any party that has requested

notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: August 16, 2026
Houston, Texas

Respectfully submitted,

*/s/ Omar J. Alaniz*
**REED SMITH LLP**
Omar J. Alaniz (24040402)
Dylan T.F. Ross (24104435)
Haley B. Bray (24143584)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: 469.680.4200
Fax: 469.680.4299
E-mail: oalaniz@reedsmith.com
dylan.ross@reedsmith.com
hbray@reedsmith.com

**REED SMITH LLP**
Amalia Sax-Bolder (admitted *pro hac vice*)
1900 Lawrence Street, Suite 2800
Denver, CO 80202
Telephone: 303.552.3800
Fax: 303.552.3799
E-mail: asaxbolder@reedsmith.com

*Proposed Counsel for Debtors and Debtors in Possession*

## Certificate of Service

I hereby certify that on August 16, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Omar J. Alaniz*
Omar J. Alaniz

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Omar J. Alaniz*
Omar J. Alaniz