# EXHIBIT A

**7 Brew APA**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("***Agreement***") is made, entered into and effective as of August 25, 2026 (the "***Effective Date***"), by and among Brew Culture, LLC, a Wyoming limited liability company ("***Buyer***"), and And Go Concepts, LLC, an Arizona limited liability company ("***Seller***"). Buyer and Seller are collectively referred to as the "***Parties***" and each, a "***Party***."

## RECITALS:

**WHEREAS**, Seller currently operates certain "Salad and Go" outlets (the "***Business***") (each Salad and Go location referred to individually as a "***Site***" and collectively as the "***Sites***") listed in Schedule A ("***Group A Sites***") and Schedule B ("***Group B Sites***") attached hereto;

**WHEREAS**, the Seller filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, §§ 101, et seq. (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") on August 4, 2026 (the "***Petition Date***");

**WHEREAS**, upon the terms and subject to the conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Buyer desires to purchase and assume from Seller, and Seller desires to sell and assign to Buyer, certain assets used or held for use by Seller in connection with the Business at the Sites free and clear of all Liens, Claims, Encumbrances and Interests, subject to the terms and conditions set forth herein;

**WHEREAS**, the Seller intends to market the assets through a public bid auction process (the "Auction," as defined further below) conducted by the Bankruptcy Court, and Buyer intends to participate in such Auction and acquire the Purchased Assets as the Successful Bidder; and

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants, agreements, conditions, representations and warranties set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to become legally bound, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

**Section 1.1 Purchase and Sale of Assets**. At the Closing, subject to the terms and conditions set forth in this Agreement and pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, Seller shall sell, convey, assign, transfer, contribute, and deliver to Buyer, and Buyer shall acquire and purchase from Seller, Seller's right, title, and interest in and to all assets used in connection with the Sites (collectively, the "***Purchased Assets***"), free and clear of all Liens, Claims, Encumbrances and Interests to the fullest extent permitted by Section 363(f) of the Bankruptcy Code; provided, that the Purchased Assets shall not include the Excluded Assets. The Purchased Assets shall include all right, title and interest of Seller in, to and under:

(a) Seller's right, title, and interest in all the Real Property Leases pertaining to the Sites (as may be adjusted pursuant to Section 6.3(c) and Section 7.3, collectively, the "***Assumed Leases***");

(b) all furniture, fixtures and equipment utilized in connection with the operation of the Sites, vehicles, machinery, computers, point of sale systems, leasehold improvements, customer lists (to the extent available on a per-Site basis), and any other fixed assets, together with, to the

extent assignable at de minimis cost to Seller, any express or implied warranty by the manufacturers, sellers, or lessors of any item or component of any item, and any other rights of Seller relating to these items;

(c) all security or similar deposits under the Assumed Leases;

(d) solely to the extent assignable pursuant to their terms, all utility contracts pertaining to the Sites of the Assumed Leases, including any security or similar deposits under such contracts;

(e) all causes of action of the Seller related to the Purchased Assets;

(f) Seller's claims for refunds of any Taxes paid in connection with the Purchased Assets; and

(g) all Licenses to the extent transferable.

**Section 1.2 Excluded Assets**. Notwithstanding anything herein to the contrary, Seller shall not sell, transfer, assign, convey, or deliver to Buyer, and Buyer shall not purchase from Seller any of the following assets (collectively, the "***Excluded Assets***"):

(a) Seller's corporate minute books, seal, and stock transfer books, and other documents relating to the organization, maintenance and existence of Seller as a limited liability company, and any Tax Returns, Tax Information and Tax records of Seller (other than copies of personal property Tax Returns and any supporting work papers) (the "***Corporate Records***");

(b) Seller's bank accounts, money market funds, cash or cash equivalents, or any other forms of investment, including investment securities and adequate assurance deposits as of the Closing Date;

(c) Seller's accounts receivable as of the Closing Date;

(d) Seller's insurance policies and the right to any rebate or refund or return of any prepaid insurance premiums related to such insurance policies;

(e) all Intellectual Property and all other intangible assets owned or purported to be owned by or licensed to Seller or any of its Affiliates or used or held for use in the operation of the Business as it is currently conducted or necessary to operate the Purchased Assets and all tangible embodiments thereof (collectively, the "***IP***");

(f) Seller's claims for, and rights with respect to, Tax refunds, rebates, credits, deposits, overpayments or similar items of any related to Taxes, other than Tax refunds included in the Purchased Assets pursuant to Section 1.1(f);

(g) all Inventory and all rebates (including vendor rebates), prepayments (including vendor prepayments), deposits and refunds that are attributable to, arise from, or relate to the purchase of Inventory of Seller prior to the Closing;

(h) all perishable inventory and food and beverage products;

(i) all causes of action of the Seller related to the Excluded Assets;

(j) all Contracts of Seller other than the Assumed Leases and assignable utility agreements; and

(k) any of the other assets identified on Schedule 1.2(k).

**Section 1.3 Assumed Liabilities**. At the Closing, subject to the terms and conditions set forth in this Agreement and the Sale Order, Buyer shall assume and agree to pay, discharge or perform, as appropriate, only the following liabilities and obligations of Seller (collectively, the "***Assumed Liabilities***"): (a) all liabilities and obligations under the Assumed Leases, and then only to the extent such obligations (i) are to be performed after the Closing Date, (ii) accrue and relate to the operation of the Sites subsequent to the Closing Date, and (iii) do not relate to an uncured breach of any Assumed Lease that occurred on or prior to the Closing Date; and (b) all liabilities for, and in respect of, Property Taxes that are the responsibility of Buyer under Section 6.4(b). For the avoidance of doubt, (x) except for the Assumed Liabilities described in the foregoing sentence, Buyer shall not and Buyer does not assume any liabilities of Seller or its Affiliates whether or not arising out of or relating to the Purchased Assets or the Business or any other business of Seller, all of which liabilities shall, at and after the Closing, remain the exclusive responsibility of Seller, and (y) any and all liabilities and obligations with respect to the Purchased Assets arising out of or relating to any event, matter or circumstance occurring from and after the Closing, or which otherwise arise or are asserted or incurred by reason of events, acts, or transactions occurring, or the operation of the Sites, from and after the Closing, shall be the exclusive responsibility of Buyer.

**Section 1.4 Excluded Liabilities**. Notwithstanding anything to the contrary contained herein, except for the Assumed Liabilities, Buyer shall not assume, perform, discharge, or agree to become liable for (including any successor liability related thereto) any other liability or obligation of Seller (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, asserted or unasserted or otherwise) (collectively, the "***Excluded Liabilities***"), including, but not limited to:

(a) any liabilities or obligations incident to, arising out of, or incurred with respect to the Excluded Assets;

(b) any accounts payable of Seller or otherwise related to the Business;

(c) any Excluded Taxes;

(d) any liabilities or obligations with respect to Seller, the Business, or the Purchased Assets arising out of or relating to any event, matter or circumstance occurring prior to the Closing or which otherwise arise or are asserted or incurred by reason of events, acts, or transactions occurring, or the operation of the Sites, prior to or on the Closing Date;

(e) any Indebtedness of Seller;

(f) any liabilities of Seller with respect to Transaction Expenses and Lease Expenses;

(g) any liabilities or obligations arising out of or relating to any claim or Proceeding against Seller as of the Closing Date, or arising out of or relating to matters or events occurring prior to the Closing;

(h) any liabilities or obligations to any equity holder of Seller, in such Person's capacity as an equity holder;

(i) any liabilities or obligations arising out of or relating to a warranty obligation under any Material Contract for any breach by Seller of any provision of any of such Material Contract;

(j) any liabilities or obligations of Seller arising out of or relating to Hazardous Materials or violations of any Environmental Law, together with any interest or penalties thereon or related thereto, that arise or accrue on or prior to the Closing Date; provided, for the avoidance of doubt, that a liability or obligation will have accrued on or prior to the Closing Date with respect to Hazardous Materials or the violation of any Environmental Law if such Hazardous Materials or violations of Environmental Law are attributable to conditions existing on or during periods prior to the Closing Date;

(k) any liabilities or obligations to or relating to any employees of the Business, independent contractors, consultants, officers, directors, or other services providers or agents of the Business that is accrued or incurred on or prior to the Closing Date or relates to a period prior to the Closing Date, including any and all liabilities or obligations relating to (i) accrued wages, (ii) accrued but unused vacation, (iii) paid-time-off, (iv) retention payments and any equity incentive or other profit or revenue sharing arrangements, in each case, owed to employees of the Business, independent contractors, consultants, officers, directors, or other services providers or agents of the Business pursuant to arrangements (written or oral) entered into prior to the Closing Date, (v) any Plan, and (vi) requirements by the WARN Act or by any other Law relating to employee separations that are required to be provided as a result of Seller's acts or omissions on or prior to the Closing Date or the termination of employment of any employee of Seller;

(l) any liabilities or obligations arising out of or relating to the Business's loyalty program or the Business's gift card program; and

(m) any Required Cure Costs.

## ARTICLE II
## PURCHASE PRICE

**Section 2.1 Purchase Price**. The aggregate consideration for the sale and transfer by Seller of the Purchased Assets to Buyer pursuant to this Agreement, in addition to the assumption of the Assumed Liabilities, shall be comprised of (i) an aggregate amount of $124,777,777.77 in cash with respect to the Group A Leases (the "***Group A Purchase Price***") and (ii) an aggregate amount of $18,400,000.00 in cash with respect to the Group B Leases (the "***Group B Purchase Price***," collectively, in aggregate, $143,177,777.77), comprised of (x) the Deposit in the amount of $14,317,777.77 to be paid into escrow in accordance with this Agreement and (y) $128,860,000.00 (the "***Base Purchase Price***"), plus any Deposit Adjustment, minus any Site Adjustment Amount, plus any Rejection Fees, subject to adjustment as set forth in this Agreement (the Base Purchase Price, as adjusted above, the "***Purchase Price***").

**Section 2.2 Closing Payment**. Upon the terms and subject to the conditions of this Agreement, at the Closing, in consideration for the purchase of the Purchased Assets, Buyer shall pay to Seller, by wire transfer of immediately available funds to the account(s) designated by Seller, an aggregate amount equal to: the Base Purchase Price, minus the amount required at Closing to discharge in full all Required Cure Costs and Lease Expenses of Seller to the extent not paid by Seller prior to or as of the Closing, if any, as set forth on the Lease Expense Statement, minus the Deposit which shall be released to Seller from the Escrow Agent at Closing (the "***Closing Payment***").

**Section 2.3 Lease Expenses and Required Cure Costs.** At the Closing, Buyer shall pay, on behalf of Seller, by wire transfer of immediately available funds in accordance with the wire instructions

set forth in the Lease Expense Statement, the amount of Required Cure Costs and Lease Expenses due and owing from Seller to such third parties as set forth in the Lease Expense Statement.

**Section 2.4 Allocation of Purchase Price**. The Closing Payment and any other items properly treated as consideration for U.S. federal income tax purposes, including the Assumed Liabilities (the "***Tax Purchase Price***") shall be allocated among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and with the methodology attached hereto as Exhibit A (the "***Allocation***"). Within ninety (90) days following the Closing Date, Buyer shall prepare a draft Allocation and deliver a copy thereof to Seller. If Seller notifies Buyer in writing within fifteen (15) days of such delivery that Seller objects to one or more items reflected in the draft Allocation, Seller and Buyer shall negotiate in good faith to resolve such dispute and shall make such revisions as are mutually agreed; provided, however, that if Seller and Buyer are unable to resolve any dispute with respect to the draft Allocation within fifteen (15) days of delivery of such notice to Seller, such dispute shall be resolved by a mutually acceptable accounting firm and such resolution by the accounting firm shall be reflected in the Allocation. The fees and expenses of such accounting firm shall be borne equally by Seller and Buyer. If Seller does not notify Buyer of any objection within the fifteen (15) day notification period above, the draft allocation shall be considered final. If the Tax Purchase Price is subsequently adjusted, the Allocation shall be correspondingly adjusted in a manner consistent with the previous final Allocation. Buyer and Seller shall, and shall cause their respective Affiliates to, file all Tax Returns, including Internal Revenue Service ("***IRS***") Form 8594 and any supplemental or amended forms, consistently with the final Allocation and shall not take any position inconsistent therewith, except as otherwise required by a final determination within the meaning of Section 1313(a) of the Code or applicable state or local Law.

**Section 2.5 Withholding**. Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under the Code or under any other applicable Tax Law. To the extent such amounts are so deducted and withheld and paid to the applicable taxing authority, all such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to Seller or any other recipient of payment in respect of which such deduction and withholding was made; provided, however, Buyer shall use commercially reasonable efforts to notify Seller of its intent to withhold as soon as reasonably practicable prior to the applicable payment date and shall reasonably cooperate with Seller to reduce or eliminate such withholding to the extent such reduction or elimination is permitted under applicable Law. Buyer shall timely remit all such withheld amounts to the applicable Governmental Authority in accordance with applicable Law and shall provide Seller with evidence of such payment.

## ARTICLE III
## CLOSING

**Section 3.1 Closing**. Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place electronically by the mutual exchange of documents and signatures on the day the conditions set forth in Article VII have been satisfied or at such other date, time or place as may be agreed to in writing by the Parties (the date on which the Closing occurs, the "***Closing Date***"). For accounting and Tax purposes, the Closing shall be deemed to occur at 11:59 p.m. Eastern Time on the Closing Date.

**Section 3.2 Closing Deliverables.**

(a) At or prior to the Closing (unless a separate time period is otherwise specified below), Seller shall deliver, or cause to be delivered, to Buyer the following (collectively, the "***Seller Closing Deliverables***"):

(i) a counterpart signature page to a bill of sale and assignment and assumption agreement, in form and substance reasonably satisfactory to Buyer and Seller (each a "***Bill of Sale and Assignment and Assumption Agreement***"), duly executed by Seller with respect to the Purchased Assets and the Assumed Liabilities;

(ii) a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 7.1(a) has been satisfied;

(iii) a good standing certificate for Seller from the jurisdiction of its organization;

(iv) evidence reasonably suitable to Buyer of the receipt of all Consents for each of the Assumed Leases (collectively, the "***Required Consents***"), to the extent such Consents are not rendered unnecessary by the Sale Order and by operation of Sections 363 or 365 of the Bankruptcy Code;

(v) unless exempt under applicable law, assignment and assumption agreements, in form and substance reasonably satisfactory to Buyer and Seller (each an "***Assignment and Assumption of Lease***"), of Seller's right, title, and interest in and to and obligations with respect to all Assumed Leases inclusive of all renewal options under the Assumed Leases, together with any amendments to any such Assumed Leases (each a "***Lease Amendment***") required to operate Buyer's business of the drive through sale of coffee, non-coffee beverages and food items, as of Closing without any Use Restrictions, in form and substance reasonably satisfactory to both Buyer and Seller or in the form required under the applicable Assumed Lease, duly executed by Seller;

(vi) a certificate of a duly authorized officer of Seller, in form and substance reasonably satisfactory to Buyer, attaching and certifying (A) the resolutions adopted by the board of directors of Seller authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (B) the incumbency and signatures of the Persons signing this Agreement and the agreements and documents delivered pursuant hereto (collectively, the "***Ancillary Agreements***") to which Seller is a party;

(vii) an IRS Form W-9, duly executed by Seller;

(viii) the Sale Order; and

(ix) such other documents as Buyer may reasonably require to evidence compliance with the conditions set forth in this Agreement, in each case to the extent within Seller's possession or control and consistent with Seller's express obligations under this Agreement; provided, that Seller shall have no obligation to deliver any document that conflicts with or is inconsistent with the Sale Order or the Bankruptcy Code.

(b) At or prior to the Closing (unless a separate time period is otherwise specified below), Buyer shall deliver, or cause to be delivered, to Seller the following (collectively, the "***Buyer Closing Deliverables***"):

(i) a counterpart signature page to each Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii) a counterpart signature page to each Assignment and Assumption of Lease and any Lease Amendment (if any), duly executed by Buyer;

(iii) a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.2(a) has been satisfied;

(iv) a certificate of the secretary or other duly authorized officer of Buyer, in form and substance reasonably satisfactory to Seller, attaching and certifying (A) the resolutions of the governing body of Buyer, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (B) the incumbency and signatures of the Persons signing this Agreement and the Ancillary Agreements to which Buyer is a party; and

(v) payment of the amounts set forth in Section 2.2, and Section 2.3 (to the extent paid by Seller) in accordance with and to the Persons set forth in such Sections.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as set forth in the disclosure schedules (the "***Disclosure Schedules***") and except as may be limited by the provisions of the Bankruptcy Code or orders of the Bankruptcy Court, the statements contained in this Article IV are true and correct in all material respects as of the date hereof and as of the Closing Date. The Parties acknowledge that Seller is (or will become) a debtor-in-possession under the Bankruptcy Code and that the representations and warranties set forth herein shall be subject to the limitations and qualifications inherent in such status. Notwithstanding anything in this Agreement to the contrary, if any inaccuracy in or breach of a representation or warranty set forth in this Article IV is attributable solely to a particular Site or its related Real Property Lease, then such inaccuracy or breach shall constitute a Site-Specific Failure (as defined in Section 7.3) and shall be addressed exclusively in accordance with Section 7.3. The foregoing shall not limit the consequences of any inaccuracy in or breach of a representation or warranty that is not reasonably attributable to a single Site or that otherwise has a transaction-wide effect.

**Section 4.1 Organization; Authority; Binding Effect**. Seller is duly organized, validly existing and in good standing under the laws of the state of its organization. Seller is duly qualified and authorized to conduct business and is in good standing under the laws of all jurisdictions in which qualification and authorization are required. Seller has full power and authority to enter into this Agreement and the Ancillary Agreements to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, acknowledgement, and delivery of this Agreement by Seller and of each Ancillary Agreement by Seller that will be a party to such agreement, and the performance by Seller of the transactions contemplated by this Agreement and the Ancillary Agreements have been duly and validly authorized by all necessary

action. This Agreement is, and the Ancillary Agreements will be, duly executed and delivered by Seller and shall constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject to the availability of equitable remedies and the enforcement of creditors' rights generally.

**Section 4.2 Legal Compliance**. Seller is, and has been in the past three (3) years, solely with regard to the Assumed Leases, in compliance in all material respects with all applicable Laws and outstanding orders, writs, judgments, injunctions, decrees, stipulations, determinations, awards, or penalties entered by or with any Governmental Authority (each, a "***Governmental Order***"). There are no claims pending, or, to Seller's Knowledge, threatened, nor has Seller received any written notice, regarding any violations of any Laws or Governmental Orders enforced by any Governmental Authority claiming jurisdiction over the Purchased Assets or the Sites.

**Section 4.3 Litigation**. There is no Proceeding of any nature pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Sites, or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. To Seller's Knowledge, no event has occurred, or circumstances exist that would reasonably be expected to give rise to any such Proceeding.

**Section 4.4 Title of Assets**. Seller owns and has good and valid title to, or a valid leasehold interest in, the Purchased Assets, in each case subject to the Permitted Liens.

**Section 4.5 Tax Matters**.

(a) None of the Purchased Assets is properly treated as owned by persons other than Seller for income Tax purposes. None of the Purchased Assets is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(b) Except as may result from the commencement of the Bankruptcy Case and any orders of the Bankruptcy Court, Seller has timely filed (taking into account any applicable extensions of time for such filings) all Tax Returns required to be filed with respect to the Purchased Assets. All such Tax Returns are complete and accurate in all material respects.

(c) Except as may result from the commencement of the Bankruptcy Case and any orders of the Bankruptcy Court, all Taxes owed and due by Seller with respect to the Purchased Assets (whether or not shown on any Tax Return) have been paid.

(d) Seller has not received written notification of any audits or other Proceedings relating to Taxes with respect to the Purchased Assets that are ongoing or pending.

(e) There are no Liens for Taxes on any of the Purchased Assets (other than the Permitted Liens).

(f) None of the Purchased Assets is treated, or required to be treated, as held under an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code.

**Section 4.6 Material Contracts.**

(a) Section 4.6(a) of the Disclosure Schedules sets forth all of the following agreements, contracts, commitments, instruments, documents, leases, certificates or other binding

arrangements or understandings, whether written or oral (each a "***Contract***"), (x) by which any of the Purchased Assets are bound or affected, or (y) to which Seller is a party or by which it is bound in connection with the Purchased Assets (collectively, the "***Material Contracts***"):

(i) all Real Property Leases; and

(ii) all Contracts relating to the creation of any Lien (other than a Permitted Lien) with respect to any Purchased Assets.

(b) Each Material Contract is in full force and effect, and valid and enforceable by and against Seller and, to Seller's Knowledge, the other parties thereto in accordance with its respective terms, in each case subject to the effects of bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and to general equitable principles. Except as set forth on Section 4.6(b) of the Disclosure Schedules, Seller has performed in all material respects all obligations required to be performed by it and is not in receipt of any written claim of breach under any Material Contract.

(c) Seller has provided to Buyer true, correct, and complete copies in all material respects of all Material Contracts disclosed on Section 4.6(a) of the Disclosure Schedules.

(d) No counterparty to any Material Contract has, within the twelve (12) months preceding the date hereof, given Seller written notice repudiating any provision thereof, or indicating an intention to exercise any right of cancellation, termination, or non-renewal thereof.

**Section 4.7 Real Property.**

(a) Section 4.7(a) of the Disclosure Schedules sets forth an accurate and complete list of all real property owned, leased, subleased or licensed by Seller as owner, lessee, sublessee or licensee for the Sites (the "***Real Property***"), setting forth for each (i) whether owned or leased, (ii) the address for such Real Property, and (iii) an accurate and complete list of all leases or subleases and any amendments, guarantees, and subordination, non-disturbance and attornment agreements related thereto, pursuant to which the Real Property is used or occupied, as well as corporate office space and storage space leases or other Contracts. The Real Property Leases consist of (x) the Group A Leases set forth on Schedule A attached hereto and (y) the Group B Leases set forth on Schedule B attached hereto (collectively, the "***Real Property Leases***"). Seller has provided Buyer with true and complete copies of all Real Property Leases in Seller's possession or reasonable control.

(b) With respect to each parcel of Real Property: (i) Seller has not received written notice of any eminent domain, condemnation, or other similar Proceedings that are pending, and, to Seller's Knowledge, there are no such Proceedings threatened in writing, affecting any portion of the Real Property; (ii) Seller has not received written notice that the operation of the Real Property by the Seller in the manner in which it is now operated does not comply in material respects with zoning, building, use, safety, or other similar statutes, ordinances, or regulations of any Governmental Authority; (iii) all Improvements on any such parcel are in working condition, ordinary wear and tear and casualty excepted; (iv) Seller has not received any notice of any special Tax, levy, or assessment for benefits or betterments that materially adversely affect any parcel of Real Property and, to Seller's Knowledge, no such special Taxes, levies, or assessments are pending or contemplated; (v) other than Permitted Liens, there are no written Contracts granting to any third-party the right of use or occupancy of any such parcel, and there are no third-parties (other than Seller) in possession of any such parcel; and (vi) no payments that are owed or due to the

landlords under any Real Property Lease are past due beyond applicable notice and cure periods, except as set forth on Section 4.7(b)(vi) of the Disclosure Schedules.

(c) With respect to each parcel of Real Property leased by Seller pursuant to a Real Property Lease ("***Leased Real Property***"): (i) Seller enjoys peaceful and quiet possession thereof; (ii) no security deposit or portion thereof deposited with respect to any of the Real Property Leases has been used or applied in respect of a breach or default under any of the Real Property Leases which has not been redeposited in full; and (iii) Seller does not owe, nor, pursuant to an executed Contract related to such Real Property Leases, will it owe in the future, any brokerage commissions or finder's fees with respect to the Real Property Leases.

(d) Each Real Property Lease is in full force and effect and is valid, binding, and enforceable against Seller and, to the Seller's Knowledge, each other party thereto, except to the extent limited by bankruptcy, insolvency or similar laws and general equitable principles affecting the rights of creditors generally. Subject to the respective terms and conditions in the Real Property Leases, Seller is the legal and equitable owner of the leasehold interest in the Real Property and possesses a good and valid leasehold interest therein, free and clear of all Liens (other than Permitted Liens).

**Section 4.8 Environmental**. Except as set forth on Schedule 4.8(e), the Seller is in compliance in all material respects with all applicable Environmental Laws, and there are no written or, to the Knowledge of the Seller, verbal claims pursuant to any Environmental Laws pending or, to the Knowledge of the Seller, threatened, against the Seller in connection with the conduct or operation of the Business or the ownership or use of the Purchased Assets. Except as set forth on Schedule 4.8(e), there are no material Liabilities under any Environmental Law with respect to the properties subject to the Purchased Assets or operation of the Business. Except as set forth on Schedule 4.8(e), neither the Seller nor, to the Knowledge of the Seller, any other Person has used the properties subject to the Purchased Assets or the Business for the manufacture, handling, transportation, treatment, storage or disposal of Hazardous Substances except in the ordinary course of business in material compliance with Environmental Law. Except as set forth on Schedule 4.8(e), to the Knowledge of the Seller, the Seller does not own and/or operate nor has the Seller owned and/or operated underground or aboveground storage tanks that store or have stored any Hazardous Substance on any of the properties subject to the Purchased Assets, there have been no releases of any Hazardous Substances on or from, nor are there any Hazardous Substances on, at, or under any of the properties subject to the Purchased Assets or related to Seller's operation of the Business that violates any applicable Environmental Law, including violations that require notification to any Governmental Authority or require any response action pursuant to any applicable Environmental Law.

**Section 4.9 Solvency.** Seller is not entering into this Agreement or the transactions contemplated hereby with the intent to hinder, delay, or defraud any present or future creditor. Immediately after giving effect to the transactions contemplated by this Agreement, Seller anticipates that the Purchase Price will be sufficient to pay all allowed Claims against Seller.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date.

**Section 5.1 Organization; Authority; Binding Effect**. Buyer is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Wyoming. Buyer has full power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party,

to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, acknowledgement, and delivery of this Agreement by Buyer and each Ancillary Agreement to which Buyer is a party, and the performance by Buyer of the transactions contemplated by this Agreement and each such Ancillary Agreement have been duly and validly authorized by all necessary action. This Agreement is, and the Ancillary Agreements to which Buyer is a party will be, duly executed and delivered by Buyer, as applicable, and shall constitute legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, subject to the availability of equitable remedies and the enforcement of creditors' rights generally.

**Section 5.2 Legal Proceedings.** There is no Proceeding of any nature pending or, to Buyer's actual or constructive knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Proceeding.

**Section 5.3 Sufficiency of Funds.** Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement. Buyer's obligation to consummate the transactions contemplated by this Agreement is not, and as of the Closing will not be, subject to any financing condition or contingency, and Buyer shall maintain funds sufficient to pay the Purchase Price in full through the Closing.

**Section 5.4 No Conflicts.** The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) violate or conflict with the organizational documents of Buyer, (b) violate or conflict with any Law or Governmental Order applicable to Buyer, or (c) require any consent, approval, authorization of, or notice to, any Governmental Authority or other Person, except for those that have been, or prior to the Closing will be, obtained or made.

**Section 5.5 Solvency.** Buyer is not entering into this Agreement or the transactions contemplated hereby with the intent to hinder, delay, or defraud any present or future creditor. Immediately after giving effect to the transactions contemplated by this Agreement, Buyer will be solvent and will be able to pay its debts as they become due.

**Section 5.6 Diligence on Use Restrictions**. Based on Buyer's due diligence conducted up until the Effective Date, to the knowledge of Buyer, there are no documented Use Restrictions in the Real Property Leases that expressly prohibit Buyer from operating Buyer's standard business of the drive through sale of coffee, non-coffee beverages and food items in its ordinary course of business ("***Buyer's Required Use***").

## ARTICLE VI
## COVENANTS; ADDITIONAL AGREEMENTS

**Section 6.1 Public Announcements**. Unless otherwise required by applicable Law or as part of public company filings, no Party shall make, or cause to be made, any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties (which consent shall not be unreasonably withheld). In the event any Party is required by applicable Law to make any such disclosure, such Party must first provide to the other Parties hereto in writing the reason that such disclosure is required by applicable Law, and the time, place and manner in which the disclosure will be made, and, to the extent reasonably practicable, shall (i) afford the other Parties a reasonable opportunity to review and comment on the form and content of such disclosure prior to its being made and (ii) consider in good faith any comments timely proposed by the other Parties.

**Section 6.2 Bulk Sales Laws**. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of the state of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer ("***Bulk Sales Laws***"); provided, however, that such waiver shall not otherwise limit a Party's rights under this Agreement.

**Section 6.3 Cooperation; Consent and Audit; Termination Agreement; Reasonable Efforts.**

(a) From the date hereof until the Closing Date, Seller shall (i) cooperate with Buyer to obtain all Consents necessary for the consummation of the transactions contemplated in this Agreement and the operation of the Sites by Buyer after Closing, and (ii) upon reasonable request, cooperate with and provide reasonable access to Buyer and its legal, accounting, insurance, and financial advisors to allow them to timely apply for any Licenses and Consents for the operation of the Sites, conduct or cause to be conducted governmental inspections, and conduct additional due diligence investigation with respect to the Sites and Purchased Assets as are commercially reasonable, including an examination of Records, Real Property, the Purchased Assets, and the operating facilities used in the Sites, including providing access to conduct such inspections of the Real Property as are commercially reasonable, permitting them to participate in the negotiations for the consents. Any access provided under this Section shall be conducted upon reasonable advance notice, during normal business hours, and in a manner that does not unreasonably interfere with the operation of the Business, and Seller shall not be required to provide access that would jeopardize any legal privilege or violate any Law or confidentiality obligation.

(b) Each of the Parties shall reasonably cooperate with the other Parties and use commercially reasonable efforts to take, or cause to be taken, all actions reasonably necessary to satisfy the conditions set forth in Section 6.4.

(c) Up until Closing, Buyer shall have the right to reject any Real Property Lease included within the Assumed Leases solely for the reasons set forth in subsections (i)-(iii) below, and in connection with the rejection of any Real Property Lease, the Purchase Price shall be reduced by the applicable "Site Adjustment Amount," such amount being $2,546,485.26 per rejected Group A Lease (the "***Group A Site Adjustment Amount***") or $766,666.67 per rejected Group B Lease (the "***Group B Site Adjustment Amount***", collectively, the "***Site Adjustment Amount***")). With respect to all Real Property Leases, Buyer shall only have a rejection right in the event (i) the Parties are not able to assign such Real Property Lease to Buyer for Buyer's Required Use pursuant to the Sale Order or Section 365 of the Bankruptcy Code, (ii) the Bankruptcy Court determines that a Use Restriction applicable to such Real Property Lease is enforceable and the applicable landlord will not consent to a waiver or modification thereof on terms reasonably satisfactory to Buyer for Buyer's Required Use or (iii) if the Bankruptcy Court determines that Buyer will not be able to utilize any lease renewal provisions and the applicable landlord will not consent to a waiver or modification thereof on terms reasonably satisfactory to Buyer. Provided, for each Group A Lease rejected by Buyer in excess of three (3), Buyer will pay Seller rejection fees in the amount of $100,000.77 for each such rejected Group A Lease ("***Rejection Fees***"). By way of example, if Buyer rejects eight (8) Group A Leases, the Rejection Fees shall be $500,003.85 (the first three (3) rejected leases would result in no Rejection Fees, but the next five (5) would each result in $100,000.77 of Rejection Fees). To the extent there are Rejection Fees payable, the Purchase Price shall be increased by such Rejection Fees. For purposes of clarity, no fee of any kind shall be payable to Seller in connection with Buyer's rejection of any Group B Lease. *Provided further*, that Buyer shall not, and shall cause its Affiliates not to, at any time during the eight (8)-month period following the Closing Date, directly or indirectly, solicit, negotiate, enter into or otherwise acquire any lease, sublease, license, occupancy agreement or other right to use or occupy all or any

portion of the premises demised under any such Real Property Lease so rejected by Buyer, with the landlord (or any successor, assignee or Affiliate thereof) under such rejected Real Property Lease. In the event Buyer or any of its Affiliates breaches the foregoing covenant with respect to any rejected Real Property Lease, Buyer shall promptly (and in any event within ten (10) Business Days) pay to Seller in cash an amount equal to the Site Adjustment Amount (net of any associated Rejection Fees) previously credited to Buyer in respect of such rejected Real Property Lease.

(d) Buyer Efforts; Landlord Credit Support. From the date hereof until the Closing Date, Buyer shall use its commercially reasonable efforts to obtain, and to cooperate with Seller and the applicable landlords in obtaining, all landlord consents, estoppels, lease assignments, Lease Amendments, waivers and other approvals necessary or reasonably required to effect the assumption and assignment to Buyer of the Assumed Leases and Buyer's operation of the Sites following the Closing.

**Section 6.4 Tax Matters.**

(a) Buyer and Seller agree to furnish or cause to be furnished to the other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the filing of all Tax Returns by Buyer or Seller, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any Proceeding relating to any Tax, and the winddown of Seller. Each of Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for the applicable statute of limitations period. Buyer and Seller shall cooperate reasonably with each other in the conduct of any Proceeding relating to Taxes involving the Purchased Assets or the Allocation.

(b) All Property Taxes levied with respect to the Purchased Assets for any Straddle Period shall be apportioned between Buyer, on one hand, and Seller, on the other hand, based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. To the extent the actual amount of any Property Tax is not known at the Closing, the Parties shall utilize the most recent information available in estimating the amount of such Tax for purposes of such determination. To the extent the actual amount of any Property Tax (or the amount thereof paid or economically borne by a Party) is ultimately determined to be different than the amount (if any) that was taken into account in the Purchase Price, timely payments will be made from one Party to the other to the extent necessary to cause each Party to bear the amount of such Tax that is allocable to such Party under this Section 6.4(b). The applicable Party shall present to the other Party any bill for Property Taxes or other statement setting forth the amount allocable to each Party under this Section 6.4 together with such supporting information, if any, as is reasonably necessary to calculate the proration amount.

(c) To the extent not exempt under the Sale Order or Section 1146 of the Bankruptcy Code, all transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder ("***Transfer Taxes***") shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such taxes or fees (and Buyer shall cooperate with respect thereto as necessary). The Parties further agree, upon request, to use commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate,

reduce or eliminate any Tax that could be imposed in connection with the transactions contemplated by this Agreement. Seller shall promptly provide Buyer with copies of any transfer, sales, or other tax records or notices received by Seller in addition to any notices or other documents evidencing the availability of any sales tax exemptions.

(d) Seller shall promptly notify Buyer in writing upon receipt by Seller of notice of any pending or threatened Tax audits or assessments relating to the income, properties, or operations of Seller that reasonably may be expected to relate to or give rise to Lien on the Purchased Assets. Buyer and Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Tax audit or assessment challenging the Allocation.

(e) Any payments made to any party pursuant to this Section 6.4 shall constitute an adjustment of the Purchase Price (including the Tax Purchase Price) and shall be treated as such by Buyer and Seller on their Tax Returns, except as otherwise required by applicable Law.

**Section 6.5 Bankruptcy Court Approval.**

(a) This Agreement and the transactions contemplated hereby shall constitute a public Auction sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "***Sale***"), subject to higher and better offers at Auction.

(b) Seller has filed the Bankruptcy Case in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") and shall file a motion or motions (the "***Sale Motion***") with the Bankruptcy Court, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, seeking entry of an order (i) approving bidding procedures for a public Auction of the Purchased Assets, (ii) approving this Agreement as a stalking horse bid and the terms hereof, (iii) authorizing the Sale of the Purchased Assets free and clear of all Liens, Claims, Encumbrances and Interests (other than Assumed Liabilities) to the Successful Bidder at Auction, and (iv) authorizing the assumption and assignment of the Assumed Leases to Buyer or the Successful Bidder (the "***Sale Order***"). The Sale Order shall be in form and substance acceptable to Buyer and Seller in their respective sole discretion. Buyer shall provide Seller with a copy of the Sale Motion within two (2) calendar days of execution of this Agreement and provide Seller with a reasonable time to provide any comments thereto before the Sale Motion and other pleadings are filed with the Bankruptcy Court. The Sale Motion shall be in form and substance reasonably acceptable to Buyer and Seller.

(c) Seller shall obtain entry of the Bidding Procedures Order on or before the date that is five (5) business days following entry into this Agreement (subject to court availability). The Bankruptcy Court shall enter the Sale Order on or before the date that is thirty (30) days (subject to court availability) after entry into this Agreement. Buyer shall cooperate with Seller and promptly provide any information reasonably requested by the Bankruptcy Court or any party in interest in connection with the Sale Motion, including information sufficient to demonstrate adequate assurance of future performance under the Assumed Leases pursuant to Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

(d) The Sale Order shall provide, among other things, that: (i) the Sale is authorized pursuant to Sections 105, 363, and 365 of the Bankruptcy Code; (ii) the Purchased Assets shall be transferred to Buyer or the Successful Bidder at Auction free and clear of all Liens, Claims, Encumbrances and Interests (other than Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code; (iii) Buyer (together with its Affiliates) is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (iv) the assumption and assignment of the Assumed Leases to Buyer or the Successful Bidder is authorized pursuant to Section 365 of the

Bankruptcy Code inclusive of lease renewals and without Use Restrictions to the maximum extent permitted by applicable law; and (v) all defaults under the Assumed Leases shall be deemed cured upon payment of the Required Cure Costs.

(e) Required Cure Costs. Seller shall promptly pay or cause to be paid all amounts necessary to cure any defaults under the Assumed Leases that are required to be cured as a condition to the assumption and assignment of such Assumed Leases and other assigned contracts pursuant to Section 365(b)(1) of the Bankruptcy Code (the "***Required Cure Costs***").

(f) Assignment of Real Property Leases Notwithstanding Use Restrictions. The Parties acknowledge and agree that (i) the assignment of the Real Property Leases pursuant to this Agreement and the Sale Order shall be made pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (ii) Section 365(f)(1) of the Bankruptcy Code permits the trustee or debtor-in-possession to assign an executory contract or unexpired lease notwithstanding a provision in such contract or lease, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, and (iii) to the extent any Real Property Lease contains a provision restricting, conditioning, or prohibiting the use of the leased premises to a specific business purpose or type of operation, or otherwise limiting the permitted uses of the leased premises, in each case such that Buyer cannot use the leased premises for Buyer's Required Use (each, a "***Use Restriction***"), such Use Restriction shall, to the maximum extent permitted by applicable law and the Sale Order, be deemed an unenforceable restriction on assignment under Section 365(f) of the Bankruptcy Code, and the applicable Real Property Lease shall be assumed and assigned to Buyer free and clear of any such Use Restriction. To the extent the Bankruptcy Court determines that any Use Restriction does not constitute an anti-assignment provision subject to Section 365(f), Seller and Buyer shall negotiate with the applicable landlord for a waiver or modification of such Use Restriction, and Buyer shall have the right to exclude any Real Property Lease subject to such Use Restriction from the Purchased Assets and reduce the Purchase Price by the applicable Site Adjustment Amount.

**Section 6.6 Transaction Expenses; Lease Expenses.** All Transaction Expenses incurred by Seller in connection with this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby shall be the responsibility of Seller. All Lease Expenses and Required Cure Costs incurred prior to Closing shall be the responsibility of Seller and to the extent not paid by Seller prior to Closing shall be deducted from the Base Purchase Price and paid by Buyer at the Closing in accordance with Section 2.3. At least three (3) Business Days prior to the anticipated Closing Date, Seller shall have provided Buyer with a statement executed by an authorized officer of Seller (the "***Lease Expense Statement***") listing all Lease Expenses and Required Cure Costs, together with the payees, amounts and wire instructions therefor, to be deducted from the Base Purchase Price and paid by Buyer at the Closing in accordance with Section 2.3.

**Section 6.7 Deposit Adjustment Statement**. Prior to the Closing, Seller and Buyer shall work in good faith to prepare and agree to a statement (the "***Deposit Adjustment Statement***") setting forth the Deposit Adjustment and the items that constitute the Deposit Adjustment. Each Party shall provide the other Party with reasonable access to all books and records reasonably requested in connection with the preparation of the Deposit Adjustment Statement.

**Section 6.8 Escrow Deposit.** Upon execution of this Agreement, Buyer shall make an aggregate deposit to Kroll, as escrow agent (the "***Escrow Agent***"), in an amount equal to ten percent (10%) of the aggregate of the Group A Purchase Price and the Group B Purchase Price (the "***Deposit***"). The Deposit shall be held and disbursed by the Escrow Agent in accordance with this Agreement and the Escrow Agreement. The Escrow Agreement shall be substantially the same form as set forth in Exhibit B attached hereto. The Deposit shall be fully refunded to Buyer if this Agreement is terminated pursuant to Sections

9.1(a), (b), (d) (e),(f), (g) and (h). The Deposit shall be forfeited to Seller if Seller terminates this Agreement pursuant to Section 9.1(c).

**Section 6.9 Fiduciary Out; Alternative Transactions; Solicitation of Competing Bids.** Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge that (a) Seller is the debtor and debtor in possession in the Bankruptcy Case and, in that capacity, is subject to fiduciary obligations to its bankruptcy estate and creditors, (b) this Agreement and the Transaction remain subject to approval by the Bankruptcy Court pursuant to the Sale Motion and the Sale Order, and (c) this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. Accordingly, nothing in this Agreement shall restrict or be construed to restrict Seller's right to the exercise of its fiduciary duties, upon the written advice of counsel, to (i) consider, respond to, solicit, and negotiate the terms of any inquiry, proposal or offer relating to an Alternative Transaction, (ii) take reasonable steps to demonstrate that Seller has sought to obtain the highest or otherwise best price for the Purchased Assets, and (iii) accept, seek approval of, and consummate, an Alternative Transaction pursuant to a Final Order of the Bankruptcy Court. Buyer acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, and that Seller, including through its representatives, may continue soliciting inquiries, proposals, or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Seller's exercise of any of the foregoing rights, including its determination to pursue and consummate an Alternative Transaction in lieu of the transactions contemplated by this Agreement, shall not constitute a breach or default by Seller of any provision of this Agreement, and Buyer's sole and exclusive remedy in connection with any termination of this Agreement as a result thereof shall be a return of the Deposit and payment of the Termination Fee as set forth in Section 9.2 as an administrative expense claim.

**Section 6.10 Further Assurances**. Following the Closing, each Party shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder. Any action taken by a Party at the request of the other Party pursuant to this Section shall be at the requesting Party's sole cost and expense. If, following the Closing, Buyer discovers that Seller possesses any Purchased Asset, Seller shall, within five (5) Business Days of receipt of notice from Buyer, transfer or cause to be transferred such Purchased Asset to Buyer, and Buyer shall accept and assume any such Purchased Asset, for no additional consideration other than as previously paid as provided in this Agreement. If, following the Closing, a Party receives any payments due to the other Party in respect of the rights, assets, or liabilities allocated to the other Party pursuant to this Agreement, then such Party shall promptly remit (or cause to be promptly remitted) or deliver (or cause to be delivered), such payments to the other Party within five (5) Business Days of receipt of such payment.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1 Conditions to Obligations of Buyer to Close**. The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of all of the following conditions, any of which may be waived by Buyer in writing at or prior to the Closing.

(a) Representations, Warranties and Covenants. The representations and warranties of Seller contained in this Agreement and any certificate delivered pursuant hereto shall be true and correct in all material respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date); provided, however, that any representation or warranty of Seller in this Agreement or in any certificate delivered pursuant hereto that is qualified by

materiality, material adverse effect, Material Adverse Effect, or similar qualification shall be true and correct in all respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date). Seller shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each Ancillary Agreement to be performed or complied with by it prior to or on the Closing Date.

(b) No Proceedings; No Governmental Orders. There shall not have been instituted and be pending any Proceeding by a Governmental Authority seeking to restrict or prohibit the consummation of the transactions contemplated by this Agreement. No Governmental Order shall have been issued by a Governmental Authority and be in effect, which restrains or prohibits any transaction contemplated hereby.

(c) Delivery of Closing Deliverables. Seller shall have delivered to Buyer the Seller Closing Deliverables.

(d) Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court in a form and substance satisfactory to Buyer and Seller in their respective sole discretion, and shall be a Final Order and shall authorize the sale of the Purchased Assets and the assumption and assignment of the Assumed Leases in accordance with this Agreement and the Bankruptcy Code.

**Section 7.2 Conditions to Obligations of Seller to Close**. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of all of the following conditions, any of which may be waived by Seller in writing at or prior to the Closing.

(a) Representations, Warranties and Covenants. The representations and warranties of Buyer contained in this Agreement, the Ancillary Agreements, and any certificate or other writing delivered pursuant hereto shall be true and correct in all material respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date); provided, however, that any representation or warranty of Buyer in this Agreement, the Ancillary Agreements, or in any certificate or other writing delivered pursuant hereto that is qualified by materiality, material adverse effect, Material Adverse Effect, or similar qualification shall be true and correct in all respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date). Buyer shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each Ancillary Agreement to be performed or complied with by it prior to or on the Closing Date.

(b) No Proceedings; No Governmental Orders. There shall not have been instituted and be pending any Proceeding to restrict or prohibit the transactions contemplated by this Agreement. No Governmental Order shall have been issued by a Governmental Authority and be in effect, which restrains or prohibits any transaction contemplated hereby.

(c) Delivery of Documents. Buyer shall have delivered to Seller the Buyer Closing Deliverables.

(d) Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Seller and Buyer in their respective sole discretion and shall be a Final Order.

**Section 7.3** Site-Specific Failures. Notwithstanding anything to the contrary in Section 7.1 or elsewhere in this Agreement, if any condition set forth in Section 7.1 (including any condition relating to the accuracy of a representation or warranty in Article IV or the performance of a covenant) is not satisfied at Closing solely as a result of a matter that is attributable solely to a particular Site or its related Real Property Lease and that does not have a transaction-wide effect and does not affect any other Site (each, a "***Site-Specific Failure***"), then such Site-Specific Failure shall not relieve Buyer of its obligation to consummate the Closing with respect to, or entitle Buyer to terminate this Agreement as to, the remaining Sites and Assumed Leases. In such event: (i) the affected Site, its related Real Property Lease, and the Purchased Assets and Assumed Liabilities uniquely associated with such Site shall be excluded from the transactions contemplated by this Agreement, and such Real Property Lease shall be treated as a rejected Real Property Lease for purposes of Section 6.3(c); (ii) the Purchase Price shall be reduced by the applicable Site Adjustment Amount; and (iii) the Closing shall proceed with respect to the remaining Sites, Assumed Leases, Purchased Assets and Assumed Liabilities; provided, notwithstanding the foregoing, Seller and Buyer may agree following Closing to continue working in good faith to satisfy the outstanding conditions set forth in Section 7.1 with respect to any such affected Site such that upon such satisfaction or waiver of such conditions, Buyer and Seller shall consummate delayed closings for any such affected Site (each, a "***Delayed Closing***"). To the extent there is a Delayed Closing, the purchase price for any affected Site shall be equal to: (A) the applicable Site Adjustment Amount with respect to such Site, (B) plus any Deposit Adjustment for such Site, minus any Rejection Fees already paid in connection with such Site. At the Delayed Closing, Buyer shall pay to Seller, by wire transfer of immediately available funds to the account(s) designated by Seller, an aggregate amount equal to the amount in the foregoing sentence minus the amount required at the Delayed Closing to discharge in full all Required Cure Costs and Lease Expenses of Seller related to such Site to the extent not paid by Seller prior to or as of the Delayed Closing. For the avoidance of doubt, this Section 7.3 shall not apply to, and the remaining provisions of this Agreement shall continue to govern, any failure, breach or inaccuracy that is not reasonably attributable to a single Site or that otherwise has a transaction-wide effect.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.1** **Notices**. All notices, requests, demands, claims, and other communications hereunder will be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail, on the date of transmission to such recipient (unless the sender received an automatic message that the e-mail was not received), (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) two (2) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

**To Buyer:**

Brew Culture, LLC
2710 S 48th St.
Springdale, AR 72762
Attention: John Davidson, CEO
Conner McNair, Chief Legal Officer
Telephone: (479) 871-4686
Email: john@7brew.com
conner.mcnair@7brew.com

*With a copy to:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn: Ross J. Fiedler
Telephone: (212) 390 4351
Email: ross.fiedler@kirkland.com

Friday Eldredge & Clark, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR 72758
Attn: Matthew D. Mitchell
Robert T. Smith
Telephone: (479) 695-6053
Email: mmitchell@fridayfirm.com
rsmith@fridayfirm.com

**To Seller:**

And Go Concepts, LLC
909 E. Broadway Rd.
Tempe, AZ 85282
Attention: Doug Brickley, Chief Restructuring Officer
Telephone: (713) 955-8406
Email: dbrickley@stout.com

*With a copy to:*

Reed Smith LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75230
Attention: Omar J. Alaniz, Esq.
Jocelyne E. Kelly
Telephone: (469) 680-4200
Email: oalaniz@reedsmith.com
jocelyne.kelly@reedsmith.com

**Section 8.2 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction); provided, that any matters relating to (a) the Bankruptcy Case, (b) the interpretation or application of the Bankruptcy Code, (c) the rights, powers, and duties of Seller as a debtor-in-possession, or (d) the Sale Order, shall be governed by the Bankruptcy Code and the applicable orders of the Bankruptcy Court.

**Section 8.3 Severability.** If any provision or term of this Agreement is held by a court of competent jurisdiction to be contrary to law, unenforceable, or invalid in any situation, the remaining provisions and terms of this Agreement will remain in full force and the validity or enforceability of the offending term or provision shall not be affected in any other situation or in any other jurisdiction.

**Section 8.4 Non-Waiver.** The failure of any Party to this Agreement to enforce the provisions of this Agreement or the rights granted hereunder on any occasion shall not operate as a waiver of such provisions or rights for future occasions. No waiver by any Party of any default, misrepresentation, condition, or breach of representation, warranty, or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, condition, or breach of

representation, warranty, or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving.

**Section 8.5 Section Headings.** The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. The Exhibits, Schedules, and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The word "including" shall mean including without limitation and no exclusion of unlisted items shall be inferred from their absence.

**Section 8.6 Entire Agreement and Amendments.** This Agreement and the Ancillary Agreements constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Ancillary Agreements, the Exhibits, the Schedules, and Disclosure Schedules (other than an exception expressly set forth or reasonably apparent as such in the Disclosure Schedules), the statements in the body of this Agreement will control. This Agreement may not be amended except by a written agreement signed by each Party.

**Section 8.7 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. Counterpart signatures need not be on the same page and shall be deemed effective upon receipt. Delivery of an executed counterpart of a signature page to this Agreement by means of electronically transmitted portable document format (PDF) or other electronic means (in each case, complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com)) shall be as effective as delivery of a manually executed counterpart of this Agreement.

**Section 8.8 No Third-Party Beneficiaries.** Except as expressly set forth herein, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 8.9 Succession and Assignment.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including any chapter 7 trustee, chapter 11 trustee, or other estate representative appointed in the Bankruptcy Case or any subsequent or converted case (and any liquidating trust or other entity appointed as a successor to Seller pursuant to a confirmed plan under the Bankruptcy Code). No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties, provided that (a) Buyer may assign any or all of its rights and interests hereunder to one or more of its Affiliates or designate one or more of its Affiliates to perform its obligations hereunder or designate one or more Affiliates to take title to the Real Property, further provided that upon any assignment, Buyer shall remain primarily liable under this Agreement notwithstanding such assignment, and (b) Seller may assign its rights under this Agreement to a chapter 7 trustee or any successor estate representative without the consent of Buyer or one or more of its Affiliates.

**Section 8.10 Expenses.** Except as otherwise provided in this Agreement, each of the Parties shall bear its own respective expenses, including attorneys' and accountants' fees, incurred in connection

with the preparation and negotiation of this Agreement and all Ancillary agreements, and the consummation of the transactions contemplated by this Agreement.

**Section 8.11 Injunctive Relief; Submission to Jurisdiction; Waiver of Jury Trial.**

(a) The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with the specific terms or were otherwise breached, and that monetary damages, even if available, would not be an adequate remedy therefor. Accordingly, the Parties acknowledge and agree that, prior to the valid termination of this Agreement in accordance with Section 9, each Party shall be entitled to specific performance of the terms and provisions of this Agreement (including the obligations of the Parties to consummate the transaction contemplated hereby and to effect the Closing in accordance with Section 3.1), and to an injunction or injunctions or any other appropriate form of equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, in each case without proof of actual damages, this being in addition to any other remedy to which such Party is entitled at law or in equity.

(b) Any Proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the Bankruptcy Court; provided, that if the Bankruptcy Case has been closed, any such Proceeding may be instituted in the U.S. District Court for the District of Delaware or the courts of the State of Delaware located in New Castle County. Each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Case has been closed, such courts) in any such Proceeding.

(c) Each of the Parties waives their respective rights to a trial by jury of any claim or cause of action based upon or arising out or related to this Agreement in any Proceeding of any type brought by any of the Parties against any other Party or any Affiliate of any other such Party, whether with respect to contract claims, tort claims, or otherwise. The Parties agree that any such claim or cause of action shall be tried by a court trial without a jury. Without limiting the foregoing, the Parties further agree that their respective right to a trial by jury is waived by operation of this Section 8.11 as to any action, counterclaim, or other proceeding which seeks, in whole or in part, to challenge the validity or enforceability of this Agreement or any provision hereof. This waiver shall apply to any subsequent amendments, renewals, supplements, or modifications to this Agreement.

**Section 8.12 No Recourse**. Except to the extent otherwise expressly set forth in this Agreement, this Agreement may only be enforced against, and any claim or cause of action (at law or in equity, in contract, tort or otherwise) based upon, arising out of, or related to this Agreement or the contemplated transactions (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement, whether written or oral) may only be brought against the Parties. Except to the extent a named party to this Agreement (and then only to the extent of the specific obligations undertaken by such party in this Agreement), no Affiliates or former, current or future officers, directors, employees, direct or indirect equity holders, general or limited partners, managers, attorneys, representatives, or successors or assignees of the foregoing of any Party hereto shall have any liability for any obligations or liabilities of any Party under this Agreement or for any claim based on, in respect of, or by reason of, the contemplated transactions.

## ARTICLE IX
## TERMINATION

**Section 9.1 Termination.** This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as follows:

(a) by the mutual written consent of Buyer and Seller;

(b) by Seller or Buyer, if any permanent injunction or other order of a Governmental Authority preventing the consummation of the transactions contemplated hereby in any material respect shall have become final and non-appealable;

(c) by Seller, if Buyer shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure of the conditions set forth in Section 7.2(a); and, if capable of being cured, shall not have been cured within thirty (30) days following receipt of written notice from Seller of such breach; provided, however, that Seller is not then in material breach of this Agreement so as to cause any of the conditions set forth in Section 7.1(a) not to be satisfied;

(d) by Buyer, if Seller shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure of the conditions set forth in Section 7.1(a); and, if capable of being cured, shall not have been cured within thirty (30) days following receipt of written notice from Buyer of such breach; provided, however, that Buyer is not then in material breach of this Agreement so as to cause any of the conditions set forth in Section 7.2(a) not to be satisfied; *provided, further*, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 9.1(d) on account of any breach or inaccuracy that constitutes a Site-Specific Failure addressed in accordance with Section 7.3;

(e) by either Buyer or Seller, upon written notice to the other Party, if the Closing shall not have occurred on or before December 31, 2026 (the "***Outside Date***"); provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to any Party whose breach of, or failure to perform any of its covenants or obligations under, this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Outside Date;

(f) by Buyer upon the occurrence of a Material Adverse Effect;

(g) by Buyer upon receiving notice from Seller that Seller intends to pursue an Alternative Transaction;

(h) automatically, upon the consummation of an Alternative Transaction in accordance with Section 6.9; or

(i) by written notice of either Buyer or Seller, if Buyer is not the Successful Bidder at the Auction.

**Section 9.2 Termination Fee.**

(a) (1) In the event this Agreement is terminated pursuant to Sections 9.1(g), (h), and (i) and (2) in the event there is an Auction, more than two (2) bidders participated at the Auction, then Seller shall pay to Buyer as liquidated damages an amount equal to $4,295,333.33 plus Buyer's reasonable and documented out of pocket expenses (including reasonable attorney fees) incurred in connection with entering into this Agreement (the "***Termination Fee***"), which Termination Fee shall be payable to Buyer as an administrative expense within five (5) days of the closing of an

Alternative Transaction. The Termination Fee, when payable, shall constitute liquidated damages and the sole and exclusive remedy of Buyer against Seller for any and all losses arising out of or relating to this Agreement or the termination hereof, and upon payment of the Termination Fee neither Buyer nor any other Person shall have any other remedy against Seller or the estate of Seller. For the avoidance of doubt, Buyer shall receive a full refund of the Deposit in addition to the Termination Fee. Seller agrees that it shall hold an amount of sale proceeds from any Alternative Transaction equal to the Termination Fee in escrow for the Buyer and that such funds shall not be deemed property of Seller's bankruptcy estate. The claim of Buyer in respect of the Termination Fee is and shall constitute an allowed super-priority administrative expense claim against Seller under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of Seller.

(b) If this Agreement is terminated pursuant to Section 9.1(c), then the Escrow Agent shall pay the Deposit (or such portion thereof paid to the Escrow Agent) to Seller as liquidated damages. If this Agreement is terminated for any reason other than pursuant to Section 9.1(c), then the Escrow Agent shall return the Deposit to Buyer. Notwithstanding the foregoing to the contrary, the receipt of any amounts by Buyer pursuant to this Section 9.2(b) shall be the sole and exclusive remedy of Buyer, and Buyer shall not be entitled to any other amounts for damages, losses, or payment from Seller, and Seller shall have no further obligations or Liability of any kind to Buyer, any of Buyer's Affiliates, or any third party on account of this Agreement. If this Agreement is terminated pursuant to Sections 9.1(g), (h), and (i), then (i) the Escrow Agent shall return the Deposit to Buyer and (ii) Seller shall pay to Buyer the Termination Fee in accordance with Section 9.2(a). The Deposit and the Termination Fee shall constitute the sole and exclusive remedy of Buyer in connection with such termination, and Buyer shall not be entitled to any other amounts for damages, losses, or payment from Seller, and Seller shall have no further obligations or Liability of any kind to Buyer, any of Buyer's Affiliates, or any third party on account of this Agreement.

**Section 9.3 Effect of Termination**. In the event of the termination of this Agreement as provided in Section 9.1, written notice thereof shall forthwith be given to the other Parties specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void, and there shall be no liability on the part of Seller or Buyer or the estate of Seller; provided, however, that except for and subject in all cases to Section 9.2, nothing herein shall relieve Seller or Buyer from liability for any willful and material breach hereof or Fraud prior to such termination; provided, further, that Section 6.1 (Public Announcements), Section 6.8 (Escrow Deposit), Section 8.1 (Notices), Section 8.2 (Governing Law), Section 8.8 (No Third-Party Beneficiaries), Section 8.10 (Expenses), Section 8.11 (Injunctive Relief; Submission to Jurisdiction; Waiver of Jury Trial), Section 8.12 (No Recourse), Section 9.2 (Termination Fee), this Section 9.3 (Effect of Termination), Article X and any related definitional provisions throughout this Agreement, shall survive any termination of this Agreement. The representations and warranties of Seller contained in Article IV shall not survive the Closing. All covenants and agreements of the Parties contained in this Agreement that by their terms are to be performed after the Closing shall survive the Closing; provided, however, that Seller's post-Closing covenants shall terminate upon the closing of the Bankruptcy Case or confirmation of a plan of reorganization or liquidation thereunder.

## ARTICLE X
## DEFINITIONS

As used in this Agreement, the following capitalized terms shall have the following meanings:

"***Affiliate***" means of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person (the term

"control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise).

"***Alternative Transaction***" means any transaction (or series of related transactions), other than the Sale to Buyer, providing for the direct or indirect sale, transfer, assignment, or other disposition of all or a substantial portion of the Purchased Assets, to any Person other than Buyer or one or more of its Affiliates or designees, whether effected pursuant to Section 363 of the Bankruptcy Code, a plan of reorganization or liquidation under the Bankruptcy Code, or otherwise; provided, that no sale, transfer, or other disposition of assets in the ordinary course of business shall constitute an Alternative Transaction.

"***Auction***" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"***Bankruptcy Case***" means the chapter 11 case to be filed by Seller in the Bankruptcy Court.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., and applicable federal rules of bankruptcy procedure thereunder.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas or such other court having jurisdiction over the Bankruptcy Case.

"***Bidding Procedures Order***" means the order entered by the Bankruptcy Court governing the auction process for the Purchased Assets, which shall be in form and substance acceptable to the Buyer and the Seller.

"***Business Day***" means any day other than a Saturday, a Sunday, or other day on which banking institutions in the State of Delaware, are not required to be open.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Claims***" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"***Consent***" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or exemption by such Person.

"***Deposit Adjustment***" means, without duplication, a positive adjustment for the amount of any security or similar deposits under any Assumed Leases, rebates, prepayments, and prepaid expenses that constitute Purchased Assets that remain available to Buyer under the Real Property Leases following the Closing.

"***Environmental Law***" means any Law, statute, regulation, or ordinance relating to contamination, pollution, the protection or preservation of the environment, occupational safety and health, or the use, handling, generation, storage, treatment, disposal arrangement for disposal, Release of, or exposure to Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq.

"***Group A Leases***" means those Real Property Leases set forth on Schedule A attached hereto.

"***Group A Purchase Price***" has the meaning set forth in Section 2.1.

"***Group A Site Adjustment Amount***" has the meaning set forth in Section 6.3(c).

"***Group A Sites***" means those Sites subject to the Group A Leases.

"***Group B Leases***" means those Real Property Leases set forth on Schedule B attached hereto.

"***Group B Purchase Price***" has the meaning set forth in Section 2.1.

"***Group B Site Adjustment Amount***" has the meaning set forth in Section 6.3(c).

"***Group B Sites***" means those Sites subject to the Group B Leases.

"***Excluded Taxes***" means (i) any liability or obligation of Taxes of Seller, (ii) any liability of Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise, (iii) any liability or obligation for Taxes with respect to the Business or the Purchased Assets with respect to any Pre-Closing Tax Period, (iv) any Transfer Taxes allocable to Seller under Section 6.4(a), and (v) any liabilities for Taxes attributable to Seller's failure to comply with any Bulk Sales Laws or to obtain any applicable Tax clearance certificates in connection with the purchase of the Purchased Assets hereunder; provided however, that notwithstanding the foregoing, Excluded Taxes shall not include any Assumed Liabilities.

"***Encumbrances***" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or otherwise), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, signage, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"***Final Order***" means an order which (i) has not been reversed, vacated or stayed, (ii) is non-appealable and not subject to a stay, and (iii) as to which no appeal or motion to vacate, reconsider, alter, stay, or amend shall be pending.

"***Fraud***" means, with respect to any party, common law Fraud under Delaware Law with respect to the making of such party's representations, warranties and covenants expressly set forth in this Agreement.

"***GAAP***" means generally accepted accounting principles in effect from time to time in the United States.

"***Governmental Authority***" means any: (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (d) multi-national organization or body; (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature; or (f) any agency of a Governmental Authority.

"***Hazardous Material***" means any material, substance, or waste that is listed, designated, classified, defined, or regulated as hazardous or toxic, or as a pollutant or contaminant, pursuant to any Environmental Law, including petroleum or any fraction or derivative thereof, lead-based paint, radon, toxic mold, and asbestos or asbestos-containing materials.

"***Improvements***" means all buildings, structures, fixtures, building systems and equipment, installations, fittings, betterments and additions, and all material components thereof (including the roof, foundation, and structural elements), included in the Real Property.

"***Interests***" means all liens, claims, encumbrances, rights, interests, Use Restrictions, and other interests of any kind or nature whatsoever, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, known or unknown, including rights or claims based on any successor or transferee liability.

"***Indebtedness***" means any (a) obligations relating to indebtedness for borrowed money, (b) obligations evidenced by bonds, notes, debentures, or similar instruments, (c) obligations in respect of capitalized leases (calculated in accordance with GAAP), (d) the principal or face amount of banker's acceptances, surety bonds, performance bonds, or letters of credit (in each case whether or not drawn), (e) obligations for the deferred purchase price of property or services including the maximum potential amount payable with respect to earnouts, purchase price adjustments, or other payments related to acquisitions, (f) obligations for underfunded pension plan liabilities or any other employee benefit plan liabilities, (g) indebtedness or obligations of the types referred to in the preceding clauses (a) through (f) of any other corporation, partnership, joint venture, limited liability company, organization, entity, Governmental Authority (as defined below), or natural person (each a "***Person***") secured by any Lien on any assets of Seller, even though Seller has not assumed or otherwise become liable for the payment thereof, (h) any accounts payable that have not been paid within sixty (60) days of their due date and are not being contested in good faith, and (i) obligations in the nature of guarantees of obligations of the type described in clauses (a) through (h) above of any other Person, in each case together with all accrued interest thereon and any applicable prepayment, redemption, breakage, make-whole, or other premiums, fees, or penalties.

"***Intellectual Property***" means all intellectual property rights and related priority rights protected, created or arising under the Laws of the United States or any other jurisdiction or under any international convention, including all: (a) copyrights and other rights associated with works of authorship (including Software), and all registrations, applications, extensions, and renewals in connection therewith ("***Copyrights***"); (b) legal names, assumed fictional business names, franchises, domain names, social media accounts, trade names, corporate names, trademarks, service marks, trade dress, logos, and slogans and all applications, registrations, and renewals in connection therewith, together with all goodwill associated with any of the foregoing ("***Trademarks***"); (c) patents and patent applications (including provisional and non-provisional applications), together with all reissues, continuations, continuations-in-part, divisionals, revisions, extensions, or reexaminations thereof, inventions, discoveries and know-how that may or may not be patentable ("***Patents***"); (d) trade secrets, know-how, and confidential and proprietary information, including ideas, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, customer lists, supplier lists, mailing lists, business plans, and techniques that, in each case, derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others ("***Trade Secrets***"); (e) rights in Software and databases; and (f) other proprietary rights relating to any of the foregoing subsections (a) through (e), including all claims, causes of action, remedies, and rights to sue for and collect damages for past, present, or future infringement, misappropriation, or other violation thereof and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect thereof.

"***Inventory***" means all inventories, materials, supplies, and products held by Seller and used in the conduct and operation of the Business, including all packaging, food and beverage products, operating supplies, paper goods, uniforms, and similar inventory goods.

"***Knowledge Person***" means each of Florian van Rappard and Wessel Meijdam.

"***Law***" or "***Laws***" means any national, federal, state, local, or other law, statute, rule, regulation, ordinance, code, plan, policy, Governmental Order, decree, judgment, injunction, ruling, charges, consent, settlement agreement, or other governmental requirement enacted, promulgated, entered into, agreed to, or imposed by any Governmental Authority.

"***Lease Expenses***" means, without duplication, any outstanding rent or fees due under any Assumed Leases due and payable as of Closing. Notwithstanding the foregoing, and for the avoidance of doubt, Lease Expenses shall not include amounts taken into account and included in any Required Cure Costs.

"***License***" means licenses, franchises, approvals, permits, orders, registrations, certifications, variances, and other foreign, federal, state or local governmental approvals, certifications, or permits pursuant to which Seller or the Purchased Assets are bound for use or operation of any Site.

"***Lien***" or "***Liens***" shall mean any mortgage, covenant, lien (statutory or otherwise), deed of trust, pledge, option, charge, lease, adverse claim, security interest, encumbrance, easement, encroachment, title defect, conditional sales agreement, demand, restriction, right of a third party, or other interest of any kind or character whatsoever.

"***Material Adverse Effect***" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the Purchased Assets, or (b) the ability of the Seller to consummate the transactions contemplated hereby; *provided, however*, that for purposes of the foregoing clause (a) only "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any changes in applicable Laws or accounting rules (including GAAP); (vii) the public announcement of the entry into this Agreement or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationship with the Business; (viii) any natural or man-made disaster or acts of God; (ix) any epidemics, pandemics, disease outbreaks, or other public health emergencies; or (x) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); *provided, further,* that the items set forth in clauses (i) – (iv), (vi), (viii) and (ix) shall not be excluded from determining whether a Material Adverse Effect has occurred, to the extent such items have had a disproportionate effect on the Business relative to other participants in the industries in which the Business operates.

"***Permitted Liens***" means (a) Liens for Taxes that arise solely by operation of law but are not yet due and payable, (b) zoning, building codes, other restrictions, variances, covenants of record, rights of way, and easements of record, and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which do not materially impair or limit the use or operation of the Real Property for their uses as currently conducted, (c) mechanics', carriers', workers', repairers', landlords' and similar statutory Liens arising or incurred in the ordinary course of business for amounts which are not delinquent, or the amount or validity of which is being contested in good faith by appropriate proceedings by or on behalf of Seller, (d) covenants, conditions, reservations, restrictions, rights-of-way, easements and other similar matters of record, title or survey exceptions and other similar restrictions or Liens affecting title to the fee interest of the Real Property which do not materially impair the occupancy or use of the Real Property for the purposes for which it is currently operated or used or contemplated, (e) with respect to any

Leased Real Property, (i) the interests and rights of the respective lessors (or any tier) with respect thereto under the applicable lease agreement and (ii) Liens not created by the Company or any of its Subsidiaries that affect the underlying fee interest of such Leased Real Property, and (f) Liens incurred pursuant to actions of Buyer or any of Buyer's Affiliates.

"***Plan***" means any employee benefit plan, program, policy, agreement, or arrangement, including any pension, retirement, savings, deferred compensation, bonus, incentive, equity, health, welfare, severance, or other fringe benefit plan, whether or not subject to ERISA, that is sponsored, maintained, or contributed to by Seller for the benefit of any current or former employee, officer, director, or independent contractor of the Business.

"***Post-Closing Tax Period***" means any Tax Period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"***Pre-Closing Tax Period***" means any Tax Period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"***Proceeding***" means action, claim, suit, complaint, investigation, petition, subpoena, inquiry, audit, lawsuit, litigation, investigation, arbitration, or other proceeding (in each case, whether civil, criminal, or administrative) pending by or before any Governmental Authority or arbitrator.

"***Property Taxes***" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"***Registered Intellectual Property***" means all Copyrights, Trademarks, and Patents that could be or are required to be registered with the United States Patent and Trademark Office or similar international body.

"***Release***" or "***Released***" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing into the environment.

"***Seller's Knowledge***," "***knowledge of Seller***" and word of similar import shall mean, with respect to any fact or matter, the actual knowledge of any Knowledge Person and the knowledge that such Knowledge Person would reasonably be expected to have after reasonable inquiry.

"***Software***" means computer programs (in source code, object code, or other form), databases and compilations, related development work product, and associated documentation.

"***Straddle Period***" means any Tax Period beginning before or on and ending after the Closing Date.

"***Successful Bidder***" means the prevailing party at the conclusion of the Auction.

"***Tax***" means any federal, state, local, or foreign income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative, or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Period***" means any period prescribed by any Governmental Authority for which a Tax Return is required to be filed, or a Tax is required to be paid.

"***Tax Returns***" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes required to be filed with a taxing authority, including any schedule or attachment thereto, and including any amendment thereof.

"***Transaction Expenses***" means any and all (a) legal, accounting, tax, financial advisory, environmental consultants, and other professional or transaction related costs, fees, and expenses incurred by Seller in connection with this Agreement or in investigating, pursuing, or completing the transactions contemplated hereby (including any amounts owed to any consultants, auditors, accountants, attorneys, brokers, or investment bankers), (b) payments, bonuses, or severance which become due or are otherwise required to be made as a result of or in connection with the Closing, and (c) fees or costs imposed by any other Person, related to the conveyance, transfer, or assignment of the Purchased Assets (including any fee or costs in connection with the assignment of the Real Property Leases).

* * *

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first set forth above.

**BUYER**:

BREW CULTURE, LLC

By:____________________________
Name: Brian Cornyn
Title: CFO

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first set forth above.

**SELLER**:

AND GO CONCEPTS, LLC

By:______________________________________
Name:
Title:

# EXHIBIT A

## Allocation Methodology

| Asset | Allocation |
|---|---|
| Class I: Cash and Cash Equivalents | Equal to $0.00. |
| Class II: Marketable Securities | Equal to $0.00. |
| Class III: Accounts Receivable | Equal to $0.00. |
| Class IV: Inventory | Equal to $0.00. |
| Class V: Tangible Assets | Equal to the fair market value of any Purchased Assets properly classified as Class V assets, as of the Closing Date as agreed to by the Parties pursuant to Section 2.4 of the Agreement, including FF&E, leasehold improvements and the leasehold interests under the Assumed Leases. |
| Classes VI: Section 197 Intangibles Other Than Goodwill and Going Concern Value | Equal to the fair market value of any Purchased Assets properly classified as Class VI assets. |
| Classes VII: Goodwill and Going Concern Value | Remainder. |

# EXHIBIT B

## KROLL ESCROW AGREEMENT

# SCHEDULE A

## Group A Sites

1 10002 Marsh Ln, Dallas, TX 75229
2 10031 E. Southern Ave., Mesa, AZ 85209
3 1040 W. Southern Ave., Mesa, AZ 85210
4 11360 East 96th Street N, Owasso, OK 74055
5 1180 E Silverado Ranch Blvd, Las Vegas, NV 89123
6 12601 N. Paradise Village Pkwy, Phoenix, AZ 85032
7 1302 S Kolb Rd, Tucson, AZ 85710
8 1322 E Florence Blvd, Casa Grande, AZ 85122
9 13838 N. Scottsdale Rd, Scottsdale, AZ 85254
10 1460 S Ferguson Pkwy, Anna, TX 75409
11 1585 N. Dysart Rd, Avondale, AZ 85392
12 17155 N Tatum Blvd, Phoenix, AZ 85032
13 1754 W Hunt Highway, San Tan Valley, AZ 85143
14 1804 E. Elliot Rd., Tempe, AZ 85284
15 18830 Noble Seven Ln, Sugar Land, TX 77479
16 1902 W. Northern Ave., Phoenix, AZ 85021
17 1956 S Country Club Dr, Mesa, AZ 85210
18 2020 W. Chandler Blvd., Chandler, AZ 85224
19 2080 W River Rd, Tucson, AZ 85704
20 21021 Highland Knolls Dr, Katy, TX 77450
21 21060 N. Cave Creek Rd., Phoenix, AZ 85024
22 2301 N 44th St, Phoenix, AZ 85008
23 2323 N. Scottsdale Rd., Scottsdale, AZ 85257
24 2323 S. Decatur Blvd, Las Vegas, NV 89102
25 251 S. Power Rd., Mesa, AZ 85206
26 2814 S. Signal Butte Rd., Mesa, AZ 85212
27 3064 N Goliad St, Rockwall, TX 75087
28 3201 Lakeview Parkway, Rowlett, TX 75088
29 3233 E. Indian School Rd., Phoenix, AZ 85018
30 3333 W. Peoria Ave., Phoenix, AZ 85029
31 3385 S Durango Dr, Las Vegas, NV 89117
32 3425 W. Greenway Rd., Phoenix, AZ 85053
33 3505 W Baseline Rd, Laveen Village, AZ 85339
34 355 Lebanon Road, Frisco, TX 75036
35 3940 W 15th St, Plano, TX 75075
36 4601 Diaz Ave / 3400 Hulen St., Fort Worth, TX
37 4716 E. Ray Road, Phoenix, AZ 85044
38 5275 S Fort Apache Rd., Las Vegas, NV 89148
39 5501 E. Speedway Blvd., Tucson, AZ 85712
40 710 E. Dunlap Ave., Phoenix, AZ 85020
41 7480 S Power Rd, Gilbert, AZ 85260
42 7560 W Lower Buckeye Rd, Phoenix, AZ 85043
43 7980 E Speedway Blvd, Tucson, AZ 85710
44 8268 W. Deer Valley Road, Peoria, AZ 85382
45 909 E. Broadway Rd., Tempe, AZ 85282

46 910 S. Cooper Rd., Gilbert, AZ 85233
47 9121 W Glendale Ave, Glendale, AZ 85305
48 938 N Cooper St, Arlington, TX 76011
49 9875 W. Lower Buckeye Rd., Tolleson, AZ 85353

## SCHEDULE B

### Group B Sites

50 10071 E Old Vail Rd., Tucson, AZ 85747
51 15305 N 87th St, Scottsdale, AZ 85260
52 16450 N Western Ave, Oklahoma City, OK 73013
53 1660 E. Pecos Rd., Gilbert, AZ 85295
54 16885 W Bell Rd, Surprise, AZ 85374
55 1930 W League City Pkwy, League City, TX 77573
56 1950 Town E Blvd, Mesquite, TX 75150
57 2219 Spring Stuebner Rd, Spring, TX 77389
58 2400 N Pennsylvania Ave, Oklahoma City, OK 73107
59 2525 N Kelly Avenue, Edmond, OK 73003
60 2590 E League City Pkwy, League City, TX 77573
61 3095 E. Queen Creek Rd., Chandler, AZ 85286
62 3220 North Campbell Avenue, Tucson, AZ 85719
63 4551 W Bailey Boswell Rd, Fort Worth, TX 76179
64 4828 S Cooper St, Arlington, TX 76017
65 5540 SE 15th St, Del City, OK 73115
66 6501 May Ave, Oklahoma City, OK 73142
67 8220 W Thunderbird Rd, Peoria, AZ 85381
68 850 E Campbell Rd, Richardson, TX 75081
69 4620 W University DR, Prosper, TX 75078
70 5010 TX -78N, Sachse, TX 75048
71 524 S Central Expy, McKinney, TX 75072
72 845 E Lake Mead Pkwy Henderson, NV 89011
73 6121 W Craig Rd, Las Vegas, NV 89130

**SCHEDULE 1.2(j)**

**Other Excluded Assets**

None.