# EXHIBIT 1

# LEASE

THIS LEASE is made and entered into by Landlord and Tenant as of the date set forth in Article 1 below.

## ARTICLE 1
## SUMMARY OF CERTAIN BASIC LEASE PROVISIONS AND DEFINITIONS

The following is a summary of certain basic Lease provisions and definitions constituting a part of this Lease. If provisions of this Article 1 conflict with the balance of this Lease, the balance of this Lease governs.

| | | |
|---|---|---|
| 1.1 Effective Date: | February 25, 2019 | |
| 1.2 Landlord: | EVERGREEN–35th AVENUE & GREENWAY, L.L.C., an Arizona limited liability company | |
| 1.3 Tenant: | BLACK ROCK STORE OPERATIONS, LLC, an Oregon limited liability company | |
| 1.4 Tenant's Trade Name: | Black Rock Coffee Bar and/or Black Rock Coffee | (Article 11) |
| 1.5 Parcel: | Lot 2, of Final Plat for Storage Conversion, according to Book 1423 of Maps, Page 21, records of Maricopa County, Arizona, located at the SEC of 35th Avenue and Greenway Road, in the City of Phoenix, as approximately shown on Exhibit A | (Article 2) |
| 1.6 Premises: | The Parcel, together with the building (the "Building") to be constructed on the Parcel as approximately shown on Exhibit B. In addition, Tenant shall have the right to operate a patio area ("Patio Area") and a drive-through facility ("Drive-Thru") as shown on **Exhibit A**. The Patio Area and Drive-Thru constitute a part of the Premises for all purposes of this Lease other than the obligation to pay rental thereon. | (Article 3) |
| 1.7 Rentable Area: | Approximately 1,800 square feet | (Para. 3.3) |
| 1.8 Term: | 180 full calendar months, plus the remainder of the partial calendar month, if any, in which the Term commences | (Article 4) |
| 1.9 Minimum Monthly Rent (initially): | $8,333.33 ($100,000 per annum) | (Article 5) |
| 1.10 Security Deposit: | $0 | (Article 7) |
| 1.11 Intentionally Omitted | | |
| 1.12 Permitted Use of Premises: | Tenant shall have the right to use the Leased Premises as a coffee store with a drive-thru for the preparation and sale of coffee, espresso and other beverage and food related items typically sold in a Black Rock Coffee Bar (including, without limitation, the retail sale of packaged and bulk coffee, coffee beans, tea, hot chocolate and hot vanilla drink mix, hot and cold coffee, tea and espresso drinks, hot and cold chocolate and vanilla drinks, sandwiches, salads, yogurt, frozen soft serve products, oatmeal, cereals, crepes, waffles, puddings, parfaits, bakery and dessert items, coffee and tea accessories and all other items as are typically sold in typical Black Rock Coffee Bar stores), for on premises and off premises consumption and take-out and for any other retail use not expressly prohibited by this Lease or the Superior Documents (the "Permissible Use"). Notwithstanding any contrary provision contained in this Lease, but subject to compliance with applicable law and the Superior Documents, Landlord hereby expressly acknowledges and agrees that Tenant shall have right to install and use speakers, sound devices and other equipment typically used in connection with a Black Rock Coffee Bar drive through aisle and/or window, as well as to install and use outdoor speakers for background music in the Patio Area of the Premises. Landlord hereby represents and warrants to Tenant that the Superior Documents do not prohibit the Permissible Use or Tenant's installation and use of (i) speakers, sound devices and other equipment typically used in connection with a Black Rock Coffee Bar drive through aisle and/or window, and (ii) outdoor speakers for background music in the Patio Area of the Premises as typically used in connection with a Black Rock Coffee Bar. | (Article 11) |
| 1.13 Time to Complete | Sixty (60) days | (Para 4.1(a)) |

Tenant's Work:

| | | | |
|---|---|---|---|
| 1.14 Guarantors: | Black Rock Coffee Holdings, LLC, a Delaware limited liability company | | (Para. 32.13) |
| 1.15 Broker(s): | CBRE, Max Bippus | (representing Landlord) | (Article 29) |
| | JLL (Tyson Switzenberg) | (representing Tenant) | |
| 1.16 Landlord's Address: | 200 North Maryland Avenue<br>Suite 201<br>Glendale, California 91206<br>Attn: Mr. Bruce Pomeroy | Telephone: (818) 240-8727<br>Fax: (818) 240-1823 | (Para. 5.1)<br>(Para. 32.1) |
| | <u>With Copy of Notices to:</u><br>c/o Evergreen Devco, Inc.<br>2390 East Camelback Road<br>Suite 410<br>Phoenix, Arizona 85016<br>Attn: Ms. Laura Ortiz | Telephone: (602) 808-8600<br>Fax: (602) 808-9100 | |
| 1.17 Tenant's Address: | <u>PRIOR TO COMMENCEMENT DATE:</u><br><br>Black Rock Store Operations Co.<br>c/o Robert Kaufmann<br>16307 NE Cameron Boulevard<br>Portland, OR 97230<br>Telephone: (541) 210-0594<br>bobby@br.coffee | | (Para. 32.1) |
| 1.18 Initial payment due at Lease execution: | Intentionally Deleted. | | |
| 1.19 Development: | The land, buildings and improvements constituting the commercial development approximately shown on <u>Exhibit A</u> | | |
| 1.20 Shopping Center: | The land, buildings and improvements constituting the shopping center approximately shown on <u>Exhibit A</u>. The Shopping Center includes the Development. | | |

ARTICLE 2
EXHIBITS

The following Exhibits are attached to this Lease and incorporated herein by this reference:

<u>EXHIBIT A</u> - Site Plan of the Parcel.

<u>EXHIBIT B</u> - Floor Plan of Building (showing approximate configuration and dimensions)

<u>EXHIBIT C</u> - Construction - Landlord's Work and Tenant's Work

<u>EXHIBIT C-1</u> - Elevations

<u>EXHIBIT D</u> - Sign Criteria

<u>EXHIBIT E</u> - Estoppel Certificate

<u>EXHIBIT F</u> – Intentionally Omitted

<u>EXHIBIT G</u> – Environmental Rider

ATTACHMENT – Guaranty of Lease

## ARTICLE 3
## PREMISES

3.1 Demise of Premises. Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, for the Term, subject to and upon the terms and conditions of this Lease.

3.2 Rentable Area. The "Rentable Area" of the Premises set forth in Paragraph 1.7 is stipulated by Landlord and Tenant and is not subject to measurement or recalculation.

3.3 Contingency. At the Effective Date, Landlord is not the owner of the Parcel. This Lease and the obligations of Landlord and Tenant hereunder are expressly conditioned upon Landlord's acquiring fee title to the Parcel on or before September 1, 2019 (the "Acquisition Date"). If Landlord fails to acquire fee title to the Parcel by such date, then either party may by written notice to the other given at any time thereafter but prior to Landlord's acquiring fee title, terminate this Lease, whereupon this Lease will be terminated and Landlord and Tenant will have no further obligations or liabilities to one another under this Lease.

## ARTICLE 4
## TERM

4.1 Term. The Term of this Lease is for the period set forth in Paragraph 1.8 and commences, together with Tenant's obligation to pay Rent, on the first to occur of the following: (a) the expiration of the period set forth as "Time to Complete Tenant's Work" in Paragraph 1.13, with or without actual entry by Tenant; or (b) the date on which Tenant first opens the Premises or any part thereof for business to the public. The Time to Complete Tenant's Work begins on that date (the "Delivery Date"), that Landlord's Work as specified in Exhibit C is substantially complete in accordance with the further provisions of this Section 4.1. As used in this Lease, the terms "substantial completion," "substantially completed," and "substantially complete" shall mean the date that (x) Landlord's Work is complete in accordance with Exhibit C of this Lease, (y) Landlord's architect has certified to Tenant in writing that Landlord's Work has been completed in accordance with Exhibit C, subject only to minor punchlist items that do not interfere with Tenant's ability to open and operate its business for the Permissible Use, and (z) the Landlord's Work has passed final inspection by the City of Phoenix (the "City") and a certificate of occupancy (but solely to the extent available without Tenant's Work being completed) has been issued by the City. Landlord agrees to obtain all permits required to construct and complete Landlord's Work as required by Exhibit C, and shall notify Tenant when such work is substantially completed and the Premises are accessible to Tenant and ready for possession by Tenant. Landlord shall provide Tenant not less than thirty (30) days' notice ("Landlord's Notice") of its intention to provide possession of the Premises to Tenant as of a certain date (the "Proposed Delivery Date"). Within ten (10) business days following that delivery of Landlord's Notice, Tenant and Landlord shall cooperate with one another to arrange a prompt joint inspection of the Premises by Tenant and Landlord on or before the Proposed Delivery Date. At the time of that inspection, Landlord shall demonstrate that all components of Landlord's Work, including all mechanical, plumbing, and utility systems, as well as all equipment serving the Premises, are working properly. Tenant and Landlord shall agree upon a written punchlist of all incomplete or faulty items of construction or mechanical installation, and any necessary adjustments or finish work needed to bring the Premises into the condition required by this Lease. On the Delivery Date, Tenant shall accept the Premises subject to Landlord's completion of all punchlist items within the agreed upon time frames, but in no event later than 30 days following the date Tenant and Landlord agree upon the punchlist. Landlord represents and warrants that, as of the Delivery Date, Landlord's Work will be substantially complete and comply with all federal, state, and local laws, codes, rules and regulations, including, without limitation, all handicapped accessibility standards, such as those promulgated under the Americans With Disabilities Act ("ADA"). For a period of one (1) year from the Delivery Date, Landlord shall correct any latent defects in Landlord's Work and the Premises promptly after Tenant notifies Landlord of any such defect. The "Term" also includes any extensions or renewals of the initial Term to the extent expressly authorized pursuant to the terms of this Lease or agreed to in writing by Landlord and Tenant.

4.2 Stipulation of Term Commencement. Tenant agrees to promptly notify Landlord in writing of the date Tenant opens the Premises for business to the public. Once known, the date on which the Term commences (the "Commencement Date") and the date on which the Term expires (the "Expiration Date") may be stipulated by Landlord to Tenant in writing, which will be binding on the parties.

4.3 Preliminary Obligations. Notwithstanding anything to the contrary contained in this Lease, except as set forth in Exhibit C, all obligations of Tenant contained in this Lease (other than the obligations to pay Minimum Monthly Rent and Additional Rent) commence upon the Delivery Date, including, without limitation, the obligations of Tenant under Paragraph 11.8, Articles 15 and 16, and Exhibit C of this Lease. Tenant agrees to be bound by this Lease and to perform such obligations notwithstanding that the Term has not yet then commenced.

4.4 Delivery Deadline. Landlord agrees to cause the Delivery Date to occur within twelve (12) months following the Acquisition Date (the "Initial Delivery Deadline"). If Landlord, for any reason whatsoever, cannot deliver possession of the Premises to Tenant on the Initial Delivery Deadline, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom. Under such circumstances, the rent provided for herein shall not commence until possession of the Premises is made available to Tenant and no such failure to give possession on the Initial Delivery Deadline shall affect the validity of this Lease or the obligations of Tenant hereunder. If Landlord has not delivered possession of the Premises to Tenant on or before the Final Delivery Deadline (defined hereafter), then Tenant shall have the one time right, as its sole and exclusive remedy (in lieu of the foregoing abatement), to terminate this Lease by delivering written notice of such termination to Landlord within thirty (30) days after the Final Delivery Deadline but prior to Landlord's delivery of possession of the Premises, which termination shall be effective upon Landlord's receipt of such notice. Tenant's failure to deliver to Landlord written notice of termination on or before the expiration of such thirty (30) day period shall be deemed a waiver by Tenant of

its right to terminate this Lease due to Landlord's failure to deliver the Premises by the Final Delivery Deadline. The "Final Delivery Deadline" shall mean the sixtieth (60[th]) day after the Initial Delivery Deadline; provided, however, each of the foregoing delivery deadlines shall be extended on a day-for-day basis for any delay due to any strike, lockout, labor dispute, unavailability of services, labor or materials, acts of God, unusually inclement weather, unusual governmental restriction, regulation or control, enemy or hostile governmental action, civil commotion, insurrection, sabotage, fire or other casualty (each a "Force Majeure Event"). Notwithstanding any contrary provision of this Lease, the inability to pay any sum of money due under this Lease or the failure to perform any other obligation due to the lack of money will not be deemed a Force Majeure Event.

4.5 Renewal Periods. Landlord grants to Tenant the right and option to extend the Term for three (3) additional periods of five (5) years each (each, a "Renewal Period") on all of the terms, conditions and covenants of this Lease except:

(a) rental concessions, tenant improvement allowances, Landlord construction obligations or similar inducements granted by Landlord to Tenant at or prior to the commencement of the initial Term do not apply to either Renewal Period;

(b) the failure of Tenant to exercise the first renewal option terminates all subsequent renewal options;

(c) Tenant has no further right to renew this Lease beyond the third Renewal Period; and

(d) the Minimum Monthly Rent to be paid by Tenant during each Renewal Period will continue to be adjusted in accordance with Paragraph 5.2 of this Lease.

Tenant may only exercise a renewal option by giving written notice of renewal to Landlord not more than one (1) year nor less than six (6) months prior to the expiration of the Term. Notwithstanding the foregoing (i) if this Lease or Tenant's right to possession of the Premises is terminated prior to the date of exercise of a renewal option granted herein, or (ii) if Tenant is in default under this Lease beyond any applicable cure periods, either at the time of exercise of a renewal option, or at the commencement of the Renewal Period, at Landlord's election, the option(s) to renew contained herein are null and void and of no force or effect, and the Term expires in accordance with its terms as though the option(s) contained herein had not been exercised. If a Renewal Period becomes effective as provided above, such Renewal Period will commence immediately after the expiration of the initial Term or prior Renewal Period, as applicable.

## ARTICLE 5
## RENT

5.1 Rent. Tenant agrees to pay to Landlord at the first address specified in Paragraph 1.16 or to such other address or person as Landlord may from time to time designate in writing, without prior notice or demand, and except as otherwise expressly provided in this Lease, without deduction or offset, in lawful currency of the United States of America:

(a) The Minimum Monthly Rent, payable in advance on the first day of the Term and on the first day of each and every calendar month thereafter during the Term. If the Commencement Date is other than the first day of a calendar month, then the monthly installment of Minimum Monthly Rent for such initial fractional month will be prorated on a per diem basis, and paid by Tenant to Landlord on the Commencement Date; and

(b) All additional rents, taxes, assessments, insurance premiums, maintenance charges, and all other sums required to be paid by Tenant pursuant to this Lease in addition to Minimum Monthly Rent (collectively, "Additional Rent"), which amounts constitute rent whether or not expressly designated as such, and are to be paid in advance on or before the first day of each month unless otherwise stipulated.

Minimum Monthly Rent and Additional Rent are sometimes collectively referred to in this Lease as "Rent".

5.2 Adjustments to Minimum Monthly Rent.

(a) Minimum Monthly Rent payable by Tenant during the Term is as set forth in the table below:

| Lease Year | Minimum Monthly Rent | Minimum Annual Rent |
|---|---|---|
| 1-5 | $8,333.33 | $100,000 |
| 6-10 | $9,166.67 | $110,000 |
| 11-15 | $10,083.33 | $121,000 |
| *16-20 | $11,091.67 | $133,100 |
| *21-25 | $12,200.83 | $146,410 |
| *26-30 | $13,420.92 | $161,051 |

*Renewal Period(s), if applicable

(b) For purposes hereof, the first "Lease Year" begins on the Commencement Date, and if the Commencement Date is the first day of a calendar month, ends 12 months thereafter. If the Commencement Date is

other than the first day of a calendar month, the first Lease Year ends on the last day of the same calendar month of the first year thereafter. Each succeeding Lease Year is each succeeding 12-month period.

(c) Minimum Monthly Rent for any fractional month will be prorated on a per diem basis.

5.3 Late Payments.

(a) If Tenant fails to pay any Rent when due, the unpaid amount bears interest from the date due until paid in full at the greater of (i) ten percent (10%) per annum or (ii) five percent (5%) per annum plus the discount rate prevailing on the twenty-fifth (25th) day of the month preceding the date such payment was due, as established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act as is now or hereafter in effect from time to time; provided, however, in no event shall said rate exceed the maximum rate permitted by applicable laws.

(b) Tenant acknowledges that late payment by Tenant to Landlord of Rent will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by the terms of any ground lease, mortgage or trust deed covering the Premises. Accordingly, if any installment of Rent is not received by Landlord within ten (10) days after the installment is due (regardless of whether Tenant has received notice of delinquency), Tenant agrees to immediately pay to Landlord a late charge equal to ten percent (10%) of the delinquent amount, in addition to the accrual of interest provided for in subparagraph (a) above and any other available right or remedy of Landlord. Such late charge represents a reasonable estimate of and is fair compensation to Landlord for its loss suffered on account of Tenant's delinquency.

(c) Acceptance of interest or a late charge by Landlord does not constitute a waiver of Tenant's default with respect to the delinquent amount, or prevent Landlord from exercising any other available right or remedy.

(d) In addition to applicable interest or late charges, any check that is returned to Landlord marked "NSF" (Not Sufficient Funds) or "Account Closed" will be charged a $25.00 handling fee for the first such check, increasing to $35.00 for any subsequent such check.

ARTICLE 6
TENANT'S RECORDS

6.1 Tenant's Reports. Within thirty (30) days after receipt of Landlord's written request given not more than one time in any Lease Year, Tenant agrees to furnish to Landlord a statement in writing, certified by Tenant to be true, correct, and complete, setting forth the total Gross Sales (as defined below) for the Premises for the immediately preceding calendar year.

6.2 Tenant's Gross Sales. The term "Gross Sales" means the gross selling price of all merchandise and services sold, rented or rendered in, on or from the Premises by Tenant, and any subtenant, concessionaire, licensee or other person conducting business on or from the Premises, and any and all other revenue derived at, from or pertaining to the Premises, without reserve or deduction, and whether the orders, no matter how communicated, are received on the Premises and executed on or from the Premises or elsewhere, or are received elsewhere and executed on or from the Premises. However, Gross Sales do not include sales of equipment or trade fixtures that are not inventory or stock-in-trade, or sums collected from customers for and paid to a taxing authority by Tenant for retail sales, excise or similar taxes imposed by applicable governmental authority. Further, there may be deducted in the computation of Gross Sales: (a) cash or credit refunds to customers for goods returned, but only if the selling price of the goods returned was previously included in the computation of Gross Sales; (b) the selling price of goods returned by customers for exchange, but only if the selling price of the goods returned and the selling price of goods delivered to the customers in exchange were included in the computation of Gross Sales; and (c) that part of the selling price of goods sold satisfied by a deposit or a gift certificate but only if the amount of the deposit or gift certificate was previously included in the computation of Gross Sales.

ARTICLE 7
INTENTIONALLY OMITTED

ARTICLE 8
TAXES

8.1 Taxes. Except as expressly provided in Paragraph 8.2, throughout the Term, Tenant agrees to pay and discharge prior to delinquency all real estate, personal property, business, occupation and occupational license taxes, water, sewer, oil, gas, steam, electricity and telephone charges and fees; assessments (including, but not limited to, assessments for public improvements or benefits, improvement district or community facilities district bonds or assessments), and all other governmental or quasi-governmental taxes, impositions and charges of every kind and nature, ordinary or extraordinary, general or special, foreseen or unforeseen, whether similar or dissimilar to any of the foregoing, which accrue as of the Commencement Date through the expiration of the Term and which are levied, assessed or imposed:

(a) Upon or with respect to, or are or become liens upon, the Premises, or any portion thereof or any interest of Landlord or Tenant therein or under this Lease;

(b) Upon or with respect to the possession, operation, management, maintenance, alteration, repair, rebuilding, use, occupancy of or employment of personnel in the Premises, or any portion thereof;

(c) Upon this transaction or any document to which Tenant is a party or is bound, creating or transferring an interest or an estate in the Premises, under or by virtue of any present or future law, statute, charter, ordinance, regulation or other requirement of any governmental authority, whether federal, state, county, city, municipal or otherwise; or

(d) Upon Landlord on account of, attributed to, or measured by Rent payable by Tenant, expressly including, without limitation, any excise, sales, use, rental, transaction privilege or like taxes now or hereafter legally levied or imposed against or on account of amounts payable by Tenant under this Lease or the receipt thereof by Landlord.

Subject to Paragraph 8.2, it is the express intention of the parties that Landlord will be free from all such Taxes and that this Lease yields net to Landlord not less than the Minimum Rent reserved hereunder throughout the Term. All of the items referred to in this Section 8.1 are sometimes, for convenience, called "Taxes" notwithstanding that such taxes, impositions, assessments and obligations may not be taxes in the strict sense.

8.2 Exclusions from Taxes. Taxes do not include municipal, state or federal net income, gift, estate, inheritance or excess profits taxes assessed against Landlord, nor any costs of challenging Landlord's tax bill or any portion thereof (provided, however, all reasonable costs of a tax contest may be reimbursed to Landlord out of tax savings realized); nor any fine, penalty, cost, or interest for any tax or assessment, or any part thereof, which Landlord should fail to timely pay (except to the extent resulting from Tenant's failure to pay amounts due under this Lease).

8.3 Evidence of Payment; Impounds. If the Premises is a separately assessed tax parcel, then Landlord shall cause the tax bill to be mailed directly to Tenant and Tenant shall pay the appropriate governmental authority directly, on or prior to delinquency, and shall provide Landlord with proof of such payment within ten business days of the date of such payment. Landlord will exercise good faith, diligent efforts to cause the Premises to be a separately assessed tax parcel prior to the Delivery Date. If Tenant fails to pay Taxes prior to delinquency, upon the request of Landlord's Mortgagee (as hereinafter defined), Tenant shall thereafter impound Taxes on a monthly basis, and Landlord shall remit payment of the impounded amounts.

8.4 Proration for Partial Tax Year. Tenant agrees to pay 100% of all ad valorem taxes and assessments on the land and improvements constituting the Premises during the Term. With respect to any assessment which, under the laws then in force, may be evidenced by improvement or other bonds payable in either a lump sum or in annual installments, the installment basis shall be elected, and Tenant is responsible for payment of all such installments applicable to the Term. However, such taxes and assessments for the year in which they first become payable by Tenant will be prorated between Landlord and Tenant so that Tenant pays only such part thereof as accrued during the period commencing on the Commencement Date and ending on the expiration of the applicable fiscal tax year, and Landlord pays such amounts which accrued to the period before the Commencement Date. Such taxes and assessments for the year in which this Lease expires or is terminated will be prorated between Landlord and Tenant so that Tenant pays only such part thereof as the period commencing on the beginning of the applicable tax year and ending on the date this Lease expires or terminates bears to such entire tax year. If at the beginning of the Term the Premises constitute a part of one or more tax assessor's parcels, Tenant will pay an equitable pro rata share thereof as reasonably agreed by Landlord and Tenant, and Landlord agrees to diligently take such steps as are necessary to constitute the Premises a single tax assessor's parcel.

8.5 Contest. Tenant and Landlord each have the right, upon written notice to the other, to contest the amount or validity of any Taxes by appropriate legal proceedings diligently pursued. The party initiating such contest agrees to permit the reasonable participation therein by the other party at such other party's request, and each party agrees to cooperate in such contest and execute any documents required therefor. If Tenant is the contesting party and Landlord elects not to participate therein, or if, prior to such time as the Parcel are assessed as a separate tax parcel, Landlord is the contesting party and Tenant elects not to participate therein (i) the contesting party agrees to first make all contested payments, under protest if it desires, but if payment under protest is not required by the taxing authority, such contested payment need not be made, (ii) neither the Parcel, nor any part thereof, nor any interest therein may be in any danger of being sold, forfeited, lost or interfered with, (iii) the contesting party must furnish such security, if any, as is required in the proceedings, and (iv) all expenses incurred in connection with such proceedings must be paid by the contesting party. Tenant covenants to take no action that would or might subject Landlord to a penalty, late charge, default, forfeiture or foreclosure with respect to the payment of Impositions.

8.6 New Impositions. If at any time during the Term, any authority having the power to tax or impose the payment of fees, assessments or impositions including, without limitation any federal, state, county, city or municipal government or any political subdivision thereof (a "Taxing Authority"), alters the methods or standards of taxation and assessment (a "Tax Plan"), against the legal or equitable interests of Landlord or any Landlord's Mortgagee (as hereinafter defined), the Premises, the Parcel, the Building or any other improvements on the Parcel in whole or in part, so as to impose a Tax Plan in lieu of or in addition to the Tax Plan in existence as of the Effective Date of this Lease, or reassesses the Parcel under an existing Tax Plan, any and all taxes, assessments, excises, surcharges, fees, levies, penalties, bonds or similar impositions, whether foreseen or unforeseen (collectively "New Impositions") that are based upon such other Tax Plan or reassessment, including without limitation (i) any New Impositions on Landlord's right to rent or other income from the Premises or as against Landlord's business of leasing the Premises, (ii) any New Impositions in substitution or in lieu of, partially or totally, any Taxes assessed upon real property prior to any such alteration in the Tax Plan, (iii) any New Impositions allocable to or measured by the area of the Premises or the Parcel, or the rent payable hereunder, including without limitation any New Impositions levied by any taxing authority with respect to the receipt of such rent or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion thereof, (iv) any New Impositions upon this Lease transaction or any document to which Tenant is a party which creates or transfers

any interest or estate in or to the Premises, or (v) so-called supplemental assessment or supplemental taxes, are payable by Tenant as if they were Taxes described in Paragraph 8.1.

8.7 Other Taxes. Tenant agrees to pay prior to delinquency all taxes, assessments, license fees, and public charges levied, assessed or imposed upon Tenant's business operation, fixtures, trade fixtures, furnishings, equipment and other personal property on or in the Premises.

8.8 Source Documents. Landlord shall, within ten business days of receipt, provide Tenant with a copy of any bill for Taxes, and if the Premises is not a separate tax parcel, a statement evidencing Tenant's proportionate share thereof, a computation as to how said amount was determined, including a tax parcel map and current tenant roll breaking down the square footage of each improvement (if requested), and a paid invoice evidencing Landlord's payment of the Taxes for the prior fiscal period (collectively, "**Tax Documentation**"). Landlord shall also notify Tenant within 5 days of any notice Landlord receives relating to a change in the assessed valuation, classification or manner of determining the amount of Taxes payable with respect to the Premises. If Landlord fails to comply with this requirement: (a) any additional liability resulting from Tenant's failure to timely pay the Taxes (i.e., interest or penalties) will be the obligation of Landlord and not Tenant, and (b) Tenant will not be in default of this Lease as a result of any delay caused by Landlord's failure to comply. This provision does not apply to Taxes for which Tenant receives the billing notices or other source documents directly from the billing authority.

## ARTICLE 9
## COMMON AREAS

9.1 Definition of Common Areas. The term "Common Areas" means those portions of the land, improvements, facilities, utilities, equipment and installations forming a part of the Shopping Center that are not a part of the Premises.

9.2 Common Use by Tenants. Subject to this Lease, the Superior Documents (defined in Paragraph 18.3) and to such rules and regulations as Landlord reasonably prescribes, Tenant, its officers, employees, customers and other invitees are granted a license (revocable in the event of Tenant's default which is not cured within any applicable cure period) to use on a nonexclusive basis during business hours, in common with all others entitled thereto, the Common Areas for their proper and intended purposes. Further, the Superior Documents grant to other tenants and other occupants and licensees of the Shopping Center a license to use on a nonexclusive basis during business hours, in common with all others entitled thereto, those portions of the Premises which consist of sidewalks, drive ways and drive aisles.

9.3 Consent of Landlord. Landlord agrees not to materially change (or will withhold consent to such change, as applicable) the size or location of the Premises, Patio Area, Drive-Thru, the "Protected Driveways" depicted on the Site Plan, or the number of parking stalls located within the Premises without Tenant's consent, which shall not be unreasonably withheld. Landlord agrees not to construct a building in the area labeled "No Building Area" on the Site Plan, or will withhold consent to such a building pursuant to the COREA, as applicable. Landlord represents, warrants and covenants that it will enforce its rights under the Superior Documents with respect to those Protected Driveways which are not on the Premises and the No Building Area.

9.4 Shared Retention Area; Shared Utilities. Tenant shall pay or reimburse to Landlord within thirty (30) days after written demand therefore together with reasonably detailed supporting information, any costs and expenses allocated to the Parcel by the Superior Documents, including but not limited to the costs of maintenance and repair of the Shared Retention Area, and maintenance and repair of shared utilities which benefit the Parcel.

## ARTICLE 10
## INTENTIONALLY OMITTED

## ARTICLE 11
## CONDUCT OF BUSINESS

11.1 Use of Premises.

(a) Tenant agrees to use and occupy the Premises only for the Permitted Use specified in Paragraph 1.12 and for no other purpose without Landlord's consent, not to be unreasonably withheld, conditioned or delayed.

(b) Tenant may not use or permit all or any portion of the Premises to be used for the provision, sale or rental, at retail or wholesale, of: (i) any item or service restricted by the Superior Documents described in Paragraph 18.3.

11.2 Intentionally Deleted.

11.3 Continued Conduct of Business. Tenant agrees to open the whole of the Premises for business to the public fully fixtured, stocked and staffed for the Permitted Use within ninety (90) days following the Commencement Date and to occupy, operate and use the entire Premises in the active conduct of its business in a reputable, diligent and first-class manner for at least one (1) day. If at any time Tenant fails to conduct business operations within the Premises for one hundred twenty (120) consecutive days or more (except for Permitted Closure Periods, defined below), Landlord may, by delivering sixty (60) days' written notice to Tenant, elect, as its sole and exclusive remedy, to terminate this Lease, in which event this Lease will terminate effective thirty (30) business days after expiration of said 60-day period unless prior to the expiration of such 30-day period, Tenant resumes business

operations within the Premises. Upon the effective date of such termination, this Lease will terminate in accordance with its terms with the same force and effect as if the Term had then expired. Upon the effective date of such termination, except as otherwise expressly provided in this Lease, neither Landlord nor Tenant will thereafter have any further obligation or liability hereunder or to the other. "Permitted Closure Periods" shall mean periods of closure resulting from (a) condemnation or force majeure, (b) periodic taking of inventory (not to exceed five (5) days per year), (c) remodeling (not to exceed one hundred eighty (180) days per remodel), (d)renovations (not to exceed one hundred eighty (180) days per renovation), (e) casualty and repairs being pursued in good faith, (f) assignment and subletting (not to exceed ninety(90) days per transaction), and national holidays.

11.4 Standards to be Adopted by Tenant. In the active and continued conduct of business in the Premises in accordance with Paragraph 11.3, Tenant agrees to: (a) keep Tenant's signs properly illuminated during Tenant's business hours; and (b) use and keep in good order and condition fixtures, furnishings and equipment of first class quality.

11.5 Tenant's Signs.

(a) Subject to applicable law, the Development's sign criteria attached hereto as Exhibit D and the comprehensive sign plan, if any, applicable to the Development (the "Comprehensive Sign Plan"), Tenant shall have the right to erect on or before opening for business and maintain thereafter throughout the Term (i) its standard trademark signage on the exterior elevations of the Premises, and (ii) all directional signs, menu boards and other signage associated with the drive-through facility. Notwithstanding anything in this Lease to the contrary, Tenant shall have the right to install the maximum signage in, on or about the Premises (including, without limitation, promotional or advertising signs or displays within the interior of the Building) allowable in accordance with applicable law, the Comprehensive Sign Plan, and the sign criteria attached hereto as Exhibit D. Tenant will keep its exterior sign(s) lit from dusk until dawn (or such shorter nighttime hours as Landlord expressly approves in its discretion).

(b) Tenant may put up temporary signage in banner format for marketing purposes during the 45-day period prior to Tenant's opening for business in the Premises for the Permitted Use (i.e., "Coming Soon") and for a period of 45 days immediately following its opening for business (i.e., "Now Open"). All such temporary banners must comply with applicable law, must comply with any Comprehensive Sign Plan or master sign program now or hereafter applicable to the Parcel and are subject to the prior written approval of Landlord, which approval may be subject to reasonable conditions, including without limitation, that the Building not be damaged as a result of the installation or removal of such signage.

(c) Landlord grants to Tenant a license to install and maintain sign panels ("Tenant's Sign Panels") on the monument sign for the Shopping Center designated as "Shared Sign No. 1" on the Site Plan, and identified as the Greenway Monument Sign in the Easement Agreement, subject to the terms and conditions of this subparagraph. Tenant's Sign Panels must be fabricated and installed by Tenant at its sole cost and expense and approved in writing by Landlord prior to installation. Tenant's Sign Panels will be in the 2nd position on said monument sign. Tenant agrees to maintain Tenant's Sign Panels in first class condition and repair at all times throughout the Term. Upon expiration of the Term or sooner termination of Tenant's right to occupy the Premises under this Lease, Tenant must remove and replace Tenant's Sign Panels with blank panels of a color and style acceptable to Landlord, at Tenant's expense. Tenant shall pay or reimburse to Landlord within thirty (30) days after written demand therefore together with reasonably detailed supporting information, any costs and expenses allocated to the Parcel by the Easement Agreement for a share of the costs associated with the Shared Sign No. 1. The Easement Agreement does not allocate to the Premises the initial costs of constructing Shared Sign No. 1 or costs associated with Shared Sign No. 2, and Tenant shall not be responsible therefore.

11.6 Intentionally Omitted.

11.7 Waste and Nuisance. Tenant may not commit or permit (a) any damage to the Premises; (b) any nuisance or other activity that might unreasonably disturb any person or interfere with any business conducted in the Shopping Center; (c) any act or practice that might damage the Shopping Center; (d) any odors, vapors, water, vibrations, noises or other undesirable effects to emanate from the Premises which, in Landlord's reasonable opinion, are objectionable; (e) the Premises to be used in any manner constituting a hazard or a violation of any insurance policy maintained by Landlord or Tenant, or for the use or storage of goods or materials which in Landlord's opinion are dangerous or hazardous; (f) the Premises to be used for the conduct of any illegal, offensive, noisy or dangerous trade, business, activity or occupation; or (g) any activity which physically interferes with the business of any other tenant or occupant of the Shopping Center. Tenant may not conduct or permit any auction sale to be held on or about the Premises, either voluntarily or involuntarily. Tenant may not display merchandise, solicit business or permit merchandise to remain, outside the exterior walls and permanent doorway of the Premises. Upon notice from Landlord or its representatives, Tenant must immediately cease any conduct prohibited by this Paragraph 11.7. Notwithstanding anything to the contrary contained in this Lease, in no event shall the ordinary smells associated with a coffee shop be deemed by Landlord to be objectionable or unpleasant so long as same is operating in compliance with all applicable law.

11.8 Compliance with Law. Tenant agrees to promptly, at its sole expense, comply with and observe all requirements of law at any time in force during the Term that are applicable to Tenant, the Premises, the contents thereof or the activities therein, including, without limitation, statutes, ordinances, codes, rules, regulations, zoning stipulations, use permits, discretionary approvals, conditional use permits, business licenses and other legal directives. Tenant also agrees to comply at its expense with all requirements as such relate to the Premises of any liability or fire insurance company insuring Landlord or Tenant at any time during the Term. If any alterations, additions, improvements or changes to the Premises are necessitated by reason of any of the foregoing, whether arising out of Tenant's specific use or occupancy, the general use, occupancy or condition of the Premises or the Development,

whether the useful life thereof will exceed the remaining Term, and whether the area requiring work is readily accessible to Tenant, including, without limitation, the installation of fire extinguishing systems and equipment, or compliance with the Americans With Disabilities Act, Tenant must perform such alterations, additions, improvements and changes at its own expense, but subject to the approval of Landlord and to the provisions of Article 12. Notwithstanding anything to the contrary contained in this Lease, it is Landlord's responsibility to assure that as of the Delivery Date, the Premises comply with all requirements of law that are applicable to the Premises, including, without limitation, statutes, ordinances, codes, rules, regulations, zoning stipulations, use permits, discretionary approvals, conditional use permits, business licenses and other legal directives (including, without limitation, ADA); provided, however, that Tenant is required to thereafter maintain such compliance throughout the Term, including making any changes required as a result of Tenant's Work, alterations made to the Premises by Tenant, or Tenant's particular use of the Premises.

11.9 Landlord's Exclusive Covenant. Subject to the limitations set forth in this Section 11.9 below, Landlord shall not (i) lease or license any space within the Development to any person or entity (except Tenant) for the Exclusive Use (defined below), or (ii) use or allow any other person or entity (except Tenant) to use any portion of the Development for the Exclusive Use ("Landlord's Exclusive Covenant"). As used in this Lease, "Exclusive Use" means the sale of: (a) whole bean or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) tea or tea-based drinks, (d) brewed coffee or (e) blended beverages containing coffee, espresso, and/or tea. Notwithstanding the foregoing, Tenant's Exclusive Use shall not apply to (y) the incidental sales of the beverages identified in items (a) through (e) above where the gross sales attributed to such beverages do not exceed fifteen percent (15%) of each such tenant/occupant's gross annual sales from the Development, or (z) a full service, sit down restaurant. In addition to the foregoing, Landlord shall have an affirmative obligation to include in all future leases and conveyances of all or any portion of the Development a provision prohibiting any tenants or occupants of the Development from violating the Landlord's Exclusive Covenant.

(a) Landlord's Exclusive Covenant terminates (i) upon the occurrence of a default by Tenant under this Lease remaining uncured after notice and expiration of applicable grace period, (ii) if Tenant ceases conducting business operations in the Premises for the Permitted Use for a period in excess of thirty (30) days (except for Permitted Closure Periods), or (iii) if a court of competent jurisdiction rules that Landlord's Exclusive Covenant violates applicable law; and

(b) Landlord's Exclusive Covenant does not apply to any lease executed prior to the Effective Date, or to any extension, expansion or renewal of any of the foregoing, or to any assignment or subletting thereunder for substantially the same use.

If Landlord breaches Landlord's Exclusive Covenant, which breach continues uncured after applicable notice from Tenant and expiration of grace period, Tenant, as its sole and exclusive remedies, may (i) bring an action for specific performance and/or obtain a temporary or permanent injunction against Landlord with respect to such uncured breach, and/or (ii) pay fifty-percent (50%) of Minimum Monthly Rent until the violation is cured, provided, however, if the violation is not cured within twelve (12) months, Tenant shall have the additional option to elect to terminate the Lease upon notice to Landlord given at any time prior to the cessation of such violation. Notwithstanding the foregoing, if Landlord properly withholds its consent as set forth above in this Paragraph 11.9 with regard to another occupant of the Development and such occupant thereafter violates the restriction, then (i) Landlord shall, upon receipt of written notice of such violation from Tenant, use commercially reasonable efforts to attempt to cause such occupant to comply with the restriction (including, without limitation, institution and diligent prosecution of litigation or lease termination), and (ii) if Landlord is unable to cause such occupant to comply with the restriction, such violation shall not constitute a default by Landlord under this Lease and Tenant shall have no rights or remedies against Landlord or under this Lease with respect to such violation; provided, however, Tenant shall have the right to pursue litigation in its own name against the offending tenant or occupant.

## ARTICLE 12
## MAINTENANCE, REPAIRS AND ALTERATIONS

12.1 Maintenance and Repair.

(a) Tenant agrees, at all times during the Term, at its sole expense, to diligently maintain and repair in good order and repair, and to make all necessary replacements of, as reasonably determined by Tenant, the Premises (including and every part thereof, including, without limitation, the Building (excluding the foundation and the structural portions of the outer walls and roof) and all improvements, equipment, fixtures, furnishings, utilities and appurtenances, both interior and exterior, ordinary and extraordinary, located in or on the Premises, and howsoever the necessity or desirability of repairs may occur. All maintenance, repair and replacement must be made promptly and be equal or better in quality and class to the original work. Within 60 days following the Delivery Date, Landlord shall transfer or assign to Tenant (on a non-exclusive basis) all warranties under any contract or subcontracts relating to the Premises and Landlord's Work. Notwithstanding any provision of this Lease to the contrary, Tenant's obligations shall not include making: (a) any repair or improvement caused by Landlord's breach of this Lease; or (b) any repair or improvement necessitated by the post-Delivery Date negligence or willful misconduct of Landlord, its agents, employees or servants.

(b) Without limiting the generality of subparagraph (a) above, Tenant at all times during the Term agrees to keep and maintain in good order and repair all exterior painted surfaces of the Building and all structures located on the Premises. Any graffiti shall be removed or painted over within 48 hours of it appearing. No change in the color of exterior painted surfaces from that originally approved by Landlord is permitted without Landlord's prior written consent, not to be unreasonably withheld.

(c) Tenant agrees to comply at its expense with all construction, maintenance and repair obligations (including reimbursement obligations for work done by a third party) applicable to the Premises or the responsibility of the owner or occupant thereof under any Superior Document.

(d) Intentionally Deleted.

(e) All landscaped areas and material located on the Premises must be maintained by Tenant in a healthy, neat, clean and weed-free condition. Dead plant material must be replaced with live plant material of equal or larger size and maturity.

(f) Tenant must supply all trash and recycling receptacles for the Premises in compliance with applicable laws and ordinances. Tenant agrees, at its expense, to periodically empty such trash and recycling receptacles as necessary and sweep as needed and keep free of refuse the sidewalks and other areas on the Premises.

12.2 Maintenance by Landlord. Landlord shall keep the foundation, and structural components of the Building, in good order, condition and repair. Landlord shall not, however, be responsible for making any repairs thereto occasioned by any act or negligence of Tenant, its employees, contractors, agents, servants, customers, invitees, lessees, licensees, assignees or concessionaires; and Tenant shall promptly make any such repairs at it sole cost and expense.

12.3 Tenant's Alterations.

(a) Tenant shall be permitted, at Tenant's sole cost and expense, to do the following without Landlord's consent: (a) install unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Building, and (b) make decorative additions, alterations and improvements located exclusively within the interior of the Building and provided that same (i) do not require plans and specifications, (ii) are not structural in nature, (iii) are not visible from outside the Building, (iv) do not affect or require modification of the Building's electrical, mechanical, plumbing, heating, air conditioning or other systems, (v) do not void any warranties for any portion of Landlord's Work, and (vi) do not cost more than $100,000.00 to complete for any such project (hard and soft costs) (the foregoing collectively referred to herein as "Cosmetic Alterations"). Other than Cosmetic Alternations, Tenant may not commence Tenant's Work or make any repairs, alterations, additions, replacements, decorations or improvements to any part of the Premises, without obtaining Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Prior to commencing any work other than Cosmetic Alterations, Tenant must submit to Landlord for approval (1) details of the proposed work reasonably satisfactory to Landlord; (2) such indemnification against liens, damages and expenses as Landlord reasonably requires; (3) evidence satisfactory to Landlord that Tenant has obtained, at its own expense, all necessary consents, permits and licenses from all governmental authorities having jurisdiction; (4) evidence reasonably satisfactory to Landlord that Tenant has the financial resources to pay for all of the proposed work; and (5) a list of all contractors and subcontractors being used. If Tenant will be performing alterations that do not require Landlord's consent, Tenant shall notify Landlord of same in writing at least ten (10) days prior to the commencement of such alterations and shall, concurrently with such notice, provide Landlord with a written description of such alterations and copies of plans and specifications, if any, that were prepared with respect to such alterations.

(b) All work described in subparagraph (a) above must be performed (1) at the sole expense of Tenant; (2) by licensed and competent contractors and workmen reasonably acceptable to Landlord; (3) in a good and workmanlike manner, and using materials properly fit for the purpose; (4) in accordance with drawings, plans and specifications approved in writing by Landlord (except for Cosmetic Alterations), and applicable law; (5) subject to such rules, conditions and restrictions as may be reasonably imposed by Landlord; and (6) in such manner as does not void any contractor's, manufacturer's or supplier's warranties existing in favor of Landlord. Upon completion, Tenant agrees to post and record a Notice of Completion in the County where the Premises are located, as required or permitted by law, and to provide Landlord with "as-built" plans if plans were produced in connection with such alteration, and proof of payment for all labor and materials.

(c) Other than Cosmetic Alterations, any repair, replacement, alteration, addition, decoration, improvement or work made or done by Tenant without the prior written consent of Landlord, or that is not made in accordance with the drawings, plans and specifications approved by Landlord, must, if requested by Landlord, be removed promptly by Tenant at Tenant's own expense and the Premises restored to their previous condition.

12.4 Liens. Tenant agrees to keep the Premises and the Parcel free from any mechanics', materialmen's, or other liens arising out of work performed, material furnished or obligations incurred due to the acts or omissions of Tenant or parties for whom Tenant is in law responsible. If any such liens or claims of lien attach or are filed, Tenant must, within five (5) business days after Tenant has notice thereof, procure the discharge thereof by payment or by giving security or taking such other action as may be required by Landlord or applicable law. Notice is given that neither Landlord nor Landlord's interest in the Premises is liable or responsible to persons who furnish material or labor to Tenant.

12.5 Notice of Commencement of Work. Tenant agrees to give Landlord at least ten (10) days' prior written notice before the commencement of any work in the Premises described in Paragraph 12.3 above in order to allow Landlord, at its option, to post and record appropriate notices of non-responsibility with respect to such work.

ARTICLE 13
UTILITIES

Commencing on the Delivery Date and thereafter throughout the Term, Tenant agrees to pay before delinquency all charges for water, sewer, electricity, power, gas, heat, telephone, trash removal, and all other services or utilities used in, upon, or about the Premises by Tenant or any of Tenant's subtenants, licensees, or concessionaires. Any security deposit or connection charges required by any utility company must be paid by Tenant. Landlord will cause electricity and water used in the Premises to be separately metered to Tenant, and Tenant agrees to pay when due directly to the utility supplier all charges for such utilities. Landlord is not liable in damages or otherwise for any failure or interruption of any utility supplied to the Premises and no such failure constitutes a constructive or actual eviction or a breach of any covenant for quiet enjoyment or any other covenant of Landlord contained in this Lease, or entitles Tenant to terminate this Lease, provided, however, if a failure or interruption of utility services which is caused by the gross negligence or intentional misconduct of Landlord prevents Tenant from reasonably operating its business in the Premises, or any portion thereof, which failure or interruption continues for forty-eight (48) consecutive hours or more after Tenant's notice of same to Landlord, then Minimum Monthly Rent and Additional Rent shall abate from the expiration of such 48-hour period and for each day during which Tenant is unable to reasonably conduct its business in the Premises, or portion thereof, due to such failure or interruption, until such utility services are restored. At all times during the Term, Landlord has the right to select the utility company or companies that provide electric and other utility services to the Premises and, subject to all applicable laws, Landlord has the right at any time and from time to time during the Term to either (a) contract for services from electric and other utility service provider(s) other than the provider(s) with which Landlord has a contract as of the Effective Date (the "Current Providers"), or (b) continue to contract for services from the Current Provider(s). Tenant agrees at all times to cooperate with Landlord and any electric or other utility service provider with which Landlord has contracted and, as reasonably necessary, to allow Landlord or such service provider reasonable access to any electric lines, feeders, risers, wiring, conduit, piping and any other machinery, systems and equipment within the Premises.

ARTICLE 14
DAMAGE, DESTRUCTION, TERMINATION AND RENT ABATEMENT

14.1 Damage or Destruction of Premises.

(a) If the Premises are at any time damaged or destroyed as a result of a casualty fully insured against by Landlord pursuant to Article 15, and if, as a result of such occurrence, the Premises are rendered untenantable in whole or in part, this Lease will continue in full force and effect and Landlord will, subject to the remaining provisions of this Article 14, commence and diligently complete the reconstruction, rebuilding, repairing, replacement and restoration (collectively, "Restoration") of the Premises to the extent only of Landlord's Work set out in Exhibit C hereto and exclusive of Tenant's Work described therein. In such event, Rent payable by Tenant under this Lease abates. If damage or destruction occurs to the Premises that does not render the Premises untenantable in whole or in part, this Lease continues in full force and effect, the Rent payable by Tenant does not abate, and Landlord will, subject to the remaining provisions of this Article 14, commence and diligently complete the Restoration of the Premises as described above. Tenant is in no event entitled to any compensation or damages from Landlord for the loss of the use of the whole or any part of the Premises, Tenant's personal property or the Premises, or for any inconvenience suffered by reason of damage or destruction thereto, or the reconstruction or replacement thereof. Tenant waives any statutory or other right of Tenant to terminate this Lease as a result of damage or destruction to the Premises or the Parcel, including, without limitation, ARS §33-343.

(b) Upon notification to Tenant that Landlord's Work has been substantially completed, Tenant must promptly complete all Tenant's Work including, without limitation, such work as is set out in Exhibit C, and all work required to fully restore the Premises for business fully fixtured, stocked and staffed in accordance with the requirements of this Lease (without the benefit of any allowance or payments, if any, made at the time of original construction by Landlord to Tenant in connection with the work described in Exhibit C). Tenant must complete its work diligently and open for business at the Premises within the Time to Complete Tenant's Work originally specified in Paragraph 1.13, and upon the earlier to occur of Tenant's reopening for business or the expiration of said period, any rental abatement otherwise described herein will terminate.

14.2 Damage or Destruction in Parcel - Termination. Notwithstanding anything contained in this Article 14 to the contrary, if (a) the Premises or Building are damaged or destroyed by fire or other casualty to any material extent in the last three (3) years of the Lease Term; or (b) the cost to Landlord of the Restoration of the Premises, by Landlord's reasonable estimate, exceeds the proceeds of insurance available to Landlord for such purpose by more than twenty-five percent (25%), Landlord or Tenant may, at its option, by notice in writing to the other, terminate this Lease. In the event of such termination, the Term expires on the thirtieth (30th) day after such notice is given, at which time Tenant must vacate and surrender the Premises to Landlord, and all Rent is due and payable without reduction or abatement through the date of termination, unless the Premises have been damaged or destroyed, in which event the provisions of Paragraph 14.1 as to abatement of Rent are applicable, and Tenant shall assign to Landlord all insurance claims and proceeds pursuant to Tenant's property insurance carried pursuant to Paragraph 15.1(a) below.

14.3 Damage or Destruction in Premises - Non-Termination. If neither Landlord nor Tenant exercises its option to terminate this Lease upon the occurrence of any event described in Paragraph 14.2, this Lease continues in full force and effect, there is no abatement of Rent except as otherwise expressly provided in Paragraph 14.1, and Landlord and Tenant agree to commence and diligently complete the Restoration of the Shopping Center and the Premises, respectively, as above provided.

14.4 Obligation of Landlord to Rebuild Conditional. The obligation of Landlord to repair and rebuild pursuant to this Article 14 is conditioned upon Landlord's full recovery of insurance proceeds from its insurers (subject to any deductible agreed to by Landlord), and upon Landlord's obtaining all necessary permits and other regulatory

approvals required for the Restoration; provided, however, that if drawing architectural plans for such repairs, reconstruction, and restoration of the Premises pursuant to this Article 14 has not commenced within six (6) months, or if such repairs, reconstruction, and restoration of the Premises pursuant to this Article 14 have not been diligently prosecuted to completion by Landlord within eighteen (18) months after the damage or destruction occurs, Tenant may, at its option, by notice in writing to Landlord, terminate this Lease.

ARTICLE 15
INSURANCE

15.1 Tenant's Insurance. Tenant agrees, from the date Tenant first occupies the Premises for any purpose and thereafter throughout the Term, at its sole expense, to procure and maintain in full force and effect the following:

(a) Property insurance, including boiler and machinery coverage, on all property owned by Tenant, or for which Tenant is responsible or legally liable whether pursuant to the terms of this Lease or otherwise, or which is installed by or on behalf of Tenant in the Premises, including, without limitation, stock-in-trade, furniture, fixtures, heating, ventilating and air conditioning equipment serving the Premises, storefront, glass, plate glass, boiler/machinery and anything in the nature of leasehold alterations, additions or improvements. The perils insured against must include all risks of direct physical loss or damage. Tenant's property insurance must (1) be written on the broadest available "causes of loss" - "special form" policy form for no less than one hundred percent (100%) of the full replacement cost (new without deduction for depreciation or physical deterioration) of the covered items and property, (2) be written in amounts of coverage that meet any coinsurance requirements of the policy or policies, (3) include sprinkler leakage coverage, and (4) not contain an exclusion for acts of terrorism. The relevant policies may not have a deductible or self-insured retention in excess of Twenty-Five Thousand Dollars ($25,000.00). Landlord, Mortgagee and such other party or parties as Landlord requires must be identified as "insureds as their interests may appear" under Tenant's property insurance;

(b) Commercial general liability insurance written on an "occurrence" policy form and covering liability for death or bodily injury, personal injury (including, without limitation, advertising injury), and property damage in any one accident, mishap or casualty arising out of or relating, directly or indirectly, to Tenant's business operations, conduct, assumed liabilities or use or occupancy of the Premises, utilizing ISO policy form CG 001 or its equivalent. Such coverage must include the activities and operations conducted by Tenant and any other person on the Premises, and by Tenant and any other person performing work on behalf of Tenant, or any person for whom Tenant is in law responsible, in any other part of the Parcel. The relevant policies must be written on a comprehensive basis with combined single limit coverage of not less than One Million Dollars ($1,000,000.00) for each occurrence or accident, Two Million Dollars ($2,000,000.00) aggregate, or such higher limits as Landlord, acting reasonably, requires from time to time, must contain a severability of interests clause and a cross-liability clause protecting Landlord and Mortgagee against claims by Tenant and others as if Landlord and Mortgagee were separately insured. The relevant policies may not have a deductible or self-insured retention in excess of Twenty-Five Thousand Dollars ($25,000.00). The relevant policies must provide that the insurance carrier(s) have the duty to defend any legal proceeding filed against Landlord seeking damages on account of bodily or personal injury, advertising injury or property damage liability even if any of the allegations of such legal proceedings are groundless, false or fraudulent and that all costs of defense will be paid in addition to and not as part of the policy limits. All liability policies must contain a provision that Landlord and Mortgagee, although named as an additional insured, shall nevertheless be entitled to recovery under the policy for any loss occasioned to such parties by reason of the negligence of Landlord, Tenant or any other additional insureds. Tenant's liability insurance coverage under this subparagraph 15.1(b) must also include the broadest available form of contractual liability coverage, which must provide coverage to the maximum extent possible of Tenant's indemnification obligations under this Lease. If Tenant's operations include the sale of alcoholic beverages, Tenant's liability insurance coverage under this subparagraph 15.1(b) must also include coverage for employer's liability, host liquor liability, legal liquor liability and so-called "dram shop" liability coverage with a combined single limit of not less than Five Million Dollars ($5,000,000) per occurrence. At least One Million Dollars ($1,000,000) of such insurance must be primary coverage and the remaining Four Million Dollars ($4,000,000) of such coverage may be pursuant to an umbrella excess liability policy);

(c) Motor vehicle liability insurance providing third party liability insurance with combined limits of not less than One Million Dollars ($1,000,000.00) per occurrence for bodily injury or property damage, and accident benefits insurance, covering all owned, non-owned and hired vehicles;

(d) Business Income/Business Interruption insurance and extra expense coverage (collectively, "Business Income Insurance") with coverage amounts that will reimburse Tenant for all direct and indirect loss of income, and charges and costs incurred, arising out of all named perils insured against by Tenant's property insurance coverage, including prevention of, or denial of use or access to, all or parts of the Premises as a result of those named perils. Tenant's Business Income Insurance must provide coverage for no less than twelve (12) months of the loss of income, charges, and costs contemplated under this Lease; and

(e) Workers' compensation insurance with an insurance carrier and in amounts required by applicable governmental authority and a policy of employer's liability insurance with limits of liability not less than One Million Dollars ($1,000,000.00), each accident; One Million Dollars ($1,000,000.00), disease policy limit; and One Million Dollars ($1,000,000.00) disease each employee. Both such policies shall contain waivers of subrogation in favor of Landlord. If Tenant maintains a policy of umbrella or excess liability insurance, such policy must also provide umbrella or excess liability coverage for Tenant's policy of employer's liability insurance.

15.2 General Provisions for Tenant's Insurance.

(a) The obligations of Tenant set forth in this Article 15 are independent of Tenant's waiver, indemnification or other obligations under this Lease and will not be construed or interpreted in any way to restrict, limit or modify Tenant's waiver, indemnification or other obligations or to in any way limit Tenant's liability under this Lease.

(b) All insurance policies of Tenant must (1) be issued by insurance companies acceptable to Landlord authorized to do business in the State in which the Parcel is located, and rated with a Financial Strength Rating of not less than A- (Excellent) and a Financial Size Category of not less than VI by A. M. Best Company, or equivalent; (2) name Landlord, Mortgagee, Landlord's property manager and such other party or parties as Landlord requires as additional insureds on ISO Form CG 20 26 11/85 or equivalent; (3) be in a form satisfactory to Landlord; (4) as to the Premises, be noncontributing with, and apply only as primary and not as excess to, any other insurance available to Landlord or Mortgagee; and (5) not be invalidated with respect to the interests of Landlord or of any Mortgagee by reason of any breach or violation of any warranties, representations, declarations or conditions contained in the policies.

(c) All insurance policies of Tenant must contain an undertaking by the insurers to notify Landlord and any Mortgagee, in writing, not less than thirty (30) days prior to any material change, cancellation or termination thereof.

(d) Tenant agrees to deliver to Landlord, prior to occupying the Premises for any purpose and thereafter from time to time, such evidence that Tenant's insurance is in place and fully paid for in advance, as Landlord reasonably requires.

(e) Tenant agrees to promptly pay all premiums due on insurance to be carried by it under this Lease and not to carry any stock of goods or have or do anything on the Premises that would impair or invalidate the obligation of any insurer, whether of Landlord or of Tenant. Tenant agrees to prosecute promptly and diligently the recovery of all insurance claims.

(f) The types of insurance and the limits of insurance to be maintained by Tenant under this Lease do not limit the liability of Tenant, and the failure of Landlord to require additional insurance coverage does not relieve Tenant from any obligations under this Lease.

15.3 Increase in Landlord's Insurance Premiums. Tenant agrees not to keep upon the Premises any article or conduct upon the Premises any activity that may be prohibited by insurance policies in force from time to time covering the Premises. If Tenant's occupancy of, or conduct of activities from or on, the Premises, whether or not Landlord has consented to the same, or any act or omission of Tenant in the Premises, causes any increase in premiums for insurance carried by Landlord, Tenant agrees to pay such increase as Additional Rent within ten (10) days following Landlord's demand. In determining whether increased premiums are a result of Tenant's occupancy, conduct, acts or omissions, Landlord's good faith determination is conclusive.

15.4 Cancellation or Reduction of Insurance. If any insurance policy or coverage on the Premises is cancelled, reduced or not renewed, or threatened to be cancelled, reduced or not renewed, by reason of the use and occupation of the Premises or any part thereof, and if Tenant fails to remedy the conditions giving rise to such cancellation, reduction, nonrenewal, or threat thereof, within five (5) days after notice thereof by Landlord, Landlord may, at its option, either:

(a) declare Tenant in default under this Lease whereupon the provisions of Paragraph 21.2 are immediately applicable, without further demand or notice; or

(b) enter upon the Premises and remedy the condition giving rise to such cancellation, reduction, nonrenewal or threat thereof, in which event Tenant agrees to pay to Landlord on demand as Additional Rent the costs thereof plus fifteen percent (15%) for Landlord's overhead.

Except to the extent of Landlord's negligence or willful misconduct, Landlord is not liable for any damage or injury caused to any property of Tenant or of others located on the Premises as a result of the exercise of any of the foregoing remedies.

15.5 Landlord's Insurance. Landlord agrees to procure and maintain in force throughout the Term:

(a) Property insurance on the Premises (including the Building, and the improvements (but excluding foundations, excavations) in an amount not less than 100% of the full replacement cost thereof, including coverage for loss of rents. The perils insured against may include such additional perils as may from time to time be required by Landlord or any Mortgagee;

(b) Commercial general liability (bodily injury and/or property damage – combined single limit) insurance with respect to the Premises and those for whom Landlord is in law responsible. Such policy may be written on a comprehensive basis with such limits or deductions for each occurrence or accident as may from time to time be required by Landlord or any Mortgagee; and

(c) Such other insurance, in such amounts and insuring such risks or perils, as may from time to time be reasonably required by Landlord or any Mortgagee.

All or portions of Landlord's insurance may be carried pursuant to a master policy of insurance or so-called blanket policy of insurance covering other locations of Landlord or its corporate affiliates, or any combination thereof.

Tenant agrees to pay to Landlord as Additional Rent throughout the Term, the cost of Landlord's insurance premiums ("Insurance Costs"). Insurance Costs may be estimated by Landlord from time to time, and Tenant agrees to pay to Landlord the amount so estimated in monthly installments in advance on the first day of each calendar month together with and in addition to other rental payments provided for in this Lease. Within ninety (90) days after the end of each calendar year (or partial calendar year at the beginning or end of the Term), or as soon thereafter as practicable, Landlord will deliver to Tenant a statement of the total actual Insurance Costs for such period. If Landlord's statement indicates that Tenant has overpaid Insurance Costs, the excess will be credited to any other amounts due or to become due from Tenant under this Lease, or refunded by Landlord to Tenant without interest, at Landlord's election. If Landlord's statement indicates that Tenant has underpaid Insurance Costs, Tenant agrees to pay to Landlord the deficiency within thirty (30) days following delivery of such statement. Landlord's and Tenant's obligations under this Article 15 survive the expiration or sooner termination of this Lease.

15.6 No Insurable Interest in Landlord's Insurance. Notwithstanding any contribution by Tenant to Landlord's insurance premiums as provided in this Lease, no insurable interest is conferred upon Tenant under policies carried by Landlord and Landlord is in no way accountable to Tenant regarding the use of any insurance proceeds arising from any claim.

15.7 Mutual Waiver of Subrogation. Tenant releases Landlord and Landlord's officers, directors, members, partners, agents, employees, lenders, and independent contractors and all persons and entities claiming through any of these persons or entities (collectively "Landlord Group"), and Landlord releases Tenant and Tenant's officers, directors, members, partners, agents, employees, lenders, and independent contractors and all persons and entities claiming through any of these persons or entities (collectively "Tenant Group"), from liability for loss or damage to property arising out of or incident to any peril required to be insured against in this Lease. If such loss or damage to a party's property occurs, such party agrees to look solely to its insurance for recovery. This release is not limited by the amount of insurance carried or required to be carried under this Lease or by any deductibles applicable thereto, or invalidated by a party's failure to carry insurance. This release is applicable even if the loss or damage is caused by the fault or negligence of any member of Landlord Group or Tenant Group, as the case may be. Each party agrees to obtain from its insurance carriers a waiver of subrogation clause or endorsement consistent with the foregoing.

15.8 Waivers. To the fullest extent permitted by law but except to the extent caused by the gross negligence or willful misconduct of Landlord or any Landlord Group, Tenant, on behalf of Tenant Group, assumes all risk with respect to, and waives all claims against Landlord Group arising from, and Landlord Group is released from liability for (a) bodily injury, personal injury, and property damage (as such terms are defined in the then most current form of commercial general insurance issued by Insurance Services Office, Inc.) occurring in, upon, at or relating to the Premises; (b) loss of or damage to property of Tenant Group by theft or otherwise; (c) bodily injury to an employee of any member of Tenant Group arising out of and in the course of employment of the employee and occurring anywhere in, on or about the Premises; (d) interruption or stoppage of any utility service or damage to persons or property arising therefrom except as otherwise provided herein; (e) any latent defect in construction of the Premises; or (f) damages, injuries or interference with Tenant's business, loss of occupancy or quiet enjoyment or any other loss resulting from Landlord's entry upon the Premises in accordance with this Lease. Tenant shall not be liable to Landlord or its assigns, agents, contractors or invitees for any loss or damage that may be occasioned by or through the acts or omissions of other tenants or owners of the Shopping Center or any other persons or entities whomsoever, excepting the acts or omissions of Tenant and its duly authorized employees, agents, licensees and invitees.

15.9 Indemnities. (a) To the fullest extent permitted by law and unless caused by the negligence or willful misconduct of Landlord, Tenant agrees, at Tenant's sole expense, to indemnify, defend and hold harmless Landlord Group for, from and against any and all claims, actions, damages, liabilities, losses (including loss of rents), attorneys' fees, costs and expenses whatsoever including, without limitation, those in respect of loss of life, bodily injury, personal injury, advertising injury or damage to property, arising from (i) any bodily injury, personal injury or property damage occurring in, upon, at or relating to the Premises; (ii) bodily injury to an employee of any member of Tenant Group arising out of and in the course of employment of the employee and occurring anywhere in, on or about the Parcel or the Shopping Center; (iii) subject to the waiver of subrogation provisions of this Lease, any act, error, omission or negligence of any member of Tenant Group in, on or about the Parcel or the Shopping Center; (iv) damages sustained by Landlord as a result of any holdover by Tenant, including, without limitation, claims of any successor lessee resulting from a delay by Landlord in delivering possession of the Premises to such lessee; (v) liens or encumbrances arising out of any work performed or materials furnished by or at the direction of Tenant; (vi) commissions or other compensation or charges claimed through Tenant by any real estate broker or salesperson (other than the Broker(s) specified in Paragraph 1.15); and (vii) any matter enumerated in Paragraph 15.8. The obligations of Tenant contained in this Paragraph 15.9 survive the expiration or earlier termination of this Lease.

(b) To the fullest extent permitted by law and unless caused by the negligence or willful misconduct of Tenant, Landlord agrees, at Landlord's sole expense, to indemnify, defend and hold harmless Tenant Group for, from and against any and all claims, actions, damages, liabilities, losses (including loss of rents), attorneys' fees, costs and expenses whatsoever including, without limitation, those in respect of loss of life, bodily injury, personal injury, advertising injury or damage to property, arising from (i) any bodily injury, personal injury or property damage occurring in, upon, at or relating to the Parcel (not including the Premises); (ii) bodily injury to an employee of any member of Landlord Group arising out of and in the course of employment of the employee and occurring anywhere in, on or about the Parcel (including the Premises) or the Development; (iii) subject to the waiver of subrogation provisions of this Lease, any act, error, omission or negligence of any member of Landlord Group in, on or about the Premises; and (iv) any matter enumerated in Paragraph 15.8. The obligations of Landlord contained in this Paragraph 15.9 survive the expiration or earlier termination of this Lease.

## ARTICLE 16
## ASSIGNMENT AND SUBLETTING

16.1 Restriction on Transfers. Except for a "Permitted Transfer" made in accordance with Section 16.6 below, Tenant may not, either voluntarily or by operation of law, assign, mortgage, encumber or hypothecate this Lease or any interest therein, or permit the use of the Premises by any person or persons other than Tenant (the agents and employees of Tenant excepted), or sublet the Premises or any part thereof, without in each instance obtaining Landlord's prior written consent, which consent may not be unreasonably withheld, conditioned or delayed. Landlord and Tenant agree (by way of example but without limitation) that it is not unreasonable for Landlord to withhold its consent by reason of any of the following: (a) the tangible net worth of the transferee is less than Tenant's tangible net worth at the time of transfer; (b) the quality of the merchandising operation of the transferee is not at least equal to that of Tenant; (c) the transfer may adversely affect the tenant mix in the Development, the business of other tenants in the Development, or Landlord's ability to obtain percentage rents (whether from Tenant or other tenants in the Development); or (d) the transferee lacks sufficient working capital or expertise to operate the business. If Tenant is a corporation, partnership, limited liability company or other entity, any transfer or assignment of this Lease by Tenant pursuant to any merger, consolidation or liquidation (unless the original-named Tenant continues to own at least fifty-one percent (51%) of the surviving entity), or any change in the effective ownership, voting or operating control of such entity from that existing as of the Effective Date, constitutes an assignment for purposes of this Lease. The consent by Landlord to any assignment or subletting does not release Tenant from the obligation to obtain the consent of Landlord to any further assignment or subletting. Any assignment or subletting to which Landlord consents must be evidenced by a written instrument in form satisfactory to Landlord executed by Tenant and the transferee, and an original thereof delivered to Landlord. Tenant's request for Landlord's consent under this Paragraph 16.1 must be accompanied by a non-refundable payment of $500 to defray Landlord's costs incurred in connection with the review and consideration of such request, including legal and accounting fees.

16.2 Tenant's Liability Not Released. Notwithstanding any permitted assignment or subletting, the original-named Tenant, any and all Guarantors, and any and all assignees of Tenant's interest under this Lease remain fully liable for all obligations of the "Tenant" under this Lease, jointly and severally. Notwithstanding anything to the contrary contained in this Lease, Tenant will be released from its covenants and obligations under this Lease accruing after the effective date (the "Release Date") of an assignment or subletting approved by Landlord pursuant to Paragraph 16.1 above, or a Permitted Transfer described in Paragraph 16.6 below (except for any claims, losses, liabilities or any other sums which relate to acts or omissions of Tenant accruing prior to such Release Date, for which Tenant will remain fully responsible), provided that (i) Tenant is not in default beyond any applicable notice and cure periods under this Lease on the Release Date, (ii) such transferee assumes all of Tenant's obligations under this Lease in writing, and (iii) such transferee (or a guarantor thereof) has, at the time of such transfer, a tangible net worth equal to or greater than $5,000,000.

16.3 Excess Rentals. If Tenant or any assignee or sublessee assigns this Lease or sublets the Premises or any portion thereof for a rental or other consideration greater than that paid by Tenant to Landlord, such excess must be paid to Landlord as and when received by Tenant or such assignee or sublessee. Notwithstanding the foregoing to the contrary, any consideration received by Tenant in connection with the sale of all or substantially all of the assets of Tenant shall not be subject to the terms of this Section 16.3.

16.4 Void Transfers. Any sale, assignment, mortgage or transfer of this Lease or subletting of the Premises by Tenant that does not comply with the provisions of this Article constitutes a default under this Lease and is, at Landlord's option, voidable.

16.5 Recapture. If Tenant proposes to assign Tenant's interest in this Lease, other than in connection with a Permitted Transfer, Landlord may, at Landlord's option, upon notice to Tenant within thirty (30) days after Landlord's receipt of Tenant's request for consent, elect to recapture the Premises, and within sixty (60) days after notice of such election has been given to Tenant, this Lease will terminate. If Tenant proposes to sublet all or any part of the Premises, other than in connection with a Permitted Transfer, Landlord may, at Landlord's option, upon notice to Tenant within thirty (30) days after Landlord's receipt of Tenant's request for consent, elect to recapture such portion of the Premises as Tenant proposes to sublet, and within sixty (60) days after notice of such election has been given to Tenant, this Lease will terminate as to the portion of the Premises recaptured. If only a portion of the Premises is recaptured, the Minimum Monthly Rent payable under this Lease will be proportionately reduced. If all or a portion of the Premises is recaptured by Landlord pursuant to this Paragraph 16.5, Tenant will promptly execute a termination agreement for the purpose of setting forth the termination date with respect to the Premises or the recaptured portion thereof, and prorating the Minimum Monthly Rent and other charges to such date. If Landlord does not elect to recapture as set forth above, Tenant may thereafter enter into a valid assignment or sublease with respect to the Premises, provided that Landlord consents pursuant to this Article 16, and provided, further, that (i) such assignment or sublease is executed within ninety (90) days after Landlord has given Landlord's consent, (ii) Tenant pays all amounts owed to Landlord under this Lease, and (iii) there is not in existence an event of default continuing uncured after notice and expiration of applicable grace period as of the effective date of the assignment or sublease.

16.6 Permitted Transfer. Notwithstanding anything to the contrary contained in this Article 16, Tenant shall have the right to assign this Lease or sublease the Premises, without the consent of Landlord, to: (a) any entity resulting from a merger or consolidation with Tenant or any organization purchasing substantially all of Tenant's assets; (b) any entity succeeding to substantially all of the business and assets of Tenant within the metropolitan Phoenix, Arizona, area, provided at least five of Tenant's stores are sold; (c) any subsidiary or parent of Tenant; or (d) any entity controlling, controlled by or under common control with Tenant or Tenant's parent entity (each, a "Permitted Transfer"). For purposes of this Lease, (i) "control" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract or otherwise; and (ii) the transferee of a Permitted Transfer may be referred to as a "Permitted Transferee". Although no consent of Landlord shall be required for a Permitted Transfer, Tenant shall provide Landlord at least thirty (30) days' prior written notice of any such Permitted Transfer, and such Permitted Transfer shall be effective only if all of the following conditions are first satisfied: (A) Tenant shall not then be in

default under this Lease (which shall mean that any required notice has been given and any applicable cure period has expired); (B) a fully executed copy of such assignment or sublease, the assumption of this Lease by the assignee or acceptance of the sublease by the sublessee, and such other information regarding the assignment or sublease as Landlord may reasonably request shall be delivered to Landlord; and (C) the Premises shall continue to be operated solely for the Permitted Use of the Premises.

ARTICLE 17
SALE BY LANDLORD

Upon the sale, transfer, assignment or disposal of all of Landlord's interest in the Premises, the Parcel or this Lease, Landlord is relieved of all liability thereafter accruing under this Lease, and Landlord's successor in interest is deemed, without any further agreement between the parties, to have assumed and agreed to carry out the covenants and obligations of Landlord under this Lease. Any security deposit or prepaid rent paid by Tenant may be transferred by Landlord to Landlord's successor in interest, whereupon Landlord is discharged from any further liability with respect thereto. This Lease is not affected by any sale, transfer, assignment or disposal of Landlord's interest, and Tenant agrees to attorn to Landlord's purchaser or assignee. This Lease may be assigned by Landlord to any Mortgagee as security.

ARTICLE 18
SUBORDINATION AND ATTORNMENT

18.1 Subordination. Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, this Lease shall be subject and subordinate at all times to any ground or underlying leases and to the lien of any mortgages or deeds of trust in effect as of the Lease Date affecting the Premises, Landlord's interest or estate in the Premises, or any ground or underlying lease; provided, however, that if the lessor, mortgagee, trustee, or holder of any such ground or underlying lease, mortgage or deed of trust (each, a "Lender") elects to have Tenant's interest in this Lease be superior to any such instrument, then, by notice to Tenant, this Lease shall be deemed superior, whether this Lease was executed before or after said instrument. Notwithstanding the foregoing, Landlord will deliver to Tenant from the Lender of any existing mortgage, deed of trust or other lien or encumbrance or ground lease (collectively, "Mortgage") of any portion of the Premises that is senior in priority to this Lease, a subordination non-disturbance and attornment agreement ("SNDA") in a commercially reasonable form reasonably acceptable to Lender, Landlord and Tenant. Landlord represents and warrants to Tenant that, as of the Effective Date, there are no Lenders. As a condition precedent to the subordination of this Lease to the lien of any future Mortgage, Landlord shall cause any such future Lender to deliver to Tenant an SNDA in a commercially reasonable form reasonably acceptable to Lender, Landlord and Tenant. Notwithstanding the foregoing, Tenant's right to quiet possession of the Premises shall not be disturbed on account of such subordination so long as Tenant is not in default beyond any applicable notice and cure periods under this Lease, unless this Lease is otherwise terminated pursuant to its terms. In no event will any of Tenant's trade fixtures, inventory, books or records, accounts or other priority or assets be or become subject or subordinate to any Mortgage or other security interest or lien of any kind in favor of Landlord or granted by Landlord to any Lender or other person.

18.2 Intentionally Deleted.

18.3 Superior Documents. Tenant acknowledges that the Premises and Tenant's rights of occupancy under this Lease are subject and subordinate to certain recorded documentation in existence as of the Effective Date (herein collectively referred to as the "Superior Documents"), including, without limitation, a Declaration of Establishment of Protective Covenants, Conditions and Restrictions and Grants of Easements, an Easement Agreement (the "Easement Agreement"), and a Common Operation and Reciprocal Easement Agreement (the "COREA"). The Easement Agreement and the COREA will be executed and recorded after the Effective Date in materially the form delivered to Tenant on February 20, 2019, and upon such execution and recordation will be "Superior Documents." Landlord will provide Tenant copies of the executed and recorded Easement Agreement and COREA, and Tenant will within ten (10) days thereafter confirm in writing whether the recorded versions materially conform to the versions delivered on February 20, 2019. If Tenant fails to timely confirm or reject, Tenant will be deemed to have confirmed the recorded documents. The Superior Documents include amendments and supplements to the original documents which amendments or supplements may be entered into before or after this Lease; provided that in no event shall any amendment or supplement to the Superior Documents (i) materially increase Tenant's obligations under this Lease, or (ii) negate or adversely affect, in any material respect, the rights expressly granted to Tenant in this Lease, or (iii) unreasonably impair access to the Premises from and across the Protected Driveways, or (iv) materially and for more than 48 hours reduce the number of parking spaces located within the Premises. Tenant acknowledges that supplements to the Superior Documents may grant exclusive uses in favor of other parcels in the Development; provided, however, no such exclusives will prohibit Tenant's then-current use. Tenant, on behalf of itself and its officers, directors, principals, employees, suppliers, agents, contractors, licensees and invitees, agrees not to breach or violate the Superior Documents or any additional documentation promulgated under the authority of the Superior Documents. Any such breach or violation constitutes a default under this Lease.

ARTICLE 19
ESTOPPEL CERTIFICATES

19.1 Tenant's Certification. Tenant agrees to execute, acknowledge and deliver to Landlord within twenty (20) days following Landlord's request a statement in writing in substantially the form of Exhibit E attached hereto (or in such other form as is required by a prospective purchaser or Mortgagee) certifying (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and stating such modifications); (b) the dates to which the Rent has been paid in advance, if applicable; (c) that Tenant has accepted possession of the Premises; (d) the Commencement Date and Expiration Date of the Term; (e) that Landlord is not in default under this Lease (or if Tenant claims such a default, the nature thereof); (f)

that Tenant claims no offsets against Rent; and (g) such other information as Landlord or any prospective purchaser or Mortgagee reasonably requires. Any such statement delivered pursuant to this Paragraph 19.1 may be relied upon by any prospective purchaser, Mortgagee or assignee of any Mortgagee of the Premises or the Parcel.

19.2 Tenant's Failure to Respond. Tenant's failure to deliver the statement required under Paragraph 19.1 within such 20-day period is conclusive upon Tenant (a) that this Lease is in full force and effect, without modification except as may be represented by Landlord; (b) that there are no uncured defaults in Landlord's performance; (c) that not more than one month's Minimum Monthly Rent has been paid in advance; and (d) that all other matters to be certified by Tenant pursuant to Landlord's written request are true and correct as stated in said request, as of the date thereof. If Tenant fails to execute and return such instrument within the time periods in this Section, Tenant hereby grants Landlord a limited power of attorney to execute and deliver such instrument on Tenant's behalf.

19.3 Financial Statements and Financing. Prior to execution of this Lease, and if at any time during the Term Landlord desires to sell, finance or refinance the Parcel or any part thereof (but in no event more than one (1) time during any twelve (12) month period during the Term), Tenant agrees within twenty (20) days following Landlord's request to deliver to Landlord or to any Mortgagee or prospective purchaser designated by Landlord, Tenant's most recent financial statements (including any Guarantor of Tenant's obligations under this Lease), to be used for the purpose of evaluating Tenant's financial condition. All such financial statements must be prepared in accordance with generally accepted accounting principles consistently applied, and must be certified to be true and correct by Tenant (and such Guarantors, if applicable). All such financial statements shall be received by Landlord in confidence, and shall be used only for the purposes herein set forth.

## ARTICLE 20
## EMINENT DOMAIN

20.1 Definition of Taking. The term "Taking" means an appropriation or taking under condemnation or the power of eminent domain by any public or quasi-public authority or a voluntary sale or conveyance in lieu or under threat thereof.

20.2 Total Taking of the Premises. If there is a Taking of the entire Premises, this Lease terminates as of the date possession is delivered to the condemning authority, and Landlord and Tenant are each released from any liability accruing pursuant to this Lease after said termination.

20.3 Partial Taking of the Premises. If there is a Taking of more than twenty-five percent (25%) of the Premises, or, regardless of the amount taken, if the remainder of the Premises is inadequate for Tenant's use, as reasonably determined by Tenant, Tenant may terminate this Lease as of the date Tenant is required to vacate a portion of the Premises, upon giving written notice of such election to Landlord not later than thirty (30) days prior to the date possession is delivered to the condemning authority.

20.4 Taking of Shopping Center/Development. If there is a Taking of more than ten percent (10%) of the floor area of all buildings in the Development, or if a Taking of a portion of the Development or the Shopping Center results (i) in noncompliance with the requirements of applicable governmental authority for parking, storm water retention, drainage, open space, or similar matters, regardless of whether any portion of the Premises is so taken; or (ii) in any of the Protected Driveways being materially restricted or impaired, Landlord or Tenant may terminate this Lease as of the date of such Taking by giving the other party written notice of such election not later than thirty (30) days prior to the date possession is delivered to the condemning authority.

20.5 Termination of Lease. Regardless of whether this Lease is terminated as provided above, Tenant is not entitled to any part of the award or compensation in such condemnation proceedings, or settlement in lieu thereof, as damages for diminution of the leasehold estate, the value of the unexpired lease term, or otherwise. Landlord is to receive the full amount of the award or compensation, and Tenant expressly waives any right or claim to any part thereof and assigns to Landlord the entire award for the Taking (including, without limitation, any so-called "lease bonus value"). However, the foregoing does not preclude Tenant from making claim against the condemning authority, but not against Landlord, for such compensation as may be separately recoverable by Tenant in Tenant's own right on account of the unamortized cost of fixtures or improvements installed in the Premises at Tenant's expense (to the extent that Tenant is entitled under this Lease to remove them at the expiration of the Term), damage to Tenant's business, or Tenant's moving expenses, so long as Landlord's award or compensation is not reduced.

20.6 Continuation of Lease. If there is a Taking that does not result in a termination of this Lease as provided above, Landlord and Tenant agree, as soon as reasonably possible after the Taking, to restore the Premises on the land remaining to a complete unit of like quality and character as existed prior to the Taking, the respective obligations of the parties being consistent with those described in Paragraph 14.1. From and after the date that the condemning authority takes title following such Taking, the Minimum Monthly Rent and other amounts payable under this Lease and calculated by reference to Rentable Area will be reduced on an equitable basis, if appropriate, taking into account the relative value of the portion remaining as compared to the original Premises, expressly subject, however, to future increases in Rent consistent with Paragraph 5.2. Landlord is not obligated to expend funds in connection with such restoration in excess of the portion of the condemnation proceeds received by Landlord as and for severance damages.

20.7 Dedications. Notwithstanding anything to the contrary contained herein, Landlord retains the right to grant to any governmental authority or utility company easements or dedications affecting the Parcel for roads, utilities or related purposes, and Tenant, if requested by Landlord, agrees to execute any and all instruments required in connection therewith.

20.8 Waiver. In the event of a Taking of all or any portion of the Premises or the Parcel, the rights and obligations of the parties are governed by this Article 20, and Tenant expressly waives the provisions of ARS §33-343, as such provisions may apply to the Premises and this Lease, as well as the provisions of any successor statue or similar law now existing or hereafter enacted.

ARTICLE 21
DEFAULT

21.1 Events of Default. The occurrence of any of the following constitutes a default of Tenant under this Lease:

(a) Landlord fails to actually receive when due an installment of Rent or other sum required by this Lease to be paid by Tenant to Landlord and such failure continues for five (5) days after notice from Landlord to Tenant;

(b) Tenant fails to perform any nonmonetary obligation of Tenant under this Lease (excluding obligations expressly described in other subparagraphs of this Paragraph 21.1) and such failure continues for thirty (30) days after notice from Landlord to Tenant (or a reasonable longer period if the failure is not reasonably capable of cure within 30 days and Tenant commences the cure within the 30-day period and thereafter diligently prosecutes the cure to completion);

(c) (1) a petition or proceedings under the Federal Bankruptcy Act or any amendment thereto or successor statute are filed or commenced by or against Tenant or any Guarantor, and if against Tenant or any Guarantor, said proceedings are not dismissed within sixty (60) days following commencement thereof; (2) Tenant or any Guarantor is adjudged insolvent, or makes a general assignment for the benefit of, or enters into an arrangement with, its creditors; (3) a writ of attachment or execution is levied on the leasehold estate hereby created and is not released or satisfied within sixty (60) days thereafter; or (4) a receiver is appointed in any proceeding or action to which Tenant is a party with authority to take possession or control of the Premises or the business conducted thereon by Tenant or the property of any Guarantor and such receiver is not discharged within thirty (30) days after his appointment. It is understood that this Lease is a lease of real property in a shopping center within the meaning of 11 USC 365(b)(3) of the Federal Bankruptcy Act;

(d) Tenant fails to comply with Tenant's obligations set forth in Exhibit C, or fails to commence within ten (10) days following the Delivery Date described in Paragraph 4.1 and thereafter diligently complete and fully pay for Tenant's Work described in Exhibit C, or fails to perform any other obligation required to be performed by Tenant prior to the commencement of the Term, and such failure continues for ten (10) days after notice from Landlord to Tenant;

(e) Tenant fails to procure the discharge of any lien described in Paragraph 12.5 within the time period required therein;

(f) Tenant fails to remedy any condition giving rise to cancellation, reduction, nonrenewal or threat thereof with respect to any insurance policy or coverage on the Parcel as required by Paragraph 15.4;

(g) Intentionally Deleted;

(h) Intentionally Deleted;

(i) Tenant or any person for whom Tenant is under law responsible violates any of the Superior Documents, and such violation continues for five (5) days after notice from Landlord to Tenant (unless such violation creates an immediate threat of default under the Superior Documents, in which event no notice need be given by Landlord to Tenant);

(j) Tenant abandons the Premises; or

(k) Any Guarantor revokes or otherwise terminates, or purports to revoke or otherwise terminate, any guaranty of all or any portion of Tenant's obligations under this Lease. Unless otherwise expressly provided, no guaranty of this Lease is revocable in whole or in part.

21.2 Remedies. Upon a default of Tenant as defined in Paragraph 21.1, Landlord may terminate this Lease and Tenant's right to possession of the Premises. If Tenant has abandoned and vacated the Premises, the mere entry onto the Premises by Landlord in order to perform acts of maintenance, cure defaults, preserve the Premises, or attempt to relet the Premises, or the appointment of a receiver in order to protect Landlord's interest under this Lease, shall not be deemed a termination of Tenant's right to possession or a termination of this Lease unless Landlord has notified Tenant in writing that this Lease is terminated. If Landlord terminates this Lease and Tenant's right to possession of the Premises pursuant to this Paragraph 21.2, then Landlord may recover from Tenant:

(a) the worth at the time of the award of unpaid Rent (which for the purposes of this Paragraph 21.2 shall be deemed to include Minimum Monthly Rent, Taxes and Additional Rent), which had been earned at the time of termination; plus;

(b) the worth at the time of the award of the amount by which the unpaid Rent that would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus;

(c) the worth at the time of the award of the amount by which the unpaid Rent or any other charge for the balance of the Lease Term after the time of the award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(d) any other amounts necessary to compensate Landlord for all of the detriment proximately caused by Tenant's failure to perform its obligations under this Lease, including, without limitation, recovery of Rent and additional or other forms of rent for any period of free rent theretofore enjoyed by Tenant (at rates in effect for the period immediately following such period of free rent); any legal expenses, brokers' commissions, or finders' fees in connection with reletting the Premises, and the pro rata portion of any leasing commission paid by Landlord in connection with this Lease that is applicable to the portion of the Lease Term, including any Renewal Period, that is unexpired as of the date on which this Lease terminated; the costs of repairs, cleanup, refurbishing, removal, and storage or disposal of Tenant's personal property, equipment, fixtures, and anything else that Tenant is required under this Lease to remove but does not remove (including those alterations that Tenant is required to remove pursuant to an election by Landlord, and that Landlord actually removes, whether or not notice to remove shall be delivered to Tenant); and any costs for alterations, additions, and renovations incurred by Landlord in regaining possession of and reletting (or attempting to relet) the Premises, but only to the extent necessary to restore Landlord's Work in the Premises as described in <u>Exhibit C</u>.

(e) All computations of the "worth at the time of the award" of amounts recoverable by Landlord under Paragraph 21.2(a) and (b) hereof shall be computed by allowing interest at the Default Rate, but not in excess of the maximum lawful rate per annum allowed for commercial transactions as of the date on which the event of default occurred. The "worth at the time of the award" recoverable by Landlord under Paragraph 21.2(c) and the discount rate for purposes of determining any amounts recoverable under Paragraph 21.2(d), if applicable, shall be computed by discounting the amount recoverable by Landlord at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one (1) percentage point. If Tenant tenders to Landlord an offer of settlement of all sums due under this Paragraph 21.2 after Landlord has notified Tenant of exercise of the remedies under this Paragraph 21.2, then the "worth at the time of the award" shall be determined at the time of the tender of payment of the entire amount of such sums by Tenant.

(f) Upon termination of this Lease, whether by lapse of time or otherwise, Tenant shall immediately vacate the Premises and deliver possession to Landlord. If the Premises are deemed abandoned, or if Landlord or any of its agents acts pursuant to a court order, then Landlord or any of its agents shall have the right, but not the obligation, without terminating this Lease, to re-enter the Premises and remove all Persons therefrom and any or all of Tenant's removable personal property, fixtures, alterations and other personal property (collectively, "Tenant's Personal Property") from the Premises, without being deemed in any manner liable for trespass, eviction, or forcible entry or detainer or conversion of Tenant's Personal Property, and without relinquishing any right given to Landlord under this Lease or by operation of law. If Landlord re-enters the Premises in such situation, all Tenant's Personal Property not claimed by the owner may be left on the vacated Premises, or handled, removed, or stored, in a commercial warehouse or otherwise by Landlord at Tenant's risk and expense, and Landlord shall in no event be responsible for the value, preservation, or safekeeping thereof. Before the retaking of any of Tenant's Personal Property from storage, Tenant shall pay to Landlord, upon demand, all expenses incurred in such removal and all storage charges against Tenant's Personal Property. Any of Tenant's Personal Property not retaken by Tenant within thirty (30) days after Landlord re-enters the Premises in such situation shall be deemed abandoned and may be either sold or otherwise disposed of by Landlord or retained by Landlord as Landlord's own property.

(g) Notwithstanding Landlord's right to terminate this Lease pursuant to this Paragraph 21.2, Landlord may, at its option, even though Tenant has breached this Lease and abandoned the Premises, continue this Lease in full force and effect and not terminate Tenant's right to possession, and enforce all of Landlord's rights and remedies under this Lease. In such event, Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due. Further, in such event, Landlord shall be entitled to recover from Tenant all costs of maintenance and preservation of the Premises, and all costs, including attorneys' fees and receivers' fees, incurred in connection with appointment of and performance by a receiver to protect the Premises and Landlord's interest under this Lease. No reentry or taking possession of the Premises by Landlord pursuant to this Paragraph 21.2 shall be construed as an election to terminate this Lease unless a written notice (signed by a duly authorized representative of Landlord) of intention to terminate this Lease is given to Tenant. Landlord may at any time after default by Tenant elect to terminate this Lease pursuant to this Paragraph 21.2, notwithstanding Landlord's prior continuance of this Lease in effect for any period of time, and upon and after Tenant's default under this Lease, Landlord shall exercise commercially reasonable efforts to relet the Premises or any part thereof for the account of Tenant to any person, firm, partnership, corporation, or other business entity for such rent, for such time, and upon such terms as Landlord, in its reasonable discretion, shall determine. Subject to the provisions of this Lease regarding transfer in Article 16, Landlord shall not be required to accept any substitute tenant offered by Tenant or to observe any instructions given by Tenant regarding such reletting. Landlord may remove (and repair any damage caused by such removal) and store (or dispose of) any of Tenant's Personal Property, equipment, fixtures, and anything else Tenant is required (under this Lease at the election of Landlord or otherwise) to remove but does not remove, and Landlord may also make repairs, renovations, alterations and/or additions to the Premises to the extent deemed by Landlord necessary or desirable in connection with any attempt to relet the Premises. Tenant shall upon demand pay the cost of such repairs, alterations, additions, removal, storage, and renovations, together with any legal expenses, brokers' commissions or finders' fees, and any other expenses incurred by Landlord in connection with its entry upon the Premises and attempt to relet the Premises. If Landlord is able to relet the Premises for Tenant's account during the remaining portion of the Lease Term and the consideration collected by Landlord from any reletting is not sufficient to pay monthly the full amount of Rent payable by Tenant under this Lease, together with any legal expenses, brokers' commissions, or finders' fees, any cost for repairs, alterations, additions, removal, storage, and renovations, and any other cost and expense incurred by Landlord in re-entering the Premises and reletting the Premises, then

Tenant shall pay to Landlord the amount of each monthly deficiency upon demand. Any rentals received by Landlord from any such reletting shall be applied as follows:

(i) First, to the payment of any indebtedness other than Rent due under this Lease from Tenant to Landlord;

(ii) Second, to the payment of any costs of reentry and reletting the Premises;

(iii) Third, to the payment of costs of any such alterations, repairs, additions, removal, storage, and renovations to the Premises, but only to the extent necessary to restore Landlord's Work in the Premises as described in Exhibit C;

(iv) Fourth, to the payment of Rent due and unpaid under this Lease; and

(v) The residue, if any, shall be held by Landlord and applied as payment of future Rent as the same may become due and payable under this Lease.

(h) No act or omission by Landlord or its agents during the Lease Term shall be an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid, unless made in writing and signed by a duly authorized representative of Landlord. Neither any remedy set forth in this Lease nor pursuit of any particular remedy shall preclude Landlord from any other remedy set forth in this Lease or otherwise available at law or in equity. Landlord shall be entitled to a restraining order or injunction to prevent Tenant from breaching or defaulting under any of its obligations under this Lease other than the payment of Rent or other sums due hereunder.

(i) Neither the termination of this Lease nor the exercise of any remedy under this Lease or otherwise available at law or in equity shall affect the right of Landlord to any right of indemnification set forth in this Lease or otherwise available at law or in equity by reason of Tenant's occupancy of the Premises, and all rights to indemnification or other obligations of Tenant shall survive termination of this Lease and termination of Tenant's right to possession under this Lease.

(j) Without prejudice to any other remedy for default, Landlord may perform any obligation or make any payment required to cure a default by Tenant. The cost of performance, including attorneys' fees and all disbursements, together with an administrative fee in an amount equal to fifteen percent (15%) of the costs incurred, shall immediately be paid by Tenant to Landlord upon demand as Additional Rent.

(k) In the event of a default or threatened default by Tenant of any covenants, agreements, terms or conditions in this Lease, Landlord is entitled to enjoin such default or threatened default and, in addition to the rights and remedies provided herein, will have any other right or remedy allowed at law or in equity, by statute or otherwise. The provisions of this Paragraph 21.2 will be construed consistent with applicable law, so that the remedies of Landlord described in this Lease are available to Landlord to the full extent, but only to the extent they are not invalid or unenforceable under applicable law.

21.3 Definition of Costs of Reletting. The term "costs of reletting" means any reasonable costs necessary to take possession of the Premises and lease the Premises to another tenant, including, without limitation (a) legal costs and expenses of recovery of the Premises including court costs and attorneys' fees; (b) brokerage costs for leasing; (c) costs and expenses of cleaning, alterations, repairs and improvements; (d) indebtedness other than Rent due from Tenant to Landlord under this Lease; (e) costs of protecting the Premises; and (f) costs of removal and storage of Tenant's property.

21.4 Acceptance of Surrender. No act or conduct of Landlord, whether consisting of reentry, taking possession or reletting the Premises, obtaining appointment of a receiver, accepting the keys to the Premises, or otherwise, prior to the expiration of the Term, constitutes an acceptance by Landlord of the surrender of the Premises or an election to terminate this Lease unless made in writing and signed by a duly authorized representative of Landlord. No notice from Landlord or notice given under a forcible entry and detainer statute or similar law constitutes an election by Landlord to terminate this Lease unless such notice specifically so states.

21.5 Landlord's Right of Self-Help. If Tenant fails to render performance in accordance with any term or condition of this Lease within ten (10) days after written notice (or such longer period as is expressly provided in this Lease), or immediately and without notice if required for the protection of the Premises, Landlord has the right, but not the obligation, to render such performance and to charge all costs and expenses incurred in connection therewith to Tenant, plus fifteen percent (15%) thereof for Landlord's overhead. All amounts so charged are Additional Rent due and payable to Landlord upon presentment of a statement to Tenant indicating the amount and nature of such costs and expenses. Landlord has no liability to Tenant for any loss or damage resulting from any such action taken in good faith by Landlord, and entry by Landlord under this Paragraph 21.5 or other provisions of this Lease does not constitute a constructive or actual eviction or a breach of any covenant for quiet enjoyment or any other covenant of Landlord contained in this Lease.

21.6 Landlord's Rights and Remedies Cumulative. No right or remedy available to Landlord is exclusive of any other, but all such rights and remedies are cumulative and in addition to every other right or remedy provided under this Lease or now or hereafter existing at law or in equity. All rights and remedies may be exercised singly, jointly, or in such combination as Landlord determines in its sole discretion. No delay or failure of Landlord in exercising any right or remedy arising from any default impairs such right or remedy, or constitutes a waiver of any such default or an acquiescence therein by Landlord. No failure of Landlord to timely submit any statement to Tenant

required by this Lease constitutes a waiver of Tenant's obligation to pay the amount that would have been shown by such statement.

21.7 No Waiver. By performing obligations of Tenant, Landlord does not waive the performance of such obligations by Tenant. No waiver by Landlord of the breach of this Lease by Tenant constitutes a waiver of any preceding or succeeding breach, and the acceptance of rent during any period in which Tenant is in default in any respect, other than the payment of rent, does not constitute a waiver of such default by Landlord. No provision of this Lease may be waived by Landlord unless the waiver is in writing, signed by Landlord.

21.8 Landlord's Lien. Landlord hereby waives any and all liens (statutory contractual or otherwise) against the equipment, furniture, trade fixtures and other personal property of Tenant located at the Premises.

21.9 Intentionally Deleted.

21.10 Acts or Omissions of Subtenants or Invitees. Tenant is responsible for assuring that persons occupying the Premises do not violate this Lease. Accordingly, a breach of any provision of this Lease by any invitee, sublessee or other person occupying any portion of the Premises, whether by act or omission, continuing uncured after notice and expiration of applicable grace period constitutes, at Landlord's option, an event of default by Tenant under this Lease.

## ARTICLE 22
## RIGHT TO CURE

If Tenant makes any claim of breach, default, or noncompliance against Landlord under this Lease, Tenant must, before exercising any right or remedy available to it, give Landlord written notice of the claimed breach, default, or noncompliance. If prior to giving such notice Tenant has been notified in writing (by way of Notice of Assignment of Rents and Leases, or otherwise) of the address of any Mortgagee that has furnished financing secured by a mortgage or deed of trust on the Premises or the Development, concurrently with giving notice to Landlord, Tenant must, by certified or registered mail, return receipt requested, also give a copy of such notice to said Mortgagee. For thirty (30) days following such notice (or such longer period of time as may be reasonably required to cure a matter which, due to its nature, cannot reasonably be remedied within thirty (30) days so long as Landlord commences to cure such matter within thirty (30) days and thereafter diligently pursues completion of such cure), Landlord has the right to cure the breach, default, or noncompliance claimed, except in cases of emergencies in which Landlord shall have two (2) business days to commence cure. If Landlord fails to cure such default within such period, Tenant has the right to (i) cure any such default or breach of warranty of Landlord hereunder, and perform any covenants that Landlord has failed to perform, and any sums expended by Tenant in curing such default or breach of warranty and performing such covenants will be offset against future payments of Rent (such deduction not to exceed a maximum of 50% of the Minimum Monthly Rent in any month) and will bear interest at the maximum rate allowed by law (such interest to be calculated from the date of demand); and/or (ii) bring a suit to recover from Landlord all sums due Tenant from Landlord together with interest at the rate of ten percent (10%) per annum (such interest to be calculated from the date of demand); provided, however, Tenant expressly waives any right to recover special, consequential or punitive damages as a result Landlord's default or any other act or omission of Landlord.

## ARTICLE 23
## ACCESS BY LANDLORD

23.1 Right of Entry. Landlord has the right to enter the Premises at all reasonable times and upon reasonable advance notice (except in the event of an emergency, as reasonably determined by Landlord, in which event entry by Landlord is permissible at any time without notice), to examine the Premises, to make such repairs, alterations, decorations, additions and improvements to the Premises or the Parcel (including tenant space or Common Areas adjacent to the Premises) as Landlord deems necessary or desirable, to perform any obligation of Tenant as provided in Paragraph 21.5, and for any other lawful purpose. If Tenant is not personally present to open the Premises for Landlord's permitted entry, Landlord may enter by means of a master key or forcibly. No permitted entry by Landlord constitutes a constructive eviction of Tenant in whole or in part, a nuisance, or a breach of Tenant's quiet enjoyment rights, and no such entry entitles Tenant to an abatement of Rent. Landlord agrees in good faith to interfere as little as reasonably practicable with Tenant's business in the Premises in making any such entry. Notwithstanding the terms and provisions of this Lease to the contrary, except for emergency situations, Landlord agrees to give Tenant not less than 24 hours' prior written notice of its intended inspection of the Premises; for any evaluation of Tenant's performance under this Lease; for work or repairs in the Premises; or for making repairs, alterations or additions to the Development, and further provided Landlord must repair any damage caused to the Premises or Tenant's personal property because of such undertakings. If Landlord's repairs force Tenant to close Tenant's business during normal store hours after a period greater than 48 hours, then Tenant's Minimum Monthly Rent will abate proportionately for the period of time beyond the initial 48 hours for which the Premises are closed due to Landlord's repairs.

23.2 Exhibition of Premises. Upon not less than twenty-four (24) hours' notice, Landlord is expressly granted permission to inspect the Premises and to show the Premises at any reasonable time to prospective Mortgagees, purchasers, and other persons with an actual or potential business interest in the Premises or the Parcel. At any time within one hundred eighty (180) days prior to expiration of the Term, Landlord may place upon the Premises any normal and customary "For Lease" signs, which Tenant agrees not to disturb or remove. If, during the last month of the Term, Tenant removes all or substantially all of Tenant's property from the Premises, Landlord may immediately enter and alter, renovate and redecorate the Premises, without elimination or abatement of Rent, or other compensation, and such acts have no effect on this Lease.

## ARTICLE 24
## SURRENDER OF PREMISES AND HOLDING OVER

24.1 Surrender. Upon the expiration or earlier termination of this Lease, Tenant agrees to quit and surrender the Premises, in "broom clean" condition and repair (reasonable wear and tear excepted) together with all alterations, additions and improvements that may have been made (subject to the provisions of Paragraph 24.4). For purposes hereof, "reasonable wear and tear" does not include damage or deterioration resulting from the failure of Tenant to observe good maintenance practice or to otherwise perform all of its obligations under this Lease.

24.2 Holding Over. If Tenant or any successor in interest of Tenant remains in possession of the Premises after expiration of the Term or earlier termination thereof without executing a new lease, then such holding over constitutes a tenancy from month to month if such holding over is consented to in writing by Landlord, or a tenancy at will if such holding over is not consented to by Landlord. In either case, such holdover tenancy is subject to all of the terms and provisions of this Lease, so far as applicable, except Minimum Monthly Rent, which is automatically increased to one hundred fifty percent (150%) times the Minimum Monthly Rent payable in the last full calendar month of the Term. Nothing contained in this Lease constitutes Landlord's permission for Tenant to hold over.

24.3 No Merger. The voluntary or other surrender of this Lease by Tenant or the cancellation of this Lease by mutual agreement of Tenant and Landlord does not cause a merger of estates, and at Landlord's option, terminates all or any subtenancies, or operates as an assignment to Landlord of all or any subtenancies, as designated in writing by Landlord. This option of Landlord may be exercised by notice to Tenant and all known subtenants in the Premises or any part thereof.

24.4 Removal of Installations and Restoration by Tenant.

(a) All trade fixtures, equipment and furnishings placed on the Premises by Tenant remain the property of Tenant, and, if not in default hereunder beyond any applicable notice and cure periods under this Lease, Tenant has the right upon the expiration of this Lease or sooner termination thereof, to promptly remove such trade fixtures, equipment and furnishings from the Premises at Tenant's sole expense. Notwithstanding the foregoing, Tenant may not remove floor or window coverings, air lines, vacuum lines, power panels, electrical distribution lines or equipment, lighting fixtures, security or fire protection systems and equipment, communication or computer networking conduit, HVAC ducting, systems or equipment, or plumbing or restroom fixtures or equipment, unless required by Landlord as provided in subparagraph (b) below.

(b) Every alteration, decoration, addition and improvement made by or on behalf of Tenant immediately becomes the property of Landlord upon attachment to or installation in the Premises, without compensation to Tenant, and must be surrendered by Tenant as part of the Premises, without disturbance or injury, upon expiration or earlier termination of this Lease, unless Landlord designates in writing that any such alteration, decoration, addition or improvement must be removed, in which event Tenant agrees, at its sole expense, to remove prior to termination or expiration of this Lease any such item designated for removal by Landlord. Notwithstanding the foregoing, Landlord has no obligation to designate for removal, and Tenant must at its cost remove prior to expiration or earlier termination of this Lease, Tenant's exterior Building signage, including Tenant's fascia sign, and repair, repaint and restore the affected area to its original condition. Except as otherwise expressly provided above, Landlord may only designate for removal under this Paragraph 24.4 (i) items installed by or on behalf of Tenant without Landlord's consent, and (ii) items requiring Landlord's consent that Landlord designated at the time such consent was given would be required to be removed upon expiration or earlier termination of this Lease.

(c) If any injury or damage to the Premises or the Parcel results from the removal by Tenant of any alteration, decoration, addition, improvement, trade fixtures, equipment or furnishings under the foregoing provisions of this Paragraph 24.4, Tenant agrees to promptly repair the same, at its sole expense, in a good and workmanlike manner or, at Landlord's election, to pay to Landlord as Additional Rent an amount sufficient for Landlord to repair such injury or damage or to compensate Landlord therefor, together with a sum equal to fifteen percent (15%) thereof for Landlord's overhead. At Landlord's option, any personal property or fixtures remaining upon the Premises after expiration of this Lease are deemed abandoned and become the property of Landlord.

(d) Nothing contained in this Paragraph 24.4 limits Tenant's obligations of restoration under Article 14 above in the absence of a termination of this Lease.

ARTICLE 25
INTENTIONALLY OMITTED

ARTICLE 26
COMPLETION OF THE PREMISES

26.1 Construction Obligations. The respective obligations of Landlord and Tenant regarding the completion of construction of any initial improvements to the Premises or any additions or modifications to existing improvements to be provided prior to Tenant's occupancy of the Premises, including, without limitation, the nature and extent of such improvements, the assumption of responsibility for construction thereof, the obligation and manner of payment for the architectural and construction costs relating thereto, and the procedures to be followed by Landlord and Tenant to accomplish the completion of such improvements, are set forth on Exhibit C attached to this Lease.

26.2 Intentionally Deleted.

26.3 Tenant's Acknowledgment. Tenant acknowledges that, except as expressly provided in this Lease, neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the Premises, or with respect to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose.

ARTICLE 27
QUIET ENJOYMENT

Upon and subject to Tenant's compliance with all of the terms and conditions of this Lease, Tenant may peaceably and quietly have, hold and enjoy the Premises for the Term without hindrance from Landlord or any person claiming by or through Landlord; subject, however, to any right of entry specifically granted herein, and to any matter to which this Lease is subordinate. This covenant does not extend to any disturbance, act or condition caused or committed by any other person in the Shopping Center and is subject to the provisions of this Lease.

ARTICLE 28
UNAVOIDABLE DELAY

If either party is delayed or prevented from the performance of any act required under this Lease by reason of acts of God, strikes, lockouts, labor disputes, civil disorder, inability to procure materials, restrictive governmental laws or regulations or other cause without fault and beyond the control of the party obligated (financial inability excepted), performance of such act is excused for the period of the delay; provided, however, nothing in this Article 28 excuses Tenant from the prompt payment of Rent. If other provisions of this Lease give Tenant the express right to terminate this Lease based on the Delivery Date not occurring by a specified date or based on work to be performed by Landlord not being completed by a specified date, then such specified date(s) will be extended by an amount of time equal to the period of delay referenced in the preceding sentence.

ARTICLE 29
BROKER'S COMMISSIONS

Tenant represents that Tenant has dealt with no broker or other person who might claim brokerage commissions or finder's fees in connection with the transaction that is the subject of this Lease, excepting only the Broker(s), if any, identified in Paragraph 1.15, whose commission is the responsibility of Landlord. Landlord shall pay Broker a commission pursuant to separate written agreement. Tenant acknowledges that Landlord or related parties are licensed real estate brokers or salespersons in the states of California, Arizona, Colorado and Utah. Landlord acknowledges that tenant or related parties are licensed real estate brokers or salespersons in the state of Arizona.

ARTICLE 30
SECURITY

Tenant shall institute and continue commercially reasonable security measures, devices, programs, restrictions and combinations thereof to protect the Premises, and any persons in the Premises.

ARTICLE 31
NONDISCRIMINATION

Tenant covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through Tenant, and this Lease is made and accepted upon and subject to the following conditions: No discrimination against or segregation of any person or group of persons by Tenant is permitted on account of race, color, creed, religion, sex, marital status, handicap, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises herein leased and neither Tenant nor any person claiming under or through Tenant, may establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sublessees, subtenants or vendees in the Premises herein leased.

ARTICLE 32
MISCELLANEOUS

32.1 Notices. All notices, demands and communications of any kind which either party to this Lease is required or desires to serve upon the other must be in writing and served to Landlord and to Tenant by personal service or by leaving a copy of such notice, demand or communication at the appropriate address indicated in Article 1, by mailing a copy thereof by certified or registered mail, postage prepaid, with return receipt requested, by deposit with a reputable nationwide overnight courier for next business day delivery, or by facsimile transmission with a confirmation copy sent by regular first class mail, postage prepaid. Any such notice is effective (a) in the case of personal delivery, upon receipt or refusal to accept delivery, (b) in the case of delivery by overnight courier, on the next business day following deposit with the overnight courier for next business day delivery, delivery charges prepaid, (c) in the case of certified or registered mailing, on the date of actual delivery as shown by the addressee's receipt or upon the expiration of three (3) days following the date of mailing, whichever first occurs, or (d) in the case of facsimile transmission, upon receipt at the fax number of the receiving party (a written confirmation of successful transmission from the transmitting facsimile machine being prima facie evidence of such receipt). Either party may change its address from time to time by giving written notice to the other in accordance herewith. Notice from Landlord's attorney or property manager constitutes notice from Landlord.

32.2 Partial Invalidity. Any provision of this Lease that is declared contrary to law, or which is otherwise invalid, may be stricken from this Lease without impairing the validity of the remainder of this Lease.

32.3 Time; Successors and Assigns. Time is of the essence of this Lease. Subject to Article 16, this Lease binds and inures to the benefit of the successors and assigns of the parties.

32.4 Entire Agreement. This Lease (including Exhibits referred to in Article 2, which are incorporated herein by this reference) contains the entire understanding and agreement of the parties with respect to all matters referred to herein, and all prior negotiations and understandings are superseded and merged into this Lease. No party is liable or bound to any other party in any manner or by any agreement, statement, warranty, representation or guarantee except as specifically set forth in this Lease. This Lease may be amended or modified only by a written instrument signed by the parties.

32.5 Landlord/Tenant Relationship. The relationship of the parties is solely that of landlord and tenant and in no event may the parties be considered as principal and agent, partners or joint venturers.

32.6 Obligations as Covenants. Every obligation set forth in this Lease is a covenant for all purposes, regardless of whether expressly so designated, and each obligation of Tenant contained herein is both a covenant and a condition to Landlord's performance hereunder.

32.7 Net Lease. It is intended that this Lease is a net lease to Landlord, and that, except as otherwise expressly provided in this Lease, Landlord is not responsible during the Term for any costs, charges, expenses or outlays arising from or relating to the Premises, the contents, use or occupancy thereof, or the business carried on therein.

32.8 Additional Documents. Tenant and Landlord agree to execute, acknowledge and deliver such further documents as may be reasonably necessary to carry out the purpose and intent of this Lease.

32.9 No Accord and Satisfaction. The acceptance or endorsement by Landlord of any payment or check from Tenant does not constitute an accord and satisfaction or prejudice Landlord's right to recover the balance of any amounts due under the terms of this Lease. Landlord's acceptance of Rent shall not constitute a waiver by Landlord of (a) any preceding breach by Tenant of any provision of this Lease, other than the failure of Tenant to pay the particular Rent so accepted; or (b) any of Landlord's rights, including but not limited to any rights Landlord may have to recover possession of the Premises or to sue for any remaining rent owed by Tenant.

32.10 Attorneys' Fees. If any legal proceeding is brought by either party against the other arising out of this Lease, the prevailing party is entitled to recover its reasonable attorneys' fees and costs incurred in such proceeding and such attorneys' fees may be included in any judgment rendered, as determined by the Court and not by the jury. In addition, if any person institutes an action against Tenant in which Landlord is involuntarily and without cause made a party defendant, Tenant agrees to indemnify, defend and hold harmless Landlord for, from and against all liability by reason thereof, including reasonable attorneys' fees and all costs (including, without limitation, expert witness fees and appellate attorneys' fees) incurred by Landlord in such action. The attorneys' fees and legal costs award shall not be computed according to any court fee schedule, but shall be sufficient to fully reimburse all attorneys' fees and costs reasonably incurred in good faith by the prevailing party. Tenant further agrees that if Landlord delivers a notice of default to Tenant in connection with a breach of any monetary obligation of Tenant under this Lease, the sum of Five Hundred and No/100 Dollars ($500.00) is a reasonable estimate of legal and administrative costs that will be incurred by Landlord in the preparation and service of such notice, and that Landlord may include such amount in the notice as Additional Rent due and payable to cure such default.

32.11 No Recordation. Tenant may not record this Lease or any memorandum thereof without Landlord's prior written consent, and any such recordation in the absence of such consent, at the option of Landlord, constitutes a noncurable default of Tenant under this Lease.

32.12 Authority. Tenant represents and warrants that the individual executing this Lease on behalf of Tenant is duly authorized to execute and deliver this Lease (as, for example, in the case of a corporation, in accordance with a duly adopted resolution of the Board of Directors of said corporation), and that this Lease is binding upon Tenant entity in accordance with its terms. Tenant agrees, within ten (10) days following demand by Landlord, to deliver to Landlord written evidence satisfactory to Landlord authorizing or ratifying Tenant's execution of this Lease. If two or more persons or entities execute this Lease as Tenant, such persons or entities are jointly and severally liable for the performance of the obligations of Tenant.

32.13 Waiver of Redemption. Tenant hereby expressly waives any and all rights provided under any and all statutes and other laws and rules of law from time to time in effect during the Lease Term providing that Tenant shall have any right to redeem, reinstate or restore this Lease following the termination of Lease by reason of Tenant's breach. The rights given to Landlord in this Paragraph 32.13 are in addition to any rights that may be given to Landlord by any statute or otherwise

32.14 Guarantors. As a condition of Landlord's execution of this Lease and performance of its obligations hereunder, each Guarantor named in Paragraph 1.14 must execute concurrently with this Lease the Guaranty of Lease in the form attached to this Lease immediately after the Exhibits.

32.15 Not Binding Until Signed. This Lease is not binding or effective as a lease or otherwise until execution by both Landlord and Tenant.

32.16 Limitation of Landlord's Liability. Anything in this Lease to the contrary notwithstanding, Tenant agrees to look solely to the estate and property of Landlord in the land and buildings constituting the Development and all rents, profits and proceeds therefrom, including proceeds from a sale thereof, and subject to the prior rights of any Mortgagee, for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord under this Lease or otherwise, and no other property or assets of Landlord are subject to levy, execution, or other procedures for the satisfaction of Tenant's remedies.

32.17 Environmental Rider. An Environmental Rider is attached hereto as Exhibit G.

32.18 Lease Construction. If this Lease contains any indication that text has been inserted or deleted (whether by bold type, italicization, strike-through, underscoring, highlighting or otherwise), such indications are solely for the convenience of the Landlord in identifying non-standard provisions and must be disregarded in the construction of this Lease. Without limiting the generality of the foregoing, no inference whatsoever may be drawn from such indications; stricken text must be construed as if it were never contained herein, and inserted text must be construed as if no indication of insertion were shown.

32.19 Governing Law. This Lease is governed by the law of the State in which the Parcel is located.

32.20 Specially Designated Nationals and Blocked Persons List. Tenant represents and warrants to Landlord that neither Tenant, Guarantor, nor any affiliate of Tenant or Guarantor (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("OFAC") pursuant to Executive Order number 13224, 66 Federal Register 49079 (September 25, 2001) (the "Order"); (ii) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of the OFAC or any other applicable requirements contained in any enabling legislation or other executive orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively in this Paragraph 32.20 called the "Orders"); (iii) is engaged in activities prohibited in the Orders; or (iv) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

32.21 Disclaimer. **LANDLORD AND TENANT ACKNOWLEDGE AND AGREE THAT EACH OF LANDLORD AND TENANT IS SOPHISTICATED AND EXPERIENCED IN COMMERCIAL REAL ESTATE TRANSACTIONS AND HAS BEEN REPRESENTED BY COMPETENT LEGAL COUNSEL IN CONNECTION WITH THE PREPARATION, NEGOTIATION AND EXECUTION OF THIS LEASE. AS REFERENCED IN PARAGRAPH 32.4 ABOVE, LANDLORD AND TENANT INTEND THAT THIS LEASE CONSTITUTE THE ENTIRE AGREEMENT OF THE PARTIES AND THAT THIS LEASE NOT BE DEEMED TO INCLUDE, BY IMPLICATION OR OTHERWISE, ANY TERM, COVENANT OR PROVISION NOT EXPRESSLY SET FORTH IN THIS LEASE. AS SUCH, LANDLORD AND TENANT EACH HEREBY WAIVE AND DISCLAIM ANY COVENANT OR OBLIGATION OF GOOD FAITH AND FAIR DEALING THAT MAY BE IMPLIED IN THIS LEASE AND EACH OF LANDLORD AND TENANT ACKNOWLEDGE AND AGREE THAT NEITHER HAS ANY OBLIGATION TO BARGAIN IN GOOD FAITH OR IN ANY WAY OTHER THAN AT ARM'S LENGTH. NEITHER LANDLORD NOR TENANT MAY REASONABLY RELY ON ANY PROMISE INCONSISTENT WITH THE PROVISIONS OF THIS ARTICLE. THIS ARTICLE SUPERSEDES ANY OTHER CONFLICTING LANGUAGE CONTAINED IN THIS LEASE WHICH MAY IMPLY THE EXISTENCE OF A COVENANT OF GOOD FAITH AND FAIR DEALING.**

**SIGNATURES APPEAR ON THE FOLLOWING PAGE**

IN WITNESS WHEREOF, the parties have executed this Lease as of the Effective Date set forth above in Article 1, which date Landlord is authorized to complete upon its execution of this Lease.

TENANT:

BLACK ROCK STORE OPERATIONS, LLC

By: [signature]

Name: Daniel Brand

Its: COO

LANDLORD:

EVERGREEN – 35TH AVENUE & GREENWAY, L.L.C., an Arizona limited liability company

By: Evergreen Development Company – 2018, L.L.C., an Arizona limited liability company
Its: Manager

By: Evergreen Devco, Inc., a California corporation
Its: Manager

By: [signature]
Name: Dana Dragon
Its: Principal

STATE OF Arizona )
) ss
County of Maricopa )

On 2/25/19 before me, Haley Banks, notary public, (here insert name and title of the officer) personally appeared Daniel Brand, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Arizona that the foregoing paragraph is true and correct.

[signature]
Notary Public

HALEY A BANKS
Notary Public - Arizona
Maricopa County
Commission # 549721
My Comm. Expires Aug 3, 2022

My Commission Expires:
8/3/2022

STATE OF ARIZONA )
)ss.
County of MARICOPA )

On this the 25th day of February, ~~2018~~ 2019, before me, the undersigned Notary Public in and for said County and State, personally appeared Dana Dragon, the Principal of Evergreen Devco, Inc., a California corporation, Manager of Evergreen Development Company-2018, L.L.C., an Arizona limited liability company, Manager of EVERGREEN – 35TH AVENUE & GREENWAY, L.L.C., an Arizona limited liability company, personally known to me to be the person whose name is subscribed to within the Lease and acknowledged to me that he or she executed the instrument in such person's authorized capacity, and that by his or her signature on the instrument the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

[signature]
Notary Public

My Commission Expires:
June 6, 2022

PEGGY DOANE
Notary Public, State of Arizona
Maricopa County
My Commission Expires
June 06, 2022



4833-5951-9088.4

EXHIBIT A

SITE PLAN OF THE PARCEL



EXHIBIT B

FLOOR PLAN OF BUILDING (SHOWING APPROXIMATE CONFIGURATION AND DIMENSIONS)



# EXHIBIT C

## CONSTRUCTION - LANDLORD'S WORK AND TENANT'S WORK

This Exhibit C sets forth the respective obligations of, and the procedures to be followed by, Landlord and Tenant in the initial construction of the Premises leased to Tenant under the Lease to which this Exhibit is attached, including, without limitation, the division of responsibility for the design and construction of improvements to the Premises and the payment of design and construction costs.

## I. LANDLORD'S OBLIGATIONS TO CONSTRUCT AND PAY FOR IMPROVEMENTS

Landlord will perform the following work in accordance with Black Rock Coffee Bar Ground-Up Prototype plans prepared by Vertical Design Studios and dated 9/20/2018 and BTS Responsibility Schedule dated 12/3/2018 (collectively, the "DD Package"). Landlord shall with due diligence obtain all approvals and permits for, and commence and complete the construction of the Building, the Patio Area, the Drive-Thru and the other exterior areas of the Premises and any necessary site work and offsite improvements necessary for the operation of the Building and Premises (collectively, "Landlord's Work"), in accordance with the Final Plans (defined below). The elevations for the Building ("Elevations") are attached hereto as Exhibit C-1. Based on the Elevations and the DD Package, Landlord's architect will prepare complete architectural plans, drawings and specifications and complete engineered mechanical, structural, electrical and plumbing working drawings for all of Landlord's Work (collectively, the "Final Plans"). The Final Plans will be submitted to Tenant for review and approval to confirm that they are consistent with the Elevations, the Lease and the DD Package. If Tenant reasonably disapproves any aspect of the Final Plans based on any inconsistency with the Lease, the Elevations and/or the DD Package, Tenant agrees to advise Landlord in writing of such disapproval and the reasons therefor within ten (10) days after receipt of the Final Plans. If Tenant does not respond within such 10-day period, Landlord may at any time thereafter give Tenant written notice specifying that Tenant's failure to disapprove the Final Plans will be deemed approval, and if Tenant does not expressly withhold approval within five (5) business days after receipt of such notice, the Final Plans will be deemed approved by Tenant.

Landlord's architect will submit the Final Plans to the appropriate governmental agencies for plan checking and the issuance of a building permit. Landlord's architect, with Tenant's cooperation, will make any changes to the Final Plans which are requested by the applicable governmental authorities to obtain the building permit.

If Tenant requires additions or changes to Landlord Final Plans, which are not contemplated in the DD Package or Elevations, or additions or changes to Landlord's construction obligations under this Section I, and if Landlord approves in writing such additions or changes, Tenant must pay Landlord any increased costs resulting from the additions or changes, including any and all architectural, engineering, inspection, construction and related costs.

Any reference to construction by Landlord to Code requirements ("Code") means Code requirements of applicable governmental authority for normal retail merchandising use, as existing at the Effective Date.

Landlord's approval of the Final Plans shall create no liability or responsibility on the part of Landlord for the completeness of such plans or their design sufficiency or compliance with applicable laws.

### LANDLORD'S WORK

Landlord will provide pursuant to approved Final Plans only the following improvements to the structure to be constructed by Landlord, and Landlord may select the manufacturer as to all materials and equipment that Landlord is obligated to supply. Landlord's Work does not include any improvements or facilities except the following:

1. SITE AND BUILDING IMPROVEMENTS:

   i. All soil testing, excavation and fill, compaction, rough and fine grading, certification and general preparation as required for the construction of the Premises;

   ii. All paving, sidewalks, lighting (including patio and any required exterior emergency egress lighting), curbs, gutters, storm drains, sewers, landscaping and irrigation within the Premises, including the surface of any exterior patio area and service yards intended for Tenant's sole use. Landlord shall install post and related signage, in an agreed upon location, for any short-term parking spaces dedicated for Tenant's use as shown on the Site Plan;

   iii. A completely finished, watertight, fully insulated building shell per code and level interior grade housing the Building. Such Building shall be constructed of concrete slab on grade, structural steel frame and/or concrete/masonry/EFIS walls, or other materials reasonably approved by Tenant;

   iv. Any work outside of the Premises required by the local jurisdiction for issuance of a final certificate of occupancy for the Premises, including without limitation any parking areas, common areas, traffic signals, other improvements; and

   v. Any other work contained in the DD Package designated to be performed by landlord and all paving within the Protected Driveways as shown on the Site Plan, per the Final Plans.

2. ELECTRICAL SYSTEMS: Electric service with separate metering, C.T. cabinet and a single fused disconnect without fuses for a 120/208 volt, 3-phase, 4-wire, 400-amp capacity stubbed via two 3-inch conduits to an agreed-upon location within the Building, provided from a single service. Landlord shall provide and install service feeders, including the ground and isolated ground wires, sized per Tenant's Working Drawings and pulled to Landlord-provided 24" x 24" x 8" splice box held tight to the bottom of the structure in an agreed-upon location within the Building. (Additional engineering required for conduit/feeder distances over 150 feet.).

3. MECHANICAL SYSTEMS:

i. Roof penetrations for the complete Heating, Ventilation and Air conditioning (HVAC) system (including curbs, vibration isolators, all distribution, exhaust and make-up air within the Premises) to be installed by Tenant. Landlord acknowledges that Tenant requires one (1) ton per two hundred (200) square feet of floor area. If a precipitator, scrubber or odor control device is required by the City, Landlord shall furnish and install the same, as well as any related equipment and required intake or exhaust vents.

ii. 2" water main, 1 1/2" domestic meter, pressure gauge and any required backflow preventer to be located outside the Building and stubbed to an agreed-upon location within the Building; to provide a constant minimum pressure of 65 psi at a flow rate of 65 gpm and a maximum pressure of 80 psi. If the maximum water pressure exceeds Tenant's requirements of 80 psi, Landlord shall provide and install a pressure reducing valve. If adequate water pressure is not available, Landlord shall furnish and install a booster pump (dedicated for sole use by Tenant) within the Premises to be connected to Tenant's electrical panel to achieve the minimum pressure and flow requirements within the Building. If a booster pump is required, Landlord will provide drawings and specifications for Tenant's engineer's review and approval prior to procurement or installation.

iii. If required by code, fire sprinkler service, backflow device, lateral lines and adequate capacity appropriate for Tenant's use. All of the foregoing shall be held tight to the bottom of the structure and Landlord's installation thereof shall be coordinated so as not to conflict with Tenant's Work. The main riser, backflow preventer and test station(s) shall be located outside of the Premises. (if allowed by the City)

iv. 4" sewer main (sanitary and grease waste (if required by the City)) stubbed and capped above grade to agreed-upon locations within the Premises. Sewer shall be at an invert depth suitable for Tenant's waste system to allow for proper fall and drainage as required by applicable codes and accepted practice, typically a minimum of 48" BFF. Landlord shall provide and install any sleeves required for plumbing lines under Building foundations or grade beams.

v. Any grease trap, pump or lift stations required for Tenant's use, in accordance per City requirements.

4. DRIVE-THRU SERVICES: Two (2) 1" conduits from back of the Building to drive thru menu board location. Along with cement footing for drive thru menu board to rest upon. Landlord shall install a self-closing drive-up window.

5. STOREFRONT: All exterior finishes upon the Building, including installation of clear (not mirrored or tinted) double-pane low-E windows (PPG SolarBan 60 (or equal having a U value of 0.27 to 0.29 and a shading coefficient of 0.44), or as required by local code), storefront doors and one (1) 42" hollow metal back door. Landlord shall provide Tenant's standard hardware pursuant to the DD Package including, but not limited to panic devices at each exterior door, as agreed upon by Landlord and Tenant. Double doors must have concealed vertical rods. All door hinges shall have non-removable hinge pins. All doors shall be located in accordance with Tenant's Working Drawings. The storefront shall be designed by Landlord and approved by Tenant prior to Lease execution. If the Premises are located in Florida, all doors must have Notice of Acceptance (NOA) ratings and all storefront systems shall adhere to applicable NOA codes. The storefront design shall include a knee wall to a minimum height of 30" (32" for masonry units) above

finish floor. Landlord shall provide tempered glass where required by code. Provide at least (1) glass panel sectional door 8'-0"W x 10'-0"H, model 903 as manufactured by Clopay. Door to have (5) full view sections of SolarBan 60, 1/2" insulated glazing. Door frame to match color or exterior storefront

6. <u>BUILDING WALLS</u>: Drywall with level 4 finish on inside of all Buildings walls.

7. <u>INSULATION</u>: Insulation value of R19 at the exterior walls, including furring at masonry walls, sized per Tenant's Working Drawings), and value greater of R30 at the roof, or the minimum required by code.

8. <u>FLOOR</u>: Concrete floor slab shall be standard gray, dry, clean, smooth, level and properly cured. The floor slab will remain exposed and polished to a level 3 or 800 grit finish and sealed.

9. <u>BUILDING INTERIOR CLEAR HEIGHT</u>: The clear height dimension from finish floor elevation to the bottom of structure (the lowest structural member below the deck) shall be a minimum of 12'0"

10. <u>LIGHTING</u>: Interior lighting to include approximately 85'-0" of track lighting at the perimeter of the space, over the service counter and menu board. Pendant can lights are used at the back of house and customer areas placed at approximately 10'-0" on center throughout the space. Interior lighting also includes a specialty lighting package consisting of chandelier, pendants and restroom vanity fixtures costing $3,500 on average.

11. <u>ROOF</u>: Landlord will construct the roof with required penetrations and adequate structural support (including required structural calculations/engineering) for Tenant's mechanical equipment on and below the roof, including support of interior loads. Landlord shall also install screen walls (sufficient to screen Tenant's rooftop equipment in all directions, if needed) and structural support as may be required for those screen walls. The configuration and exact locations of Tenant's roof-top equipment shall be coordinated by Landlord and Tenant and shall be shown in Tenant's Working Drawings and Tenant's construction documents. Landlord shall ensure that any air intakes for any adjacent tenants are at least ten (10) feet from Tenant's exhaust and that any adjacent tenants' exhaust fans are at least ten (10) feet from Tenant's air intakes. Landlord shall also provide a roof ladder for Tenant's unobstructed access to the roof (24 hours/day, 7 days/week). The roof ladder shall be located either on the exterior of the Building or in a separate room accessible from outside the Building.

12. <u>TRASH ENCLOSURE</u>: Landlord shall provide a minimum 6'-0" high masonry-screened enclosure (with swinging metal gates) of sufficient size to hold two (2) 8-yard trash containers or equivalent alternative to be mutually agreed to by Landlord and Tenant for Tenant use only. Tenant shall contract directly with trash provider and pay all costs directly

13. <u>GREASE TRAP</u>: Per 3(v) above.

14. <u>REQUIREMENTS FOR LANDLORD'S WORK</u>: Landlord will complete all Landlord's Work in a good and workmanlike manner and in compliance with all applicable laws and code requirements, using all new, commercial grade equipment and materials prior to the Delivery Date. Prior to delivering possession of the Premises to Tenant, Landlord will have all necessary building code inspections completed and shall also obtain any required approval of any energy use calculations by the appropriate agencies having jurisdiction

15. <u>DEVELOPMENT COSTS</u>: Prior to delivering possession of the Premises to Tenant, Landlord shall pay all fees and costs related to the development of the Premises, including, without limitation, the following: (a) any architectural, engineering and legal fees and all permitting, utility, development and demolition costs; (b) all fees and costs necessary to complete Landlord's Work (including, without limitation, all fees and costs to any governmental authority associated with or related to the development of the Premises, including, but not limited to, all impact and development fees or other taxes and assessments); and (c) all initial utility connection charges and development charges for the Premises, including but not limited to impact fees, water and sewer fees, tap fees,

EDU fees, site development fees, meter and meter installation fees and traffic impact fees. Tenant shall pay all standard utility deposits and account transfer fees.

16. CHANGE IN PLANS; CONSTRUCTION SCHEDULE:

After mutual approval of Final Plans, Landlord shall advise Tenant of any changes in or deviations from the Final Plans covering Landlord's Work. Should said changes cause modification in Tenant's design documents and such change was not due to a request of Tenant, Landlord shall reimburse Tenant for the cost of revising the design documents and for the cost of any field changes that may be required. Promptly after commencing construction, Landlord shall provide Tenant with a current, updated and accurate construction status report, and Landlord will promptly notify Tenant of any changes to or modifications of the construction schedule. Landlord represents and warrants that is not seeking any kind of GREEN or LEED certification for the Building or the Premises. If Landlord elects to seek any such certification, Landlord shall promptly advise Tenant of that election and provide Tenant with documentation of any Tenant requirements in connection therewith. Landlord will reimburse Tenant for all costs associated with Tenant's compliance with the requirements for GREEN or LEED certification within 30 days after submittal of invoices therefor

17. TENANT'S ACCESS:

During performance of Landlord's Work, Landlord shall provide and coordinate full access to the Premises for Tenant to inspect the Premises for the purposes of site assessment, measurements and determination of all existing conditions. Without limiting the foregoing, Tenant's construction manager, or its designated representative, may enter upon the Premises to inspect progress, take progress photos and determine if Landlord's Work is being completed in accordance with Tenant's standards, plans and specifications, and whether the work is progressing on schedule. Tenant shall not be allowed to interfere with the progress of Landlord's work.

18. DELIVERY OF PREMISES; INSPECTION PROCESS:

Landlord shall notify Tenant in writing at least 30 days prior to the date the Premises are ready for delivery to Tenant. Following that notice, Tenant and Landlord shall cooperate with one another to arrange a prompt joint inspection of the Premises by Tenant and Landlord on or before the scheduled delivery date. At the time of that inspection, Landlord shall demonstrate that all components of Landlord's Work, including all mechanical, plumbing, and utility systems, as well as all equipment serving the Premises, are working properly. Tenant shall deliver to Landlord a written punchlist of all incomplete or faulty items of construction or mechanical installation, and any necessary adjustments or finish work needed to bring the Premises into the condition required by the Lease and Tenant's approved plans. Landlord shall complete all punchlist items prior to Tenant's acceptance of the Premises, or if Tenant chooses to accept delivery of the Premises prior to completion, then Landlord shall complete all punchlist items within the agreed upon time frames, but in no event later than 30 days of the date Tenant accepts the Premises

19. CONSTRUCTION ISSUES:

(a) Temporary Power. If permanent power is not made available to Tenant at the time the Premises are delivered, Landlord, at Landlord's expense, shall provide temporary power through the date of issuance of the certificate of occupancy (or equivalent) to the Premises to within the Construction Limit Line as described in the DD Package.

(b) Staging Area; Trailers; Construction Dumpster. During the entirety of Tenant's construction period until receipt of a certificate of occupancy (or equivalent), Landlord shall provide a clear level area for Tenant's construction trailers and roll off dumpster and a clear level area adequate for staging of equipment and material, all in reasonable proximity to the Premises. Tenant will be responsible for any damage caused in the staging area

(c) No Construction Deposit. Notwithstanding anything to the contrary contained in any tenant handbook, the Lease or otherwise, neither Tenant nor Tenant's contractors shall be required to provide a construction deposit or pay any landlord construction fees

(d) No Requirement to Use Union Labor. In no event shall Tenant be required to utilize union labor or prevailing wages in connection with Tenant's Work or other construction work at or about the Premises

(e) Conflicts. In the event of any conflict among the construction documents approved by Landlord and Tenant, the DD Package, this work letter and the balance of the Lease, the documents shall control in the following order: the work letter attached to the Lease, the balance of the Lease, the most-recent construction documents mutually approved by Landlord and Tenant, and then the DD Package.

## III. TENANT'S OBLIGATIONS TO CONSTRUCT AND PAY FOR IMPROVEMENTS

### A. TENANT'S WORK

All items of work not specifically included above in Landlord's Work required for the operation of Tenant's business at the Premises must be provided by Tenant at Tenant's expense ("Tenant's Work"). The failure of Tenant to pay when due all costs and expenses relating to Tenant's Work constitutes a default under this Lease in like manner as the failure to pay rent when due.

### B. INTENTIONALLY DELETED

## IV. PROCEDURE FOR CONSTRUCTION OF TENANT'S WORK

### A. NOTICE OF DELIVERY DATE

Tenant's Work may not commence until the Delivery Date notification has been given to Tenant and Tenant has provided Landlord with evidence that the insurance required to be maintained by Tenant under Article 15 of the Lease has been obtained and fully paid for in advance. Tenant's Work must be performed through the services of a licensed, bondable and reputable contractor approved by Landlord, in a good and workmanlike manner, free and clear of any liens or encumbrances, and in strict conformance with all applicable statutes, ordinances, rules, regulations and building codes of any governmental authority having jurisdiction over the Premises. Tenant must comply with any construction directives of Landlord and may not interfere with any of Landlord's construction activities. Tenant is responsible for any loss or damage to Landlord's Work caused by Tenant or its contractors during construction of Tenant's Work, regardless of whether Tenant is negligent.

### B. INTENTIONALLY DELETED

### C. ACCEPTANCE OF POSSESSION

1. At the time Tenant enters the Premises to perform the work required of Tenant and in any event prior to commencement of construction of Tenant's Work:

(a) All of Tenant's obligations under this Lease (excepting the obligation to pay rent, if not then accrued) will be in full force and effect.

(b) Tenant agrees to pay for the utilities (air conditioning or heat, gas, water, electricity) thereafter furnished to the Premises.

(c) All of Tenant's insurance required under Article 15 of this Lease must be in full force and effect and evidence thereof delivered to Landlord.

(d) Tenant must require Tenant's contractor(s) to maintain Worker's Compensation insurance as required by law and public liability insurance with limits equal to those set forth in Article 15 of this Lease. Tenant agrees to indemnify, defend and hold harmless Landlord for, from and against any claim, demand, loss, liability, injury or damage to persons or property resulting from such work including the activities of Tenant's contractor(s), including, without limitation, mechanics' liens and attorneys' fees.

(e) Copies of any construction contract, change orders or other documentation relating to the construction of Tenant's Work or any portion thereof between Tenant and any contractor must be fully executed and delivered to Landlord.

(f) Copies of all necessary licenses (including sales tax licenses of Tenant's contractors) and permits must be delivered to Landlord.

### D. CONSTRUCTION OF TENANT'S WORK

Construction of Tenant's Work is subject to the following:

1. If Landlord's Work is complete and approved by applicable governmental authority and Tenant desires to make changes thereto, Tenant will be fully responsible for associated plans or plan revisions and obtaining all municipal and other required permits, coordinating and scheduling all subcontractor's work and obtaining final inspection and Certificate of Occupancy from applicable governmental authority for such changes. Any such modifications to Landlord's Work must be approved in writing by Landlord.

2. Notwithstanding anything to the contrary contained herein, Tenant agrees, at its cost, to use Landlord's contractors for any alterations, additions and revisions to the roof of the Building. In all events, Tenant will use Landlord's fire sprinkler, fire alarm and roofing contractors.

3. Tenant is responsible in all instances to obtain approvals, permits and inspections from the applicable governmental authority, if required for Tenant's Work.

4. If Tenant's Work requires modifications or changes to any structural elements, Tenant is required to submit architectural and structural drawings to be reviewed and approved by Landlord's architect or structural engineer for the Premises, so that the structure may be modified accordingly. Tenant is responsible for all fees, costs, and permits required and necessary to complete said modifications.

5. During construction of Tenant's Work, all trash must be cleaned up daily and either removed from the Parcel site or put in a construction dumpster provided by Tenant in a location approved by Landlord. If Tenant fails to keep areas clean, Landlord may at Landlord's option perform the necessary work at Tenant's expense.

6. The use of any building material containing asbestos is strictly prohibited.

7. Tenant's contractor(s) and workmen must maintain clear access to all areas of the Premises for police, fire and emergency personnel and equipment, as required by local authorities.

E. CASUALTY OR CONDEMNATION

The provisions of this Exhibit C apply with equal force and effect to repair or restoration of the Premises necessitated by casualty or condemnation as described in Articles 14 and 20 of the Lease, but without the benefit of any allowance or payments, if any, made by Landlord to Tenant at the time of original construction in connection with the work described in this Exhibit C.

V. RISK OF LOSS

Any work performed by Tenant, and any fixtures or personal property moved onto the Premises are at Tenant's own risk. Neither Landlord nor Landlord's agents or contractors are responsible to Tenant for loss, theft, damage or destruction of Tenant's Work or property. Tenant agrees to indemnify, defend and hold harmless Landlord for, from and against any claims, damages, actions and causes of action made or brought and all liabilities, losses, damages, costs and expenses (including, without limitation, attorneys' fees) made with respect to loss, theft, damage or destruction of property of third persons moved onto the Premises.

VI. NOTICE OF NONRESPONSIBILITY

Landlord and Tenant agree, and notice is hereby given, that Tenant is not the agent of Landlord for the construction, alterations or repair of any improvements on the Premises that are the obligation of Tenant under this Lease, the same being done at the sole direction and expense of Tenant. All contractors, materialmen, mechanics, and laborers are hereby charged with notice that they must look solely to Tenant for the payment of any charge for work done or material furnished on the Premises by or at the direction of Tenant. Tenant has no right, agency, power or authority to bind Landlord, or any interest of Landlord, for the payment of any claims for labor or material, or for any additions, alterations or repairs on or to the Premises, and Tenant agrees to post notices on the Premises during all construction work of any nature performed by Tenant that Landlord is not responsible for any material and labor used or employed by Tenant on the Premises. Further, at least ten (10) days prior to commencement of any work that might result in any lien, Tenant agrees to notify Landlord in writing, and Landlord or its representatives have the right to go upon and inspect the Premises at all reasonable times and to post and record or confirm the posting by Tenant and/or recordation of notices of nonresponsibility or such other notices as Landlord deems proper for the protection of Landlord's interests.

4833-5951-9088.4

C-7




EXHIBIT C-1
ELEVATIONS

# EXHIBIT D

## SIGN CRITERIA

This criteria has been established for the purpose of assuring an outstanding commercial shopping center for the benefit of all tenants. Conformance will be strictly enforced and any nonconforming installation or unapproved signage must be brought into conformance at the expense of Tenant.

A. <u>GENERAL REQUIREMENTS</u>

1. Tenant must submit to Landlord for approval, prior to submittal to applicable governmental authority, and prior to fabrication or installation, two (2) copies of detailed sign drawings. Drawings must include the location, size, design and color of the proposed letters, including any logo graphics. Landlord's approval may take up to fifteen (15) days.

2. All municipal sign permits must be obtained by Tenant. Tenant must comply with all codes and ordinances and pay all necessary fees. Compliance with all governmental requirements is Tenant's sole responsibility. Landlord's approval of Tenant's sign drawings does not constitute an implication, representation or certification that such drawings are in compliance with applicable statutes, codes, ordinances or other regulations.

3. Tenant's sign drawings will be reviewed by Landlord for conformance with this criteria and overall design quality.

4. Tenant must keep its signs fully lighted and in proper working order at all times. Upon termination of this Lease, Tenant must at its expense remove all exterior signs and appropriately restore with plaster and paint all damage caused by such removal to a condition acceptable to Landlord.

5. No sign, placard, picture, advertisement, display, name or notice may be placed in or about the Premises so as to be seen from the Common Areas, or placed in or about the Common Areas, without the prior written consent of Landlord. If such consent is given by Landlord, Landlord may regulate the manner of display of such sign, placard, picture, advertisement, display, name or notice. Landlord has the right to remove any sign, placard, picture, advertisement, display, name or notice that has not been approved by Landlord or is being displayed in an unapproved manner, at the expense of and without notice to Tenant.

6. Wherever Landlord's approval or consent is required in this <u>Exhibit D</u>, such approval or consent is subject to any rules, regulations, ordinances or codes of governmental authority, , and to all covenants, conditions, restrictions and other matters of record, and Landlord's approval or consent does not constitute approval or consent on behalf of any governmental authority or as required under any covenants, conditions, restrictions and other matters of record.

7. Animated, flashing, blinking, rotating, moving, audible, placards, "A"-frame signs, painted signs, balloons, flags and signs in the public right-of-way are not permitted.

8. Signs are restricted to advertising only the business being conducted within the Premises and the products sold therein.

B. <u>MATERIALS</u>

1. All attached Building signs must be fabricated with individual pan channel letters and logos. Custom cabinet signs will be allowed for uses such as corporate logos and marketing logos, if approved in advance by Landlord.

C. <u>LAYOUT SPECIFICATIONS</u>

1. Maximum height of letters and logos is as follows: As allowed by Code

2. Actual sign area is controlled by the front footage of the Building and may not exceed the area permitted by the City of Phoenix Sign Ordinance or the Comprehensive Sign Plan.

3. Tenant must obtain Landlord's approval of sign location prior to installation.

D. <u>INSTALLATION</u>

1. Electrical service and hook up to all signs must be from Tenant's meter at Tenant's expense. Electrical service must include a photo cell and time clock to control the hours of illumination. Tenant's Building sign(s) must be kept illuminated every evening between dusk and dawn, or for such other period as Landlord may approve in writing.

2. All penetrations of the Building structure required for sign installation must be sealed in a watertight condition. Absolutely no penetrations of the roof structure are permitted.

3. All letter strokes must completely cover drilled PK holes.

4. At all stores (except at towers), sign installation will be on wood-framed canopies. All PK housings must be located at the top of each letter to avoid penetration of the roof structure. Sign installation at towers will be through stucco and plywood fascia.

5. Tenant is responsible for any damage done to the Building caused by the installation of or work done on any of its signs.

6. All sign bolts, fastenings, sleeves and clips must be hot-dipped, galvanized iron, stainless steel, aluminum, brass or bronze. No black iron material of any type will be permitted.

7. No labels are permitted on the exposed surface of signs, except those required by applicable governmental authority, which must be applied in an inconspicuous location.

8. All electrical signs must bear the UL label and conform to local building and electrical codes.

9. All exposed metals must be painted to render them inconspicuous.

E. COMPREHENSIVE SIGN PLAN

1. Tenant's signs must conform to any comprehensive sign plan applicable to the Shopping Center.

# EXHIBIT E

## ESTOPPEL CERTIFICATE

Pursuant to Paragraph 19.1 of the Lease dated ________________, by and between EVERGREEN–________________________, L.L.C. ("Landlord") and ________________________________ ("Tenant") covering suite(s) ______________________________ (the "Premises") in the retail space known as ______________________________ (the "Parcel"), Tenant hereby certifies the following:

1. Tenant is in possession of and occupies the Premises.
2. The Lease is in full force and effect and unmodified except as follows: [NONE] ______________.
3. Tenant has not assigned the Lease or subleased all or any portion of the Premises.
4. The Commencement Date of the Lease is ____________________________________.
5. The Expiration Date of the Lease is ________________________________________.
6. Tenant currently pays Minimum Monthly Rent under the Lease in the amount of $______________________, which has been paid through ______________________________.
7. The amount of the Security Deposit held by Landlord under the Lease is $____________________________.
8. Tenant has no claim, charge, defense, right to setoff, lien, abatement or counterclaim against Landlord in respect of payment of Rent or otherwise under the Lease.
9. To the best of Tenant's knowledge, there are no defaults under the Lease on the part of Landlord or Tenant and no event has occurred which, with the passage of time or the giving of notice, or both, would constitute such a default.
10. All work, if any, required to be performed by Landlord under the Lease has been performed in full, and the Premises are entirely satisfactory and suitable for Tenant's purposes.
11. Tenant claims no right, title or interest in or to the Premises except pursuant to the Lease, there are no oral or written agreements affecting Tenant's occupancy of the Premises except the Lease, and Tenant has no option to purchase, right of first refusal, or similar right to acquire any interest in or to the Parcel or the Premises.
12. Tenant acknowledges and agrees that its rights and interests under the Lease are subject and subordinate to any financing and related documentation now or hereafter placed against the fee interest in the Premises by Landlord.
13. The Lease is guaranteed by Guarantor. Guarantor has reviewed this Certificate and certifies that (i) to Guarantor's actual knowledge, this Certificate is true, correct and complete, and (ii) the Guaranty of Lease executed by Guarantor and delivered to Landlord (the "Guaranty") is in full force and effect and there are no existing credits, defenses, offsets or counterclaims which Guarantor has against Landlord or against Tenant which would adversely affect the enforcement of the Guaranty by Landlord against Guarantor.
14. This Estoppel Certificate may be relied on by any prospective lender or purchaser of the Premises or the Parcel.

DATED: ______________________________

TENANT

______________________________

GUARANTOR

______________________________

EXHIBIT F

INTENTIONALLY OMITTED

# EXHIBIT G

## ENVIRONMENTAL RIDER

THIS ENVIRONMENTAL RIDER is attached to and made a part of that certain Lease of even date herewith by and between the parties hereto (the "Lease"). In the event of a conflict between the terms and provisions of the Lease and this Rider, this Rider controls.

**1. Definitions**

For purposes of this Rider, the following terms have the following meanings:

(a) "Environmental Laws" means all federal, state or local statutes, common law duties, ordinances and regulations (including any amendments thereto), pertaining to health, industrial hygiene or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 *et seq.* ("CERCLA"); the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.* ("RCRA"); the Clean Air Act, as amended, 42 U.S.C. Section 7401 *et seq.*; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651 *et seq.*; the Emergency Planning and Community Right-to-Know Act of 1986, as amended, 42 U.S.C. Section 11001 *et seq.*; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 *et seq.*; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f *et seq.*; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 *et seq.*; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601, *et seq.*; and the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Section 5101 *et seq.*); the Arizona Environmental Quality Act, Title 49, Arizona Revised Statutes, and all rules and regulations adopted and guidelines promulgated pursuant to the foregoing.

(b) "Hazardous Substance" includes (i) those substances included within the definitions of "hazardous substances," "pollutants," "contaminants," "hazardous materials," "toxic substances," or "solid waste" in any Environmental Laws and in lists and regulations promulgated thereunder; (ii) those substances defined as "hazardous substances" pursuant to Arizona law and in rules adopted or guidelines promulgated pursuant thereto; and (iii) all other substances, materials and wastes that are, or that become, regulated, or that are classified as hazardous or toxic, under any Environmental Laws.

(c) "Release" means any releasing spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance).

(d) "Remediate" or "Remediation" shall mean the necessary actions to comply with applicable Environmental Law with respect to the unlawful presence of, or suspected discharge of, a Hazardous Substance. Remediation may include, without limitation: environmental investigation, monitoring and sampling; installation, maintenance and removal of monitoring wells; removal, treatment, neutralization or containment of any Hazardous Substance; storage of excavated materials; and installation, maintenance, storage and removal of machinery and equipment used in connection with the Remediation.

**2. Tenant Warranties, Representations and Covenants Regarding Environmental Matters**

Tenant warrants, represents and covenants with Landlord as follows:

(a) Tenant will not violate any Environmental Laws in connection with its occupancy or use of the Premises;

(b) Tenant will notify Landlord in writing prior to storing, generating, treating or transporting any Hazardous Substances on or about the Premises, and obtain Landlord's prior written consent thereto, other than with respect with those types and quantities contained in normal retail/restaurant products and environments, which are hereby permitted. Such notice must include a detailed description of the nature of the business or activity which requires such storage or use of Hazardous Substances, the specific Hazardous Substances involved, and any licenses or permits under any Environmental Laws which have been obtained or are required to be obtained in connection with such operations. Tenant further agrees to notify Landlord in writing of any material change in the nature of such businesses or activities;

(c) Tenant will not cause the Release of any Hazardous Substances on, in or about the Premises;

(d) Tenant agrees to indemnify, defend and hold harmless Landlord for, from and against all claims, damages, costs, expenses, and liabilities of any kind whatsoever, including attorneys' fees, incurred by Landlord, directly arising out of (i) the use, generation, manufacture, production, storage, Release, threatened Release, or presence of Hazardous Substances in, on or about the Premises, caused by Tenant, its agents, employees, contractors or licensees; (ii) any violation by Tenant of any Environmental Laws with respect to Tenant's use and occupancy of the Premises; and (iii) any breach by Tenant of the warranties, representations and covenants contained herein; and

(e) Notwithstanding any provision in this Lease to the contrary, Tenant shall not be responsible for, shall have no liability or obligations with respect to, and shall not be obligated to pay for or take any action with respect to the violation of any Environmental Law or existence of any Hazardous Substance on the Premises which occurred or existed prior to or after the date of this Lease unless caused or knowingly permitted by Tenant or any of Tenant's Parties.

**3. Landlord's Representations and Covenants Regarding Environmental Matters.**

Landlord hereby represents, warrants and covenants to Tenant that:

(a) To Landlord's actual knowledge, except as set forth in that certain Phase I Environmental Site Assessment (Project No 9-418-0660) prepared by Salem Engineering Group, Inc. (the "Phase I"), the Building, the Premises, and the Development are and have been, and Landlord agrees to use its best efforts to cause them to remain, in compliance with all applicable Environmental Laws.

(b) To Landlord's actual knowledge, except as ser fort in the Phase I, there has been no release and there is no threat of release of any Hazardous Substances on, onto or from the Premises, or the Development that has resulted in or that could result in a violation of any Environmental Law or in the creation of liability or obligations, including, without limitation, notification, deed recordation or Remediation, under any Environmental Law. To the best of its knowledge, the Development does not contain underground or aboveground storage tanks, "PCBs" or "PCB items," as those terms are defined in 40 C.F.R. §761.3, or asbestos.

(c) Landlord agrees to indemnify and hold Tenant, its directors, officers, stockholders, employees, agents, attorneys, consultants, contractors, successors and assigns (collectively, "Tenant's Parties"), harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, judgments, administrative orders, Remediation requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including, but not limited to, reasonable attorneys' fees and expenses), arising out of any material misrepresentation of Landlord contained in this Section or any breach by Landlord of its obligations under this Section.

(d) If it is discovered that the Premises contain Hazardous Substances, the presence of which predates this Lease and was not caused by Tenant or any of Tenant's Parties, Landlord, at its sole expense, shall take all action required, including Remediation of the Premises, to comply with the covenants herein or applicable Environmental Laws.

Landlord's actual knowledge means the present, actual (not imputed) knowledge of Dana Dragon, principal of Landlord, with no duty of investigation. In no event shall Dana Dragon be personally liable under this Lease.

Landlord's Initials: DD

Tenant's Initials:

GUARANTY OF LEASE

WHEREAS, that certain Lease of even date herewith (the "Lease") has been or will be executed by and between EVERGREEN – 35TH AVENUE & GREENWAY, L.L.C., an Arizona limited liability company (therein and herein referred to as "Landlord"), and BLACK ROCK STORE OPERATIONS, LLC, an Oregon limited liability company (therein and herein referred to as "Tenant"), covering certain premises located in Phoenix, Maricopa County, Arizona, as more particularly described in the Lease (the "Premises");

WHEREAS, Landlord has required as a condition of Landlord's execution of the Lease that BLACK ROCK COFFEE HOLDINGS, LLC, a Delaware limited liability company ("Guarantor") guarantee the full performance of the obligations of Tenant under the Lease; and

WHEREAS, Guarantor desires that Landlord enter into the Lease with Tenant and has represented to Landlord that Guarantor will receive direct, pecuniary benefit if the Lease is entered into;

NOW, THEREFORE, in consideration of the execution of the Lease by Landlord, and for other valuable consideration the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

1. Guarantor, jointly and severally, hereby unconditionally guarantees the full and punctual performance of each and all of the terms, covenants, and conditions of the Lease to be kept and performed by Tenant during the initial 180 months of the Lease Term (as defined in the Lease), including the payment of all rentals and other charges to accrue thereunder, and agrees to indemnify, defend and hold harmless Landlord for, from and against any and all liabilities, claims, losses, costs, expenses (including, without limitation, attorneys' fees), damages, actions and causes of action arising out of any failure of Tenant to pay said rentals and other charges or the failure of Tenant to perform any of the terms, covenants and conditions contained in the Lease. If at any time during the initial 180 months of the Lease Term Tenant is in breach of the Lease, Guarantor will keep, perform and observe the defaulted obligation in the place and stead of Tenant.

2. This Guaranty is not waived, released, discharged, diminished, or otherwise affected by, and Guarantor expressly consents to and waives notice of, the following:

(a) Any assignment of the Lease or subletting of all or any portion of the Premises described therein by Tenant with or without the consent of Landlord;

(b) The assignment or transfer in whole or in part of Landlord's interest in the Lease and/or this Guaranty;

(c) The bankruptcy, reorganization, or insolvency of Tenant or any successor or assignee thereof, the release, discharge, impairment, limitation or modification of the liability of Tenant or the estate of Tenant in any bankruptcy or other proceedings, any disaffirmance or abandonment of the Lease by a trustee of Tenant in any such proceedings, or the cessation from any cause whatsoever of the liability of Tenant, or the occurrence of any of the foregoing with respect to any one or more Guarantors;

(d) The amendment, modification or change in the terms, covenants and conditions of the Lease entered into by and between the parties thereto, or their successors and assigns; provided, however, in the event of any such amendment, modification or change in the Lease, the liability and obligations of Guarantor under this Guaranty thereupon and thereafter guarantee the performance of the Lease in accordance with the terms of any such amendment, modification or change in the Lease;

(e) The granting of indulgences or extensions of time by Landlord with respect to the performance of any of the terms and provisions of the Lease;

(f) Any deferral, reduction, increase or compromise of any rental or other charge due Landlord under the provisions of the Lease;

(g) The failure by Landlord to require strict performance of any term or provision of the Lease or to exercise any right, power or remedy granted to Landlord in the Lease;

(h) The repossession of the Premises by Landlord, provided that the net payments, if any, thereafter received by Landlord after deducting all costs and expenses of repossession and reletting the same, will be credited from time to time by Landlord to the account of Guarantor and Guarantor must pay any balance owing to Landlord from time to time, immediately upon demand;

(i) Landlord's acceptance of other or additional security for the payment and performance of the obligations secured hereby, and the enforcement, exchange, waiver or release of any such security;

(j) Landlord's acceptance of additional guarantors or the release or substitution of anyone primarily or secondarily liable for the payment and performance of the obligations secured hereby, whether by Landlord or by operation of law;

(k) The inability of Landlord or Tenant to enforce any provision of the Lease for any reason; and

(l) Any defenses or rights of set-off or counterclaims which Guarantor or Tenant may have or assert.

3. (a) Guarantor, to the extent Guarantor may legally do so, waives any right now or hereafter existing to require Landlord, as a condition to proceeding against Guarantor hereunder, to (i) proceed against Tenant, (ii) proceed against or exhaust any security held from Tenant, (iii) proceed against any other guarantor prior to proceeding against Guarantor in any proceeding, or (iv) pursue any other remedy in Landlord's power. GUARANTOR WAIVES ALL RIGHTS AND DEFENSES ARISING BY REASON OF ANY DISABILITY OR OTHER DEFENSE OF TENANT OR BY REASON OF THE CESSATION FROM ANY CAUSE WHATSOEVER OF THE LIABILITY OF TENANT OTHER THAN FULL PAYMENT OF ALL SUMS OWING LANDLORD UNDER THE LEASE AND FULL PERFORMANCE OF ALL TENANT'S OBLIGATIONS THEREUNDER.

(b) GUARANTOR, TO THE EXTENT GUARANTOR MAY LEGALLY DO SO, WAIVES ANY RIGHTS AND DEFENSES GUARANTOR MAY OTHERWISE HAVE, WHETHER NOW OR HEREAFTER EXISTING, BASED UPON AN ELECTION OF REMEDIES BY LANDLORD WHICH LIMITS OR DESTROYS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT.

4. The liability of Guarantor under this Guaranty is primary, and in any right of action which accrues to Landlord under the Lease, Landlord may, at its option, proceed against Guarantor or any of them without having commenced any action against Tenant, or Landlord may proceed against Tenant without having commenced any action against Guarantor. In either event, the election by Landlord to proceed against only Tenant or Guarantor does not release the other or any of them from liability under the Lease or this Guaranty. Furthermore, the judgment by any court of competent jurisdiction, or the admission by Tenant in any action or proceeding against Tenant, as to the liability of Tenant arising from a breach or default under the Lease, is, at Landlord's option, conclusive of such liability as between Landlord and Guarantor, regardless of whether Guarantor is a party to such action or proceeding.

5. Guarantor agrees to pay Landlord's reasonable attorneys' fees and all costs and other expenses incurred in recovering possession of the Premises or in any collection or attempted collection or in any negotiations relating to the obligations hereby guaranteed or in enforcing this Guaranty.

6. Guarantor waives notice of nonpayment, nonperformance or nonobservance, dishonor, proof, protest, demand or other notice by Landlord, as well as any notice of default given to Tenant, and waives Landlord's acceptance of this Guaranty. Guarantor waives any right provided by law, including, without limitation, the provisions of Arizona Revised Statutes §12-1641, *et seq.*, or otherwise, to be discharged from liability by reason of Landlord's failure, after demand from Guarantor, to bring suit against Tenant. Guarantor waives all defenses and claims based on principles of suretyship and/or guaranty, and any and all benefits under A.R.S. § 44-142, *et seq.*, and Rule 17(f) of the Arizona Rules of Civil Procedure.

7. The obligations of Tenant under the Lease to execute and deliver estoppel certificates (and financial statements, if any) as required therein apply with equal force and effect to Guarantor.

8. Until all of the terms, covenants and conditions contained in the Lease are fully performed and observed by Tenant, Guarantor during the initial 180 months of the Lease Term (i) has no right of subrogation against Tenant by reason of any payment or acts of performance by Guarantor in compliance with the obligations of Guarantor, (ii) waives any right to enforce any remedy that Guarantor now or hereafter has against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor, and (iii) subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to Landlord under the Lease.

9. The use of the singular herein includes the plural. When this Guaranty is executed by two or more Guarantors, their obligations are joint and several, and the word "Guarantor" means all and any one or more of them. If the undersigned Guarantor includes husband and wife, this Guaranty must be executed by each and binds both their community estate and their respective separate estates. The invalidity or unenforceability of any provision of this Guaranty does not affect the remainder of this Guaranty, which continues in full force and effect. This Guaranty binds the heirs, successors and assigns of Guarantor and inures to the benefit of Landlord and any person or entity acquiring Landlord's interest in the Lease or this Guaranty, including, without limitation, the holder of any mortgage or deed of trust to which the Lease may be subject and subordinate from time to time. Time is of the essence hereof. No modification of this Guaranty is effective unless in writing and executed by both Landlord and Guarantor. This Guaranty is governed by the law of the state in which the Premises are located.

10. Guarantor shall, within twenty (20) days after Landlord's request to do so, deliver to Landlord a certificate, in a form and substance reasonably satisfactory to Landlord, confirming that (a) this Guaranty remains in full force and effect and has not been waived, discharged or released; and (b) Guarantor has no defenses or offsets against its obligations to Landlord under this Guaranty. The failure by Guarantor to deliver such certificate to Landlord within such ten-day period shall constitute a material breach and default by Guarantor of this Guaranty and shall constitute an event of default under the Lease.

11. Notwithstanding anything to the contrary set forth in this Guaranty, the terms of this Guaranty shall not apply to any rents or other obligations that accrue under the Lease after the last day of the 180th month of the Lease Term.

****SIGNATURES APPEAR ON THE FOLLOWING PAGE****

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by the undersigned Guarantor as of the date of the Lease.

GUARANTOR:

BLACK ROCK COFFEE HOLDINGS, LLC,
a Delaware limited liability company

By: [signature]
Name: Dane Bend
Its: COO

STATE OF arizona )
) ss
County of Maricopa )

On 2/25/19 before me, Haley Banks, notary public,
(Here insert name and title of the officer)
personally appeared Daniel Band, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of arizona that the foregoing paragraph is true and correct.

[signature]
Notary Public

HALEY A BANKS
Notary Public - Arizona
Maricopa County
Commission # 549721
My Comm. Expires Aug 3, 2022

My Commission Expires:
8/3/2022

# LEASE

**EVERGREEN – 35TH AVENUE & GREENWAY, L.L.C.,**
an Arizona limited liability company

"Landlord"

and

**BLACK ROCK STORE OPERATIONS, L.L.C.,**
an Oregon limited liability company

"Tenant"

LEASE INDEX


**ARTICLE 1 - SUMMARY OF CERTAIN BASIC LEASE PROVISIONS AND DEFINITIONS ..... 1**

**ARTICLE 2 - EXHIBITS ..... 2**

**ARTICLE 3 - PREMISES ..... 3**

3.1 DEMISE OF PREMISES ..... 3
3.2 RENTABLE AREA ..... 3
3.3 CONTINGENCY ..... 3

**ARTICLE 4 - TERM ..... 3**

4.1 TERM ..... 3
4.2 STIPULATION OF TERM COMMENCEMENT ..... 3
4.3 PRELIMINARY OBLIGATIONS ..... 3
4.4 DELIVERY DEADLINE ..... 3
4.5 RENEWAL PERIODS ..... 4

**ARTICLE 5 - RENT ..... 4**

5.1 RENT ..... 4
5.2 ADJUSTMENTS TO MINIMUM MONTHLY RENT ..... 4
5.3 LATE PAYMENTS ..... 5

**ARTICLE 6 - TENANT'S RECORDS ..... 5**

6.1 TENANT'S REPORTS ..... 5
6.2 TENANT'S GROSS SALES ..... 5

**ARTICLE 7 - INTENTIONALLY OMITTED ..... 5**

**ARTICLE 8 - TAXES ..... 5**

8.1 TAXES ..... 5
8.2 EXCLUSIONS FROM TAXES ..... 6
8.3 EVIDENCE OF PAYMENT ..... 6
8.4 PRORATION FOR PARTIAL TAX YEAR ..... 6
8.5 CONTEST ..... 6
8.6 NEW IMPOSITIONS ..... 6
8.7 OTHER TAXES ..... 7
8.8 SOURCE DOCUMENTS ..... 7

**ARTICLE 9 - COMMON AREAS ..... 7**

9.1 DEFINITION OF COMMON AREAS ..... 7
9.2 COMMON USE BY TENANTS ..... 7
9.3 CONSENT OF LANDLORD ..... 7

**ARTICLE 10 – INTENTIONALLY OMITTED ..... 7**

**ARTICLE 11 - CONDUCT OF BUSINESS ..... 7**

11.1 USE OF PREMISES ..... 7
11.2 INTENTIONALLY DELETED ..... 7
11.3 CONTINUED CONDUCT OF BUSINESS ..... 7
11.4 STANDARDS TO BE ADOPTED BY TENANT ..... 8
11.5 TENANT'S SIGNS ..... 8
11.6 INTENTIONALLY OMITTED ..... 8
11.7 WASTE AND NUISANCE ..... 8
11.8 COMPLIANCE WITH LAWS ..... 8
11.9 LANDLORD'S EXCLUSIVE COVENANT ..... 9

**ARTICLE 12 - MAINTENANCE, REPAIRS AND ALTERATIONS ..... 9**

12.1 MAINTENANCE AND REPAIR ..... 9
12.2 MAINTENANCE BY LANDLORD ..... 10
12.3 TENANT'S ALTERATIONS ..... 10
12.4 LIENS ..... 10
12.5 NOTICE OF COMMENCEMENT OF WORK ..... 10

**ARTICLE 13 - UTILITIES ..... 11**

**ARTICLE 14 - DAMAGE, DESTRUCTION, TERMINATION AND RENT ABATEMENT ..... 11**

14.1 DAMAGE OR DESTRUCTION OF PREMISES ..... 11
14.2 DAMAGE OR DESTRUCTION IN PARCEL - TERMINATION ..... 11
14.3 DAMAGE OR DESTRUCTION IN PREMISES - NON-TERMINATION ..... 11
14.4 OBLIGATION OF LANDLORD TO REBUILD CONDITIONAL ..... 11

**ARTICLE 15 - INSURANCE ..... 12**

15.1 TENANT'S INSURANCE ....12
15.2 GENERAL PROVISIONS FOR TENANT'S INSURANCE ....12
15.3 INCREASE IN LANDLORD'S INSURANCE PREMIUMS ....13
15.4 CANCELLATION OR REDUCTION OF INSURANCE ....13
15.5 LANDLORD'S INSURANCE ....13
15.6 NO INSURABLE INTEREST IN LANDLORD'S INSURANCE ....14
15.7 MUTUAL WAIVER OF SUBROGATION ....14
15.8 WAIVERS ....14
15.9 INDEMNITIES ....14

**ARTICLE 16 - ASSIGNMENT AND SUBLETTING ....14**

16.1 RESTRICTION ON TRANSFERS ....15
16.2 TENANT'S LIABILITY NOT RELEASED ....15
16.3 EXCESS RENTALS ....15
16.4 VOID TRANSFERS ....15
16.5 RECAPTURE ....15
16.6 PERMITTED TRANSFER ....15

**ARTICLE 17 - SALE BY LANDLORD ....16**

**ARTICLE 18 - SUBORDINATION AND ATTORNMENT ....16**

18.1 SUBORDINATION ....16
18.2 INTENTIONALLY DELETED ....16
18.3 SUPERIOR DOCUMENTS ....16

**ARTICLE 19 - ESTOPPEL CERTIFICATES ....16**

19.1 TENANT'S CERTIFICATION ....16
19.2 TENANT'S FAILURE TO RESPOND ....17
19.3 FINANCIAL STATEMENTS AND FINANCING ....17

**ARTICLE 20 - EMINENT DOMAIN ....17**

20.1 DEFINITION OF TAKING ....17
20.2 TOTAL TAKING OF THE PREMISES ....17
20.3 PARTIAL TAKING OF THE PREMISES ....17
20.4 TAKING OF SHOPPING CENTER/DEVELOPMENT ....17
20.5 TERMINATION OF LEASE ....17
20.6 CONTINUATION OF LEASE ....17
20.7 DEDICATIONS ....17
20.8 WAIVER ....18

**ARTICLE 21 - DEFAULT ....18**

21.1 EVENTS OF DEFAULT ....18
21.2 REMEDIES ....18
21.3 DEFINITION OF COSTS OF RELETTING ....20
21.4 ACCEPTANCE OF SURRENDER ....20
21.5 LANDLORD'S RIGHT OF SELF-HELP ....20
21.6 LANDLORD'S RIGHTS AND REMEDIES CUMULATIVE ....20
21.7 NO WAIVER ....21
21.8 LANDLORD'S LIEN ....21
21.9 INTENTIONALLY DELETED ....21
21.10 ACTS OR OMISSIONS OF SUBTENANTS OR INVITEES ....21

**ARTICLE 22 - RIGHT TO CURE ....21**

**ARTICLE 23 - ACCESS BY LANDLORD ....21**

23.1 RIGHT OF ENTRY ....21
23.2 EXHIBITION OF PREMISES ....21

**ARTICLE 24 - SURRENDER OF PREMISES AND HOLDING OVER ....21**

24.1 SURRENDER ....22
24.2 HOLDING OVER ....22
24.3 NO MERGER ....22
24.4 REMOVAL OF INSTALLATIONS AND RESTORATION BY TENANT ....22

**ARTICLE 25 – INTENTIONALLY OMITTED ....22**

**ARTICLE 26 - COMPLETION OF THE PREMISES ....22**

26.1 CONSTRUCTION OBLIGATIONS ....22
26.2 INTENTIONALLY DELETED ....22
26.3 TENANT'S ACKNOWLEDGMENT ....22

**ARTICLE 27 - QUIET ENJOYMENT ....23**

**ARTICLE 28 - UNAVOIDABLE DELAY ....23**

ARTICLE 29 - BROKER'S COMMISSIONS ........ 23

ARTICLE 30 - SECURITY ........ 23

ARTICLE 31 - NONDISCRIMINATION ........ 23

ARTICLE 32 - MISCELLANEOUS ........ 23

32.1 NOTICES ........ 23
32.2 PARTIAL INVALIDITY ........ 23
32.3 TIME; SUCCESSORS AND ASSIGNS ........ 23
32.4 ENTIRE AGREEMENT ........ 24
32.5 LANDLORD/TENANT RELATIONSHIP ........ 24
32.6 OBLIGATIONS AS COVENANTS ........ 24
32.7 NET LEASE ........ 24
32.8 ADDITIONAL DOCUMENTS ........ 24
32.9 NO ACCORD AND SATISFACTION ........ 24
32.10 ATTORNEYS' FEES ........ 24
32.11 NO RECORDATION ........ 24
32.12 AUTHORITY ........ 24
32.13 WAIVER OF REDEMPTION ........ 24
32.14 GUARANTORS ........ 24
32.15 NOT BINDING UNTIL SIGNED ........ 24
32.16 LIMITATION OF LANDLORD'S LIABILITY ........ 24
32.17 ENVIRONMENTAL RIDER ........ 25
32.18 LEASE CONSTRUCTION ........ 25
32.19 GOVERNING LAW ........ 25
32.20 SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST ........ 25
32.21 DISCLAIMER ........ 25

EXHIBIT A - Site Plan of Parcel

EXHIBIT B - Floor Plan of Building (showing approximate configuration and dimensions)

EXHIBIT C - Construction - Landlord's Work and Tenant's Work

EXHIBIT C-1 - Elevations

EXHIBIT D - Sign Criteria

EXHIBIT E - Estoppel Certificate

EXHIBIT F – Intentionally Omitted

EXHIBIT G - Environmental Rider

ATTACHMENT – Guaranty of Lease

# FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE (this "**Amendment**") is made and dated effective as of this 6th day of April, 2020 (the "**Effective Date**"), between BRC 4SHER, LLC, an Arizona limited liability company ("**Landlord**"), and Black Rock Store Operations LLC, an Oregon limited liability company ("**Tenant**"), and consented to by Black Rock Coffee Holdings, LLC, a Delaware limited liability company ("**Guarantor**").

## RECITALS:

A. Whereas, Landlord (as successor in interest to Evergreen–35th & Greenway, L.L.C.) and Tenant entered into that certain Lease dated effective as of February 25, 2019 (the "**Lease**");

B. Whereas, Guarantor guarantied Tenant's obligations under the Lease pursuant to that certain Guaranty of Lease dated February 25, 2019 (the "**Guaranty**"); and

C. Whereas, mandatory travel and operational restrictions ("**Restrictions**") have been issued by state and federal governmental agencies having jurisdiction over the Tenant's business in response to the COVID-19 outbreak and, as a result of such restrictions, Tenant has suffered and expects to suffer from a significant decline in its revenues. Due to the foregoing, Landlord and Tenant desire to amend certain terms of the Lease, as more fully provided below.

NOW THEREFORE, in consideration of the Lease, the foregoing Recitals, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, Landlord and Tenant agree as follows:

## AGREEMENT:

1. Capitalized Terms. Capitalized terms used but not defined herein shall have the same meaning as set forth in the Lease.

2. Minimum Monthly Rent Deferral Period.

   a) Commencing on May 1, 2020 and ending on July 31, 2020 (the "**Rent Deferral Period**"), subject to the terms of this Section 2, Tenant shall pay $1,500.00 (plus rent tax in the amount of $43.50) (the "**Interim Rent**") to Landlord. The Interim Rent shall be due on or before the first day of each month during the Rent Deferral Period.

   b) The sum of $6,833.33 per month (plus rent tax in the amount of $198.17) (the "**Deferred Rent**") shall be deferred each month during the Rent Deferral Period.

   c) Tenant shall re-commence payment of Minimum Monthly Rent in the amount of $8,333.33, plus $241.67 for rent tax, on August 1, 2020.

   d) The Deferred Rent shall continue to accrue during the Rent Deferral Period and shall be amortized in equal monthly payments over each subsequent rent payment commencing on February 1, 2021 through July 31, 2021 (the "**Repayment Period**").

   e) Notwithstanding the foregoing, in the event the Restrictions are lifted prior to August 1, 2020, Tenant shall commence payment to Landlord of the full Minimum Monthly Rent in the amount of $8,333.33, plus rent tax in the amount of $241.67, upon the lifting of the Restrictions. Further, the Repayment Period shall then commence six (6) months after the date Tenant commences full operation of its business (but no later than February 1, 2021).

   f) Tenant may prepay all or of any portion of the Deferred Rent.

   g) A summary of the payments under this Section 2 are set forth on Schedule 1 attached to this Amendment.

3. Additional Rent.

   a) Tenant shall continue to pay to Landlord all Additional Rent as set forth in the Lease.

   b) As permitted under Section 5.1(b) of the Lease, commencing on August 1, 2020, Tenant shall pay with the Minimum Monthly Rent an estimated amount for real estate taxes to Landlord as follows: $2,507.00, plus rent tax in the amount of $72.70, per month. The

2020 real estate taxes shall be reconciled as set forth in the Lease and the remainder applied against outstanding rent. Tenant further acknowledges that the foregoing is an estimate for 2020 only and such amount shall increase during the term of the Lease based on the yearly assessment by the Maricopa County Assessor.

c) Tenant acknowledges receipt of the invoice from Landlord for the Insurance Costs in the amount of $1,256.00. As permitted under Section 15.5 of the Lease, commencing on August 1, 2020, Tenant shall pay with the Minimum Monthly Rent the following as reimbursement for the Insurance Costs: $251.20, plus rent tax in the amount of $7.28, per month.

d) A summary of the payments under this Section 3 are set forth on Schedule 1 attached to this Amendment.

4. Expenses Under Superior Documents. In addition to the payments set forth in Sections 2 and 3 above, and summarized on Schedule 1 attached hereto, Tenant shall continue to pay any costs and expenses allocated to the Parcel by the Superior Documents, including but not limited to the costs of maintenance and repair of the Shared Retention Area, and maintenance and repair of shared utilities which benefit the Parcel.

5. Forbearance of Remedies. For so long as there is no default hereunder or under the Lease during the Rent Deferral Period, Landlord will not, except as set forth herein, exercise any remedies available to it under the Lease (including, without limitation, the Guaranty), at law or in equity.

6. Reservation of Rights. Except as expressly provided in this Amendment, Landlord expressly reserves all rights, powers and remedies provided for in the Lease, this Amendment, or available at law or in equity, whether now or hereafter existing, including but not limited to any default which may have heretofore occurred or which may hereafter occur with respect to the Lease. No action or inaction by Landlord shall be deemed a waiver by Landlord of any default or limit Landlord in declaring any default, or limit or waive any rights, powers, or remedies which Landlord may have under the Lease, this Amendment, or applicable law. No delay or failure in exercising any rights, powers, or remedies under the Lease, this Amendment, or applicable law shall operate as a waiver of any such rights, powers, or remedies. Landlord may exercise such rights, powers, and remedies at any time, with or without prior notice, except as required by the Lease, this Amendment, or applicable law.

7. Modification. Notwithstanding anything herein to the contrary, neither this Amendment nor any discussions, oral agreements, e-mails, memoranda or summaries of meetings, or other contact between Landlord and Tenant or their representatives constitutes (a) waiver or release of any of Landlord's rights, powers, or remedies relating to the Lease, (b) course of dealing obligating Landlord to provide additional or other accommodations to Tenant, or (c) commitment or any agreement to make a commitment with respect to any possible waiver of the Lease. Tenant agrees and acknowledges that Landlord has no obligation whatsoever to discuss, negotiate or agree to any possible waiver or future amendment or modification of the Lease, except as expressly provided in this Amendment. Nothing in this Amendment shall confer on Tenant any right to notice or cure period other than as provided in the Lease, this Amendment, or applicable law.

8. Default Interest; Late Charges. Default interest and late charges shall accrue on the Deferred Rent during the Rent Deferral Period as provided in the Lease. However, if the Deferred Rent is paid as provided herein, such default interest and late charges shall be waived upon repayment of the Deferred Rent.

9. Due Upon Default. Tenant and Landlord agree that, upon Tenant's failure to timely pay any amounts due under this Amendment, Landlord may exercise its rights as set forth in Article 21 of the Lease.

10. Minimum Monthly Rent. Tenant has paid Minimum Monthly Rent for April 2020 in the amount of $8,333.33, plus rent tax in the amount of $241.67, to Landlord.

11. Miscellaneous.

(a) Full Force and Effect; Merger. The Lease, subject to the modifications herein, remains in full force and effect and is hereby ratified by Landlord and Tenant. In the event of any conflict between the Lease and this Amendment, the terms and conditions of this Amendment shall control. This Amendment contains the entire agreement of Landlord and Tenant with respect to the subject matter hereof, and may not be amended or modified except by an instrument executed in writing by Landlord and Tenant.

(b) Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The parties agree that signatures transmitted by facsimile or electronically shall be binding as if they were original signatures.

(c) Brokers. Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Amendment, and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Amendment. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent occurring by, through, or under the indemnifying party. Landlord acknowledges that Tenant or related parties are licensed real estate brokers or salespersons in the State of Arizona.

(d) Confidentiality. Tenant shall not disclose, other than to its attorneys, insurers and accountants who need to know to perform their respective duties, the terms and conditions of this Amendment, except as may otherwise be required by law.

(e) Governing Law. This Amendment is governed by the laws of the State of Arizona.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment to be executed and made effective as of the Effective Date.

**LANDLORD:**

**BRC 4SHER, LLC,**
an Arizona limited liability company

By: Sherry Carlo
Name: Sherry Carlo
Its: Manager

**TENANT**:

**Black Rock Store Operations, LLC**,
an Oregon limited liability company

By: ______________________
Bryan Pereboom, Authorized Signatory

CONSENT BY GUARANTOR:

**Black Rock Coffee Holdings, LLC,**
a Delaware limited liability company

By: ______________________
Name: Bryan Pereboom
Its: Authorized Signatory

**SCHEDULE 1**

**May 1, 2020 Through and Including July 31, 2020 (Rent Deferral Period):***

| | |
|---|---|
| Interim Rent - | $1,500.00 |
| Rent Tax on Interim Rent- | $ 43.50 |
| TOTAL PER MONTH: | $1,543.50 |

**Monthly Payments August 1, 2020 Through and Including December 31, 2020:***

| | |
|---|---|
| Minimum Monthly Rent (MMR) - | $8,333.33 |
| Rent tax on MMR- | $ 241.67 |
| Estimated 2020 Property Tax - | $2,507.00 |
| Rent tax on Property Tax - | $ 72.70 |
| Insurance Costs - | $ 251.20 |
| Rent tax on Insurance Costs - | $ 7.28 |
| TOTAL PER MONTH - | $11,413.18 |

**February 1, 2021 Through and Including July 31, 2021(Repayment Period) – subject to Section 2(e) of this Amendment:***

| | |
|---|---|
| Minimum Monthly Rent (MMR) - | $8,333.33 |
| Rent tax on MMR- | $ 241.67 |
| Deferred Rent - | $3,416.66 [$6,833.33 x 3= $20,500/6] |
| Rent tax on Deferred Rent - | $ 99.08 |
| TOTAL PER MONTH - | 12,090.74** |

*Does not include any payment due under the Superior Documents, which shall be required to be paid in accordance with the terms of the Lease

**Does not include reimbursement for 2021 real estate taxes and Insurance Costs, which shall be determined by Landlord and paid by Tenant in accordance with the terms of the Lease

# EXHIBIT B

Unofficial
Document

RECORDED ELECTRONICALLY
BY CHICAGO TITLE AGENCY

20

C1
Ho

When Recorded, Return to:

Evergreen Devco, Inc.
2390 East Camelback Road
Suite 410
Phoenix, Arizona 85016
Attn: Ms. Laura Ortiz

# COMMON OPERATION AND RECIPROCAL EASEMENT AGREEMENT

(SEC 35th Avenue and Greenway Road, Phoenix, Arizona)

# TABLE OF CONTENTS

PAGE

ARTICLE 1 - DEFINITIONS ........ 3

ARTICLE 2 - EASEMENTS ........ 6

ARTICLE 3 - COMMON AREAS ........ 10

ARTICLE 4 - DEVELOPMENT CONTROL ........ 13

ARTICLE 5 - PARCEL ........ 16

ARTICLE 6 - MANAGEMENT ........ 20

ARTICLE 7 - ASSESSMENTS ........ 23

ARTICLE 8 - INDEMNIFICATION AND INSURANCE ........ 25

ARTICLE 9 - SIGNS ........ 27

ARTICLE 10 - CONDEMNATION ........ 29

ARTICLE 11 - RESTRICTIONS ........ 29

ARTICLE 12 - ENFORCEMENT ........ 31

ARTICLE 13 - TRANSFER ........ 32

ARTICLE 14 - DECLARANT'S RIGHTS ........ 33

ARTICLE 15 - PLATTING ........ 36

ARTICLE 16 - TERM OF AGREEMENT ........ 36

ARTICLE 17 - AMENDMENT ........ 37

ARTICLE 18 - MISCELLANEOUS ........ 37

Unofficial Document

# COMMON OPERATION AND RECIPROCAL EASEMENT AGREEMENT

THIS COMMON OPERATION AND RECIPROCAL EASEMENT AGREEMENT (this "Agreement") is made as of the 1st day of July, 2019, by EVERGREEN–35TH & GREENWAY, L.L.C., an Arizona limited liability company ("Declarant"), whose address is c/o Evergreen Devco, Inc., 2390 East Camelback Road, Suite 410, Phoenix, Arizona 85016.

## RECITALS

A. Declarant is the owner and developer of certain real property situated in Phoenix, Maricopa County, Arizona, more particularly described on Exhibit "A" attached hereto (the "Development").

B. A conceptual site plan for the Development is attached hereto as Exhibit "B".

C. The Development is intended to be developed as an integrated commercial development on the terms and conditions herein set forth.

D. Fee simple title to all or portions of the Development may from time to time hereafter be transferred to third parties, and prior thereto, Declarant desires (i) to establish and subject each and every portion of the Development to the easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards hereinafter set forth, (ii) to provide for the use and maintenance of the Development as an integrated commercial development, and (iii) to enhance and protect the value and desirability of the Development by encouraging the development of attractive improvements at appropriate locations, preventing haphazard or inharmonious development, assuring adequate pedestrian and vehicular ingress, egress and circulation throughout the Development and to and from adjacent public rights-of-way, providing for adequate on-site parking, on-site loading and on-site drainage facilities, assuring the installation and maintenance of attractive landscaping, assuring appropriate lighting, and otherwise regulating the development, use and operation of the Development.

Unofficial Document

NOW, THEREFORE, Declarant hereby declares, on behalf of all present and subsequent Owners (as hereinafter defined), that the Development and all portions thereof are now held and from and after the date hereof will be acquired, held, conveyed, hypothecated, encumbered, leased, used, occupied and improved subject to the following easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards, all of which are declared to be in furtherance of a plan for the mutual and reciprocal benefit, common use and enjoyment, improvement and sale of the Development and all portions thereof, and which are established for the purpose of enhancing and protecting the value of the Development as a whole, as follows:

AGREEMENTS

## ARTICLE 1 - DEFINITIONS

When used in this Agreement, the following capitalized terms have the following meanings:

1.1 "**Building**" means a building or other structure intended for occupancy and constructed or to be constructed from time to time on a Parcel.

1.2 "**Building Envelope**" means that area of a Parcel within which Buildings are permitted to be constructed, as shown on the Site Plan or in COREA Supplement(s).

1.3 "**Circulation Drives**" means those vehicular driveways designated as such on the Site Plan including, without limitation, any immediately adjacent sidewalk, walkways, curbs, gutters and similar Improvements appurtenant to the Circulation Drives. The Circulation Drives are intended to be paved and used for purposes of vehicular and pedestrian access, ingress and egress. Evergreen reserves the right to designate which portions of the Development constitute Circulation Drives, or to withdraw all or a portion of a Circulation Drive previously so designated, as to all or any portion of the Development then owned in fee by Evergreen. Those driveways designated on the Site plan as "Wentworth Drives" are not Circulation Drives and do not constitute part of the Common Areas under this Agreement, but are governed by the Wentworth Agreement.

1.4 "**Circulation Drive Lights**" means the lights, including light poles, bases and standards, upon or in the vicinity of and primarily intended to illuminate the Circulation Drives.

Unofficial Document

1.5 "**City**" means the City of Phoenix and its duly authorized departments and agencies.

1.6 "**Common Areas**" means those exterior portions of the Development (outside exterior walls of Buildings) that are available, under this Agreement, for the nonexclusive use, convenience and enjoyment of all Owners and their Permittees, including the Circulation Drives and those portions of the Development intended from time to time for use as parking areas (subject to the prohibitions against cross-parking set forth in subparagraph 2.1(c) below), landscaped areas, sidewalks, walkways, roadways, and ingress and egress to and from public rights-of-way. Common Areas do not include loading, docking, delivery, trash or service areas, enclosures or facilities, drive-up or drive-through lanes or facilities, patio seating or similar exterior areas for outside dining, or any portion of a Parcel expressly excluded from Common Areas on the Site Plan or in a COREA Supplement(s).

1.7 "**COREA Supplement**" means an instrument signed and Recorded by Declarant against a Parcel while Declarant is the Owner of the Parcel, or by Declarant and the Owner of the Parcel after Declarant is no longer the Owner of the Parcel, which instrument may be a supplement to this Agreement, or separate and distinct from this Agreement, and may include, without limitation, easements, covenants, conditions or restrictions in addition to those set forth in this Agreement. COREA Supplements are subject and subordinate to this Agreement. In the event of any conflict or inconsistency between this Agreement and a COREA Supplement, the instrument containing the more stringent requirements governs, unless Declarant determines to the contrary.

COREA Supplements may be amended in accordance with the terms and provisions for amendment expressly contained therein, or in the absence thereof, in accordance with the terms and provisions for amendment of this Agreement contained in ARTICLE 17. The term of any COREA Supplement may not exceed the term of this Agreement, and if this Agreement is terminated for any reason, all COREA Supplements likewise terminate without the necessity of further action by any party.

1.8 "**Declarant**" means Evergreen–35th & Greenway, L.L.C., an Arizona limited liability company, as the holder of all rights and obligations granted or reserved in favor of Declarant as the original signer and declarant under this Agreement, and/or its duly authorized successor(s) under this Agreement. Any right, privilege or easement granted or reserved in favor of Declarant also runs in favor of the agents, employees and contractors of Declarant designated by Declarant.

1.9 "**Design Guidelines**" means a design that is architecturally compatible with the design theme of the Buildings originally constructed in the Development (allowing for reasonably integrated accent, trademark or corporate colors that may differ from that design theme), as approved by Declarant under this Agreement, and applicable governmental authority.

1.10 "**Development**" means the real property described on Exhibit "A" attached hereto, subject to Declarant's right to annex or de-annex as further provided in paragraph 14.6 below.

1.11 "**Evergreen**" means only Evergreen–35th & Greenway, L.L.C., an Arizona limited liability company and not its successors or assigns, unless the rights expressly reserved to Evergreen in this Agreement are expressly assigned to and assumed by a third party under 0.

Unofficial Document

1.12 "**Fixed Drive**" means a vehicular driveway designated as such on the Site Plan.

1.13 "**Improvements**" means, as applicable, the Buildings, Circulation Drives, Circulation Drive Lights, Fixed Drives, parking areas, loading areas, refuse, storage or collection areas, fences, walls, paving, sidewalks, Landscaping, light poles and bases, lighting, signs, utility installations, bridges, and other structures or improvements, constructed or to be constructed on a Parcel.

1.14 "**Landscaping**" means all exterior landscaping in the Common Areas of the Development, and in the adjacent public rights-of-way (including roadway medians) to the extent that the City is not responsible for the maintenance thereof, including related irrigation and electrical systems.

1.15 "**Manager**" means the Person responsible for maintenance under ARTICLE 6. Declarant is the Manager until Declarant either assigns its rights and obligations as Manager to another Person in accordance with paragraph 14.1, or Declarant resigns and withdraws as Manager in accordance with paragraph 14.2.

1.16 "**Master Declaration**" means that certain Declaration of Establishment of Protective Covenants, Conditions and Restrictions and Grants of Easements dated November 21, 1973 and Recorded on December 31, 1973 at Docket 10456, Page 993, as amended by that certain Supplement dated February 24, 1976 and Recorded April 1, 1976 at Docket 11613, Page 337, that

certain First Amendment dated June 26, 1987 and Recorded November 10, 1987 as Instrument No. 87-682298 and that certain Second Amendment dated January 7, 2019 and Recorded January 15, 2019 as Instrument No. 20190028334 against the Development and certain adjacent real property. This Agreement is subject and subordinate to the Master Declaration. In the event of conflict between the Master Declaration and this Agreement, the Master Declaration governs.

1.17 "**<u>Owner</u>**" means the holder(s) of fee simple title to a Parcel, whether by sale, assignment, inheritance, operation of law, trustee's sale, foreclosure, or otherwise; provided, however, the term "<u>Owner</u>" does not include the holder of any lien or encumbrance on a Parcel, or any tenant or occupant of all or a portion of the Parcel or a Building constructed or to be constructed thereon, who is not also vested with fee simple title. Subject to any express exception elsewhere provided herein, Declarant is an Owner for all purposes of this Agreement as to Parcel(s) owned in fee by Declarant.

1.18 "**<u>Parcel</u>**" means each of the five (5) separate lots into which the Development has been or will be subdivided as shown on the final Recorded Plat for the Development. No Parcel may be further subdivided or aggregated with another Parcel or Parcels without the prior written consent of Declarant. Upon dedication by an Owner to applicable governmental authority of a portion of such Owner's Parcel for public right-of-way or other public purposes, and so long as such dedicated portion is used solely for such purposes, such dedicated portion will no longer be considered a part of the Parcel, but will thereupon automatically be excluded from the operation and effect of this Agreement as fully as though the legal description of such dedicated portion were not included in the description of the Parcel originally subjected to this Agreement.

Unofficial Document

1.19 "**<u>Parcel Monument Sign</u>**" means each free-standing monument sign permitted to be installed on a Parcel by the City. A Parcel Monument Sign may only be located as shown on the Site Plan and must conform to the comprehensive sign plan for the Development. Except as otherwise expressly permitted by Declarant, a Parcel Monument Sign may only be used for purposes of the identification of businesses operated in the Development from time to time.

1.20 "**<u>Permittees</u>**" means the tenant(s) or lawful occupant(s) of a Parcel (other than the Owner thereof), and the respective employees, agents, contractors, customers, invitees, and licensees of (i) the Owner of the Parcel, and (ii) such tenant(s) or occupant(s).

1.21 "**<u>Person</u>**" means an individual, corporation, partnership, limited liability company, association, trust, governmental entity, or other legal entity, or combination of them.

1.22 Intentionally Omitted.

1.23 "**<u>Recorded</u>**" means recorded in the official public records of Maricopa County, Arizona.

1.24 "**<u>Shared Sign</u>**" means each free-standing sign labeled as such and located or to be located as shown on the Site Plan, all of which are collectively referred to herein as "**Shared Signs**." Each Shared Sign may be shared by one or more Owners and other parties, as determined by Declarant and designated in a COREA Supplement. Except as otherwise expressly permitted by Declarant, Shared Signs may only be used for purposes of the identification of businesses

operated in the Shopping Center from time to time, as further provided in paragraphs 2.1(n) and 9.3. The Shared Signs are referred to in the Wentworth Agreement as the Monument Signs.

1.25 "**Shopping Center**" means the real property comprising the Development and the Wentworth Parcel.

1.26 "**Site Plan**" means the conceptual site plan for the Development attached hereto as Exhibit "B", as the Site Plan may be subsequently revised or amended in accordance with this Agreement. Declarant reserves the right at any time, and from time to time, to revise the Site Plan as to any permitted annexation or deannexation, and as to all or any portion of the Development then owned in fee by Declarant), subject to any express limitations expressly set forth in this Agreement or in any Recorded COREA Supplement.

1.27 "**Wentworth Agreement**" means that certain Easement Agreement dated July 1, 2019 and recorded on July 2, 2019 as Instrument No. 2019 - 0502190 in the Official Records of the Maricopa County Recorder. This Agreement is subject and subordinate to the Wentworth Agreement. The Owners are bound by the obligations of the Wentworth Agreement, including the insurance and indemnification obligations thereof. In the event of conflict between the Wentworth Agreement and this Agreement, the Wentworth Agreement governs.

1.28 "**Wentworth Parcel**" means that certain parcel of real estate located adjacent to the Development and identified as such on the Site Plan.

Unofficial Document

## ARTICLE 2 - EASEMENTS

2.1 **Grant of Easements**. Intending to benefit and burden each Parcel now existing within the Development or as may hereafter from time to time be established, Declarant grants and reserves the following easements for the Development:

(a) Easements in favor of Declarant, the Manager, the Owners and their Permittees for driveway purposes and the reasonable passage of pedestrians and motor vehicles (including, without limitation, trash, utility, emergency and delivery vehicles) over and across the Circulation Drives;

(b) Easements in favor of Declarant, the Manager, the Owners and their Permittees for reasonable access, ingress and egress over all driveways, roadways, walkways and sidewalks surfaced with pavement or concrete as now or hereafter constructed and constituting a part of the Common Areas, so as to provide for the passage of motor vehicles and pedestrians between all portions of the Common Areas intended for such purposes, and to and from all abutting public streets or rights of way furnishing access to the Development (i.e., 35th Avenue and Greenway Road);

(c) Easement for the reasonable parking of motor vehicles by Declarant, the Manager, the Owners and their Permittees in parking stalls or spaces in the Common Areas of the Development intended for such purposes; provided, however, this easement does not permit cross-parking by the employees or vendors of an Owner or the employees or vendors of such Owner's

Permittees on the Parcel of another Owner, and each Owner agrees to take reasonable steps to limit to its Parcel parking by such employees and vendors (unless otherwise agreed under subparagraph (b)). As to any Parcel then owned by Declarant, Declarant reserves the right in one or more COREA Supplements to terminate the easement for cross-parking contained herein as between the Parcel and the balance of the Development, whereupon each Owner agrees to use reasonable efforts to enforce the prohibition against cross-parking between the Parcel and the balance of the Development. Declarant reserves the right to subsequently reinstate cross-parking rights previously terminated hereunder. Unless otherwise approved by Declarant and the City, each Parcel, when improved, must contain a sufficient number of parking spaces to satisfy both minimum and maximum City code parking requirements for the use to be made of the Parcel. However, if the City and Declarant expressly permit a reduced number of parking spaces on a Parcel (or combination of Parcels with cross easements for parking), the reduced number of parking spaces satisfies the foregoing minimum parking requirement;;

(d) (i) Easements in favor of Declarant, the Manager, and such Owner(s) or other Person(s) served by the easement(s) in each specific instance as Declarant may designate in a separate easement or in a COREA Supplement, upon, over, under, above and across the Development for the purpose of the construction, use, operation, maintenance, removal, and replacement of water (domestic, irrigation and fire), gas, electric, telephone, sewer (storm and sanitary, including lift stations), fiber optic and cable television lines, conduits or systems, and similar reasonable and necessary utilities or services, together with reasonable rights of ingress and egress thereto; provided that all such Improvements, systems, and structures installed or constructed on another Owner's Parcel must be installed and maintained below the ground or surface of that Parcel (except as expressly provided Unofficial Document below); and, provided further, that the written approval of the Owner of the burdened Parcel as to the location of any such easement must first be obtained. Such approval may not be unreasonably withheld so long as the location of such easement is at least ten (10) feet from any existing or contemplated Building on the burdened Parcel (including for this purpose any loading or drive-through areas appurtenant to the Building), or if the burdened Parcel is a Parcel then owned by Declarant (or Evergreen-35th & Greenway, L.L.C., if it is no longer Declarant), so long as the location of such easement is upon or within a Circulation Drive or within fifteen (15) feet of the right-of-way line of Greenway Road or 35th Avenue, or (C) otherwise expressly set forth on the Site Plan. Any such Improvements, systems and structures required or requested to be placed above ground on another Owner's Parcel are subject to the prior written approval of the Owner of the burdened Parcel, such approval not to be unreasonably withheld with respect to reasonable transformers, utility cabinets or panels, and risers that do not obstruct access or visibility or reduce the number of parking spaces on such Owner's Parcel. Each Owner agrees at the request of Declarant to execute, acknowledge and deliver in recordable form reasonably acceptable to Declarant a specific written easement in favor of Declarant, the Manager, any Owner or other Person designated by Declarant who is served by the easement, and/or any utility provider or governmental or quasi-governmental authority as to specific Improvements installed pursuant to this easement;

(ii) At any time and from time to time the Owner of a Parcel has the right to relocate on its Parcel any utility line or facility installed pursuant to a grant of easement described in this <u>subparagraph (d)</u> that is then located on such Owner's Parcel, provided that such relocation (1) may be performed only after the Owner proposing to undertake such relocation gives at least

thirty (30) days' prior notice to the Owner of each Parcel served by the utility line or facility, (2) may not unreasonably interfere with or diminish utility service to the Parcel(s) served by the utility line or facility, (3) may not reduce or unreasonably impair the usefulness or function of the utility line or facility, (4) must be performed without cost or expense to the Owner of any other Parcel, (5) must be performed with all due diligence so as to minimize any disruption, and (6) must include restoration of the surface of all affected areas to a condition equal to or better than the condition that existed prior to such relocation. The Owner performing such relocation agrees to provide within thirty (30) days following the date of completion of such relocation as-built plans for all such relocated utility lines and facilities to the Owner(s) of all Parcel(s) served by such utility lines and facilities. Upon completion of such relocation, any specific easement Recorded under this subparagraph (d) will be amended by the necessary parties to conform to the relocation of the Improvements;

(iii) Except in cases of emergency, the right of Declarant, the Manager, or any Owner to enter upon the Parcel of another Owner pursuant to easements granted in this subparagraph (d), or of any Owner to prosecute work on such Owner's own Parcel if the work interferes with utility easements or easements of ingress, egress or access to or in favor of another Owner's Parcel, may be undertaken only after giving the Owner of the adversely affected Parcel not less than thirty (30) days' prior written notice of the scope and nature of the work, the duration of the work, and the area in which the work is to be performed, and obtaining the advance written approval of the Owner of the adversely affected Parcel to the work; provided, however, Declarant or the Manager, acting reasonably, is exempted from giving such notice to or obtaining such consent from another Owner. The Owner of the adversely affected Parcel may not withhold or delay such written approval when reasonable arrangements are made to perform any work required in a manner and at times calculated to cause minimal disruption to the use and occupation of any adversely affected Parcel, and no affirmative monetary obligation is imposed upon the Owner thereof. The Owner undertaking such work agrees with due diligence to repair at its own cost and expense any and all damage caused by such work and to restore the affected portion of the Parcel upon which such work is performed to a condition equal to or better than the condition that existed prior to the commencement of such work. All such work must be performed in a good and workmanlike manner, free and clear of liens. Except as otherwise expressly provided herein, the Owner undertaking such work agrees to pay all costs and expenses associated therewith and agrees to indemnify, defend and hold harmless Declarant, the Manager, all Owners and their respective Permittees for, from and against all damages, losses, liens or claims (including reasonable attorneys' fees and costs) attributable to the performance of such work; and

Unofficial Document

(iv) In addition to the foregoing provisions of this subparagraph (d), each Owner agrees to cooperate in the granting of appropriate easements within the Common Areas of such Owner's Parcel to any governmental or quasi-governmental entity or utility company for underground utilities to serve other portions of the Development.

(e) Easements in favor of the Owners for footings, screen walls, retaining walls, curbing, and light pole bases or standards which may encroach by no more than one (1) foot into or upon the Common Areas of another Owner's Parcel, excluding the Circulation Drives; provided, however, the Owner of the Parcel upon which an Improvement encroaches but for this easement may require by advance written notice to the encroaching Owner that in the event of damage,

destruction, demolition, exterior renovation or remodeling, or other removal by any means of all or any significant portion of the encroaching Improvement so identified, the encroaching Improvement must be removed in its entirety from the notifying Owner's Parcel, at the encroaching Owner's sole expense;

(f) An easement in favor of the Owners for purposes of the construction, use, operation, maintenance, removal and replacement of any portion of any landscape planters, light poles, bases and standards, curbing, sidewalks and drive aisles that inconsequentially encroach into or upon the Common Areas of an adjoining Parcel, excluding the Circulation Drives, in a location approved by Declarant or set forth on the Site Plan, provided that such location does not unreasonably impair the use, enjoyment and operation of the Common Areas of the burdened Parcel or adversely affect the conduct of business thereon;

(g) A temporary easement in favor of Declarant, the Manager and the Owners upon, over, under, above and across the Common Areas of each Parcel (excluding the Circulation Drives) for the sole purpose of constructing, maintaining, repairing, or reconstructing with due diligence any Improvements on a Parcel that may most advantageously be constructed, maintained, repaired or reconstructed from the Parcel of another Owner, including construction and installation of Buildings and other Improvements, subject to the written approval of the Owner of the burdened Parcel as to the nature, extent and duration of any proposed use of the easement, which approval may not be unreasonably withheld so long as the use of this easement does not unreasonably impair the use, enjoyment and operation of the Common Areas of the burdened Parcel or adversely affect the conduct of business thereon; provided, however, it is reasonable for an Owner to withhold approval to the use of developed portions of its Parcel pursuant to this easement for purposes of construction staging or the parking of construction vehicles. Without limiting the generality of the foregoing, this easement is also for the maintenance, repair and service of any portion of the Common Areas that the Manager or any Owner is obligated or permitted to perform hereunder, subject to the provisions hereof. Use of this easement must be minimized to the extent reasonably practicable;

Unofficial Document

(h) An easement in favor of Declarant, the Manager and the Owners to enter upon a Parcel pursuant to the self-help provisions of paragraph 12.2 for the purpose of performing any obligation that the Owner of the Parcel is required to perform under this Agreement but fails or refuses to perform within the applicable time period provided in said paragraph 12.2;

(i) Easements in favor of Declarant, the Manager and the Owners for the incidental surface drainage of stormwater runoff from one Parcel onto another Parcel over and across the Common Areas in minimal volumes not causing damage to the Parcel receiving the runoff, consistent with the original grading and drainage plans for the Development approved by Declarant (or a modified design expressly permitted by this Agreement);

(j) An easement in favor of Declarant, the Manager, and such Owner(s) served by the easement in a specific instance as Declarant may designate, under the Fixed Drives, Circulation Drives and upon, over, under, above and across the Common Areas of the respective Parcels within ten (10) feet of the Circulation Drives, and within any landscaped area along public right-of-way frontage of the Development for purposes of the installation, use, operation, maintenance, repair,

removal and replacement in locations originally approved by Declarant of the Circulation Drive Lights and associated utilities for illumination of the Circulation Drives, Landscaping,and electrical panels and transformers, utility meters, landscape sprinkler controls and similar facilities, if any, deemed necessary or desirable by Declarant to serve all or portions of the Development;

(k) An easement in favor of Evergreen upon, over, under, above and across the Common Areas and other exterior portions of the Development for purposes of the initial construction and installation of any Improvements that Evergreen is contractually obligated or otherwise elects to construct and install; and

(l) An easement in favor of Declarant and the Manager upon, over, under and across the Common Areas of the Development for the purposes of performing the maintenance, repair and replacement obligations described in ARTICLE 6.

2.2 **Reasonable Use of Easements**.

(a) Each Owner and its Permittees may only use the easements granted herein in such a manner as not to unreasonably interfere with, obstruct or delay the conduct and operations of the business of any other Owner or its Permittees at any time conducted on its Parcel, including, without limitation, public access to and from said business, and the receipt or delivery of merchandise in connection therewith. Each Owner undertaking work on the Parcel of another Owner pursuant to an easement granted herein agrees with due diligence to repair in a good and workmanlike manner at its own cost and expense any and all damage caused by such work and to restore the affected portion of the Parcel upon which such work is performed to a condition equal to or better than the condition that existed prior to the commencement of such work.

Unofficial Document

(b) The easements granted herein are nonexclusive, and each Owner has the right to use and occupy all or any portion of the Common Areas of such Owner's Parcel for any use or purpose not inconsistent with such easements and this Agreement.

2.3 **Easements Perpetual**. Except as otherwise expressly provided herein, all easements granted in this Agreement are perpetual in duration.

2.4 **No Implied Easements**. Nothing contained in this Agreement creates any implied easements not otherwise expressly granted herein.

## ARTICLE 3 - COMMON AREAS

3.1 **Use and Configuration of Common Areas**. Common Areas may only be used for purposes of ingress, egress and vehicular and pedestrian access and circulation between the Parcels and adjacent public rights-of-way, for vehicular parking, for loading and unloading of commercial and other vehicles and the servicing and supplying of businesses in the Development, for the comfort and convenience of Owners and their Permittees, and for any other use expressly permitted by Declarant, this Agreement or a COREA Supplement, or required by any governmental authority having jurisdiction over the Development. Except as otherwise provided in this Agreement or in a COREA Supplement, the size, configuration and arrangement of the Common Areas and all

Improvements and facilities constructed thereon, including, without limitation, Circulation Drives, Circulation Drive Lights, parking areas and spaces, patterns of traffic flow, entrances and exits, and location of Trash Facilities, are subject to the prior written approval of Declarant as to the initial construction thereof, and as to any reconfiguration, rearrangement, relocation or remodeling thereof.

3.2 **No Obstructions**. Except as otherwise expressly shown on the Site Plan or approved by Declarant as to the initial construction thereof or any reconfiguration, rearrangement or remodeling thereof, no bumper guard, curb, lighting standard, landscape planter, sidewalk, fence, wall, rail, division or any other permanent Improvement that could constitute a barrier may be constructed or placed by an Owner in the Common Areas of such Owner's Parcel or upon or along any of the common boundary lines thereof, if it interferes with the Circulation Drives or otherwise materially adversely affects the parking configuration, vehicular and pedestrian circulation (including, without limitation, trash, utility, emergency and delivery vehicles), or access in and through the Common Areas of the Development. Temporary structures and barricades may be installed on portions of the Development in connection with the construction of permanent Improvements on the Parcels or the maintenance or repair of the Circulation Drives, subject to the prior written consent of Declarant, which consent may not be unreasonably withheld provided that such structures and barricades do not unreasonably interfere with use of the Common Areas or interfere with, obstruct or delay the conduct and operations of the business of any Owner or its Permittees at any time conducted on its Parcel. All temporary barricades and structures must be maintained in a safe, neat and clean condition by the Owner installing them and must be promptly removed when the construction to which they relate has been completed. Use of extruded curb is strictly temporary within the meaning of this paragraph 3.2 and may not be used as a permanent Improvement without Declarant's express written consent.

Unofficial Document

3.3 **Possession of Common Areas**. Declarant, the Manager, the Owners and their respective Permittees jointly enjoy possession of the Common Areas under and subject to this Agreement. Declarant reserves the right at any time and from time to time to remove, exclude or restrain by appropriate means any Person who is using or occupying the Common Areas in a manner contrary to this Agreement or applicable law, as determined by Declarant. If such unauthorized use is by an Owner or its Permittees, such Owner agrees to immediately cease and cause its Permittees to immediately cease such unauthorized use upon notice from Declarant. Declarant also reserves the right to restrict access to Common Areas not intended for use by Owners and their Permittees, including, without limitation, washes and natural open spaces, if any.

3.4 **Parking**.

(a) All motor vehicles of Owners and Permittees must be parked in the Common Areas in parking spaces and within lines and stripes intended for parking purposes. Except as may be required by applicable governmental authority, no charge or other validation for parking in the Common Areas may be made unless agreed upon by all affected Owners and permitted by applicable law. No portion of the parking facilities upon the Common Areas of a Parcel may be designated as "reserved" by the Owner thereof without the prior written consent of Declarant (excluding parking reserved for the handicapped if required by applicable governmental authority); provided, however, time and use restrictions such as, by way of example only, 15-minute parking

or restaurant "to-go pickup" parking, may be established for a limited number of parking spaces on a Parcel with the written approval of Declarant. This subparagraph (a) does not prohibit a valet parking operation conducted by an Owner solely on its own Parcel, provided that the prior written consent of Declarant is obtained.

(b) As further provided in subparagraph 0, each Owner agrees to use reasonable efforts to restrict to such Owner's Parcel parking by the employees and vendors of such Owner and its Permittees.

(c) Overnight parking of semi-trucks or trailers in the Development is expressly prohibited without Declarant's prior written consent. Parking by one vehicle or vehicle/trailer combination in more than one parking space, or in a manner that blocks or partially blocks a Circulation Drive or drive aisle is expressly prohibited without Declarant's prior written consent.

(e) No structures for covered parking, solar panels or electrical vehicle recharging stations are permitted in the Common Areas without Declarant's prior written consent.

(f) Declarant reserves the right to enforce the provisions of this paragraph 3.4 by such means as Declarant deems appropriate, including, without limitation, towing or "booting" improperly parked vehicles or trailers.

3.5 **Waste or Nuisance**. No rubbish or debris of any kind may be placed or permitted to accumulate upon any portion of the Development for any unreasonable length of time, and no obnoxious or offensive odor is permitted Unofficial Document from any portion of the Development. No nuisance is permitted in any portion of the Development. Without limiting the generality of the foregoing, no horn, whistle, bell, speaker, sound system or other exterior sound device may be located, used or placed upon, or audible from, exterior portions of the Development other than (i) those used to broadcast music commonly used in the operation of an Owner's business (e.g., Muzak or similar commercial music service), provided that such music is not played in a loud or offensive manner or in a manner that adversely affects the operation of the business of another Owner or its Permittees as reasonably determined by such other Owner, (ii) security devices or fire alarms used solely for such purposes, (iii) exterior speakers and sound systems for outdoor dining areas and for drive-up or drive-through facilities, (iv) exterior bells, paging or sound systems normal and customary for an educational facility, or (v) any other exterior sound system or device expressly permitted in a COREA Supplement.

3.6 **Rules and Regulations**. Declarant may at any time and from time to time by written notice to all Owners establish and thereafter supplement, modify or amend, reasonable and nondiscriminatory rules and regulations for the use of the Common Areas, which must be complied with by all Owners and their respective Permittees, and which may include, but not be limited to, the temporary closure of all or any portion of the Common Areas as may be legally necessary, in the opinion of Declarant or its legal counsel, to prevent a dedication of the Common Areas or the accrual of any prescriptive rights therein to any Person or the public, but may not otherwise adversely affect vehicular parking, ingress or egress. Declarant is also expressly granted the right during the prosecution of construction on an Owner's Parcel to require the Owner and its contractor(s) and workmen to restrict materials and equipment storage, construction-related

deliveries, and construction traffic and parking, to times and areas designated by Declarant. At any time that no Declarant is then serving under this Agreement, the Manager may exercise the rights of Declarant set forth in this paragraph 3.6.

3.7 **Commercial Use of Common Areas Restricted**. Except as expressly permitted by this Agreement, a COREA Supplement or with Declarant's prior written consent, no sale, lease, or display of merchandise may be made, conducted or permitted in the Common Areas or otherwise outside the exterior walls of any Building in the Development, no portion of such areas may be used for commercial purposes by any Owner or Permittee, and no traveling carnivals, fairs, rides, auctions, shows, performances, kiosks, booths or lots for the sale of fireworks or Christmas trees, sales by transient merchants from vehicles or booths, fund-raisers or other charitable events, are permitted in the Common Areas. No Owner may cause, permit or undertake any posting of advertisements on vehicles or Buildings other than advertisements placed by an Owner or its Permittees on the Buildings located upon its own Parcel related to the business purposes conducted thereon and in compliance with this Agreement and all applicable law. No political demonstration or rally, political advertising or campaigning, promotions outside of Buildings, sidewalk sales or similar activities are permitted in the Development without the prior written consent of Declarant. Shopping carts may only be stored in Common Areas within locations approved by Declarant and the City, and no exterior overnight storage of shopping carts is permitted except within storage corrals approved by Declarant and the City. No maintenance or repair of vehicles is permitted in the Common Areas without the prior written consent of Declarant.

3.8 **Vending Machines**. Except as expressly permitted by a COREA Supplement, no vending machines, ATM/Banking facilities, Unofficial Document or other retail fixtures or equipment of any kind may be located in the Common Areas or on any sidewalk within the Development (whether said sidewalk is considered a part of Building Envelope or Common Areas), without the prior written consent of Declarant.

## ARTICLE 4 - DEVELOPMENT CONTROL

4.1 **Building Envelopes**. Buildings may only be constructed or placed upon the respective Parcels within Building Envelopes. All construction within Building Envelopes must conform with this Agreement and all applicable law. Nothing contained in this paragraph 4.1 prohibits the construction by an Owner within a Building Envelope of Improvements commonly found in Common Areas, in which event such areas will thereupon be deemed Common Areas for purposes of this Agreement during such time as such Improvements are located therein. Canopies, canopy support columns and associated subsurface installations may encroach from the Building Area of a Parcel into the Common Areas of the Parcel (so long as the normal use of the Common Areas is not impaired), in which event such Improvements will constitute part of the Buildings to which they are attached and not part of the Common Areas.

4.2 **Maximum Building Coverage and Building Height**. Notwithstanding the size of any Building Envelope indicated on the Site Plan, the total square footage of floor area and maximum height (measured in accordance with City ordinances and guidelines) of all Buildings to be constructed within the Building Envelope on a Parcel may not exceed the maximum

limitations, if any, shown on the Site Plan or otherwise set forth in this Agreement or in a COREA Supplement.

4.3 **Review and Approval of Plans**. In order to achieve and maintain a harmonious and uniform quality of development for all Parcels within the Development, construction and development plans for the improvement or alteration of a Parcel must be reviewed and approved by Declarant in advance of construction on a Parcel, as further provided in this ARTICLE 4.

4.4 **Submission of Preliminary Plans**. Prior to construction or placement of any Building or other Improvement on a Parcel, including, without limitation, exterior alterations or additions to existing Buildings, or reconstruction following casualty, the Owner thereof agrees to submit to Declarant for approval, prior to or concurrently with a similar submission to the City, preliminary plans for all proposed Improvements to such Owner's Parcel, including, without limitation, two (2) full sets of the following: site plan (including, without limitation, an indication of Building footprint, parking, exterior lighting and other proposed Improvements in Common Areas), grading and drainage plan, Building elevations (including, without limitation, a color and material sample board and a colored rendering of all sides of all Buildings), landscape plan, and signage plan (collectively, "Preliminary Plans"). If expressly required by Declarant, submission of Preliminary Plans, to be complete, must also be accompanied by a $500 architectural review and processing fee to defray the costs of architectural review. All Preliminary Plans for Buildings and other Improvements upon the Parcels must at a minimum conform to the requirements of this Agreement and the Design Guidelines. All Buildings and other Improvements constructed upon the Parcels must be of first-quality construction and be architecturally designed so that the exterior elevations of Buildings (including, without limitation, color, materials, texture and signage) and Common Area Improvements will be architecturally compatible and harmonious with all other Buildings and Improvements constructed or to be constructed in the Development, as determined by Declarant in its sole and absolute discretion.

Unofficial Document

4.5 **Approval/Final Plans**. If, within thirty (30) days after Declarant's actual receipt from an Owner of a submission of Preliminary Plans satisfying the requirements of paragraph 4.4, Declarant does not object to or make a proposal that would add to or modify the Preliminary Plans, the submitting Owner must give written notice to Declarant making reference to this Agreement and this paragraph 4.5, and advising Declarant that Declarant's failure to respond within an additional ten (10) days after such notice is given will result in the Preliminary Plans being deemed approved by Declarant. If Declarant does not object to or make a proposal that would add to or modify the Preliminary Plans within such additional 10-day period, the Preliminary Plans will be deemed approved and satisfactory for further development, provided that they otherwise comply with this Agreement and the Design Guidelines (the "Approved Preliminary Plans"). If Declarant does timely object to or make a proposal that would add to or modify the Preliminary Plans, the submitting Owner will modify the Preliminary Plans accordingly and resubmit them adhering to the procedures and timeframes set forth above in this paragraph 4.5 until they are approved or deemed approved. Two (2) sets of final working drawings, plans and specifications (the "Final Plans") must be completed and submitted to Declarant prior to commencement of construction and must conform to the Approved Preliminary Plans. Such Final Plans are subject to Declarant's review and approval on the same basis as is set forth above in this paragraph 4.5 with respect to the Preliminary Plans. The Final Plans as approved in writing by Declarant and the City are herein

referred to as the "Approved Final Plans." In no event does Declarant's approval of any Owner's drawings, plans, specifications, calculations or work constitute an implication, representation or certification of any kind by Declarant that said items are in compliance with all applicable law, and Declarant is not liable for any defect in any structure constructed in accordance therewith, whether or not in accordance with the Approved Final Plans. The Owner assumes all risk and responsibility with respect to the plans and other drawings and specifications submitted to Declarant and agrees to indemnify, defend and hold harmless Declarant for, from and against any and all losses, claims, damages, obligations or liabilities (including attorneys' fees and costs) arising therefrom or related thereto.

4.6 **No Alterations**. Once Declarant has reviewed and approved the Approved Final Plans for the construction of Buildings and other Improvements on a Parcel, such Buildings and other Improvements must be constructed in accordance therewith, and any further modification thereof requires the prior written approval of Declarant; provided, however, the foregoing does not require the submission to Declarant for approval of "minor modifications" to the Approved Final Plans. For the purposes of this paragraph 4.6, "minor modifications" are modifications that (i) do not affect the exterior appearance of the Buildings and other Improvements on a Parcel, (ii) do not result in an increase or decrease in construction cost of more than Twenty-Five Thousand Dollars ($25,000.00), (iii) do not result in the Approved Final Plans, as modified, no longer being in substantial conformance with the Final Plans as originally approved by Declarant, and (iv) do not result in the Approved Final Plans, as modified, no longer being in conformance with the Design Guidelines. Once constructed, any alteration, addition, repainting, remodeling or reconstruction to or of any existing Building that involves any change in the exterior appearance thereof, and any material alteration of the Common Areas including, but not limited to, alteration of the layout of driveways or parking spaces, requires the prior written consent of Declarant. No changes or alterations to the Circulation Drives or Circulation Drive Lights as originally designated by Declarant and constructed on any Parcel (excluding any Parcel then owned in fee by Declarant) may be made without the prior written consent of those Persons necessary to effect an amendment of this Agreement under ARTICLE 17.

Unofficial Document

4.7 **Sprinklers/Fire Rating**. Unless otherwise approved by Declarant, each Building constructed in the Development must either be (a) equipped with such automatic sprinkler systems as meet all requirements of the Fire Insurance Rating Authority (or other similar organization having jurisdiction), or (b) constructed, maintained and used so as to be fire-rated as a separate and distinct unit from every other Building constructed in the Development.

4.8 **Party Walls**. No party walls (in which the Owners of Buildings share a common wall along the boundary of their respective Parcels) are permitted in the Development except with the prior written consent of Declarant and the Owners of the affected Parcels. Any agreements between such Owners regarding party walls may be contained in a COREA Supplement.

4.9 **City Review**. Compliance with the requirements of this ARTICLE 4 is in addition to, not in lieu of, compliance with the requirements of the City, including, without limitation, any site plan or design review process of the City, which is the responsibility of each Owner. If the requirements of the City conflict with the requirements of this Agreement, the more restrictive requirements are controlling.

## ARTICLE 5 - PARCEL CONSTRUCTION AND MAINTENANCE

5.1 **Initial Construction of Improvements**. Except as otherwise provided in paragraph 5.2 or as otherwise agreed by Declarant, once construction is commenced (following written approval by Declarant of the Approved Final Plans for the initial construction of Building(s) and other Improvements on a Parcel), the Owner of the Parcel agrees to proceed to construct or cause to be constructed such Building(s) and other Improvements with reasonable diligence, at such Owner's sole cost and expense, in a good and workmanlike manner, in accordance with the Approved Final Plans and free and clear of all liens and encumbrances. Such construction may not unreasonably interfere with the use of the Common Areas by any other Owner or its Permittees. All such construction must in any event be completed within twelve (12) months following the date of commencement of such construction, unless otherwise agreed by Declarant.

5.3 **Right of Declarant to Complete**. If any Owner fails to complete construction of Buildings and other Improvements within the time period required under paragraph 5.1, upon thirty (30) days' written notice to such Owner, Declarant or its authorized designee is entitled, but not obligated, to enter upon such Owner's Parcel and cause the completion of all or portions of such construction in accordance with the Approved Final Plans, at such Owner's sole cost and expense.

5.4 **Initial Construction of Common Areas**. Notwithstanding the foregoing provisions of this Agreement to the contrary, in order to achieve architectural harmony, uniformity of appearance and coordination of the initial construction of Improvements to the Common Areas of the Development in connection with the initial construction of Building(s) and other Improvements on a Parcel by an Owner, Declarant may undertake the responsibility for the construction of all or any portion of the Common Area Improvements for the Parcel on such terms and conditions as Declarant and the Owner of the Parcel mutually agree in writing.

Unofficial Document

5.5 **General Provisions Regarding Construction**. All construction, alteration or repair work undertaken by an Owner must be accomplished expeditiously, in accordance with all applicable law, and in a good and workmanlike manner using first-class materials, free and clear of liens and encumbrances. All construction work must be accomplished in such a manner as to minimize any damage or adverse effect that might be caused by such work to any other Owner or its Permittees.

5.6 **Covenant to Maintain**.

(a) Each Owner agrees, at its expense, to maintain all unimproved portions of such Owner's Parcel in a clean and neat condition, to take such measures as are necessary to control grass, weeds, blowing dust, dirt, sand, litter or debris, to prevent excessive drainage of storm water runoff onto another Parcel, and to otherwise maintain such unimproved portions of its Parcel in compliance with all applicable law.

(b) Each Owner agrees to operate, maintain, repair and replace, at its sole cost and expense, all Buildings, other Improvements, and Common Areas located on or under its Parcel

(excepting those obligations, if applicable, to be performed by the Manager under ARTICLE 6), in good order, condition and repair, in a manner consistent with first-class neighborhood retail and office developments in metropolitan Phoenix, Arizona. An Owner's obligations hereunder include, without limitation, with respect to Improvements located in the Common Areas of such Owner's Parcel, keeping illuminated Circulation Drive lights on its Parcel as further provided in subparagraph (c) below, maintaining, repairing and replacing Circulation Drives, parking lots, drive lanes, drive-up or drive-through facilities, and other paved areas (by replacement of base, skin patch, sealing, resealing, resurfacing, restriping and replacement, as applicable), curbs, gutters and sidewalks, storm drains, sewers and other utility lines and facilities not dedicated to the public, signage (including, without limitation, directional, stop and handicapped parking signs), sidewalks and planters, and retaining walls; keeping clearly marked fire lanes, loading zones and pedestrian crosswalks; and removing all papers, debris, filth and refuse and thoroughly sweeping the Common Areas of the Parcel to the extent reasonably necessary to keep them in a clean and orderly condition. For purposes hereof, the Common Areas of a Parcel include any neighboring property or Improvements contiguous to the Parcel or in the public rights-of-way adjacent to the Parcel that are required by the City or any other governmental authority to be maintained by the Owner of the Parcel. Each Owner further agrees, at its sole cost and expense, and subject to paragraph 2.2, to construct, operate, maintain, repair and replace in good order and condition, all private utility lines, systems and facilities serving the Parcel of such Owner but located on the Parcel of another Owner.

(c) Circulation Drive Lights constructed on a Parcel may initially be connected to a "house panel" for the benefit of the Development, in which event the associated utility charges will be assessed among all Owners under ARTICLE 6 below. Except as otherwise provided in this Agreement or in a COREA Supplement, as each Parcel is developed, the Owner thereof agrees at its expense to promptly cause any such Circulation Drive Lights existing on its Parcel to be appropriately recircuited, or if not then existing, to be originally constructed, as necessary to connect the Circulation Drive Lights to metering on such Owner's Parcel, after which the maintenance, repair and replacement of such Circulation Drive Lights, and the associated utility charges will be the obligation of such Owner. The Circulation Drive Lights must be illuminated during nighttime hours until 11 pm or such later hours as the City requires; provided, however, upon the request of one or more Owners, all or portions of the Circulation Drive Lights must be illuminated beyond such normal hours subject to payment by the Owner(s) requesting such after-hours lighting of the additional utility charges associated therewith. All other lighting in the Common Areas of the Development must be illuminated during such hours as Declarant or Manager requires in rules and regulations established under paragraph 3.6 above. Subject to the foregoing, all exterior lighting on a Parcel (including, without limitation, light standards, wires, conduits, lamps, ballasts and lenses, time clocks and circuit breakers) must be maintained, repaired and illuminated by the Owner of the Parcel as required herein and must be separately metered to the Parcel. The Owner of the Parcel agrees to cause to be supplied and to timely pay all utility charges relating thereto.

Unofficial Document

(d) Each Owner of a Parcel agrees to operate, maintain, repair and replace, at its sole cost and expense, all Landscaping located on such Owner's Parcel and in the adjacent right-of-way (to the extent not maintained by the City). However, if the City requires as a condition to development of portions of the Development the installation of Landscaping on or adjacent to a Parcel prior to the date that the Owner of such Parcel becomes obligated for the payment of

Common Expenses under paragraph 6.3, the maintenance, repair, replacement and irrigation of such Landscaping, and payment of utility charges therefor, will be performed and paid by the Manager for the benefit of the Development, and the costs thereof will be assessed among the Owners under ARTICLE 6. Except as otherwise provided in this Agreement or in a COREA Supplement, on or before the date that the Owner of such Parcel becomes obligated for the payment of Common Expenses under paragraph 6.3, such Owner agrees at its expense to promptly cause all sprinkler and irrigation systems relating to such Landscaping, including associated water timers and meters, to be appropriately recircuited to such Owner's Parcel, whereupon the Owner of the Parcel is responsible for such Landscaping in accordance with the first sentence of this subparagraph (e).

(e) Each Owner agrees to regularly inspect the Building(s) and other Improvements, if any, located on its Parcel for the presence of graffiti and each Owner must promptly, and in any event not later than two (2) business days after written notice from the Manager or the City, remove any graffiti from its Building(s) and other Improvements. If an Owner fails to remove graffiti from its Building(s) and other Improvements within such 2-business-day period, which failure is not cured within two (2) business days after a second written notice from the Manager or the City, the Manager or Declarant is entitled, but not obligated, to remove such graffiti at the expense and for the account of such Owner.

(f) If the business operated on a Parcel involves a restaurant or other food service operation, and if applicable governmental authority requires the installation of one or more grease interceptors as a condition to the operation of such business, the Owner of the Parcel agrees to cause one or more grease interceptors to be installed and periodically inspected and cleaned (not less often than once every six (6) months) as reasonably necessary to accommodate the requirements of the business and prevent the emanation of noxious odors from the Parcel. The Owner of the Parcel agrees promptly upon request to furnish to Declarant copies of reports and invoices evidencing such periodic inspection and cleaning.

Unofficial Document

(g) If any Owner fails to perform any recircuiting of Circulation Drive Lights or Landscaping any operation, maintenance, repair, replacement or illumination of the Building(s), Landscaping, other Improvements, or Common Areas located on such Owner's Parcel for which such Owner is responsible as required herein, Declarant may, at its option, give the Owner written notice of such failure. If such Owner fails to commence the required performance within twenty (20) days from the date of such written notice or thereafter fails to diligently prosecute such performance to completion, or if such Owner fails to complete the required performance within thirty (30) days from the date of the notice (provided, however, if the nature of the performance is such that it cannot reasonably be completed within thirty (30) days, provided that the Owner so noticed has commenced within such 30-day period to render the required performance and is diligently pursuing such performance to completion without interruption, such Owner has a reasonable period of time within which to complete such performance), Declarant is entitled, but not obligated, to enter upon the Parcel during reasonable hours and perform such recircuiting, operation, maintenance, repair, replacement or illumination at such Owner's sole cost and expense. Notwithstanding the foregoing to the contrary, if such Owner's failure to maintain its Building or other Improvements presents an immediate risk of damage to property, injury to persons, or loss or obstruction of access, the prior notice requirement of this paragraph does not apply, and

Declarant is entitled, but not obligated, to take immediate steps to minimize or eliminate such risk, at the cost and expense of such Owner. In such event, notice of such action will be given to such Owner as soon as reasonably practicable under the circumstances. At any time that no Declarant is then serving under this Agreement, the Manager may exercise the rights of Declarant set forth in this subparagraph (h).

5.7 **Trash Facilities**. Each Owner agrees to construct within the Common Areas of such Owner's Parcel in a location approved by Declarant, trash facilities and receptacles ("Trash Facilities") for the exclusive use and benefit of the Parcel and the containment of garbage, trash and refuse generated by the business conducted on the Parcel. The location of the Trash Facilities on each Parcel must be approved by Declarant and situated so as to comply with all applicable law and not to obstruct or unreasonably interfere with the use and enjoyment of neighboring Parcels. In no event may the concrete apron of the Trash Facilities on a Parcel be located in a Circulation Drive unless expressly approved by Declarant. All Trash Facilities on a Parcel must be completely screened with a masonry screen wall (or other material) approved by Declarant pursuant to the provisions of ARTICLE 4. Each Owner is solely responsible for periodically emptying (not less often than weekly), and all maintenance and clean-up of, such Owner's Trash Facilities and agrees to pay all costs for refuse service. The Trash Facilities must be maintained in a safe, clean and operating condition at all times, and all rubbish, trash and garbage must be regularly removed and may not be allowed to accumulate. Gates and lids to the Trash Facilities must remain closed when not in use. All rubbish, trash and garbage must be kept in rodent-proof containers. Liquids deposited in Trash Facilities must be reasonably contained in closed plastic garbage bags to prevent spills. Each Owner further agrees to comply with all present and future laws relating to recycling and must sort and separate waste products, garbage, refuse, trash and recycling into such categories and receptacles as required by applicable laws. Rubbish, trash and garbage that emits odor must be kept in air-tight containers. If an Owner defaults in its use or operation of its Trash Facilities, Declarant (or if no Declarant is then serving under this Agreement, the Manager) may, upon ten (10) days' prior written notice, but without obligation to do so, take such steps as are necessary to properly maintain such Trash Facilities at the sole cost and expense of the Owner in default.

Unofficial Document

5.8 **Damage or Destruction of Buildings**. If all or a portion of a Building on a Parcel is damaged or destroyed, the Owner of the Parcel agrees with all due diligence, and at its sole cost and expense, to either (a) repair, restore and rebuild such Building to its condition existing prior to such damage or destruction, subject to the provisions hereof, or with such changes, alterations or additions as comply with ARTICLE 4, or (b) tear down and remove all portions of such damaged or destroyed Building and related Improvements, including the debris resulting therefrom, and otherwise clean and restore the area affected by such casualty to a level and clean condition. If any Owner fails to repair, restore or rebuild the Building or tear down and remove the Building as set forth above, Declarant may, at its option, give the Owner written notice of such failure. If such Owner fails to commence the required performance within thirty (30) days from the date of such written notice or thereafter fails to diligently prosecute such performance to completion within twelve (12) months from the date of such notice, Declarant is entitled, but not obligated, to enter upon the Parcel during reasonable hours and perform such repair, restoration, rebuilding or removal at such Owner's sole cost and expense.

5.9 **Damage or Destruction of Common Areas**. If the Improvements within the Common Areas of a Parcel are damaged or destroyed in whole or in part, the Owner of the Parcel agrees with all due diligence, at its sole cost and expense, to restore, repair and rebuild said Improvements substantially in accordance with the original plans therefor, or with such changes, alterations or additions as comply with ARTICLE 4 above. If any Owner fails to make such repairs or restoration or to rebuild as required above, Declarant may, at its option, give the Owner written notice of such failure. If such Owner fails to commence the required performance within ten (10) days from the date of such written notice or thereafter fails to diligently prosecute such performance to completion within thirty (30) days from the date of such notice (or such longer period not to exceed ninety (90) days as is reasonably necessary to complete such performance), Declarant (or if no Declarant is then serving under this Agreement, the Manager) is entitled, but not obligated, to enter upon the Parcel and perform such repair, restoration or rebuilding at such Owner's sole cost and expense.

5.10 **Right to Reimbursement**. All reasonable costs and expenses incurred by Declarant (or the Manager) in connection with (a) any recircuiting, operation, maintenance, repair, replacement, restoration, rebuilding, removal or illumination on an Owner's Parcel undertaken by Declarant, and all reasonable costs and expenses incurred by Declarant (or the Manager) in connection with the completion of construction under paragraph 5.3 above following an Owner's failure of performance under ARTICLE 4 or this ARTICLE 5 (which failure was not cured within the time frames provided), plus an administrative fee for overhead and supervision equal to twenty percent (20%) of such costs, are due and payable by such Owner upon demand of Declarant and constitute an assessment in favor of Declarant (or the Manager) with respect to which Declarant (or the Manager) has the rights and remedies Unofficial Document set forth in ARTICLE 7 below.

5.11 **Fixed Drives**. The first Owner to develop a Parcel having a Fixed Drive located in whole or in part on its Parcel must at its expense construct the entirety of the Fixed Drive concurrently with development of its Parcel, and thereafter maintain it in good order, condition and repair, in a manner consistent with first-class neighborhood retail developments in metropolitan Phoenix, Arizona, including keeping the Fixed Drive reasonably clear of snow and ice so as to be safe and passable by motor vehicles at all times, until such time as each adjacent Parcel upon which a portion of said Fixed Drive is located is developed, whereupon each Owner is responsible for so maintaining only that portion of the Fixed Drive located on its Parcel. A Fixed Drive may not be relocated without the consent of the Manager and the Owners of all Parcels upon which the Fixed Drive is or will be located.

## ARTICLE 6 - MANAGEMENT

6.1 **Maintenance Obligations of Manager**. Except as otherwise expressly provided herein, the Manager, at the cost and expense of the Owners as provided in this ARTICLE 6, will perform or cause to be performed in the Development in a manner consistent with first-class neighborhood retail and office developments in metropolitan Phoenix, Arizona, the following:

(a) **Circulation Drive Lights**. Maintenance, cleaning, repair, replacement and illumination of Circulation Drive Lights on a Parcel, including payment of associated utility

charges, prior to the date that the Owner of the Parcel becomes responsible therefor under subparagraph 5.6);

(b) **Landscaping**. Maintenance, repair, replacement and irrigation of Landscaping, and payment of utility charges therefor, prior to the date that the Owner of the Parcel becomes responsible therefor under subparagraph 5.6; and

6.2 **Common Expenses**. All reasonable costs and expenses incurred by the Manager for the benefit of the Development under this Agreement that are not otherwise allocated specifically to one or more Owners, including, without limitation, the costs and expenses incurred by the Manager under paragraphs 6.1 are herein referred to as "Common Expenses." Common Expenses also include, without limitation, reasonable and customary reserves, miscellaneous expenses for checks, bank charges, bookkeeping and accounting, reasonable legal fees, and similar administrative costs paid to third parties and directly related to the duties performed by the Manager under this ARTICLE 6, and a reasonable management fee (whether payable to the Manager and/or to a third party designated by the Manager) for supervision and overhead in no event to exceed fifteen percent (15%) of the total of such costs and expenses (exclusive of taxes and insurance premiums). Common Expenses also include all assessments, fees, charges and other amounts payable by and allocable to the Development under the Master Declaration and the Wentworth Agreement, to the extent such costs are not billed directly to Owners of Parcels pursuant to the Wentworth Agreement. The Manager may hire companies affiliated with it to perform all or any portion of its duties hereunder, but only if the rates charged by such companies are competitive with those of other companies furnishing similar services in the metropolitan Phoenix area.

Unofficial Document

6.3 **Assessments**. Common Expenses are a continuing lien and assessment against the Parcels governed by ARTICLE 7 below, and will be assessed against each Owner and its respective Parcel in the same proportion as the gross square footage of land area of such Owner's Parcel bears to the total gross square footage of land area of all Parcels in the Development. Notwithstanding the foregoing to the contrary, Common Expenses may not be assessed against an Owner or its Parcel under this paragraph 6.3 until the earlier to occur of (a) substantial completion of a Building on such Owner's Parcel (as conclusively evidenced by issuance of a temporary or permanent certificate of occupancy), or (b) the expiration of six (6) months following the conveyance of the Parcel by Declarant (or by Evergreen if it is no longer Declarant) to an unrelated Person; provided, however, if Declarant reacquires fee title to a Parcel pursuant to the exercise of a repurchase option contained in a COREA Supplement or otherwise, no assessments for Common Expenses may be made against the Parcel under this paragraph 6.3 until the condition contained in either subparagraph (a) or (b) of this sentence is thereafter satisfied. In calculating assessments payable by the Owners hereunder, the Manager has the right to appropriately exclude the land area of any Owner excused from the payment of such assessments pursuant to the immediately preceding sentence. In addition, with respect to any particular component of such assessments, the Manager may also exclude the land area of any Parcel or applicable portion thereof the Owner or Permittee of which, with the consent of the Manager, self-maintains with respect to such component, to assure that one hundred percent (100%) of each assessment is allocated among the remaining Owners. Notwithstanding the foregoing to the contrary, the Manager may, on such basis as the

Manager reasonably determines to be equitable, allocate specific Common Expenses (y) to a specific Owner or Owners where such costs can be shown to be directly attributable to the acts or omissions of such Owner(s) or their Permittees and would not otherwise have been incurred in the absence of such acts or omissions, and (z) to a specific Owner or Owners where such costs can be shown to principally benefit the Parcel(s) of such Owner(s). Allocations of Common Expenses consistent with the provisions of this paragraph 6.3 may be provided for in COREA Supplement(s).

6.4 **Payment Obligation**. The Manager may, at its option, not more often than monthly, reasonably estimate the amount of each Owner's assessment next due and collect and impound in advance from each Owner the amount thereof, or collect in arrears from each Owner the actual amount of such Owner's assessment, as shown in a statement to be sent by the Manager to each Owner. Each Owner agrees to pay to the Manager the amount shown to be due on such statement (such statement to show the total amount of the assessment and the Manager's calculation of each Owner's share thereof) within thirty (30) days after such Owner's receipt thereof. If estimated impounds are collected, the Manager will endeavor, within ninety (90) days after the close of each fiscal year, to provide each Owner with a statement setting forth a reconciliation of such Owner's impound account. If such reconciliation statement discloses that the amount collected in any Owner's impound account is insufficient to satisfy such Owner's assessment under this ARTICLE 6 for the previous year, such Owner agrees to pay to the Manager the deficiency within thirty (30) days after such Owner's receipt of the reconciliation statement. Any excess in an Owner's impound account that is not necessary, in the Manager's judgment, for reasonable and customary reserves, will be returned to such Owner or applied against next succeeding impounds hereunder, at the option of the Manager.

Unofficial Document

6.5 **Record Keeping/Dispute Resolution**.

(a) The Manager will keep accurate books and records relating to the costs and expenses incurred by the Manager in connection with the performance of its obligations under this ARTICLE 6, which will be available at the office of the Manager for inspection and copying by any Owner at its expense during reasonable business hours. Any Owner may, within ninety (90) days after receipt of any statement described in paragraph 6.4, dispute the amount or propriety of any item appearing thereon by written notice to the Manager, and if such Owner and the Manager cannot agree as to the amount and propriety of any such disputed item within thirty (30) days thereafter, the dispute will be resolved by arbitration under subparagraph (b) below. The failure of any Owner to notify the Manager of a dispute as to any item within such 90-day period will conclusively be deemed to be the Owner's acceptance of the amounts and items shown on the statement and the Owner will have no further right to dispute such amounts and items. Notwithstanding that an Owner has disputed any amount or item, such Owner agrees to nevertheless promptly pay to the Manager when due all amounts shown to be due in any statement, subject to reimbursement of any such disputed amount if the arbitration proceeding favors such Owner.

(b) If a dispute under subparagraph (a) above continues unresolved for more than thirty (30) days, either the Manager or the disputing Owner has the right to notify the other of its desire to arbitrate the dispute, in which event the dispute will be settled by arbitration in the manner described in this subparagraph (b). The arbitration will be conducted by one (1) independent

arbitrator, who must have at least ten (10) years' experience in the management of commercial/retail properties. If the parties cannot agree upon an arbitrator, then one will be appointed by the governing official of the local American Arbitration Association. The arbitration will be governed by the Rules of Commercial Arbitration of the American Arbitration Association then prevailing, subject, however, to the limitations set forth herein. Judgment upon the award rendered by the arbitrator may be entered in a court of competent jurisdiction. The arbitrator's decision must include written findings of fact and be rendered within sixty (60) days following a hearing. The arbitrator has no power to modify any provision of this Agreement, and his jurisdiction is limited accordingly. The arbitrator has the power to award interest on any disputed sum. All costs of the arbitration will be borne by the non-prevailing party, or if neither party is clearly the non-prevailing party, as apportioned by the arbitrator.

6.6 **<u>Delegation of Manager's Rights and Obligations</u>**. The Manager reserves the right at any time, by written notice to the Owners, to delegate all of its rights and obligations under this <u>ARTICLE 6</u> (collectively, "**<u>Property Management</u>**") to an Owner (provided that the Owner to whom the rights and obligations of the Manager are delegated accepts and assumes such rights and obligations in writing), or to a recognized commercial property management company managing no fewer than five (5) projects similar to the Development in the Phoenix metropolitan area (a "**<u>Property Management Company</u>**"). The Manager will provide to each Owner written notice of the delegation, which notice will set forth the name and address of the Person to whom Property Management has been delegated, and a counterpart original of such notice will be Recorded. The delegation and transfer of Property Management is deemed to include the right to exercise the rights and remedies for delinquent assessments set forth in <u>ARTICLE 7</u>. Upon such delegation and transfer of Property Management to another Owner, the delegating Manager is forever relieved of all rights and obligations relating to Property Management thereafter arising, and the Manager to whom Property Management has been delegated and transferred agrees to thereafter perform Property Management in accordance with this Agreement. Upon such delegation and transfer of Property Management to a Property Management Company, the Manager remains responsible for the performance of such obligations by the Property Management Company. If Declarant assigns all rights and obligations of Declarant to a successor under <u>ARTICLE 14</u>, the rights and obligations of Declarant's successor will include the rights and obligations of the Manager (to the extent not previously assigned). The Manager may resign and withdraw upon ninety (90) days' written notice to all Owners. Any Manager (other than Evergreen) then serving may be removed, or a new Manager may be designated to fill a vacancy, by the Owners in the same manner as is set forth in <u>paragraph 14.2</u> for the designation or removal of Declarant's successor.

Unofficial Document

## <u>ARTICLE 7 - ASSESSMENTS</u>

7.1 **<u>Covenant to Pay</u>**. Declarant, for and on behalf of each Owner within the Development, hereby agrees, and each subsequent Owner by acceptance of a deed to a Parcel (whether or not such obligation is specifically expressed therein), agrees, to pay Declarant all sums due and owing to Declarant under this Agreement, and to pay to the Manager all sums due and owing to the Manager under this Agreement, which are deemed assessments for purposes hereof whether or not specifically so characterized elsewhere in this Agreement. In addition, in connection with a Site Development Agreement or similar agreement (an "<u>SDA</u>"), if any, executed

by an Owner (an "SDA Owner") and Declarant, any amounts that may be owing from such SDA Owner to Declarant under the SDA are declared to be "assessments" for the purposes of this Agreement, payable by such Owner.

7.2 **Continuing Lien**. Each assessment established by this Agreement in favor of Declarant or the Manager, together with any interest, costs and reasonable attorneys' fees, is a charge and continuing lien upon the Parcel against which, or against the Owner of which, such assessment is made, until paid. Each such assessment, together with any interest, costs and reasonable attorneys' fees, is also the personal obligation of the Owner of the Parcel at the time the assessment is declared. Said personal obligation for assessments does not pass to an Owner's successors in interest unless expressly assumed by them, but the Owner of the Parcel at the time the assessment is declared continues to remain personally liable to Declarant or the Manager for such assessment.

7.3 **Delinquent Assessment**. Failure to pay an assessment within the time period provided for such payment, which failure continues for ten (10) days after written notice thereof from Declarant or the Manager to the Owner constitutes a default by the Owner of the Parcel to which such assessment relates. Declarant or the Manager is authorized and empowered to proceed in the event of such default to collect such delinquent assessment, together with interest at the rate of eighteen percent (18%) per annum from the date such assessment is due and payable (not to exceed the maximum rate of interest allowed by law), until it is fully paid, together with all recording costs and expenses and reasonable attorneys' fees. In this regard, in addition to any and all other remedies permitted at law or in equity, Declarant or the Manager has the right to enforce payment of the delinquent assessment or other amount due against the Owner and/or its Parcel by taking either or both of the following actions, concurrently or separately (and by exercising either of the remedies set forth below, Declarant or the Manager does not prejudice or waive its right to exercise the other remedy or such other additional rights or remedies as may be available under applicable law):

Unofficial Document

(a) Bring an action at law against the Owner personally obligated to pay the assessment or other sum of money; and/or

(b) Foreclose the lien against such Owner's Parcel(s) under then-prevailing Arizona law relating to the foreclosure of realty mortgages (including, to the extent available, the right to recover any deficiency).

In addition to any and all other remedies permitted at law or in equity, Declarant or the Manager reserves the right to include in Common Expenses any delinquent assessment or other amount due from a defaulting Owner, together with all costs of collection or attempted collection, including, without limitation, filing fees, attorney's fees and court costs, to be allocated among and paid by the non-defaulting Owners, subject to a pro rata credit or reimbursement of amounts subsequently collected.

7.4 **Liability for Assessments**. No Owner may waive or otherwise escape liability for the assessments provided for herein by nonuse or abandonment of its Parcel or its interest therein. The lien for assessments provided for in this ARTICLE 7 is superior to all liens and encumbrances

other than liens for taxes and other public charges which by applicable law are expressly made superior. The sale or transfer of a Parcel does not affect the lien for assessments provided in this ARTICLE 7.

7.5 **Recordation**. If any assessment or any portion of an assessment becomes delinquent, a notice of lien against the Parcel to which such assessment relates for the unpaid amount of such assessment and the costs and expenses described above may be Recorded by Declarant or the Manager. The notice of lien will be signed and acknowledged by Declarant or the Manager, and will contain the following:

(a) an itemized statement of all amounts due and payable;

(b) a description sufficient for identification of the Parcel to which the notice relates;

(c) the name of the Owner or reputed Owner of the subject Parcel; and

(d) the name and address of the Person causing the notice to be Recorded (Declarant or the Manager as applicable).

Such notice of lien is additional evidence of the lien against the interest in real property described in such notice, in the amount specified therein. Upon the curing of any default for which a notice of lien was Recorded by Declarant or the Manager, an appropriate release of such notice will be Recorded by Declarant or the Manager upon payment by the defaulting Owner of a reasonable fee determined by Declarant or the Manager to cover the costs of preparing and recording such release together with the payment of such other costs, including, without limitation, legal fees and court costs, interest or charges, as Declarant or the Manager has incurred.

Unofficial Document

## ARTICLE 8 - INDEMNIFICATION AND INSURANCE

8.1 **Indemnification**.

(a) Each Owner agrees to indemnify, defend and hold harmless Declarant, including, without limitation, Declarant's agents, employees, directors, officers, partners, members, managers and contractors, the Manager, and all other Owners within the Development, and their respective Permittees, for, from and against any and all claims and all costs, expenses and liabilities (including reasonable attorneys' fees and costs) incurred in connection with all claims, including any action or proceeding brought thereon, arising from or as a result of any accident, injury, death, loss or damage whatsoever to any Person, or to the property of any Person, proximately caused by the acts or omissions of such Owner or its Permittees and occurring on such Owner's Parcel, except to the extent caused by the negligence or intentional misconduct in whole or in part of the indemnified party.

(b) Each Owner having rights with respect to an easement granted hereunder agrees to indemnify, defend and hold harmless Declarant, including, without limitation, Declarant's agents, employees, directors, officers, partners, members, managers and contractors, the Manager and the Owner whose Parcel is subject to the easement for, from and against any and all claims and all

costs, expenses and liabilities (including reasonable attorneys' fees and costs) incurred in connection with all claims, including any action or proceeding brought thereon, arising from or as a result of any accident, injury, death, loss or damage whatsoever to any Person, or to the property of any Person, proximately caused by the acts or omissions of the indemnifying Owner or its Permittees in the use of any such easement granted hereunder, except to the extent of the negligence or intentional misconduct in whole or in part of the indemnified party whose Parcel is subject to the easement or its Permittees.

(c) Declarant, the Manager, and their respective agents, employees, directors, officers, partners, members, managers or contractors are not liable to any Owner or such Owner's Permittees for any mistake or error in judgment or for any other act or omission under this Agreement if it is not fraudulent, grossly negligent or in bad faith, and each Owner expressly waives and relinquishes any and all claims against Declarant, the Manager, and their respective agents, employees, directors, officers, partners, members, managers and contractors on account thereof.

8.2 **Insurance by Owners**. Each Owner (or Permittee of such Owner responsible for carrying insurance) agrees to provide and maintain, or cause its Permittees to provide and maintain, such policies of property insurance (written on a "Special Form" or equivalent basis) on all Building(s) and other Improvements located on such Owner's Parcel (in an amount not less than eighty percent (80%) of the full replacement value thereof), and commercial general liability insurance insuring against claims for bodily injury, personal injury, death or property damage (including contractual liability arising under the indemnities contained in paragraph 8.1), occurring on or about such Owner's Parcel (including, without limitation, Circulation Drives located on its Parcel) and the easement areas that are subject to use and enjoyment by such Owner and its Permittees hereunder, with combined single limit coverage of not less than Three Million Dollars ($3,000,000) per occurrence, or such higher amounts of coverage as the Manager may from time to time reasonably designate (but without obligation to do so) based on insurance coverage carried by reasonable and prudent owners of like property in metropolitan Phoenix, Arizona. Each policy of commercial general liability insurance procured and maintained by an Owner or its Permittees must be primary and not contributing with any policy or policies of insurance maintained by Declarant, the Manager or any other Owner or its Permittees, and must name Declarant, any person designated in writing by Declarant, the Manager (if other than Declarant), all other Owners, and the owner of the Wentworth Parcel as additional insureds (using ISO Endorsement CG 20 26, or its equivalent), provided that the Owner obtaining such insurance has been supplied with the name(s) of the other Owner(s) in the event of a change therein. Any insurance required under this Agreement may be brought within the coverage of so-called blanket or master policies of insurance, provided that such blanket or master policies contain a so-called "per location aggregate" endorsement (or equivalent) preventing the coverages required by this Agreement from being reduced or diminished by reason of the use of such policies. All insurance must be issued by insurance companies authorized to do business in the State of Arizona rated with a Financial Strength Rating of not less than A- (Excellent) and a Financial Size Category of not less than IX by A. M. Best Company, must be written on an occurrence basis and must include coverage for contractual liability and broad form property damage.

8.3 Intentionally Omitted



Unofficial Document

8.4 **Evidence of Insurance**. Upon the request of any Owner or Declarant, an Owner agrees to furnish to the requesting party certificates of insurance and, with respect to the additional insured obligations referenced in this ARTICLE 8, a copy of ISO Endorsement CG 20 26 (or its equivalent), and other reasonable evidence indicating that insurance meeting the requirements hereof has been obtained and is in full force and effect. At any time that no Declarant is then serving under this Agreement, the Manager may exercise the rights of Declarant set forth in this paragraph 0.

8.5 **Insurance of Common Areas by Owners**. Each Owner must procure and maintain property insurance coverage (to the extent reasonably insurable) for the Common Areas of its Parcel (including, without limitation, Circulation Drives), to include such endorsements and additional coverages as such Owner reasonably determines based on insurance coverages carried by reasonable and prudent owners of like property in metropolitan Phoenix, Arizona. Such insurance must be maintained by the Owner in an amount equal to not less than eighty percent (80%) of the full replacement value thereof (to the extent reasonably insurable), with a deductible not to exceed five percent (5%) of the full replacement value. The proceeds of the property insurance maintained hereunder by the Owner payable in the event of a loss will be used solely to restore, replace, reconstruct and rebuild the insured property to the condition existing immediately prior to the occurrence of the loss, which the Owner agrees to do as soon as practicable. The Owner will upon request provide evidence meeting the requirements of paragraph 8.4 above as to the insurance maintained by the Owner under this paragraph 8.5.

8.6 **Mutual Waiver**. The Owner of each Parcel in the Development, for itself, and, to the extent legally permissible, on behalf of its Permittees and insurance carriers, hereby waives the right of recovery against Declarant, the Manager and any other Owner for (a) any loss or damage to the property of the waiving Owner located in the Development, (b) any loss or damage to the Buildings or other Improvements in the Development or the contents thereof, and (c) any other direct or indirect loss or damage caused by fire or other risks, which loss or damage is or would be covered by the property insurance (including self-insurance) required to be carried pursuant to this ARTICLE 8. Each Owner agrees to obtain for the benefit of Declarant, the Manager and each other Owner a waiver of any right of subrogation that the insurance carrier(s) of the waiving Owner may acquire against Declarant, the Manager or any other Owner by virtue of the payment of any such loss covered by such property insurance.

Unofficial Document

## ARTICLE 9 - SIGNS

9.1 **General**. No exterior sign may be installed or maintained by an Owner on its Parcel without first obtaining (a) the approval of such sign by Declarant under ARTICLE 4, including, without limitation, the design and location of such sign, and (b) all necessary approvals and permits from the City.

9.2 **Parcel Monument Signs**.

(a) The design of each Parcel Monument Sign (which includes, for purposes of this paragraph 9.2, the sign panels to be installed thereon), must be approved by Declarant prior to

installation and prior to subsequent material modification thereof. No Parcel Monument Sign may be placed on a Parcel except in a location permitted by the Site Plan.

(b) If an Owner fails to properly maintain, repair or replace its Parcel Monument Sign, the Manager may, at its option, give the non-performing Owner written notice of such failure. If such Owner fails to commence the required performance within five (5) days from the date of such written notice or thereafter fails to diligently prosecute such performance to completion, or if such Owner fails to complete the required performance within thirty (30) days after the date of such notice, the Manager is entitled, but not obligated, to perform such maintenance, repair or replacement at the defaulting Owner's sole cost and expense.

(c) If the business of any Owner (including such Owner's Permittees) identified on a Parcel Monument Sign or a Building permanently closes, upon thirty (30) days' notice from the Manager, the Owner whose business has closed is obligated to replace all sign panels on the Parcel Monument Sign identifying such business with blank panels of a color approved by the Manager, and to remove its Building signage and repair the Building fascia, failing which the Manager has the right, but not the obligation, to do so at the expense of the Owner whose business closed.

(d) Costs and expenses incurred by the Manager pursuant to subparagraph (b) or (c) above will be assessed to and paid by the defaulting Owner under paragraph 5.10 above.

(e) With the approval of Declarant, the Owner of a Parcel Monument Sign may permit the installation by another Owner of sign panels thereon, subject to such terms and conditions as the Owners mutually agree, to be set forth Unofficial Document in a COREA Supplement Recorded against the Parcel upon which the Parcel Monument Sign is located.

9.3 **Shared Signs**.

(a) Subject to the Master Declaration, the Wentworth Agreement and the requirements of governmental authority, Declarant may grant to any Owner the right to place sign panels on a Shared Sign identified on the Site Plan, which grant may be contained in one or more COREA Supplements.

(b) Each Shared Sign will be illuminated from dusk until dawn or such fewer hours as are unanimously approved by the Manager and all Owners having sign panels on such Shared Sign, subject to applicable law.

(c) The design of each Owner's sign panels must be approved by the Manager. Each Owner (or such Owner's designee) granted rights to maintain sign panels on a Shared Sign is solely responsible for the costs of fabrication, installation, maintenance and repair in good and operating condition of its sign panels in accordance with the Design Guidelines, any comprehensive sign plan applicable to the Development and applicable law. If any Owner fails to properly maintain or repair its sign panels (including, without limitation, leaving a Shared Sign exposed to the elements during sign panel fabrication), the Manager, the Owner of any other Parcel with a sign panel on the Shared Sign, or the Owner of the Parcel upon which the Shared Sign is located (the "Notifying Owner") may, at its option, give the non-performing Owner written notice of such

failure. If such Owner fails to commence the required performance within five (5) days from the date of such written notice or thereafter fails to diligently prosecute such performance to completion, or if such Owner fails to complete the required performance within thirty (30) days after the date of such notice, the Manager or the Notifying Owner is entitled, but not obligated, to perform such maintenance and repair at the defaulting Owner's sole cost and expense.

(d) If the business of any Owner (including such Owner's Permittees) identified on a Shared Sign permanently closes, upon thirty (30) days' notice from the Manager or a Notifying Owner, the Owner whose business has closed is obligated to replace all sign panels identifying such business on the Shared Sign with blank panels of a color approved by the Manager, failing which the Manager or the Notifying Owner has the right, but not the obligation, to do so at the expense of the Owner whose business has closed. Costs and expenses incurred by the Manager pursuant to subparagraph 0 or 0 above will be assessed to and paid by the defaulting Owner under paragraph 0, and costs and expenses so incurred by a Notifying Owner may be recovered under 0.

9.4 **<u>Governmental Regulations</u>**. All signs within the Development must conform with all applicable law, including, without limitation, all necessary approvals and permits from the City and the comprehensive sign plan, if any, for the Development.

## ARTICLE 10 - CONDEMNATION

If all or any part of the Development is taken by eminent domain, condemnation or similar process by a duly constituted authority, the entire award for the value of the land and Improvements so taken belongs only to the Owner of the Parcel so taken (and to such Owner's mortgagees and tenants, as their interests may appear), and no other Owner has a right to claim any portion of the award by virtue of any interest created by this Agreement. Any Owner of a Parcel that is not the subject of such taking (and such Owner's mortgagees and tenants, as their interests may appear) may, however, file a separate claim with the condemning authority (but not against the Owner of the Parcel so taken) for the loss of easement or other rights to the extent of any damage resulting from the severance of the land or Improvements so taken. In the event of a partial taking, the Owner of the portion of the Development so taken agrees to restore the Improvements located on the Common Areas of such Owner's Parcel as nearly as possible to the condition existing prior to the taking to assure the continued ingress and egress to, from and between all areas of the Development to the extent reasonably feasible, without contribution from any other Owner.

Unofficial Document

## ARTICLE 11 - RESTRICTIONS

11.1 **<u>General Limitation on Uses</u>**. All Parcels within the Development may only be used for lawful purposes in conformance with all restrictions imposed by all applicable law. No Owner may use or permit the use of all or any portion of such Owner's Parcel for any of the following businesses or purposes without Declarant's prior written consent: discotheque or dance hall (but this restriction does not prohibit dancing by patrons of a restaurant not otherwise prohibited), amusement arcade (not including video games, etc., incidental to a primary use that is not otherwise prohibited hereunder), adult book store, adult theatre, adult amusement facility or similar shop selling or displaying sexually explicit or pornographic materials (but these "adult" restrictions are not applicable to a drugstore, to a full-line bookstore, or to a full-line video store),

pawn shop, flea market, massage parlor (except for the provision of massages by licensed massage therapists in conjunction with a beauty salon, nail salon, day spa or any medical use), junk yard, mortuary, funeral parlor, or bar, lounge or night club, provided that the foregoing does not prohibit a restaurant complying with all liquor licensing requirements and other applicable law whose primary business is the preparation and retail sale of food and alcoholic and non-alcoholic beverages for on-site consumption.

11.2 **Drive-Through Facilities**. Facilities, if any, constructed on a Parcel for vehicular drive-up or drive-through in which the stopping or standing of motor vehicles in line at a location for drop-off or pickup is intended (as, for example, at a restaurant, bank or pharmacy), must be designed, constructed, used and operated in such a manner that motor vehicles in line at such facility do not stop or stand in or across a Circulation Drive, or onto any portion of another Parcel (including, without limitation, parking areas of another Parcel), or otherwise interfere with the normal pattern and flow of pedestrian or vehicular traffic on and across the Parcels.

11.3 **Environmental Restrictions and Covenants**. Each Owner agrees that such Owner's Parcel and any and all facilities located or operations conducted on the Parcel will not be used to generate, manufacture, refine, transport, treat, store, handle, dispose of, transfer, produce or process hazardous, toxic or regulated substances or solid wastes of any kind, except in compliance with all applicable law. Each Owner agrees to indemnify, defend, and hold harmless Declarant, the Manager, and each and every other Owner for, from and against any and all actions, causes of action, claims, liabilities, damages, costs, expenses and losses of any nature whatsoever (including reasonable attorneys' fees), arising from a breach by the indemnifying Owner of this covenant.

Unofficial Document

11.4 **Future Additional Use Restrictions**. To promote and protect a diversity of uses within the Development, in connection with the development of any Parcel for a particular use (the "Benefited Parcel"), Evergreen reserves the right to impose future additional use restrictions on all or any portion of the remainder of the Development to prohibit the same or similar uses; provided, however:

(a) if at any time after the imposition of future additional use restrictions in favor of the Benefited Parcel, the Benefited Parcel is thereafter not used and operated for such purposes for a continuous period of eighteen (18) consecutive months or more for any reason other than (i) strike, lockout or other labor difficulty, fire or casualty, condemnation, war, riot, insurrection, act of God, or other temporary closure beyond the reasonable control of the Owner of the Benefited Parcel, (ii) temporary closure due to the restoration, reconstruction, expansion, alteration or remodeling of the Building or other Improvements located on the Benefited Parcel, or (iii) governmental restrictions, then the future additional use restrictions imposed for the benefit of the Benefited Parcel are void and of no further force or effect at the expiration of said 18-month period. Notwithstanding the foregoing to the contrary, Evergreen reserves the right in COREA Supplement(s) to modify the application of this provision to specific future additional use restrictions (whether by tolling, delaying the commencement of, lengthening or shortening, the 18-month period described above, reinstating future additional use restrictions after they have expired, or otherwise);

(b) no future additional use restrictions may be imposed on a Parcel under this paragraph 11.4 at a time when the Parcel is then being used for a purpose that would otherwise be expressly prohibited by such use restrictions;

(c) future additional use restrictions imposed under this paragraph 11.4 may be perpetual, or limited to a term of years following the imposition thereof (after which such future additional use restrictions will expire and be of no further force or effect), as determined by Evergreen and set forth in the instrument pursuant to which the future use restrictions are imposed, as described in subparagraph (d) below; and

(d) future additional use restrictions imposed by Evergreen will be effective against all or any portion of the Development other than the Benefited Parcel when one or more supplements to this Agreement (whether COREA Supplements or otherwise) setting forth such future additional use restrictions are Recorded by Evergreen.

## ARTICLE 12 - ENFORCEMENT

12.1 **Remedies**. If an Owner or its Permittees breaches or threatens to breach this Agreement, Declarant, the Manager, and any one or more of the other Owners are entitled to any or all remedies available at law or in equity including, without limitation, the right to collect damages, the right to enjoin such breach or threatened breach in any court of competent jurisdiction, and the right of specific performance.

12.2 **Self-Help**. In addition to all other remedies available at law or in equity, upon the failure of a defaulting Owner to cure a breach of this Agreement by such Owner or its Permittees within thirty (30) days following written notice of such default given by Declarant, the Manager or another Owner (unless, with respect to any such breach the nature of which cannot reasonably be cured within such 30-day period, the defaulting Owner commences such cure within such 30-day period and thereafter diligently prosecutes such cure to completion), Declarant, the Manager or any nondefaulting Owner has the right to perform such obligation contained in this Agreement on behalf of such defaulting Owner and be reimbursed by such defaulting Owner upon demand for the reasonable costs thereof (including, without limitation, attorneys' fees and court costs) together with interest at the rate of eighteen percent (18%) per annum, not to exceed the maximum rate of interest allowed by law, from the date such costs are incurred until paid.

Unofficial Document

12.3 **Lien Rights**. Any claim for reimbursement, including interest as aforesaid, and all costs and expenses including reasonable attorneys' fees awarded to Declarant, the Manager or any Owner, as applicable, in enforcing any payment in any suit or proceeding under this ARTICLE 12 may be assessed against the defaulting Owner in favor of the prevailing party and constitutes a lien (the "Assessment Lien") against the Parcel of the defaulting Owner until paid, effective when a notice of lien with respect thereto is Recorded; provided, however, that any such Assessment Lien is subject and subordinate to (i) liens for taxes and other public charges which by applicable law are expressly made superior, (ii) all liens Recorded prior to the date of recordation of said notice of lien, (iii) any lien for assessments arising under ARTICLE 7 hereof, and (iv) all bona fide leases with third parties (regardless of whether Recorded) entered into prior to the date the notice of lien is Recorded. The Assessment Lien may be foreclosed under then-prevailing Arizona law relating

to the foreclosure of realty mortgages (including the right to recover any deficiency). Declarant and the Manager have the option, in lieu of exercising or enforcing any lien rights arising under this paragraph 12.3, to proceed under ARTICLE 7 of this Agreement as if the amount owing to Declarant or the Manager hereunder were a delinquent assessment described therein.

12.4 **Remedies Cumulative**. The remedies specified herein are cumulative and in addition to all other remedies permitted at law or in equity.

12.5 **No Cancellation**. Notwithstanding anything to the contrary contained herein, no breach of this Agreement entitles Declarant, the Manager or any Owner to cancel, rescind or otherwise terminate this Agreement, but such limitation does not affect in any manner any of the other rights or remedies that Declarant, the Manager or any Owner may have by reason of a breach of this Agreement.

## ARTICLE 13 - TRANSFER

13.1 **No Assignment or Transfer**. The rights, powers and obligations conferred upon each Owner under this Agreement (excluding Declarant or the Manager) may not at any time be transferred or assigned by such Owner except through a transfer of its Parcel complying with the requirements of paragraph 13.2. (The foregoing does not, however, prohibit an Owner from delegating or passing through any such rights, powers or obligations to a Permittee occupying such Owner's Parcel, which is expressly permitted, but does not release such Owner from liability by reason thereof.)

Unofficial Document

13.2 **Sale by Owner**. Upon the sale, transfer, conveyance or assignment by an Owner (other than a transfer by Declarant) of fee title in such Owner's Parcel, the following apply:

(a) The transferring Owner agrees to give written notice of the sale, transfer, conveyance or assignment to the Manager on or before the date that the instrument effecting the transfer is Recorded.

(b) On or before the effective date of the transfer, the transferee agrees to execute and deliver to the Manager a written statement containing the name and address of the transferee and the signed agreement of the transferee to be bound by this Agreement and to perform all obligations hereof applicable to such Owner and its Parcel. Failure to deliver any such written statement does not affect the running of any easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards contained herein with the land, nor does any such failure negate, modify or otherwise affect the liability of any Owner or transferee pursuant to this Agreement, but such failure constitutes a default of this Agreement by the transferee.

(c) The transferring Owner is released from all obligations under this Agreement arising from and after the effective date of the transfer of its entire interest in the Development and the receipt by the Manager of the written statement of the transferee described in subparagraph (b) above, provided that such transferring Owner is not then in default in the performance of this Agreement or in the payment of any amounts due and owing hereunder.

(d) In no event is any transferee of an Owner personally liable for any default of the transferring Owner under this Agreement which arose prior to the effective date of the transfer; provided, however, nothing contained in this paragraph 13.2 affects the existence, priority, validity or enforceability of any lien placed upon the transferred Parcel under ARTICLE 7 or ARTICLE 12 above.

13.3 **Fractionalized Interests**. If any Owner acquires, transfers or conveys its interest in its Parcel in such manner as to vest ownership of fractionalized interests in more than one Person, then the several owners of such fractionalized interests must designate one of their number to act on behalf of all such owners in the performance of this Agreement, which designation the Manager is entitled to rely upon until notice of a new designation signed by all such owners or an order of a court of competent jurisdiction is received by the Manager to the contrary; provided, however, all such owners are jointly and severally liable under this Agreement. This paragraph 13.3 does not apply to subdivisions of a Parcel, which are governed by the definition of "Parcel" set forth in ARTICLE 1 hereof.

## ARTICLE 14 - DECLARANT'S RIGHTS

14.1 **Declarant's Rights and Obligations**.

(a) Declarant reserves the right to assign, in whole or in part, to one or more Persons, any or all of the rights and obligations of Declarant set forth in this Agreement (including, without limitation, for purposes of this ARTICLE 14, any or all of the rights and obligations of the Manager), whereupon such Person(s) succeed to the rights and obligations so assigned. Such assignment must be in writing, must expressly refer to this Agreement and this subparagraph (a), must specify the rights and obligations being assigned, must contain an express assumption by such Person or Persons of the rights and obligations being assigned and must be executed by Declarant and its successor or assignee and Recorded. Promptly after such assignment is Recorded, such successor or assignee of Declarant will provide a copy of such assignment to each Owner. Any such successor or assignee of Declarant has the right to similarly further assign such rights and obligations to its successors and assigns. The term "Declarant" or "Manager" (as applicable) as used herein includes all such specific assignees, as to the rights or obligations so assigned. Declarant reserves the right to engage agents, employees and contractors to exercise and perform on behalf of Declarant all or any of the rights and obligations of Declarant under this Agreement, but none of them will be deemed an assignee of Declarant's rights or obligations in the absence of a Recorded assignment as described above. In addition to or in combination with an assignment described above in this subparagraph 14.1(a), Declarant reserves the right to assign to the Owners Quorum (defined in paragraph 14.2 below) any or all of Declarant's rights set forth in this Agreement (but not Declarant's obligations) by a written assignment executed by Declarant and Recorded, whereupon the Owners Quorum will succeed to the rights so assigned without the necessity of an express assumption of such rights.

Unofficial Document

(b) Declarant (including for purposes of this subparagraph (b) any successors or assigns) reserves the right at any time to unilaterally resign and withdraw as to any or all of its rights and obligations as Declarant under this Agreement, by executing and causing to be Recorded

a written notice of such resignation and withdrawal expressly referring to this Agreement and this subparagraph (b). A copy of such notice will be given to all Owners; provided, however, such resignation is effective when Recorded as provided above, and receipt by all Owners of such notice is not a condition to effectiveness.

(c) Notwithstanding anything to the contrary contained in this Agreement, and regardless of any transfer or assignment by Declarant of all or any portion of the Development, Declarant retains in gross all rights and obligations of Declarant set forth in this Agreement with respect to which Declarant has neither made an assignment under subparagraph (a) above nor a resignation and withdrawal under subparagraph (b) above. Declarant is released from further obligation or liability under this Agreement as to rights and obligations of Declarant thereafter accruing with respect to which an assignment under subparagraph (a) above or a resignation and withdrawal under subparagraph (b) above is applicable. At such time as a full assignment, resignation or withdrawal as to all rights and obligations of Declarant under this Agreement has occurred, Declarant thereupon and thereafter has no further right, power or authority to act, and no further obligation or liability thereafter accruing, as Declarant under this Agreement.

(d) While Evergreen is Declarant, all rights of Evergreen or Declarant set forth in this Agreement may be exercised by Evergreen or Declarant in its sole and absolute discretion, and no exercise by Evergreen or Declarant of any such right may be challenged or set aside as being arbitrary, capricious, unreasonable or in bad faith. However, in the absence of specific language to the contrary in the assignment from Declarant, any successor or assignee of Declarant (but not Evergreen) is obligated to exercise the rights so assigned reasonably and in good faith.

Unofficial Document

(e) Declarant may grant in COREA Supplement(s) such waivers of the provisions of this Agreement with respect to an individual Parcel or Owner thereof as Declarant deems appropriate, so long as any such waiver, in the sole discretion of Declarant (i) does not result in an unsafe, unsanitary or aesthetically displeasing condition, (ii) does not result in a substantial departure from the common plan of development contemplated by this Agreement, and (iii) has no adverse effect on the easement rights or use restrictions in favor of any Owner or its Parcel otherwise contained herein. The granting of any such waiver does not automatically entitle any Owner to the same waiver or to any subsequent or additional waiver, it being understood that each such waiver, if any, will in every instance be considered on its own merits.

14.2 **Designation of Persons to Assume Declarant's Rights or Obligations**. As to any rights or obligations of Declarant under this Agreement with respect to which Declarant (including its successors or assigns) has resigned and withdrawn without making an assignment to one or more successors under subparagraph 14.1(a), including, without limitation, the rights and obligations of the Manager, the Owners of fifty-one percent (51%) or more of the total square feet of land area in the Development (herein referred to as the "Owners Quorum") may at any time and from time to time thereafter designate a Person or Persons to succeed to any such unassigned rights or obligations of Declarant. Likewise, the Owners Quorum may at any time and from time to time remove a Person (other than Evergreen) then exercising any or all of the rights or obligations of Declarant and designate a Person or Persons to succeed to such rights and obligations of Declarant. To be effective, any such designation must be in writing, must expressly refer to this Agreement and this paragraph 14.2, must specify the rights and obligations being assigned and the Person(s)

succeeding to such rights and obligations, must contain the signed assumption by such Person(s) of such rights and obligations, and must be executed by the requisite Owners and Recorded. During any time that no Person is entitled by this Agreement to exercise specific rights or obligations of Declarant, except as otherwise expressly provided herein, without otherwise affecting the validity and enforceability of the remainder of this Agreement (a) no Owner has the right to exercise or enforce any such unassigned rights or obligations of Declarant, (b) if rights of consent or approval by Declarant are unassigned, any action by an Owner otherwise requiring such consent or approval may be taken without the necessity of obtaining such consent or approval, and (c) during such time, if any, as no Manager is then serving, each Owner is responsible for maintaining and insuring at its expense all Common Areas and Improvements located on its Parcel.

14.3 **Evergreen's Rights**. Certain rights set forth in this Agreement ("Evergreen's Rights") are expressly reserved to Evergreen rather than Declarant. Unless all or a portion of Evergreen's Rights are specifically assigned by Evergreen in a manner similar to the assignment by Declarant of its rights under subparagraph 14.1(a) above, Evergreen's Rights are personal to Evergreen, automatically terminate at such time as Evergreen no longer owns any interest in the Development and no longer has any rights or obligations as Declarant under this Agreement, and may not be exercised by a successor or assignee Declarant. If at such time or thereafter rights of consent or approval by Evergreen are unassigned, any action by an Owner otherwise requiring such consent or approval may be taken without the necessity of obtaining such consent or approval.

14.4 **Exculpation**. Notwithstanding anything to the contrary contained in this Agreement, Evergreen and Declarant (including any authorized successor) have absolutely no liability whatsoever for mistakes or errors Unofficial Document in judgment or for any other act performed or omitted under this Agreement, in the absence of fraud, gross negligence or bad faith on the part of Evergreen or Declarant, and each Owner expressly waives and relinquishes any and all claims against Evergreen or Declarant on account thereof.

14.5 **Formation of Property Owner's Association**. So long as Evergreen (including for purposes of this paragraph 14.5 any authorized successor) owns any interest in the Development, Evergreen reserves the right, but not the obligation, at the expense of the Owners, to form a property owners' association (the "Association") for the benefit of the Development. The Association must be a nonprofit Arizona corporation having articles of incorporation, bylaws, a board of directors and such other rights and attributes as are customary for developer-controlled commercial property owners' associations in first-class neighborhood retail and office developments in metropolitan Phoenix, Arizona, as reasonably determined by Evergreen's legal counsel. Membership by all Owners in the Association, if formed, will be mandatory. If formed, Evergreen may assign to the Association any or all of the rights and obligations of Declarant and/or Evergreen set forth in this Agreement. Evergreen will retain effective control of the Association until Evergreen no longer owns any interest in the Development, when control of the Association will be transferred to the Owners in the same proportions as the gross square footage of land area of each Owner's Parcel bears to the total gross square footage of land area of all Parcels in the Development.

14.6 **Annexation and Deannexation**.

(a) Evergreen reserves the right, at any time and from time to time, to annex contiguous real property into the Development and subject such property to this Agreement by causing to be Recorded an instrument to such effect signed by Evergreen (and the Owner of the annexed property, if other than Evergreen).

(b) Evergreen reserves the right to deannex and remove from the Development and from the effect and operation of all or a portion of this Agreement real property then owned by Evergreen in fee (but not then subject to a lease or ground lease unless the tenant or ground lessee joins therein); provided, however, as an express condition to the deannexation and removal by Evergreen of property from the Development and the effect and operation of this Agreement (i) all then-existing use restrictions, if any, imposed against the property to be removed, whether under ARTICLE 11 of this Agreement, under a COREA Supplement or otherwise; and (ii) all then-existing easements, if any, upon, over, above, under or across the property to be removed that are materially necessary for the reasonable use and benefit of another Parcel in the Development, must be preserved in a manner that will permit the substantial realization of the benefits of such restrictions and easements in favor of each Owner as they existed prior to the deannexation, unless such restrictions or easements are terminated or amended by such action as is necessary to amend this Agreement. It is expressly acknowledged that easements on the property to be removed for cross-parking or for vehicular or pedestrian access, ingress and egress over Common Areas that are not Circulation Drives, are not materially necessary for the reasonable use and benefit of other Parcels in the Development.

Unofficial Document

## ARTICLE 15 - PLATTING

Declarant reserves the right, whether before or after the Recording of this Agreement, to obtain the approval of applicable governmental authority to the recordation of one or more subdivision plats for the Development, including any subsequent amendments thereto (collectively, the "Plat"). In connection with recordation of the Plat, each Owner agrees (a) to cooperate with Declarant in accomplishing the recordation of the Plat so long as such Owner incurs no material third-party expense in connection therewith, and no rights or benefits otherwise arising under this Agreement in favor of such Owner are materially and adversely affected thereby, (b) to reasonably consent to a change in the record legal description of such Owner's Parcel, so long as the description shown on the Plat is the legal equivalent of the metes and bounds legal description contained in the original conveyance from Declarant to such Owner (less portions, if any, previously dedicated or to be dedicated to applicable governmental authority), and (c) to reasonably consent to the dedication of all or any portion of the Circulation Drives, additional public right-of-way in Greenway Road and 35th Avenue if required by the City or the Arizona Department of Transportation, or of public utility and facility easements and other normal and customary easements shown on the Plat, so long as they are otherwise consistent with this Agreement. Each Owner agrees to execute the Plat within fifteen (15) days following written request from Declarant, failing which Declarant is irrevocably designated as such Owner's authorized agent, coupled with an interest, to execute the Plat for and on behalf of such Owner.

## ARTICLE 16 - TERM OF AGREEMENT

This Agreement and the easements, covenants, conditions and restrictions contained herein are effective commencing on the date that this Agreement is Recorded, and continue in perpetuity except to the extent that this Agreement is modified, amended, canceled, terminated or rescinded in whole or in part under ARTICLE 17 hereof.

## ARTICLE 17 - AMENDMENT

This Agreement may not be modified or amended in any respect, or canceled, terminated or rescinded, in whole or in part, except by a written instrument duly Recorded, fully executed and acknowledged by Evergreen (so long as it owns any interest in the Development or has any rights or obligations as Declarant or Manager under this Agreement), and the Owners of seventy-five percent (75%) or more of the total square feet of land area in the Development. Notwithstanding the foregoing to the contrary, all or any portion of the Development then owned in fee by Declarant (or Evergreen, if it is no longer Declarant) and shown on the Site Plan attached hereto as Exhibit "B", including, without limitation, Circulation Drives, parking layout, ratio and traffic flow pattern, and the location and extent of Building Envelopes, if any, depicted thereon, may be modified and amended from time to time by Declarant's executing and causing to be Recorded a supplement to this Agreement (whether a COREA Supplement or otherwise) amending Exhibit "B" (subject to any restrictions or limitations with respect thereto imposed by applicable governmental authority); provided, however, no such modification may materially increase an Owner's obligations or liabilities hereunder, without such Owner's written consent. It is intended that any modification, amendment, cancellation, termination, rescission or supplementation of this Agreement, in whole or in part, made in compliance with the requirements of this ARTICLE 17 by Declarant and/or the requisite Owners described above is binding and effective immediately, any custom or law to the contrary notwithstanding.

Unofficial Document

## ARTICLE 18 - MISCELLANEOUS

18.1 **Notices**.

(a) Any notice to be given by any Owner hereunder must be given in writing and delivered in person, or by reputable nationwide overnight courier (e.g., Federal Express), or forwarded by certified or registered mail, postage prepaid, return receipt requested, at the address indicated below, unless the party giving such notice has been notified, in writing, of a change of address:

Declarant: Evergreen–35th & Greenway, L.L.C.
c/o Evergreen Devco, Inc.
2390 East Camelback Road
Suite 410
Phoenix, Arizona 85016
Attention: Ms. Laura Ortiz

| | |
|---|---|
| With Copy to: | Evergreen Devco, Inc.<br>200 North Maryland Avenue<br>Suite 201<br>Glendale, California 91206<br>Attention: Mr. Bruce D. Pomeroy |
| Other Owners: | Unless designated in a COREA Supplement or other supplement to this Agreement, or otherwise advised to the contrary by notice given in accordance herewith, to the address for mailing tax bills set forth in the latest real property tax rolls available |

Any such notice is effective on the date on which such notice is delivered, if notice is given by personal delivery, on the next-succeeding business day after deposit with an overnight courier for next-day delivery, or if notice is sent through the United States mail, on the date of actual delivery as shown by the addressee's receipt or upon the expiration of three (3) days following the date of mailing, whichever first occurs.

(b) Each Owner agrees to give a copy to an Owner's lender of any notice of default given to the Owner, provided that the lender has previously requested the right to receive the notice by submitting an address to which the notice must be delivered and by giving all Owners and the Manager a copy of the following certification:

Unofficial Document

> The undersigned, whose address is [Complete] hereby certifies that it is the holder of a first lien upon the real property described on Exhibit A attached hereto which lien encumbers Parcel [complete] in (real estate description/shopping center) and is a mortgagee holding a security interest in said Parcel. If any notice is given of the default of the Owner upon whose Parcel this lien applies, a copy thereof must be delivered to the undersigned who will have all rights of the Owner to cure the default pursuant to the Common Operation and Reciprocal Easement Agreement ("COREA"). Failure to deliver a copy of such notice to the undersigned in no way affects the validity of the notice of default as respects such Owner, but tolls any applicable time period for cure by the undersigned or the taking by the undersigned of any other action required under the COREA, until such notice is properly delivered to the undersigned.

Any such notice to an Owner's lender must be given in the same manner as provided in subparagraph (a) above. The lender of the defaulting Owner is entitled to the same right, to be exercised, if at all, concurrently with such defaulting Owner, to cure such default, and failure to deliver a copy of such notice to the lender in no way affects the validity of the notice of default as respects the defaulting Owner, but tolls any applicable time period for cure by the lender or the taking by the lender of any other action required under this Agreement, until such notice is properly delivered to the lender. Giving any notice of default or the failure to deliver a copy to any lender of a notice of default in no way creates any liability on the part of Declarant, the Manager or the Owner so declaring a default.

18.2 **Attorneys' Fees**. If Declarant, the Manager or any Owner institutes a legal action or proceeding for the enforcement of any right or obligation contained in this Agreement, the prevailing party in such action or proceeding is entitled to recover its costs and reasonable attorneys' fees incurred in the preparation and prosecution of such action or proceeding.

18.3 **Consents**. Wherever in this Agreement the consent or approval of an Owner is required, unless otherwise expressly provided herein, such consent or approval may not be unreasonably withheld.

18.4 **No Waiver**. No waiver of any default of any obligation by an Owner may be implied from any omission by Declarant, the Manager, or another Owner to take any action with respect to such default. Notwithstanding the foregoing to the contrary, Declarant may elect to waive on behalf of all Owners the enforcement of any provision contained in this Agreement, upon a determination that such waiver is in the best interests of the Development as a whole.

18.5 **No Agency**. Nothing in this Agreement creates the relationship of principal and agent or of limited or general partners or of joint venturers or of any other association among the Owners or any of them.

18.6 **Covenants to Run with Land**. All of the easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards set forth herein run with the land and create equitable servitudes in favor of the entire Development, bind every person having any fee, leasehold, lien or other interest therein and inure to the benefit of Declarant, the Owners, and their respective successors, assigns, heirs, and personal representatives. All agreements set forth herein are deemed covenants regardless of whether expressly so designated.

Unofficial Document

18.7 **Grantee's Acceptance**. The grantee of any Parcel or any portion thereof, by acceptance of a deed conveying title thereto or the execution of a contract for the purchase thereof, whether from Declarant or from a subsequent Owner of the Parcel, accepts such deed or contract upon and subject to each and all of the easements, covenants, conditions, restrictions, reservations, servitudes, assessments, liens, charges and development standards contained herein. By such acceptance, any such grantee for himself and his successors, assigns, heirs, and personal representatives, is deemed to covenant, consent, and agree to and with Declarant, the Manager and the other Owners, to keep, observe, comply with, and perform the obligations and agreements set forth in this Agreement with respect to the property so acquired by such grantee.

18.8 **Rights and Obligations of Lenders**. The charges and burdens of this Agreement are, and at all times will be, prior and superior to the lien or charge of any mortgage or deed of trust affecting any Parcel or any part thereof, or any Improvements now or hereafter placed thereon; provided, however, a breach of any of the provisions of this Agreement or the enforcement of any lien rights herein granted does not defeat or render invalid the lien or charge of any mortgage or deed of trust given in good faith and for value.

18.9 **No Rights in Public**. Nothing contained in this Agreement creates any rights in the general public or dedicates for public use all or any portion of the Development.

18.10 **Taxes and Assessments**. Each Owner agrees to pay all taxes, assessments, and charges of any type levied or made by any governmental authority or agency with respect to its Parcel. If an Owner fails to pay said taxes and assessments prior to delinquency, which failure continues for fifteen (15) days after written notice by the Manager to such Owner, the Manager has the right, but not the obligation, to pay said taxes and assessments, and the costs thereof, together with interest thereon at the rate of eighteen percent (18%) per annum (not to exceed the maximum rate of interest allowed by law) until paid in full, will be a charge and continuing lien upon the Parcel until paid, subject to foreclosure by the Manager in the manner set forth in ARTICLE 7.

18.11 **Separability**. Each provision of this Agreement is declared to be independent of and severable from the remainder of this Agreement. If any provision contained herein is held to be invalid or to be unenforceable or not to run with the land, such holding does not affect the validity or enforceability of the remainder of this Agreement. If the validity or enforceability of any provision of this Agreement is held to be dependent upon the existence of a specific legal description, the Manager will promptly cause such legal description to be prepared, at the cost and expense of the Owners.

18.12 **Time of Essence/Force Majeure Delay**. Time is of the essence of this Agreement. However, no Person is liable for any failure or delay in performance under this Agreement (other than for failure or delay in the payment of money due and payable) to the extent such failure or delay is proximately caused by an event that (a) is not reasonably foreseeable, (b) is beyond the reasonable control of the Person, and (c) occurs without the fault or negligence of the Person (a "Force Majeure Delay"). Upon the occurrence of a Force Majeure Delay, the time for performance will be extended for a period equal to the duration of the Force Majeure Delay.

Unofficial Document

18.13 **Entire Agreement**. This Agreement (including all Exhibits attached hereto, which are incorporated herein by this reference) contains the complete declaration, understanding and agreement of Declarant with respect to all matters referred to herein.

18.14 **Captions**. The underlined captions preceding the various paragraphs and subparagraphs herein and the headings of the Articles, are for convenience of reference only, and may not be used as an aid to the construction or interpretation of any provision of this Agreement. Whenever applicable, the singular form includes the plural, and the masculine gender includes the feminine and neuter, and vice versa.

18.15 **Declarant's Disclaimer**. Declarant makes no warranty or representation whatsoever that the plans envisioned for the Development at the time this Agreement is Recorded can or will be carried out, or that the Development is or will be committed to, or developed for, a particular (or any) use, or that if the Development or any portion thereof is once used for a particular use, such use will continue. Declarant makes no representation or warranty that the use of the Development or any portion thereof will not be changed in the future.

18.16 **Ownership of Development**. The validity and binding effect of this Agreement is not affected or impaired by reason of the ownership of the entire Development by the same Person.

18.17 **Prescriptive Easements/Adverse Possession**. No title, easement or use pertaining to the Development or any portion thereof may be established by prescription or adverse possession, the statute of limitations for such purposes being expressly hereby waived.

18.18 **Perpetuities Savings Clause**. It is the intention of Declarant that any interest in real or personal property created under this Agreement that violates the rule against perpetuities be minimally reformed to cure the violation, rather than terminated. In this regard, if a court of competent jurisdiction determines that an interest created under this Agreement violates the rule, upon the petition of any interested Person, the court will reform the interest to either vest, if at all, or terminate, twenty-one (21) years after the death of the last survivor of all lineal descendants, living at the date that this Agreement is Recorded of Presidents of the United States of America. In determining whether an interest violates the rule and in reforming the interest, the period of perpetuities will be measured by actual rather than possible events.

18.19 **Incorporation of Recitals**. The Recitals of this Agreement are incorporated herein and made a part of this Agreement by this reference.

18.20 **Cross Access or other Easements with Neighboring Property**. Declarant reserves the right to enter into separate agreement(s), including, without limitation, the Master Declaration and the Wentworth Agreement, with owner(s) of real property adjacent to or in the vicinity of the Development (but not constituting a part thereof), for purposes of granting or obtaining vehicular and/or pedestrian cross access rights or easements over all or portions of such adjacent real property or the Common Areas of the Development intended for such purposes, or for purposes of granting or obtaining other reasonable easements, on such terms and conditions as Declarant determines in its discretion. Contributions, if any, by such adjacent owner(s) toward the costs of maintenance of the Common Areas will be credited in reduction of Common Expenses otherwise payable by the Owners under ARTICLE 6 of this Agreement.

Unofficial Document

18.21 **Estoppel Certificate**. The Manager and each Owner agree to issue within twenty (20) days following receipt of a written request (made not more frequently than three (3) times during any calendar year) from any other Owner or the Manager, to the requesting Person or its existing or prospective lender or successor, an estoppel certificate stating to the issuer's actual knowledge as of such date (a) whether it knows of any default under this Agreement and if there are known defaults, specifying the nature thereof, (b) whether this Agreement has been assigned, modified or amended in any way by it and if so, stating the nature thereof, (c) whether any sums are currently due and payable under this Agreement from or to the requesting Person , and (d) whether this Agreement is in full force and effect. Such statement constitutes a waiver of any claim by the issuer to the extent such claim is based upon facts contrary to those asserted in the statement and to the extent the claim is asserted against a bona fide lender or purchaser/assignee for value without knowledge of facts to the contrary of those contained in the statement and who has acted in reasonable reliance upon the statement.

18.22 **Consent to Assignment and Obligations of Declarant's Mortgagee**. Each Owner consents to any assignment by Declarant to any mortgagee ("Mortgagee") holding a lien granted by Declarant pursuant to any mortgage or deed of trust ("Mortgage") on all or any portion of the of Declarant's interest in the Development of Declarant's rights and obligations as "Declarant" under this Agreement, subject to the terms of this paragraph. If Mortgagee succeeds to the rights of Declarant pursuant to an exercise of its rights under any Mortgage, Mortgagee will be bound by the terms of this Agreement and the Owners will have the same rights and remedies against Mortgagee for a breach of this Agreement as the Owners would have against Declarant but for the assignment; provided, however, that Mortgagee will not be liable to the Owners for any act or omission of Declarant including, without limitation, Declarant's failure to pay any amounts owing or to be paid hereunder or to perform any act or obligation required to be performed by Declarant hereunder, arising prior to the date Mortgagee succeeds to Declarant's rights and takes possession of all or any portion of the Development. Mortgagee will be deemed to have assumed the obligations and be liable to each of the Owners under this Agreement only for matters and obligations arising or to be performed from and after the date Mortgagee succeeds to Declarant's rights hereunder and takes and holds possession of all or any portion of the Development, and any further or additional liability terminates upon the transfer by Mortgagee of all of its interest in the Development; provided, however, Mortgagee has no personal liability for any obligations under this Agreement except to the extent of, and Mortgagee's liability is limited to, Mortgagee's estate and interest in the Development.

18.23 **Governing Law**. The law of the State of Arizona governs the interpretation, validity, performance, and enforcement of this Agreement.

Unofficial Document

[SIGNATURE FOLLOWS]

IN WITNESS WHEREOF, Declarant has executed this Common Operation and Reciprocal Easement Agreement as of the date first written above.

DECLARANT

EVERGREEN–35th & Greenway, L.L.C.,
an Arizona limited liability company
By: Evergreen Development Company-2018, L.L.C.,
an Arizona limited liability company
Its: Manager
By: Evergreen Devco, Inc.,
Its: Manager

By: [signature]

Its: President

STATE OF Arizona )
)ss
County of Maricopa )

Unofficial Document

The foregoing instrument was acknowledged before me this 27th day of June, 2019, by Laura Ortiz, the President of Evergreen Devco, Inc., a California corporation, Manager of Evergreen Development Company-2014, L.L.C., an Arizona limited liability company, Manager of EVERGREEN–35TH & GREENWAY, L.L.C., an Arizona limited liability company, on behalf said entities.

WITNESS my hand and official seal.

Peggy Doane
Notary Public

My Commission Expires:

June 6, 2022

PEGGY DOANE
Notary Public, State of Arizona
Maricopa County
My Commission Expires
June 06, 2022

# EXHIBIT "A"

Legal Description of Development

Lots 1,2, and 3, of "FINAL PLAT FOR STORAGE CONVERSION", according to Book 1423 of Maps, page 21, records of Maricopa County, Arizona.

AND

That portion of the Northwest quarter of Section 11, Township 3 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona and that portion of Lot 5 according to the final plat for Storage Conversion, as recorded in Book 1423, Page 21, Maricopa County Records (M.C.R.), more particularly described as follows;

BEGINNING at the Southeast corner of said Lot 5;

THENCE South 89 degrees 24 minutes 15 seconds West, along the south line of said Lot 5, a distance of 173.16 feet to the west line of said Lot 5;

THENCE leaving said south line, North 00 degrees 06 minutes 41 seconds East, along said west line, a distance of 17.11 feet;

THENCE North 89 degrees 49 minutes 06 seconds West, a distance of 10.00 feet;

THENCE North 00 degrees 06 minutes 41 seconds East, a distance of 147.65 feet;

THENCE leaving said west line, North 89 degrees 30 minutes 10 seconds East, a distance of 40.33 feet;

THENCE South 00 degrees 29 minutes 50 seconds East, a distance of 17.17 feet;

THENCE North 89 degrees 46 minutes 27 seconds Unofficial Documentnce of 142.36 feet to the east line of said Lot 5;

THENCE South 00 degrees 00 minutes 00 seconds West, along said east line, a distance of 146.73 feet to the TRUE POINT OF BEGINNING.

AND

That portion of the Northwest quarter of Section 11, Township 3 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona and that portion of Lots 5 and 6 according to the final plat for Storage Conversion, as recorded in Book 1423, Page 21, Maricopa County Records (M.C.R.), more particularly described as follows;

BEGINNING at the Northeast corner of said Lot 6;

THENCE South 00 degrees 00 minutes 00 seconds West, along the east line of said Lots 5 and 6, a distance of 154.15 feet;

THENCE leaving said east line, South 89 degrees 46 minutes 27 seconds West, a distance of 142.36 feet; THENCE North 00 degrees 29 minutes 50 seconds West, a distance of 17.17 feet;

THENCE South 89 degrees 30 minutes 10 seconds West, a distance of 40.33 feet to the west line of said Lot 5;

THENCE North 00 degrees 06 minutes 41 seconds East, along said west line of Lots 5 and 6, a distance of 92.08 feet;

THENCE South 89 degrees 53 minutes 20 seconds East, along said west line of Lot 6, a distance of 2.00 feet;

THENCE North 00 degrees 06 minutes 41 seconds East, a distance of 45.82 feet to the Northwest corner of said Lot 6;

THENCE leaving said west line, North 90 degrees 00 minutes 00 seconds East, along the north line of said Lot 6, a distance of 180.57 feet to the TRUE POINT OF BEGINNING.

**EXHIBIT "B"**

SITE PLAN

(see next page)

Unofficial Document




20190503082

Unofficial Document

RECORDED ELECTRONICALLY
BY CHICAGO TITLE AGENCY

20

C1
Ho

When Recorded, Return to:

Evergreen Devco, Inc.
2390 East Camelback Road
Suite 410
Phoenix, Arizona 85016
Attn: Ms. Laura Ortiz

SUPPLEMENT NO. 3 TO COMMON OPERATION
AND RECIPROCAL EASEMENT AGREEMENT
LOT 2

THIS SUPPLEMENT NO. 3 TO COMMON OPERATION AND RECIPROCAL EASEMENT AGREEMENT is made as of the 1st day of July, 2019, by EVERGREEN–35TH & GREENWAY, L.L.C., an Arizona limited liability company ("Declarant"), whose address is c/o Evergreen Devco, Inc., 2390 East Camelback Road, Suite 410, Phoenix, Arizona 85016.

RECITALS

A. Declarant is the "Declarant" under a Common Operation and Reciprocal Easement Agreement dated July 1, 2019, and recorded July 2, 2019 as Document No. Recorded Concurrently in the official records of Maricopa County, Arizona, as now or hereafter amended or supplemented in accordance with its terms (collectively, the "COREA"). The real property that is subject to the COREA is located in Maricopa County, Arizona, and more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Development").

B. A portion of the Development legally described on Exhibit "B" attached hereto and made a part hereof ("Lot 2") has been leased (the "Lease") to BLACK ROCK STORE OPERATIONS, LLC, an Oregon limited liability company ("Black Rock").

C. Declarant desires to impose certain covenants, conditions and restrictions to burden and benefit Lot 2, the Owner thereof and Black Rock, and/or other portions of the Development, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in accordance with the right, power and authority expressly reserved to Declarant under the COREA, in furtherance of a general plan for the use, enjoyment, development and improvement of the Development for the benefit and complement of all portions thereof and all present and future Owners thereof, and intending that this Supplement No. 3 be construed in conjunction with and as a part of the COREA, Declarant declares as follows:

AGREEMENTS:

1. Definitions.

All capitalized terms not otherwise expressly defined herein have the same meanings as are assigned to such terms in the COREA.

2. Site Plan.

The Site Plan attached to the COREA is hereby modified, amended and superseded by the site plan attached hereto as Exhibit "C" and made a part hereof, which is deemed the Site Plan under the COREA from and after the date of recording of this Supplement No. 3 for all intents and purposes.

3. Lot 2 Building Envelope.

The Building Envelope for Lot 2 is as shown on the Site Plan.

4. Lot 2 Building Limitations and Parking.

The total square footage of floor area of the Building to be constructed within the Building Envelope on Lot 2 may not exceed 2,000 square feet.

5. Building Limitations Benefitting Lot 2.

Unofficial Document

The Owner of Lot 1 shall not construct any portion of a building in the area labeled "No Building Area" on the Site Plan.

6. Use Restrictions Benefitting and Burdening Lot 2.

(a) Lot 2 may only be used for the operation of a coffee store with a drive-thru for the preparation and sale of coffee, espresso and other beverage and food related items typically sold in a Black Rock Coffee Bar (including, without limitation, the retail sale of packaged and bulk coffee, coffee beans, tea, hot chocolate and hot vanilla drink mix, hot and cold coffee, tea and espresso drinks, hot and cold chocolate and vanilla drinks, sandwiches, salads, yogurt, frozen soft serve products, oatmeal, cereals, crepes, waffles, puddings, parfaits, bakery and dessert items, coffee and tea accessories and all other items as are typically sold in typical Black Rock Coffee Bar stores), for on premises and off premises consumption and take-out, and for any other retail use not prohibited by the COREA, that certain Declaration of Establishment of Protective Covenants, Conditions and Restrictions and Grants of Easements recorded at Docket 10456 Page 993, as amended, or that certain Easement Agreement recorded at 2019-0502190, and for no other purpose.

(b) Reasonable future additional use restrictions may be imposed against Lot 2 by Declarant under the COREA (whether before or after the date of recording

hereof); provided, however, no future additional use restriction may be imposed against Lot 2 under the COREA (i) that restricts in any manner the right to use Lot 2 for the use described in subparagraph (a) above, and (ii) except in connection with the sale, lease, exchange or other disposition by Declarant of a Parcel or premises in the Development that are intended by Declarant and the transferee to be developed and used for the purpose protected by such future additional use restriction at the time it is imposed.

(c) Subject to the COREA, no Parcel in the Development other than Lot 2 may be used, directly or indirectly, for the sale of: (a) whole bean or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) tea or tea-based drinks, (d) brewed coffee or (e) blended beverages containing coffee, espresso, and/or tea. Notwithstanding the foregoing, the foregoing exclusive shall not apply to (y) the incidental sales of the beverages identified in items (a) through (e) above where the gross sales attributed to such beverages do not exceed fifteen percent (15%) of each such tenant/occupant's gross annual sales from the Development, or (z) a full service, sit down restaurant.

7. Common Expenses.

Black Rock shall have the right to dispute common expenses as set forth in paragraph 6.5 of the COREA.

8. Shared Sign.

Unofficial Document

(a) Declarant, grants to the Owner of Lot 2 (or its designee) the exclusive right to place one (1) two-sided sign panel advertising the business conducted on Lot 2 on the Greenway Road Shared Sign in the location and position shown on Exhibit "D" attached hereto and made a part hereof (i.e., the second position from the top).

(b) The rights and obligations of the Owner of Lot 2 pertaining to the Greenway Road Shared Sign and such Owner's sign panel placed thereon are governed by applicable provisions of the COREA and that certain Easement Agreement by WPC Greenway Storage, LLC, dated July 1, 2019 and recorded on July 2, 2019 as Instrument No. 2019-0502190, in the Official Records of the Maricopa County Recorder (the "Wentworth Easement"). The Greenway Road Shared Sign is referred to in the Wentworth Easement as the Greenway Monument Sign. Without limiting the generality of the foregoing, the Owner of Lot 2 is responsible for the costs of fabrication, installation, maintenance and repair in good and operating condition of its sign panels on the Greenway Road Shared Sign, and is subject to periodic assessment pursuant to the Wentworth Easement for a pro rata share of the reasonable costs and expenses of operation, insurance, illumination, maintenance, repair, and replacement of the Greenway Road Shared Sign (sometimes referred to in the COREA as a Shared Sign), including payment of all utility costs related thereto, as further provided in the COREA and Wentworth Easement.

9. Notices.

Notice is hereby given that for purposes of paragraph 18.1 of the COREA, from and after the date of recording of this Supplement No. 3, until further notice, notices to the Owner of Lot 2 are to be given and addressed as follows:

Evergreen-35th & Greenway, L.L.C.
c/o Evergreen Devco, Inc.
2390 East Camelback Road
Suite 410
Phoenix, Arizona 85016
Attn: Dana Dragon
Email: ddragon@evgre.com

With a copy to:

Black Rock Store Operations Co.
16307 NE Cameron Boulevard
Portland, OR 97230
Attn: Robert Kaufmann
Email: bobby@br.coffee

10. Amendment.

Unofficial Document

This Supplement No. 3 may only be amended by a writing signed by Declarant and the Owner of Lot 2, or if there is then no Declarant, the Manager and the Owner of Lot 2, recorded in the Official Records of Maricopa County, Arizona.

11. Ratification.

The COREA, as supplemented by this Supplement No. 3, is hereby ratified and remains in full force and effect in accordance with its terms.

****SIGNATURES APPEAR ON THE FOLLOWING PAGE****

IN WITNESS WHEREOF, Declarant has executed this Supplement No. 3 to Common Operation and Reciprocal Easement Agreement as of the date first written above.

DECLARANT:

EVERGREEN–35TH & GREENWAY, L.L.C.,
an Arizona limited liability company
By: Evergreen Development Company-2018, L.L.C.,
an Arizona limited liability company
Its: Manager
By: Evergreen Devco, Inc.,
a California corporation
Its: Manager

By: Dana Dragon

Its: Principal

STATE OF ARIZONA )
)ss.
County of Maricopa )

Unofficial Document

The foregoing instrument was acknowledged before me this 27th day of June, 2019, by Dana Dragon, the Principal of Evergreen Devco, Inc., a California corporation, Manager of Evergreen Development Company-2018, L.L.C., an Arizona limited liability company, Manager of EVERGREEN–35TH & GREENWAY, L.L.C., an Arizona limited liability company, on behalf of said entities.

WITNESS my hand and official seal.

Peggy Doane
Notary Public

My Commission Expires:

June 6, 2022

PEGGY DOANE
Notary Public, State of Arizona
Maricopa County
My Commission Expires
June 06, 2022

## Exhibit "A" to COREA Supplement

## Legal Description of Development

Lots 1,2, and 3, of "FINAL PLAT FOR STORAGE CONVERSION", according to Book 1423 of Maps, page 21, records of Maricopa County, Arizona.

AND

That portion of the Northwest quarter of Section 11, Township 3 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona and that portion of Lot 5 according to the final plat for Storage Conversion, as recorded in Book 1423, Page 21, Maricopa County Records (M.C.R.), more particularly described as follows;

BEGINNING at the Southeast corner of said Lot 5;

THENCE South 89 degrees 24 minutes 15 seconds West, along the south line of said Lot 5, a distance of 173.16 feet to the west line of said Lot 5;

THENCE leaving said south line, North 00 degrees 06 minutes 41 seconds East, along said west line, a distance of 17.11 feet;

THENCE North 89 degrees 49 minutes 06 seconds West, a distance of 10.00 feet;

THENCE North 00 degrees 06 minutes 41 seconds East, a distance of 147.65 feet;

THENCE leaving said west line, North 89 degrees 30 minutes 10 seconds East, a distance of 40.33 feet;

THENCE South 00 degrees 29 minutes 50 seconds East, a distance of 17.17 feet;

THENCE North 89 degrees 46 minutes 27 seconds Unofficial Document ice of 142.36 feet to the east line of said Lot 5;

THENCE South 00 degrees 00 minutes 00 seconds West, along said east line, a distance of 146.73 feet to the TRUE POINT OF BEGINNING.

AND

That portion of the Northwest quarter of Section 11, Township 3 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona and that portion of Lots 5 and 6 according to the final plat for Storage Conversion, as recorded in Book 1423, Page 21, Maricopa County Records (M.C.R.), more particularly described as follows;

BEGINNING at the Northeast corner of said Lot 6;

THENCE South 00 degrees 00 minutes 00 seconds West, along the east line of said Lots 5 and 6, a distance of 154.15 feet;

THENCE leaving said east line, South 89 degrees 46 minutes 27 seconds West, a distance of 142.36 feet; THENCE North 00 degrees 29 minutes 50 seconds West, a distance of 17.17 feet;

THENCE South 89 degrees 30 minutes 10 seconds West, a distance of 40.33 feet to the west line of said Lot 5;

THENCE North 00 degrees 06 minutes 41 seconds East, along said west line of Lots 5 and 6, a distance of 92.08 feet;

THENCE South 89 degrees 53 minutes 20 seconds East, along said west line of Lot 6, a distance of 2.00 feet;

THENCE North 00 degrees 06 minutes 41 seconds East, a distance of 45.82 feet to the Northwest corner of said Lot 6;

THENCE leaving said west line, North 90 degrees 00 minutes 00 seconds East, along the north line of said Lot 6, a distance of 180.57 feet to the TRUE POINT OF BEGINNING.

Exhibit "B" to COREA Supplement

Legal Description of Lot 2

Lot 2 of "FINAL PLAT FOR STORAGE CONVERSION", according to Book 1423 of Maps, page 21, records of Maricopa County, Arizona.

Unofficial Document




Exhibit "C" to COREA Supplement

Revised Site Plan for Development

20190503086

Exhibit "D" to COREA Supplement

Sign Exhibit




Unofficial Document

Greenway Road Shared Sign




Unofficial Document

RECORDED ELECTRONICALLY
BY CHICAGO TITLE AGENCY

Unofficial
20 Document
C1
sa

When Recorded, Return to:

Evergreen Devco, Inc.
2390 East Camelback Road
Suite 410
Phoenix, Arizona 85016
Attn: Ms. Laura Ortiz

C 19023318-347-MC

SUPPLEMENT NO. 4 TO COMMON OPERATION
AND RECIPROCAL EASEMENT AGREEMENT
LOT 1

THIS SUPPLEMENT NO. 4 TO COMMON OPERATION AND RECIPROCAL EASEMENT AGREEMENT is made as of the 2nd day of Jan, 2020, by EVERGREEN–35TH & GREENWAY, L.L.C., an Arizona limited liability company ("Declarant"), whose address is c/o Evergreen Devco, Inc., 2390 East Camelback Road, Suite 410, Phoenix, Arizona 85016.

RECITALS

A. Declarant is the "Declarant" under a Common Operation and Reciprocal Easement Agreement dated July 1, 2019, and recorded July 2, 2019 as Document No. 20190503082 in the official records of Maricopa County, Arizona, as now or hereafter amended or supplemented in accordance with its terms (collectively, the "COREA"). The real property that is subject to the COREA is located in Maricopa County, Arizona, and more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Development").

B. A portion of the Development legally described on Exhibit "B" attached hereto and made a part hereof ("Lot 1") will, concurrently with the execution and recordation of the Supplement No. 4, be conveyed to GREENWAY SALAD LLC, ("Salad and Go").

C. Declarant desires to impose certain covenants, conditions and restrictions to burden and benefit Lot 1 and the Owner thereof, and/or other portions of the Development, on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in accordance with the right, power and authority expressly reserved to Declarant under the COREA, in furtherance of a general plan for the use, enjoyment, development and improvement of the Development for the benefit and complement of all portions thereof and all present and future Owners thereof, and intending that this Supplement No. 4 be construed in conjunction with and as a part of the COREA, Declarant declares as follows:

AGREEMENTS:

1. Definitions.

All capitalized terms not otherwise expressly defined herein have the same meanings as are assigned to such terms in the COREA.

2. Site Plan.

The Site Plan attached to the COREA is hereby modified, amended and superseded by the site plan attached hereto as Exhibit "C" and made a part hereof, which is deemed the Site Plan under the COREA from and after the date of recording of this Supplement No. 4 for all intents and purposes.

3. Lot 1 Building Envelope.

The Building Envelope for Lot 1 is as shown on the Site Plan.

4. Lot 1 Building Limitations and Parking.

The total square footage of floor area of the Building to be constructed within the Building Envelope on Lot 1 may not exceed 2,500 square feet. The Owner of Lot 1 shall not construct any portion of a building in the area labeled "No Building Area" on the Site Plan.

Unofficial Document

5. Covenant to Build and Open.

The Owner of Lot 1 agrees to construct on Lot 1 and to open for business to the public for at least one (1) day a fully fixtured, stocked and staffed drive-thru restaurant primarily serving salads, not later than the date which is three hundred sixty-five (365) days after the date of this Supplement No. 4 (the "Opening Covenant").

6. Repurchase Option.

(a) Declarant reserves, and title to Lot 1 is subject to, the right and option of Declarant to repurchase Lot 1 (the "Repurchase Option"), on the terms and conditions set forth in this paragraph 6.

(b) Prior to satisfaction of the Opening Covenant, the Owner of Lot 1 may not sell, lease, exchange or otherwise transfer all or substantially all of Lot 1 without first giving Declarant written notice of the proposed transfer and the details thereof (including, without limitation, the name and address of the proposed transferee and all written documentation entered into by the Owner of Lot 1 pertaining to the proposed transfer). Declarant then has thirty (30) days following receipt of such notice in which to exercise the Repurchase Option. Upon the expiration of said 30-day period without Declarant's exercise of the Repurchase Option, the proposed transfer may proceed on terms

and conditions no more favorable to the proposed transferee than those contained in the documentation given to Declarant; provided, however, if the proposed transfer is not consummated within one hundred eighty (180) days thereafter, the Repurchase Option again becomes effective, and the Owner of Lot 1 must again comply with the requirements of this subparagraph (b) prior to consummating any transfer of Lot 1.

(c) In addition to Declarant's rights under subparagraph (b) above, if the Opening Covenant has not timely occurred, Declarant may exercise the Repurchase Option at any time within one hundred eighty (180) days thereafter, unless the Opening Covenant is satisfied prior to such exercise.

(d) The Repurchase Option is exercised when Declarant gives written notice (in accordance with the COREA) of exercise to the then Owner of Lot 1 ("Notice of Exercise").

(e) Within ten (10) days following Notice of Exercise, the parties will open an escrow with Chicago Title Agency, Inc., 2390 East Camelback Road, Suite 100, Phoenix, Arizona 85016, Attn: Ms. Melissa Cocanower, ("Chicago"), for the sale of Lot 1 by the Owner thereof to Declarant, and upon request of Chicago will execute formal escrow instructions on Chicago's standard form (or with such modifications as are necessary to conform to the terms of this paragraph 6 or as are otherwise mutually acceptable to the parties). Close of escrow will take place on the sixtieth (60th) day following Notice of Exercise (the "Closing Date") at the offices of Chicago.

Unofficial Document

(f) The purchase price payable by Declarant for Lot 1 will equal the sum of (i) the purchase price paid by Salad and Go the original purchaser ("Buyer") of Lot 1 from Evergreen under a Real Estate Purchase Agreement pertaining to the purchase and sale of Lot 1 between Evergreen and Buyer (the "Purchase Agreement"), plus (ii) the unamortized cost of the buildings and improvements, if any, constructed on Lot 1 by Salad and Go, with such amortization to be on a straight-line basis, as reflected on the books and records of Salad and Go maintained in accordance with generally accepted accounting principles, consistently applied (collectively, the "Purchase Price"). No interest or carry costs associated with the foregoing are payable by Declarant. Notwithstanding the foregoing, if the Repurchase Option is exercised as the result of a proposed sale under subparagraph (b) above, the Purchase Price for purposes of the Repurchase Option will be the lesser of the Purchase Price determined in accordance with the immediately preceding sentence, or the purchase price that is specified in the proposed sale. If Declarant so requests, the Owner of Lot 1 will certify to Declarant the then-unamortized cost of its building and improvements on Lot 1 as reflected in its books and records, maintained in accordance with generally accepted accounting principles, consistently applied. The Purchase Price is payable by Declarant in cash on the Closing Date.

(g) On the Closing Date, the Owner of Lot 1 will convey fee simple title to Lot 1 to Declarant by Special Warranty Deed on Chicago's standard form, but expressly subject to only those exceptions to title to which Lot 1 was subject on the date hereof, and such additional exceptions to title as Declarant approves in writing. Declarant's approval

of additional exceptions to title requested by the Owner of Lot 1 prior to the imposition thereof against Lot 1 will not be unreasonably withheld or delayed. All amounts owing by the Owner of Lot 1 to Declarant, or secured by liens or encumbrances approved by Declarant, will be deducted from the Purchase Price. All other title exceptions must be extinguished by the Owner of Lot 1, at its expense, on or before the Closing Date. Exclusive possession of Lot 1 free and clear of any possessory rights or interests will be delivered to Declarant at the Closing Date in its then physical condition; provided, however, risk of loss is the obligation and responsibility of the Owner of Lot 1 prior to the Closing Date.

(h) On the Closing Date, the Owner of Lot 1 will provide Declarant with an extended coverage ALTA owner's title insurance policy issued by Chicago for the amount of the Purchase Price and subject only to the usual printed exclusions and those title exceptions permitted under subparagraph (g) above. Declarant will pay the incremental increase in premium over and above the charge for a standard coverage title policy. Real estate taxes and assessments for the then current year will be prorated as of the Closing Date, based on the latest available figures. Chicago's escrow fee will be shared equally between the Owner of Lot 1 and Declarant, and all other escrow-related costs and prorations will be charged according to Chicago's custom in Maricopa County.

(i) The Repurchase Option is personal to Declarant, and notwithstanding any assignment in whole or in part of the rights as Declarant, the Repurchase Option will not be deemed assigned (in the absence of an express assignment signed by Declarant and referring specifically to the Repurchase Option) to Manager or any successor Declarant.

Unofficial Document

7. Use Restrictions Benefitting and Burdening Lot 1.

(a) Lot 1 may only be used for the operation of a drive-thru restaurant primarily serving salads, for on premises and off premises consumption and take-out, and for any other retail use (i) not prohibited by the COREA, and (ii) approved by Declarant (for so long as there is a Declarant under the COREA), which approval shall not be unreasonably withheld, conditioned or delayed, but which may be withheld if the proposed change of use is prohibited under the COREA or conflicts with a proposed or contemplated exclusive for a different Lot within the Development.

(b) Reasonable future additional use restrictions may be imposed against Lot 1 by Declarant under the COREA (whether before or after the date of recording hereof); provided, however, no future additional use restriction may be imposed against Lot 1 under the COREA (i) that restricts in any manner the right to use Lot 1 for the use described in subparagraph (a) above, and (ii) except in connection with the sale, lease, exchange or other disposition by Declarant of a Parcel or premises in the Development that are intended by Declarant and the transferee to be developed and used for the purpose protected by such future additional use restriction at the time it is imposed.

(c) Subject to the COREA, no Parcel in the Development other than Lot 1 may be used, directly or indirectly, for the operation of a drive-thru restaurant primarily serving salads. Notwithstanding the foregoing, the foregoing exclusive shall not apply to (x) the incidental sales of salads where the gross sales attributed to such salads do not exceed twenty-five percent (25%) of each such tenant/occupant's gross annual sales from the Development, or (y) a full or limited service, sit down restaurant.

8. Shared Sign.

(a) Declarant grants to the Owner of Lot 1 (or its designee) the exclusive right to place one (1) two-sided sign panel advertising the business conducted on Lot 1 on the Greenway Road Shared Sign and on the 35th Avenue Shared Sign in the locations and positions shown on Exhibit "D" attached hereto and made a part hereof.

(b) The rights and obligations of the Owner of Lot 1 pertaining to the Shared Signs and such Owner's sign panels placed thereon are governed by applicable provisions of the COREA and that certain Easement Agreement by WPC Greenway Storage, LLC, dated July 1, 2019 and recorded on July 2, 2019 as Instrument No. 20190502190, in the Official Records of the Maricopa County Recorder (the "Wentworth Easement"). The Greenway Road Shared Sign is referred to in the Wentworth Easement as the Greenway Monument Sign while the 35th Avenue Shared Sign is referred to therein as the 35th Monument Sign. Without limiting the generality of the foregoing, the Owner of Lot 1 is responsible for the costs of fabrication, installation, maintenance and repair in good and operating condition of its sign panels on the Shared Signs, and is subject to periodic assessment pursuant to the Wentworth Easement for a pro rata share of the reasonable costs and expenses of operation, insurance, illumination, maintenance, repair, and replacement of the Shared Signs, including payment of all utility costs related thereto, as further provided in the COREA and Wentworth Easement.

Unofficial Document

9. Notices.

Notice is hereby given that for purposes of paragraph 18.1 of the COREA, from and after the date of recording of this Supplement No. 4, until further notice, notices to the Owner of Lot 1 are to be given and addressed as follows:

________________________________, L.L.C.
c/o Greenway Salad, LLC
10229 North Scottsdale Road
Suite F
Scottsdale, Arizona 85253
Attn: Beau Woodring
Email: beau@generaldevelop.com

10. Amendment.

This Supplement No. 4 may only be amended by a writing signed by Declarant and the Owner of Lot 1, or if there is then no Declarant, the Manager and the Owner of Lot 1, recorded in the Official Records of Maricopa County, Arizona.

11. Ratification.

The COREA, as supplemented by this Supplement No. 4, is hereby ratified and remains in full force and effect in accordance with its terms.

Unofficial Document

IN WITNESS WHEREOF, Declarant has executed this Supplement No. 4 to Common Operation and Reciprocal Easement Agreement as of the date first written above.

DECLARANT:

EVERGREEN–35TH & GREENWAY, L.L.C.,
an Arizona limited liability company

By: Evergreen Development Company-2018, L.L.C.,
an Arizona limited liability company

Its: Manager

By: Evergreen Devco, Inc.,
a California corporation

Its: Manager

By: [signature]

Its: Principal

Unofficial Document

STATE OF ARIZONA )
)ss.
County of Maricopa )

The foregoing instrument was acknowledged before me this 26 day of November, 2019, by Dana Dragon, the Principal of Evergreen Devco, Inc., a California corporation, Manager of Evergreen Development Company-2018, L.L.C., an Arizona limited liability company, Manager of EVERGREEN–35TH & GREENWAY, L.L.C., an Arizona limited liability company, on behalf of said entities.

WITNESS my hand and official seal.

MARIA F CRUZ
Notary Public – Arizona
Maricopa County
My Comm. Expires Jan 5, 2022

Notary Public

My Commission Expires:

Jan 5, 2022

Exhibit "A" to COREA Supplement

Legal Description of Development

Lots 1,2, 3, of "STORAGE CONVERSION", according to Book 1423 of Maps, page 21, records of Maricopa County, Arizona.

AND

That portion of the Northwest quarter of Section 11, Township 3 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona and that portion of Lot 5 according to the final plat for Storage Conversion, as recorded in Book 1423, Page 21, Maricopa County Records (M.C.R.), more particularly described as follows;
BEGINNING at the Southeast corner of said Lot 5;
THENCE South 89 degrees 24 minutes 15 seconds West, along the south line of said Lot 5, a distance of 173.16 feet to the west line of said Lot 5;
THENCE leaving said south line, North 00 degrees 06 minutes 41 seconds East, along said west line, a distance of 17.11 feet;
THENCE North 89 degrees 49 minutes 06 seconds West, a distance of 10.00 feet;
THENCE North 00 degrees 06 minutes 41 seconds East, a distance of 147.65 feet;
THENCE leaving said west line, North 89 degrees 30 minutes 10 seconds East, a distance of 40.33 feet;
THENCE South 00 degrees 29 minutes 50 seconds East, a distance of 17.17 feet;
THENCE North 89 degrees 46 minutes 27 seconds East, a distance of 142.36 feet to the east line of said Lot 5; THENCE South 00 degrees 00 minutes 00 seconds West, along said east line, a distance of 146.73 feet to the TRUE POINT OF BEGINNING.

Unofficial Document

AND

That portion of the Northwest quarter of Section 11, Township 3 North, Range 2 East of the Gila and Salt River Meridian, Maricopa County, Arizona and that portion of Lots 5 and 6 according to the final plat for Storage Conversion, as recorded in Book 1423, Page 21, Maricopa County Records (M.C.R.), more particularly described as follows;
BEGINNING at the Northeast corner of said Lot 6;
THENCE South 00 degrees 00 minutes 00 seconds West, along the east line of said Lots 5 and 6, a distance of 154.15 feet;
THENCE leaving said east line, South 89 degrees 46 minutes 27 seconds West, a distance of 142.36 feet; THENCE North 00 degrees 29 minutes 50 seconds West, a distance of 17.17 feet;
THENCE South 89 degrees 30 minutes 10 seconds West, a distance of 40.33 feet to the west line of said Lot 5; THENCE North 00 degrees 06 minutes 41 seconds East, along said west line of Lots 5 and 6, a distance of 92.08 feet;
THENCE South 89 degrees 53 minutes 20 seconds East, along said west line of Lot 6, a distance of 2.00 feet; THENCE North 00 degrees 06 minutes 41 seconds East, a distance of 45.82 feet to the Northwest corner of said Lot 6;
THENCE leaving said west line, North 90 degrees 00 minutes 00 seconds East, along the north line of said Lot 6, a distance of 180.57 feet to the TRUE POINT OF BEGINNING.

Exhibit "B" to COREA Supplement

Legal Description of Lot 1

Lot 1, of "Storage Conversion", according to Book 1423 of Maps, page 21, records of Maricopa County, Arizona.

Unofficial Document




Exhibit “C” to COREA Supplement

Revised Site Plan for Development

2020000005413

Exhibit "D" to COREA Supplement

Sign Exhibit



Greenway Road Shared Sign



35th Ave Shared Sign



# EXHIBIT C

DAVIS GRAHAM

Kyler Burgi
303.892.7223
kyler.burgi@davisgraham.com

September 9, 2026

*Via Email and FedEx*

Sherry Carlo, Manager
BRC 4SHER, LLC
31946 North 63rd Place
Cave Creek, AZ 85331
sherrycarlo8@gmail.com

Re: Notice of Imminent Breach and Demand for Enforcement of Use Restrictions—
3415 Greenway Road, Phoenix, Arizona ("Lot 2" or the "Black Rock Store")

To Whom It May Concern:

We represent Black Rock Store Operations LLC ("Black Rock") in connection with the Black Rock Store. We write to formally notify BRC 4SHER, LLC ("Landlord") that it will imminently be in breach of the Lease and COREA (both defined below)[1] and demand that Landlord take immediate action to prevent such breach.

Black Rock is the tenant in the Landlord's shopping center located at 35th Avenue and Greenway Road (the "Center"). It occupies Lot 2 (a/k/a Lot 2 of the Final Plat for Storage Conversion, at the southeast corner of 35th Avenue and Greenway Road, Phoenix, Arizona) under the Lease, dated February 25, 2019 (as amended, the "Lease"), originally between Evergreen-35th Avenue & Greenway, L.L.C., as landlord, and Black Rock, as tenant, which was amended by the First Amendment to Lease, dated April 6, 2020. Landlord is the current landlord under the Lease. The Center currently has a mix of tenants, including Black Rock operating a coffee retail facility on Lot 2 within the Center and And Go Concepts, LLC d/b/a Salad And Go ("Salad And Go") operating a drive-thru restaurant primarily serving salads on Lot 1.

Under Section 11.9 of the Lease (the "Black Rock Covenant"), Landlord agreed not to lease or license any space within the Center to any person or entity (except Black Rock) for the sale of: (a) whole bean or ground coffee beans; (b) espresso, espresso-based drinks, or coffee-based drinks; (c) tea or tea-based drinks; (d) brewed coffee; or (e) blended beverages containing coffee, espresso, and/or tea. Furthermore, Landlord agreed to include in all future leases and conveyances of all or any portion of the Center a provision prohibiting any tenants or occupants from violating the Black Rock Covenant.

The Black Rock Covenant and the requirements and restrictions on tenant mix within the Center are further memorialized and binding on the Landlord and occupants of the Center in documents of record, including:

- Common Operation and Reciprocal Easement Agreement, dated July 1, 2019, and recorded as Document No. 20190503082 in the official records of Maricopa County, Arizona (as amended and supplemented, the "COREA"), which under Article 11 establishes general use restrictions for the Center and reserves to the Declarant the right to impose additional use restrictions to promote tenant diversity.

[1] Capitalized terms not defined here are defined in the Lease and the COREA.

- Supplement No. 3 to the COREA, dated July 1, 2019, recorded as Document No. 20190503086 in the official records of Maricopa County, Arizona, which under Section 6(c) expressly provides that "no Parcel in the [Center] other than Lot 2 may be used, directly or indirectly, for the sale of: (a) whole bean or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) tea or tea-based drinks, (d) brewed coffee or (e) blended beverages containing coffee, espresso, and/or tea."
- Supplement No. 4 to the COREA, dated January 2, 2020, recorded as Document No. 20200005413 in the official records of Maricopa County, Arizona, which under Section 7(a) expressly restricts Lot 1 to use solely "for the operation of a drive-thru restaurant primarily serving salads, for on premises and off premises consumption and take-out." Other uses are permitted so long as the use (1) is not prohibited under the COREA and (2) is approved by the Declarant "which approval shall not be unreasonably withheld, conditioned or delayed, but which may be withheld if the proposed change of use is prohibited under the COREA or conflicts with a proposed or contemplated exclusive [use] for a different Lot within the [Center]."

These restrictions are covenants running with the land. They bind all owners and occupants of the Center and are enforceable against any successor in interest.

**The And Go Bankruptcy and the Proposed Lease Sale**

On August 4, 2026, Salad And Go and its affiliated debtors (together, the "Debtors") filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the jointly administered case captioned *In re And Go Concepts, LLC*, Case No. 26-90753 (ARP) (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors have filed a motion to sell a portion of their lease portfolio, including the lease applicable to Lot 1 (the "Lot 1 Lease"). Brew Culture, LLC d/b/a 7 Brew ("7 Brew") has been selected as the successful bidder for the Lot 1 Lease, among other leases.

7 Brew operates drive-thru coffee retail facilities throughout the country. All indications are that it intends to open a coffee retail facility on Lot 1. The proposed order approving the sale of the Lot 1 Lease and other leases to 7 Brew, along with the asset purchase agreement, contemplates that the Lot 1 Lease will be assumed and assigned to 7 Brew free and clear of all use restrictions. Specifically, the proposed sale order provides that "any use restriction contained in an Assumed Contract/Lease that purports to prohibit, restrict, condition, or limit Buyer's operation of the leased premises following Closing constitutes an unenforceable restriction on assignment for the drive through sale of coffee, non-coffee beverages, and food items in the ordinary course of its business." The proposed order further provides that all such use restrictions "are overridden by section 365(f)(1) and are unenforceable against Buyer."

The deadline to file objections to the sale is September 16, 2026. A hearing before the Bankruptcy Court on the proposed sale of the Lot 1 Lease to 7 Brew is scheduled for September 23, 2026.

**Landlord's Imminent Breach of the Lease and COREA**

The Lease and the recorded COREA are unequivocal: other than Black Rock on Lot 2, no coffee-related business may operate in the Center. Such use restrictions are standard fare in shopping center leases and development documents and were a material inducement for Black Rock to enter into the Lease (and likely an inducement for Salad And Go to enter into the Lot 1 Lease). The tenant mix of the Center, combined with the recorded

documentation confirming that no other coffee shop would operate in the Center, was central to Black Rock's decision to locate its business in the Center.

If 7 Brew acquires the Lot 1 Lease and opens a coffee retail facility, regardless of whether the use restrictions applicable to the Lot 1 Lease are set aside, Landlord will be in breach of Section 11.9 of the Lease and the recorded use restrictions set forth in the COREA. Indeed, 7 Brew's apparent proposed use would violate not only the Black Rock Covenant, but also the recorded covenant applicable to Lot 1 itself, which limits that parcel to the operation of a drive-thru salad restaurant or such other use that does not overlap with an existing use within the Center. A coffee business is not a permissible use on Lot 1 under any reading of the recorded documents. Black Rock intends to vigorously enforce its rights and pursue Landlord for any and all damages and remedies available under the Lease and applicable law. Among the remedies Black Rock reserves the right to pursue are damages, rent abatement (including Black Rock's right under Section 11.9 of the Lease to pay only 50% of Minimum Monthly Rent during any period of violation), and termination of the Lease, which would force Landlord to find a new tenant for the Premises. Black Rock expressly reserves all rights and remedies available at law and in equity, including, without limitation, specific performance and injunctive relief, and nothing in this letter shall be construed as a waiver of any such rights.

**Landlord's Obligation to Prevent a Breach of the Lease and COREA**

The proposed assumption and assignment of the Lot 1 Lease, purportedly free and clear of use restrictions, is contrary to the Bankruptcy Code and applicable law. The Bankruptcy Code, including Section 365(b)(3), prohibits the transfer of unexpired leases of real property in a shopping center without adequate assurance that the use restrictions and tenant mix contemplated by the lease and applicable recorded documents will be maintained. The Debtors are proposing a transfer of the Lot 1 Lease that would contravene Section 365(b)(3) of the Bankruptcy Code and strip Black Rock of its negotiated and recorded exclusive use rights. Landlord has an independent obligation to assert its rights in the Bankruptcy Case to ensure that the Lot 1 Lease is not transferred free and clear of the use restrictions that protect both Black Rock and Landlord. [2]

**Black Rock demands that Landlord immediately confirm, and in any event no later than Friday, September 11, 2026, at 5:00 p.m. Pacific Time**, that it will take all necessary steps to prevent the breach of the Lease and COREA that is currently contemplated by the Lot 1 Lease sale. Such steps may include, without limitation:

- Filing an objection in the Bankruptcy Case to the transfer of the Lot 1 Lease free and clear of any use restrictions;
- Participating in the September 23, 2026 sale hearing to assert Landlord's rights under Section 365(b)(3) of the Bankruptcy Code and applicable law; and
- Taking all other actions necessary to preserve and enforce the use restrictions that benefit Black Rock and the Center.

---

[2] Contrary to arguments raised in the Bankruptcy Case, the COREA does not limit the use of Lot 1 to operation of a "Salad And Go" or use of specific trade name. Under the COREA, Lot 1 can be used to operate a salad restaurant or any other use that does not overlap with the business of an existing tenant—a business-related limitation that governs nearly every shopping center in the country. This is not a wholesale prohibition on assignment, but merely a potential future limitation on the Debtors' preferred buyer of the Lot 1 Lease, which limitation would not hamper any other buyer that does not intend to operate a coffee shop.

Time is of the essence. If Landlord fails to act promptly and the use restrictions are set aside, Black Rock will hold Landlord responsible for all resulting damages and will pursue every available remedy without further notice.

Please contact me to discuss at your earliest convenience.

Sincerely,

Kyler Burgi
Partner
for
DAVIS GRAHAM & STUBBS LLP

cc: Sam Seiberling, sseiberling@br.coffee