United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 29, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **And Go Concepts, LLC, *et al.*,** | § | **Case No. 26-90753 (ARP)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**ORDER (I) APPROVING THE BULK SALE OF ASSETS TO BREW CULTURE, LLC, THE SUCCESSFUL BIDDER, UNDER ITS FINAL PURCHASE AGREEMENT, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF**
[Relates to Dkt. No. 283]

Upon the motion [Docket No. 283] (the "**Bulk Sale Motion**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), including And Go Concepts, LLC (the "**Seller**"), for entry of an order (this "**Bulk Sale Order**") (a) approving and authorizing the Debtors' entry into and performance under the terms and conditions of that certain Asset Purchase Agreement, substantially in the form attached hereto as **Exhibit A** (as amended or modified, the "**APA**"),[2] including the sale (the "**Sale**") of the Purchased Assets (as defined in the APA) free and clear of all liens, claims, encumbrances, and other interests, to Brew Culture, LLC ("**7 Brew**" or "**Buyer**"), and all other ancillary documents related thereto, (b) authorizing and approving the sale (including all actions taken or required to be taken in connection with the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); Garland New Market LLC (6838); AGC Topco, LLC (6845); and AGC Holdco, LLC (0294). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the APA.

implementation and consummation of the Sale) of the Purchased Assets, (c) authorizing the assumption and assignment of executory contracts referenced in the APA, upon the Closing, and (d) granting related relief, all as more fully set forth herein and in the Bulk Sale Motion; and the Court having conducted a hearing on September 29, 2026 (the "**Bulk Sale Hearing**"); and this Court having entered the *Order Approving Auction Procedures for Competitive Bidding between Boersma Bros. LLC and Brew Culture LLC* [Dkt. No. 199] (the "**Auction Procedures Order**"); and the Debtors having conducted an auction (the "**Auction**") for the Purchased Assets; and the Debtors having determined that the Buyer has submitted the highest or otherwise best bid for the Purchased Assets and determined that the Buyer is the Successful Bidder and that Boersma Bros. LLC ("**Dutch Bros**") is the Backup Bidder (as defined in the Auction Procedures Order); and the Court having reviewed and considered the APA, the Bulk Sale Motion, the Auction Procedures Motion, all relief related thereto, the objections thereto, and statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Bulk Sale Motion, including, among other things, the Declaration of Francis P. Gallagher [Dkt. No. 448-3] and Declaration of Douglas J. Brickley [Dkt. No. 448-2] (the "**Supporting Declarations**") and the Buyer, including, among other things, the statements made by counsel on the record at the hearing; and due notice of the Bulk Sale Motion, Bulk Sale Hearing, and the APA having been provided; and the Court having held a hearing on the Sale and the relief requested in the Bulk Sale Motion, at which time all parties were offered an opportunity to be heard with respect to the Bulk Sale Motion; and determining that the relief requested in the Bulk Sale Motion and this Bulk Sale Order being in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and that the legal and factual bases set forth in the Bulk Sale Motion establish just cause for the relief granted herein; and after due deliberation it is hereby:

**FOUND, CONCLUDED, AND DETERMINED THAT:**[3]

A. **Petition Date.** On August 4, 2026 and August 5, 2026 (collectively, the "**Petition Date**"), the Debtors commenced these chapter 11 cases (these "**Chapter 11 Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On August 24, 2026, the United States Trustee for the Southern District of Texas appointed the Official Committee of Unsecured Creditors (the "Committee"). Dkt. No. 154.

B. **Jurisdiction and Venue**. The Court has jurisdiction to consider the Bulk Sale Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Chapter 11 Cases and the Bulk Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Statutory Predicates**. The statutory bases for the relief sought in the Bulk Sale Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the applicable Bankruptcy Local Rules for the Southern District of Texas (the "**Local Rules**") and the Complex Case Procedures.

D. **Final Order**. This Bulk Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Bulk Sale Order and authorizes the closing of all transactions contemplated hereby and in the APA without regard to any stay or delay in its implementation, and expressly directs entry of judgment as set forth herein.

E. **Notice**. As evidenced by the certificates of service previously filed with the Court (including [Docket Nos. 353, 402 and 403]), proper, sufficient, and timely notice of the Bulk Sale Motion, the Bulk Sale Hearing, the Sale, the Cure Amounts (as defined herein) and the transactions contemplated thereby and hereunder has been provided in accordance with sections 105(a), 363(b), and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9008, and the Local Rules. The Debtors have complied with all obligations to provide notice of the Bulk Sale Motion, the Auction, the Bulk Sale Hearing, the APA. No other or further notice of the Bulk Sale Motion, the Auction, the Sale Hearing, the APA, or the Sale is required. A reasonable opportunity to object or to be heard regarding the relief requested in the Bulk Sale Motion was afforded to all interested persons and entities. The Debtors have served a notice of their intent to assume and assign the Assumed Contracts/Leases (as defined herein) and of the related Cure Amounts (as defined herein) upon each counterparty to an executory contract proposed to be assumed and assigned to Buyer. The service and provision of such notice was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect thereof.

F. **Sufficiency of Marketing**. The pre- and post-petition marketing process undertaken by the Debtors and their professionals, together with the Auction, in which Dutch Bros and 7 Brew were permitted to submit competing bids and 7 Brew submitted the highest or otherwise best bid and was selected as the Successful Bidder, with Dutch Bros designated as the

Back-Up Bidder, was adequate and appropriate and was reasonably calculated to maximize the value of the Purchased Assets for the benefit of the Debtors' estates.

G. The Debtors filed and served a Supplemental Cure Notice [Dkt. No. 250] identifying the amounts required to cure any and all defaults and actual pecuniary losses to the non-Debtor counterparties to unexpired leases and executory contracts that may be assumed and assigned in connection with the Sale or the non-bulk auctions, including all claims, demands, charges, rights to refunds, and monetary and non-monetary obligations that the non-Debtor counterparties may be entitled to assert under the Bankruptcy Code with respect to such leases and contracts, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising under or out of, in connection with, or in any way relating to, such leases and contracts, including any accrued but unbilled or unpaid claims or obligations, including any valid indemnification obligations, as of the Closing Date (the foregoing amounts as stated in the Supplemental Cure Notice, collectively, the "**Cure Amounts**") for each non-Debtor counterparty to an applicable assumed executory contract and unexpired lease (collectively, the "**Assumed Contracts/Leases**"). The service and provision of the Supplemental Cure Notice containing the Cure Amounts was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of the assumption and assignment of the Assumed Contracts/Leases or establishing a Cure Amount for any respective Assumed Contract/Lease. Non-Debtor counterparties to the Assumed Contracts/Leases had adequate opportunity to object to assumption and assignment of the applicable Assumed Contracts/Leases and the Cure Amount set forth in the Supplemental Cure Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor

counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code). The deadline for a non-Debtor counterparty to file an objection to the stated Cure Amounts set forth on the Supplemental Cure Notice (a "**Cure Objection**," and such deadline, the "**Cure Objection Deadline**") has expired and, to the extent any such party timely filed a Cure Objection, all such Cure Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties. To the extent that any non-Debtor counterparty did not timely file a Cure Objection, such party shall be deemed to have consented to (x) the assumption and assignment of the Assumed Contract/Lease and (y) the proposed Cure Amount set forth in the Supplemental Cure Notice. Any non-Debtor counterparty that did not timely assert any additional amount beyond the stated Cure Amounts by the Cure Objection Deadline is deemed to have consented and is forever barred from asserting any such amount against any party, including the Buyer, the 7 Brew Parties, the Debtors, and the Debtors' estates. Notwithstanding the foregoing, the Supplemental Cure Procedures set forth in Paragraphs 33(a) through 33(f) of this Bulk Sale Order shall govern the assertion and resolution of any accrued but unbilled or unknown cure amounts not reflected in the Supplemental Cure Notice.

H. **Corporate Authority**. The Debtors (i) have full corporate power and authority to execute, deliver, and perform their obligations under the APA and all other documents contemplated thereby and by this Bulk Sale Order, and the Debtors' sale of the Purchased Assets has been duly and validly authorized by all necessary corporate or similar action; (ii) have all corporate power and authority necessary to consummate the transactions contemplated by the APA; and (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation of the transactions contemplated thereby. The Debtors' respective boards of

directors or equivalent governing bodies have authorized the execution and delivery of the APA and the Sale of the Purchased Assets to the Buyer. No consents or approvals, other than those expressly provided for herein or in the APA and entry of this Bulk Sale Order, are required for the Debtors to consummate such transactions.

I. **No Fraudulent Transfer**. The consideration provided by the Buyer pursuant to the APA and this Bulk Sale Order (i) was negotiated at arm's length, (ii) is fair and reasonable, (iii) is the highest or otherwise best offer for the Purchased Assets, and (iv) constitutes reasonably equivalent value and fair consideration (each as defined in the Uniform Voidable Transactions Act (formerly the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code, as applicable) under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither the Debtors nor the Buyer is fraudulently entering into the transactions contemplated by the APA under any law, including, for the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims. The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.

J. The Debtors are the sole and lawful owners of the Purchased Assets. The Purchased Assets constitute property of the Debtors' estates and title to the Purchased Assets is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. Subject to section 363(f) of the Bankruptcy Code, the transfer of each of the Purchased Assets to the Buyer, in accordance with the APA and this Bulk Sale Order, will be, as of the Closing Date, a legal, valid, binding, and effective transfer of the Purchased Assets, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets, free and clear of all claims,

liens, encumbrances, and interests (other than Assumed Liabilities). Claims in the APA are defined by referencing the definition of "claim" in section 101(5) of the Bankruptcy Code and the breadth of such definition includes, all debts arising under, relating to, or in connection with any act of the Debtors or claims, causes of action, liabilities, obligations, demands, guaranties, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, subleases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, derivative and vicarious liability, alter-ego, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims (including, without limitation, claims on account of income taxes, sales and use taxes, property taxes, excise taxes, payroll taxes, consumption taxes, Medicare taxes, employment taxes, or any other tax or impost of any kind), regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, or any other matters of any kind or nature, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto, including those that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, any restriction of use, charges of interests of any kind or nature, profit sharing interest, or termination of, any of the Debtors' or the Buyer's interests in the Purchased Assets, or any similar rights.

K. **Highest or Otherwise Best Offer**. Good and sufficient reasons for approval of the APA and the transactions to be consummated in connection therewith have been articulated, and

the relief requested in the Bulk Sale Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. Prior to the Auction, the Debtors, in a reasonable exercise of their business judgment, determined that the bid submitted by 7 Brew constituted an Alternative Transaction (as that term is defined in the Dutch Bros APA) and selected 7 Brew as the Lead Bid. At the Auction, the Debtors selected 7 Brew as the Successful Bidder having submitted the highest or otherwise best offer for the Purchased Assets and Dutch Bros as the Back-Up Bidder. As demonstrated by the Supporting Declarations, the evidence proffered or adduced as the Bulk Sale Hearing, and the representations of counsel made on the record at the Bulk Sale Hearing, the Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code in that the immediate consummation of the Sale to the Successful Bidder is necessary and appropriate to preserve and maximize the value of the Debtors' estates, and the Debtors afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Purchased Assets and assume the Assumed Liabilities.

L. The transaction memorialized by the APA with 7 Brew that was selected through Auction constitutes the highest or otherwise best offer for the Purchased Assets. The consideration provided by the Buyer under the APA, including the assumption of the Assumed Liabilities, is fair and adequate and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. Given the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price and other consideration payable under the APA, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment, consistent with their fiduciary duties, and should be approved.

M. The consummation of the Sale and the assumption and assignment of the Assumed Contracts/Leases are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363, and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale and the transactions contemplated thereby.

N. **Good Faith of the Buyer and the Debtors**. As demonstrated by (i) the Supporting Declarations; (ii) the testimony and other evidence proffered or adduced at the Bulk Sale Hearing; and (iii) the representations of counsel made on the record at the Bulk Sale Hearing, the APA was negotiated, proposed, and entered into by the Debtors and 7 Brew, the Successful Bidder, and their respective management and boards of directors or equivalent governing bodies, officers, directors, employees, agents, professionals, representatives, affiliates, related parties, all in their capacities as such, without collusion, in good faith, and as a result of arm's-length bargaining, and is substantively and procedurally fair to all parties.

O. The Auction was conducted without collusion, and 7 Brew, the Successful Bidder, and its affiliates and the Related Parties[4] of 7 Brew and its affiliates (each in their capacities as such, and collectively, the "7 Brew Parties") each is not an insider (as defined in section 101(31) of the Bankruptcy Code) of any of the Debtors. Neither the Debtors nor the 7 Brew Parties, in their capacities as such, has engaged in any conduct that would cause or permit the Sale or the APA to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code.

---

[4] "Related Parties" means, with respect to a person, such person's current and former affiliates, and each of its and their current and former affiliates' respective current and former directors, managers, officers, members, shareholders, unitholders, equityholders (regardless of whether such interests are held directly or indirectly), limited partners, general partners, investment committee members, managing members, principals, employees, agents, trustees, representatives, attorneys, accountants, and each insurance, environmental, legal, investment, financial and other advisors and other consultants, agents and sub-advisors of or to such person and of or to such person's affiliates.

Specifically, each of the 7 Brew Parties has not acted in a collusive manner with any person and the Purchase Price and other consideration payable under the APA were not controlled by any agreement among bidders. The 7 Brew Parties are purchasing the Purchased Assets in good faith, are good-faith purchasers within the meaning of section 363(m) of the Bankruptcy Code, are therefore entitled to all of the protections afforded by such provision, and otherwise have proceeded in good faith in all respects in connection with these Chapter 11 Cases.

P. The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. The Debtors and the 7 Brew Parties, each in their capacities as such, have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

Q. **No *Sub Rosa* or *De Facto* Plan.** Good and sufficient reasons for approval of the APA and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Bulk Sale Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

R. The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for the Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale with the Buyer is necessary and appropriate to maximize the value of the Debtors' estates, and the Sale will provide the means for the Debtors to maximize distributions to creditors. The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with

respect to any plan that may be proposed by the Debtors, (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities. Accordingly, the Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating chapter 11 plan for the Debtors.

S. **No Successor Liability**. By virtue of the consummation of the transactions contemplated under the APA, (i) each of the Buyer and the 7 Brew Parties is not a continuation of any Debtor and its respective estate, there is not substantial continuity between the Buyer or the 7 Brew Parties and the Debtors, and there is no continuity of enterprise between the Debtors and the Buyer or the 7 Brew Parties; (ii) neither the Buyer nor the 7 Brew Parties, in their capacities as such, is holding itself out to the public as a continuation of the Debtors or their respective estates; (iii) the transactions do not amount to a consolidation, merger, or *de facto* merger of the Buyer or the 7 Brew Parties, and any or all of the Debtors and/or the Debtors' estates; and (iv) the Buyer and the 7 Brew Parties, in their capacities as such, are not a successor of any or all of the Debtors or their estates for any purpose, including, without limitation, under any federal, state, or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat, or unclaimed property laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such law, rule, or regulation), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, regulation, doctrine, or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine. Accordingly, the Buyer and the 7 Brew Parties, in their capacities as such, are not and shall not be deemed a successor to any of the Debtors or their respective estates as a result of the consummation of the Sale pursuant to the APA and this Bulk

Sale Order. Except for the Assumed Liabilities, (i) the transfer of the Purchased Assets to the Buyer and (ii) the assumption and assignment to the Buyer of the Assumed Contracts/Leases do not and will not subject the Buyer or the 7 Brew Parties, in their capacities as such, to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity, including, without limitation, any theory of antitrust or successor or transferee liability.

T. **Free and Clear**. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full and, therefore, the Debtors may sell the Purchased Assets free and clear of any liens, claims, defenses (including rights of setoff and recoupment), and interests, in each case, in, on, or related to the Purchased Assets, including in respect of the following: (i) all mortgages, covenants, liens (statutory or otherwise), deeds of trust, pledges, charges, security interests, encumbrances, or other interests of any kind or character whatsoever; (ii) all claims; (iii) all charges, claims, community property interests, pledges, conditions, equitable interests, liens (statutory or otherwise), options, security interests, and mortgages; and (iv) all liens, claims, encumbrances, rights, interests, and other interests of any kind or nature whatsoever, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, known or unknown, including rights or claims based on any successor or transferee liability.

U. The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale to the Buyer and the assumption of any Assumed Liabilities by the Buyer were not free and clear of all liens, claims, encumbrances, and interests

other than the Assumed Liabilities. The Debtors may sell the Purchased Assets free and clear of any lien, claim, encumbrance, or interest of any kind or nature whatsoever because, in each case, one or more of the standards set forth in sections 363(f)(1)–(5) and 365 of the Bankruptcy Code has been satisfied. Each entity with a lien, claim, encumbrance, or interest in the Purchased Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Bulk Sale Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such lien, claim, encumbrance, or interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of such liens, claims, encumbrances, and interests who did not timely object, or withdrew their objections, to the Bulk Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All holders of liens, claims, encumbrances, and interests (other than the Assumed Liabilities) are adequately protected by having their liens, claims, encumbrances, or interests attach to the proceeds received by the Debtors (if any) that are ultimately attributable to the property against or in which such liens, claims, encumbrances, or interests are asserted, subject to the terms of such liens, claims, encumbrances, or interests, with the same validity, force, and effect, and in the same order of priority, which such liens, claims, encumbrances, or interests now have against the Purchased Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

V. The injunction set forth in this Bulk Sale Order against creditors and third parties pursuing liens, claims, encumbrances, or interests on the Purchased Assets is necessary to induce the Buyer to close the Sale, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtors' estates and will benefit the Debtors' creditors.

W. **Cure/Adequate Assurance**. The Cure Amounts applicable to the Assumed Contracts/Leases included in the APA and approved at the Bulk Sale Hearing, inclusive of the Required Cure Costs and Lease Expenses, are the amounts necessary under sections 365(b)(1)(A), 365(b)(1)(B) and 365(f) of the Bankruptcy Code to cure all monetary defaults reflected in the Supplemental Cure Notice and the Cure Amount Schedule. To the extent that additional amounts may be owed under section 365(b) of the Bankruptcy Code on account of accrued but unbilled obligations, year-end reconciliations, taxes, common area maintenance charges, or other amounts not reflected in the Supplemental Cure Notice, such amounts shall be addressed through paragraphs 42–44 in this Order or the Supplemental Cure Procedures set forth in this Bulk Sale Order. For the avoidance of doubt, notwithstanding anything to the contrary, the Seller shall be responsible for all Cure Amounts as provided under the APA, and all parties shall be enjoined from seeking payments for any Cure Amounts from the Buyer and/or the 7 Brew Parties. The Debtors are the sole and exclusive entities responsible for the Cure Amounts as provided under the APA, including for the avoidance of doubt, any accrued but unbilled obligations through the date of the closing of the APA, including any valid indemnification claims that are required to be cured under 11 U.S.C. § 365(b)(1)(A). Except with respect to the cure amount asserted in docket 376, the Cure Amounts applicable to the Assumed Contracts/Leases included in the APA and approved at the Bulk Sale Hearing shall not exceed the amounts set forth in the Cure Amount Schedule attached to this Order as **Exhibit B**[5], except as may be supplemented through the Supplemental Cure Procedures set forth herein. To the extent that the Cure Amounts do not include all accrued but unbilled obligations, year-end reconciliations, or adjustment amounts that become

[5] Notwithstanding anything to the contrary contained in the APA, the only executory contracts and unexpired leases that constitute Purchased Assets are those Assumed Contracts/Leases set forth on Exhibit B.

due after the Closing Date in accordance with the terms of an Assumed Lease, such amounts shall be addressed through the Supplemental Cure Procedures set forth herein; *provided*, *however*, that (a) any indemnification obligations that come due or are asserted on or after the effective date of the assumption and assignment of such Assumed Lease regardless of whether such amounts relate to the period prior to or after the assignment date, and (b) any repair and maintenance obligations relating to the conditions at the premises subject to the Assumed Lease that may exist as of the assignment date, shall remain subject to the bar set forth herein, and any counterparty that did not timely assert such indemnification or repair and maintenance obligations by the applicable Cure Objection Deadline shall be forever barred and estopped from seeking payment for such amounts. With respect to the cure objection that was filed at docket 376, the Debtors shall reserve from the sale proceeds the amount of $267,718.85, with such amount to be distributed only upon further order of this Court. The Debtors and Apache Hacienda, LP shall obtain a court hearing to resolve such cure dispute. With respect to the cure objection that was filed at docket 387, the Debtors and Landlord have agreed to an undisputed Cure Amount of $16,250, with the landlord (Tony W. and Marva Brooks Family Trust) reserving all rights to the remainder of the asserted Cure Amount to be addressed in connection with the Supplemental Cure Procedures set forth herein.

X. To the extent any of the Assumed Contracts/Leases to be assigned to the Buyer contains provisions which would otherwise prohibit, restrict, or condition assignment of any Assumed Contract/Lease, or any applicable non-bankruptcy law would otherwise prohibit, restrict, or condition assignment of any Assumed Contract/Lease, including all renewal options, extension rights, expansion rights, and similar rights arising thereunder, such provisions and law has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365, as applicable. Without limiting the foregoing, any use restriction contained in any of the Assumed Contracts/Leases that

purports to prohibit, restrict, condition, or limit Buyer's operation of the leased premises following the Closing Date constitutes an unenforceable restriction on assignment for the drive through sale of coffee, non-coffee beverages, and food items in the ordinary course of its business within the meaning of section 365(f) of the Bankruptcy Code.

Y. Assumption and assignment of the Assumed Contracts/Leases to the Buyer pursuant to this Bulk Sale Order and the APA, and full payment of any applicable Cure Amounts in accordance with the APA, shall result in the full release and satisfaction of any and all cures, claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Contract/Lease at any time prior to the Closing Date, subject to any Supplemental Cure Claims asserted and resolved in accordance with the Supplemental Cure Procedures set forth herein. The assumption and assignment of the Assumed Contracts/Leases pursuant to the terms of this Bulk Sale Order is integral to the APA, the Sale, and the transactions contemplated thereby, is in the best interests of the Debtors and their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Debtors.

Z. The Buyer has the financial wherewithal to consummate the transactions contemplated by the APA, and its operating history and format compatibility with the Sites were demonstrated at the Bulk Sale Hearing. Buyer operates a drive-thru only format. The payment of Cure Costs and the Buyer's promise to perform the Debtors' obligations under the Assumed Contracts/Leases from and after the Closing Date constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C), 365(b)(3), and 365(f)(2)(B) of the Bankruptcy Code. The evidence presented at the Bulk Sale Hearing demonstrating the Successful

Bidder's ability to perform the obligations under the Assumed Contracts/Leases after the Closing Date shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C), 365(b)(3), and 365(f)(2)(B) of the Bankruptcy Code.

AA. Pursuant to section 365 of the Bankruptcy Code, the Debtors have demonstrated that the assumption and assignment to the Buyer, as the Successful Bidder, of the Assumed Contracts/Leases included in the APA is appropriate. All objections to the assumption and assignment of any of the Assumed Contracts/Leases included in the APA by the Buyer are hereby overruled. To the extent that any counterparty failed or fails to timely object to the Scheduled Cure Amounts, such counterparty is deemed to have consented to such Scheduled Cure Amounts and the assumption and assignment of its respective Assumed Contract(s)/Lease(s) to the Buyer in accordance with the APA; *provided*, *however*, that nothing herein shall bar or impair such counterparty's right to assert a Supplemental Cure Claim, solely against the Debtors, in accordance with the Supplemental Cure Procedures set forth herein.

BB. **Use Restrictions Constitute De Facto Anti-Assignment Provisions**. To the extent any of the Assumed Contracts/Leases restricts the use of the leased premises to the operation of a "Salad and Go" restaurant or a specific brand name, such restriction constitutes a de facto anti-assignment provision within the meaning of section 365(f)(1) of the Bankruptcy Code. Section 365(f)(1) permits assignment of an unexpired lease "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease." 11 U.S.C. § 365(f)(1). Such use restrictions are overridden by section 365(f)(1) and are unenforceable against Buyer. No evidence was presented that any landlord subject to the terms of this Order would suffer actual and substantial detriment from the assignment of the Assumed Leases to the Buyer, especially because of the Buyer's drive-

thru format, financial health, operation in the same geographic markets as the Sites, and status as a traffic-driving anchor tenant; no landlord subject to the terms of this Order will suffer actual and substantial detriment from the assignment of the Assumed Leases to Buyer.

CC. **Compelling Circumstances for Immediate Sale**. To maximize the value of the Purchased Assets, it is essential that the transactions contemplated by the APA, including, without limitation, the Sale and the assumption and assignment of the Assumed Contracts/Leases, occur within the time constraints set forth in the APA. Time is of the essence in consummating the transactions contemplated by the APA, the Sale and the assumption and assignment of the Assumed Contracts/Leases.

DD. **Cure Amount Schedule and Assumed Lease Schedule**. The Sale and non-bulk sale processes encompass all of the Debtors' available unexpired leases, constituting the Debtors' entire lease portfolio. Only the leases and contracts included in the APA shall be assumed and assigned to the Buyer under this Bulk Sale Order. Leases and contracts not included in the APA remain available for sale under the Non-Bulk Bidding Procedures Order [Dkt. No. 240].

**IT IS HEREBY ORDERED THAT:**

1. The Bulk Sale Motion, as supplemented and amended by the Auction Procedures Motion, is **GRANTED** as set forth herein.

2. **The Sale is Approved**. The Sale contemplated by the APA is hereby **APPROVED** as set forth herein.

3. **Objections Overruled**. Any objections to the entry of this Bulk Sale Order or the relief granted herein and requested in the Bulk Sale Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bulk Sale Hearing (the full record of which is incorporated herein by reference), by stipulation filed with the Court, or by representation by the

Debtors in a separate pleading, and all reservations of rights included therein, if any, are hereby denied and overruled on the merits with prejudice.

4. **Approval**. The APA (including, for the avoidance of doubt, any documents entered into in connection therewith) and all of the terms and conditions thereof are hereby approved in all respects subject to the terms hereof. Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors, as well as their officers, employees, and agents, without further order of the Court, are hereby authorized, empowered, and directed to (a) execute any additional instruments or documents that may be reasonably necessary or appropriate to implement the APA, the Sale, and the transactions contemplated thereby, including any Lease Amendments as contemplated by the APA, (b) consummate the Sale in accordance with the terms and conditions of the APA and the instruments contemplated thereby, (c) transfer and assign all rights, title, and interest to all assets, property, licenses, and rights of the Debtors to be conveyed in accordance with the terms and conditions of the APA, and (d) execute and deliver, perform under, consummate, implement, and close fully the transactions contemplated by the APA, including the assumption and assignment of the Assumed Contracts/Leases, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, the Sale, and this Bulk Sale Order, and ancillary documents, including any actions that otherwise would require further approval by shareholders, members, or their boards of directors, as the case may be, without the need to obtain such approvals, to the Buyer. The Debtors are hereby authorized to perform their covenants and undertakings as provided in the APA and any ancillary documents before or after the Closing Date without further order of the Court. Neither the Buyer nor the Debtors shall have any obligation to proceed with the Closing under the APA until all conditions precedent to their obligations to do so in the APA and this Bulk Sale Order have been met, satisfied, or waived,

except as otherwise contemplated or provided for in the APA. Without limiting the foregoing, and notwithstanding anything to the contrary in this Bulk Sale Order, the Buyer's rights under the APA, including any rights thereunder to exclude leases from the Assumed Contracts/Leases and to make corresponding adjustments to the Purchase Price, are approved.

5. This Bulk Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors (including counterparties to Assumed Contracts/Leases), any holders of liens, claims, encumbrances, interests, or other interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Buyer, and all successors and assigns of the Buyer, the Purchased Assets, and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to chapter 7 of the Bankruptcy Code or dismissal of these Chapter 11 Cases. This Bulk Sale Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, the Official Committee of Unsecured Creditors, the Buyer, and the respective successors and assigns of each of the foregoing. Neither the APA nor any Transaction Document shall be subject to rejection, avoidance, or unwinding by the Debtors, their estates, their creditors, their equity holders, or any trustees, examiners, or receivers.

6. **Transfer of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Interests**. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors are authorized and directed to transfer the Purchased Assets to the Buyer in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and shall vest the Buyer with title in and to the Purchased Assets and the Buyer shall take title to and possession of the Purchased Assets free and clear of all liens, claims, encumbrances, interests and other interests of any kind or nature whatsoever (other than the

Assumed Liabilities), including obligations, demands, guarantees of or by the Debtors, debts, contractual commitments, restrictions, interests, radius, location, use, and exclusivity provisions, restrictive covenants, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including claims and encumbrances (A) that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the interest of any Debtor or 7 Brew or an affiliate, as the case may be, in the Lease (but only in connection with the assignment by the Debtor to 7 Brew or an affiliate) or (B) in respect of any taxes), successor or successor-in-interest liability and claims in respect of the Excluded Liabilities, with all such liens, claims, encumbrances, interests, and other interests to attach to the cash proceeds received by the Debtors that are ultimately attributable to the property against or in which such liens, claims, encumbrances, or interests are asserted, subject to the terms of such liens, claims, encumbrances, or interests with the same validity, force, and effect, and in the same order of priority, which such liens, claims, encumbrances, or interests now have against the Purchased Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, and any successors in interest as applicable, may possess with respect thereto.

7. Unless otherwise expressly included in the definition of "Assumed Liabilities" in the APA, the Buyer shall not be responsible for any liens, claims, encumbrances, or interests, including, without limitation, in respect of the following: (a) any mortgages, deeds of trust, and security interests; (b) any bulk transfer law or similar law; (c) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, or any state or local tax laws; (d) any escheat or unclaimed property laws; (e) any of the Excluded Liabilities under the APA; and (f) any theories of successor or transferee liability.

8. All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer in accordance with the APA on the Closing Date or at such time thereafter as the Buyer may request. On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary, in each case, at no expense to the Buyer, to release its liens, claims, encumbrances, interests, or other interests in the Purchased Assets, if any, other than the Assumed Liabilities.

9. If any person or entity that has filed statements or other documents or agreements evidencing liens, claims, encumbrances, or interests (other than the Assumed Liabilities that are not otherwise being discharged at Closing) on, against, or in, all or any portion of the Purchased Assets (other than statements or documents with respect to the Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of such liens, claims, encumbrances, interests, or other liens, claims, or interests, that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, then the Buyer and the Debtors are each hereby authorized to (i) execute and file such statements, instruments, releases, and other documents in the name and on behalf of such person or entity with respect to the Purchased Assets and otherwise seek relief from the Court pursuant to this Bulk Sale Order, if necessary, or (ii) file, register, or otherwise record a certified copy of this Bulk Sale Order, which, once filed, registered, or otherwise recorded, will constitute conclusive evidence of the release of all liens, claims, encumbrances, or interests in the Purchased Assets of any kind or nature; *provided that*, notwithstanding anything in this Bulk Sale Order or the APA to the contrary, the provisions of this

Bulk Sale Order shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Bulk Sale Order.

10. On the Closing Date, this Bulk Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to the Buyer of the Debtors' interests in the Purchased Assets. This Bulk Sale Order is and shall be effective as a determination that, on the Closing Date, all liens, claims, encumbrances, interests, or other interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, other than the Assumed Liabilities, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effectuated. This Bulk Sale Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

11. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. A certified copy of this Bulk Sale Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local

authority to act to cancel any of the liens, claims, encumbrances, interests, and any other encumbrances of record, except the Assumed Liabilities.

12. **Exemptions from Transfer Taxes and Fees**. The transactions contemplated by the APA and this Bulk Sale Order, and the execution, delivery, and/or recordation of any and all documents or instruments necessary or desirable to consummate the Sale, are exempt from any and all document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee, regulatory filing or fee, or other similar tax, fee, or governmental assessment incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) to the maximum extent permitted by law.

13. **Prohibition of Actions Against the 7 Brew Parties**. Except for the Assumed Liabilities, the 7 Brew Parties, in their capacities as such, shall not have any liability or other obligation of the Debtors arising under or related to any of the Purchased Assets, including, without limitation, any liability for any liens, claims, encumbrances, or interests, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date, including, but not limited to, the Excluded Liabilities.

14. Except with respect to the Assumed Liabilities, which, for the avoidance of doubt, shall not include any indemnification claims held or made by any person (including any counterparty to any non-residential real property lease), notwithstanding anything to the contrary herein or in any lease agreement relating to the Purchased Assets, all persons and entities,

including, without limitation, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, landlords, and other creditors, holding claims, liens, encumbrances, interests, or other interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate) arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Buyer are hereby forever barred, estopped, and permanently enjoined from asserting against the 7 Brew Parties, in their capacities as such, their successors or assigns, its property, or the Purchased Assets such persons' or entities' liens, claims, encumbrances, or interests in, on, or to the Purchased Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the 7 Brew Parties, in their capacities as such, their assets, or their properties; (b) enforcing, attaching, collecting, or recovering, in any manner, any judgment, award, decree, or order against the 7 Brew Parties or their assets or properties; (c) creating, perfecting, or enforcing any encumbrance, lien, claim, or interest against the 7 Brew Parties, in their capacities as such, their successors, their assets, or their properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the 7 Brew Parties, in their capacities as such; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Bulk Sale Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets; (g) asserting any

claims for indemnification against the 7 Brew Parties, in their capacities as such, in any way relating to or arising out of Buyer's or Seller's use or operation of the Purchased Assets. Following the Closing, no holder of any claim or interest shall interfere with the Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such claim or interest.

15. To the extent that any contract counterparty has not timely objected to this Bulk Sale Order, they are forever barred and estopped from raising claims against the 7 Brew Parties, in their capacities as such, based on provisions in the Assumed Contracts/Leases relating to radius, location, use, or exclusivity.

16. Nothing herein shall impair or prejudice the Debtors' or the Committee's ability to contest, in their sole discretion, the extent, validity, or amount of any lien, claim, encumbrance, or interest asserted against the Purchased Assets. Any such liens, claims, encumbrances, and interests shall attach to the proceeds of the Sale with the same validity, priority, and effect as they had against the Purchased Assets immediately prior to the Closing of the Sale.

17. Notwithstanding the relief granted in this Bulk Sale Order and any actions taken pursuant to such relief, except as otherwise provided herein, nothing in this Bulk Sale Order shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors or their estates under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Bulk Sale Order or the Bulk Sale Motion or any order granting the relief requested by the Bulk Sale Motion; (e) other than with respect to the Assumed Contracts/Leases as expressly set forth herein, a request or

authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or the Committee's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) other than with respect to the Assumed Contracts/Leases, an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Bulk Sale Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim other than the Buyer as set forth herein; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease other than the Assumed Contracts/Leases.

18. To the greatest extent available under applicable law, the Buyer and its successors or assigns shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets to the extent transferred in the APA, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Buyer as of the Closing Date.

19. Pursuant to the terms of the APA, the Buyer and the Debtors shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable law to consummate and make effective the transactions

contemplated by the APA, including, without limitation, with respect to any and all applications, notices, reports, disclosures, or other filings required under applicable law referenced in the APA.

20. No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any representative thereof may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale to the extent that any such action by a governmental unit or any representative thereof would violate section 525 of the Bankruptcy Code.

21. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of this Bulk Sale Order and the APA, including any person or entity that is party to a contract or lease with the Debtors.

22. The Buyer has given substantial consideration under the APA and this Bulk Sale Order for the benefit of the Debtors, their estates, their creditors, and their other stakeholders. The consideration given by the Buyer shall constitute valid and valuable consideration for the releases of any potential liens, claims, encumbrances, and interests pursuant to this Bulk Sale Order, which releases shall be deemed to have been given in favor of the Buyer by all holders of liens, claims, encumbrances, or interests in or against any of the Debtors or any of the Purchased Assets, other than with respect to the Assumed Liabilities. The consideration provided by the Buyer for the Purchased Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

23. None of the Buyer nor any of the 7 Brew Parties, in their capacities as such, shall have or incur any liability to, or be subject to any action by, any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation,

preparation, execution, delivery of the APA, and the entry into and consummation of the sale of the Purchased Assets, except as expressly provided in the APA and this Bulk Sale Order.

24. No bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the Buyer and/or the transactions with the Debtors that are approved by this Bulk Sale Order, including, without limitation, the APA and the Sale.

25. The Dutch Bros APA shall remain in full force and effect during the sixty (60)-day Back-Up Bid period commencing as of the close of the Auction. At the Closing of the Sale, the Debtors shall pay the Termination Fee (as defined in the Dutch Bros APA) directly to Dutch Bros from the Sale proceeds. The Termination Fee consists of $3,800,000 plus Dutch Bros' reasonable and documented out-of-pocket expenses (including reasonable attorneys' fees) and shall constitute an allowed administrative expense claim.

26. **Assumption and Assignment of Leases**. The Debtors are authorized and directed, pursuant to sections 105(a) and 365 of the Bankruptcy Code, to assume and assign to the Buyer, effective as of the Closing Date and in accordance with the APA, the Assumed Contracts/Leases included in the APA and approved at the Bulk Sale Hearing, free and clear of all claims, liens, encumbrances, interests, and other interests of any kind or nature whatsoever (other than the Assumed Liabilities), and to execute and deliver to the Buyer such documents and instruments as are reasonably necessary to assign and transfer the Assumed Contracts/Leases and the Assumed Liabilities to the Buyer in accordance with the APA. Leases and contracts not included in the APA are not assumed or assigned under this Bulk Sale Order and remain available for sale under the Non-Bulk Bidding Procedures Order.

27. With respect to the Assumed Contracts/Leases included in the APA and approved at the Bulk Sale Hearing: (a) each Assumed Contract/Lease is an executory contract or unexpired

lease under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Contracts/Leases in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Contract/Lease in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Contracts/Leases that prohibit or condition the assignment of such Assumed Contract/Lease or allow the party to such Assumed Contract/Lease to terminate, recapture, impose any penalty, condition, renewal, or extension, or modify any term or condition upon the assignment of such Assumed Contract/Lease, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Contract/Lease, in accordance with the APA, have been satisfied; (e) the Assumed Contracts/Leases shall be transferred and assigned to, and following the Closing Date, remain in full force and effect for the benefit of, the Buyer in accordance with the APA, notwithstanding any provision in any such Assumed Contract/Lease or applicable law (including any of the kind described in sections 365(b)(2), 365(b)(3), and 365(f) of the Bankruptcy Code) that prohibits, restricts, or conditions assignment, and any such anti-assignment provision is void and unenforceable to the maximum extent permitted by applicable law, and pursuant to section 365(k) of the Bankruptcy Code; and (f) upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested with all right, title, and interest in each Assumed Contract/Lease, including all renewal options, extension rights, expansion rights, and similar contractual rights thereunder, and pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts/Leases after such assumption and assignment to the Buyer in accordance with the APA.

28. Notwithstanding anything to the contrary contained in this Bulk Sale Order, pursuant to sections 105(a) and 365(f) of the Bankruptcy Code, any use restriction contained in an Assumed Contract/Lease that purports to prohibit, restrict, condition, or limit the assignment of such Assumed Contract/Lease to Buyer (or its affiliates), or Buyer's (or its affiliates') operation of the leased premises for the drive-through sale of coffee, non-coffee beverages, and food items in the ordinary course of its business following the Closing Date, shall be unenforceable against Buyer (or its affiliates). Notwithstanding any provision of any of the Assumed Contracts/Leases limiting the trade name, brand, concept, or type of retail operation, Buyer (and its affiliates) shall be authorized to operate the Assumed Contracts/Leases under its own trade name, trademarks, and retail concept, and any such restrictions are unenforceable pursuant to sections 363 and 365 of the Bankruptcy Code.

29. Except as expressly provided in this Bulk Sale Order, each Assumed Contract/Lease shall remain in full force and effect in accordance with its terms following assignment to the Buyer. The assignment shall be *cum onere*, with the Buyer assuming the benefits and burdens of each Assumed Contract/Lease and performing all obligations arising or accruing thereunder from and after the Closing Date to the extent required under applicable law. Nothing in this Bulk Sale Order shall rewrite, alter, annul, vary, or otherwise modify any provision of an Assumed Contract/Lease, and nothing herein shall bar or impair a non-Debtor lessor from enforcing against the Buyer any default, breach, or obligation arising or accruing from and after the Closing Date.

30. All defaults and other obligations of the Debtors under the Assumed Contracts/Leases included in the APA and approved at the Bulk Sale Hearing that arise or accrue before the Closing Date (without giving effect to any acceleration clause or default provision of

the kind described in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing Date or promptly thereafter by the Debtors' payment of the Cure Amounts, including the Required Cure Costs and Lease Expenses. The Cure Amounts set forth in the Cure Amount Schedule that was filed as Docket No. 250 and the Supplemental Cure Notice (the "**Scheduled Cure Amounts**"), as approved at the Bulk Sale Hearing, are the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure such defaults, except as may be supplemented through the Supplemental Cure Procedures set forth herein, and no other amounts are due in connection with the assumption and assignment except as expressly preserved in this Bulk Sale Order; *provided however* that Cure Amounts listed in **Exhibit B** shall be deemed the Scheduled Cure Amounts as to amounts that differ from previously Scheduled Cure Amounts to which any party timely objected. A counterparty that did not timely object to the Scheduled Cure Amounts applicable to its Assumed Contract/Lease by the Cure Objection Deadline is deemed to have consented to such Scheduled Cure Amounts and the assumption and assignment of its Assumed Contract/Lease to the Buyer in accordance with the APA and is forever barred and estopped from disputing such Scheduled Cure Amounts against any party, including the Debtors, the Buyer, its affiliates, and related parties, each in their capacity as such; *provided*, *however*, that nothing herein shall bar or impair such counterparty's right to assert a Supplemental Cure Claim in accordance with the Supplemental Cure Procedures set forth herein. The Cure Amounts attached to this Order as **Exhibit B**, or such other amounts as agreed to between the applicable contract counterparty and the Seller, shall be paid in accordance with the APA.

31. The Cure Amounts satisfy all amounts accrued and billed through the Closing Date. To the extent that accrued but unbilled obligations, including year-end adjustments and reconciliation amounts for taxes, common area maintenance charges, utilities, insurance,

promotion funds, royalties, fees, and other additional rent obligations that accrued prior to the Closing Date but are unbilled, not yet due, or subject to adjustment as of the Closing Date, become due after the Closing Date under an Assumed Lease, such amounts shall be addressed through paragraphs 42–44 in this Order or the Supplemental Cure Procedures set forth in this Bulk Sale Order. Notwithstanding the foregoing, indemnification obligations that come due or are asserted on or after the effective date of the assumption and assignment, regardless of whether they relate to the period before or after the assignment date, or repair and maintenance obligations relating to conditions at the premises existing as of the assignment date, shall remain subject to the bar set forth herein, and any counterparty that did not timely assert such amounts by the applicable Cure Objection Deadline shall be forever barred and estopped from seeking payment for such amounts from any party, including the Buyer, the 7 Brew Parties, the Debtors, or the Debtors' estates. For the avoidance of doubt, the Seller shall be responsible for all Cure Amounts as set forth in the APA and all parties shall be enjoined from seeking payments for any of the Cure Amounts from the Buyer and/or the 7 Brew Parties.

32. Except for the right to payment of any Cure Amount, and except for the right to assert supplemental cure claims in accordance with the Supplemental Cure Procedures set forth herein, upon the Debtors' assignment of the Assumed Contracts/Leases to the Buyer and payment of the Cure Amounts, all contract counterparties are forever barred and permanently enjoined from raising or asserting against any party, including any of the Debtors, the Buyer, or the 7 Brew Parties, any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment arising under or related to an Assumed Contract/Lease that existed as of the Closing Date or arose by reason of the Closing. Unless otherwise agreed to in writing by the Debtors, the Buyer, and the appropriate counterparty, the Scheduled Cure Amounts included in the Supplemental Cure Notice

and the Cure Amount Schedule reflect the amounts necessary under section 365(b) of the Bankruptcy Code to cure all defaults under the Assumed Contracts/Leases, except as may be supplemented through the Supplemental Cure Procedures set forth herein, and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment to the Buyer of the Assumed Contracts/Leases in accordance with the APA, except as expressly preserved in this Bulk Sale Order. No default shall exist under any Assumed Contract/Lease, and no counterparty may (a) declare a default by the Buyer or otherwise take action against the Buyer based on the Debtors' financial condition, bankruptcy, or failure to perform any pre-Closing obligation under such Assumed Contract/Lease, (b) otherwise take action against the Buyer as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under such Assumed Contract/Lease. Each non-Debtor counterparty to an Assumed Contract/Lease is hereby also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer or the 7 Brew Parties, each in their capacities as such, or the property of any of them, any default or claim arising out of any indemnity obligations or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities or, against the Buyer, any counterclaim, defense, setoff, or any other Claim asserted or assertable against the Debtors, and (ii) imposing or charging against the Buyer, its affiliates, and related parties, each in their capacities as such, any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment to the Buyer of any Assumed Contract/Lease in accordance with the APA, or (iii) imposing or charging against the Buyer any rent acceleration, assignment fee, increase, or other fee as a result of the assumption and assignment. The validity of the assumption and assignment shall not be affected by any dispute relating to the Cure Amounts.

33. **Supplemental Cure Procedures**.

(a) The Debtors shall file a notice of the closing of the 7 Brew transaction (the "**Closing Notice**") with the Bankruptcy Court within two (2) Business Days of the Closing Date. The Closing Notice shall include the Closing Date and shall set forth the Supplemental Cure Claims Bar Date as defined herein.

(b) Each non-Debtor counterparty to an Assumed Contract/Lease shall have thirty (30) days after the Closing Date (the "**Supplemental Cure Claims Bar Date**") to file with the Bankruptcy Court a supplemental cure claim for any accrued or unknown amounts that accrued after the Cure Objection Deadline and are not reflected in the Cure Amount Schedule that such counterparty asserts are owed under section 365(b)(1)(B) of the Bankruptcy Code (each, a "**Supplemental Cure Claim**"). Any non-Debtor counterparty that does not timely file a Supplemental Cure Claim by the Supplemental Cure Claims Bar Date shall be forever barred and estopped from asserting any such amounts. In no event is the Buyer or the 7 Brew Parties responsible for any Supplemental Cure Claims. Notwithstanding anything to the contrary herein, any counterparty asserting a Supplemental Cure Claim may only seek payment from the Debtors and is enjoined from seeking payment from the Buyer or the 7 Brew Parties.

(c) Each Supplemental Cure Claim must: (i) identify the applicable Assumed Contract/Lease; (ii) set forth a detailed calculation of the amounts claimed; (iii) attach all supporting documents, invoices, statements, or other evidence substantiating the amounts claimed; and (iv) be served on counsel for the Debtors, counsel for the Buyer, and counsel for the Committee in accordance with the notice provisions of this Bulk Sale Order.

(d) The Debtors and the Committee may object to any disputed Supplemental Cure Claim amounts by filing an objection (or an omnibus objection) with the Bankruptcy Court

within thirty (30) days of the Supplemental Cure Claims Bar Date. Any disputed Supplemental Cure Claim amounts shall be resolved by the Bankruptcy Court upon hearing, with notice to the applicable contract counterparty, the Debtors, the Buyer, and the Committee. Pending resolution of any disputed Supplemental Cure Claim, the Debtors shall pay any undisputed portion of such claim in accordance with the following paragraph.

(e) The Debtors shall pay any undisputed Supplemental Cure Claim amounts within forty-five (45) days of the Supplemental Cure Claims Bar Date.

(f) Nothing in these Supplemental Cure Procedures shall afford any non-Debtor counterparty any greater rights than those afforded under section 365 of the Bankruptcy Code with respect to the cure of defaults and the payment of actual pecuniary losses in connection with the assumption and assignment of the Assumed Contracts/Leases. The Supplemental Cure Procedures are intended solely to provide an orderly mechanism for the assertion and resolution of accrued but unbilled or unknown cure amounts under section 365(b)(1)(B) of the Bankruptcy Code.

34. The Buyer has demonstrated adequate assurance of future performance under the Assumed Contracts/Leases included in the Successful Bid and approved at the Bulk Sale Hearing within the meaning of sections 365(b)(1)(C), 365(b)(3), and 365(f)(2)(B) of the Bankruptcy Code.

35. **Successor Liabilities**. The consideration provided by the Buyer for the Debtors' rights, title, and interest in the Purchased Assets under the APA constitutes reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, and other applicable law within the meaning of section 544(b) of the Bankruptcy Code, under the laws of the United States, any state, territory, possession, or the District of Columbia. The sale

of the Purchased Assets may not be avoided, or costs or damages imposed or awarded under section 363(n) of the Bankruptcy Code, or any other provision of the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal, state, or foreign laws.

36. None of the Buyer or the 7 Brew Parties, each in their capacities as such, as a result of any action taken in connection with the APA, the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction, or the transfer or operation of the Purchased Assets, shall be deemed to: (a) be a legal successor or successor employer to any Debtor (including, without limitation, with respect to any health or benefit plans) or otherwise be deemed a successor to any Debtor; (b) have, *de facto*, or otherwise, merged or consolidated with or into any Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of any Debtor or the enterprise of any Debtor, including, without limitation, in the case of each of (a)–(c), without limitation, (i) within the meaning of any foreign, federal, state or local revenue law, or the Comprehensive Environmental Response Compensation and Liability Act ("**CERCLA**"); or (ii) in respect of (1) any environmental liabilities, debts, claims or obligations arising from conditions existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances, or wastes), which may be asserted on any basis, including, without limitation, under CERCLA and (2) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine. Without limiting the generality of the foregoing, none of the Buyer or the 7 Brew Parties, each in their capacities as such, shall have any responsibility for any (a) liability or other obligation of the Debtors related to the Purchased Assets or (b) any claims against the Debtors or any of their predecessors or affiliates. By virtue of the purchase of the Purchased

Assets, none of the Buyer or the 7 Brew Parties, each in their capacities as such, shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon, but not limited to, any theory of antitrust, environmental (including, without limitation, CERCLA), successor or transferee liability, de facto merger or substantial continuity, or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, any liabilities or obligations related to or arising from any settlement or injunction or any liabilities on account of any taxes (including, without limitation, sales and use taxes) arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets, in each case, either (x) arising on or prior to the Closing Date, or (y) from and after the Closing Date, but which arise out of or relate to any act, omission, circumstances, breach, default or other event occurring before the Closing Date. The Buyer would not have acquired the Purchased Assets but for the foregoing protections against successor or transferee Liability.

37. **Good Faith**. The transactions contemplated by the APA are undertaken by the Buyer and the 7 Brew Parties, in their capacities as such, without collusion and in good faith (including as that term is used in section 363(m) of the Bankruptcy Code) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale with the Buyer and the 7 Brew Parties, in their capacities as such, unless such authorization is duly stayed pending such appeal. Each of the Buyer and the

7 Brew Parties, in their capacities as such, is a good-faith purchaser of the Purchased Assets and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

38. **Failure to Specify Provisions**. The failure specifically to include any particular provisions of the APA in this Bulk Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety; *provided*, *however*, that this Bulk Sale Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Bulk Sale Order. All provisions of this Bulk Sale Order are non-severable and mutually dependent. To the extent that this Bulk Sale Order is inconsistent with any prior order or pleading with respect to the Bulk Sale Motion in these Chapter 11 Cases, the terms of this Bulk Sale Order shall control.

39. **Material Modifications**. The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, with a copy to the Committee, and in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates; *provided*, *however*, that any modification, amendment, or supplement that has a material adverse effect on the Debtors' estates shall be (i) filed on the docket and served on the master service list, and (ii) parties in interest shall have five (5) Business Days to object to any such amendment. Absent any such objection, such modification, amendment, or supplement shall be binding, and any timely objection shall be heard by the Court on an expedited basis.

40. **Escrow**. Pursuant to Section 6.8 of the APA, the Deposit may be held by the Escrow Agent pursuant to the Escrow Agreement. The Deposit and any proceeds thereof shall be held, administered, and disbursed in accordance with the APA and the Escrow Agreement, and

shall not constitute property of the Debtors' estates unless and until validly released to the Debtors pursuant to the terms thereof.

41. **Subsequent Plan Provisions**. Nothing contained in any chapter 11 plan, any order confirming any such plan, or any other order in these Chapter 11 Cases (including any order entered after any conversion of any of these Chapter 11 Cases to chapter 7 or dismissing these Chapter 11 Cases) or any related proceeding subsequent to entry of this Bulk Sale Order shall alter, conflict with, or derogate from, the provisions of the APA or this Bulk Sale Order. To the extent that the Closing Date has not occurred prior to confirmation of any Chapter 11 plan, the Debtors may implement this Bulk Sale Order through any confirmed Chapter 11 plan.

42. **Tax Provisions and Pre-Closing Rent**. The Debtor shall pay all obligations under Assumed Leases due October 1, 2026, including obligations for payment of rent, additional rent, and Transaction Privilege Tax; provided, however, that any obligations to pay taxing authorities directly shall be governed by paragraphs 43 and 44 herein.

43. For the avoidance of doubt, and notwithstanding anything to the contrary in this Bulk Sale Order or the APA, to the extent any of the Debtors' property in Texas subject to any ad valorem tax claims held by any of the Texas Taxing Authorities[6] is to be sold, the Debtors shall pay any delinquent taxes owed to the Texas Taxing Authorities with respect to the Purchased Assets for tax years 2025 and prior, including any accrued penalties and interest (the "**Delinquent**

[6] The term "**Texas Taxing Authorities**" is defined as all ad valorem taxing jurisdictions represented by the firms of Linebarger Goggan Blair & Sampson, LLP, Perdue, Brandon, Fielder, Collins & Mott LLP, and McCreary Veselka Bragg and Allen, including but not limited to Bexar County, Dallas County, Town of Fairview, McLennan County, Town of Prosper, Prosper Independent School District, Rockwall CAD, Spring Independent School District, Meadowhill Regional Municipal Utility District, Fort Bend Independent School District, Fort Bend County Levee Improvement District #15, Fort Bend County Municipal Utility District #128, Fort Bend County Municipal Utility District #143, City of Katy, Fort Bend County Municipal Utility District #161, Fort Bend County Municipal Utility District #167, City of Rosenberg, Dickinson Independent School District, Clear Creek Independent School District, Harris County Municipal Utility District #433, City of Garland, Bell County Tax Appraisal District, Guadalupe County, City of Waco, Waco Independent School District, and Frisco Independent School District.

**Taxes**"), as soon as reasonably practicable after Closing, but, in any event, no later than three (3) Business Days after Closing; *provided, however*, the Debtors shall ensure that an amount sufficient to satisfy such Delinquent Taxes is set aside from the sale proceeds prior to making any disbursement of such proceeds to any other person or entity. The Texas Taxing Authorities' ad valorem tax liens securing payment of the Delinquent Taxes shall be retained against the sale proceeds until such time as the Delinquent Taxes are paid in full. At least three Business Days before Closing, the Debtors shall estimate the amount of 2026 property taxes pertaining to the Purchased Assets prior to Closing based on the most recent information available to the Debtors (the "**Pre-Closing Texas Accrued Property Taxes**"). The Buyer shall deduct the Pre-Closing Texas Accrued Property Taxes from the Purchase Price to be paid at Closing to the Debtors and shall pay such Pre-Closing Texas Accrued Property Taxes to the Texas Taxing Authorities at Closing. Following Closing, any unpaid property taxes for tax year 2026 pertaining to the Purchased Assets shall become the responsibility of the Buyer and the 2026 ad valorem tax liens shall be retained against the Purchased Assets until said taxes, including any penalties and interest that may accrue, are paid in full. If the actual assessed amount of property taxes attributable to the 2026 period prior to Closing is higher than the Pre-Closing Texas Accrued Property Taxes, the Debtors or their successor shall pay the difference to the Buyer.

44. As to any 2026 property taxes in states other than Texas (the "**Non-Texas Property Taxes**") that the Debtors are obligated to pay directly to such taxing authorities (the "**Non-Texas Taxing Authorities**"), the Debtors shall pay all such taxes to any taxing authorities that are due on or before October 1, 2026 that are attributable to periods prior to October 1, 2026. At least three Business Days before Closing, the Debtors shall estimate the amount of 2026 Non-Texas Property Taxes pertaining to the Purchased Assets prior to Closing based on the most recent information

available to the Debtors (the "**Pre-Closing Non-Texas Accrued Property Taxes**"). The Buyer shall deduct the Pre-Closing Non-Texas Accrued Property Taxes from the Purchase Price to be paid at Closing to the Debtors and shall pay such Pre-Closing Non-Texas Accrued Property Taxes to the Non-Texas Taxing Authorities at Closing. Following Closing, any unpaid property taxes for tax year 2026 pertaining to the Purchased Assets shall become the responsibility of the Buyer. If the actual assessed amount of property taxes attributable to the 2026 period prior to Closing is higher than the Pre-Closing Non-Texas Accrued Property Taxes, the Debtors or their successor shall pay the difference to the Buyer.

45. **Specific Objections**.

(a) With respect to the objection filed at docket number 344 pertaining to store number 1161 located at 7480 South Power Road, Gilbert, AZ 85297 (the "**Gilbert Store**"), the landlord for the Gilbert Store and the Buyer agreed that any amendment related to the Gilbert Store lease entered into between the landlord for the Gilbert Store and the Buyer shall control in the event of any conflicts between such lease amendment and this Order, the APA and the Master Assignment (as defined in the amendment for the Gilbert Store).

(b) With respect to the objection filed at docket number 374 pertaining to store number 14060 located at 130 S Central Expy, McKinney, TX 75072 (the "**McKinney Store**"), the landlord for the McKinney Store and the Buyer agreed that any amendment or other agreement related to the McKinney Store lease entered into between the landlord for the McKinney Store and the Buyer shall control in the event of any conflicts between such lease amendment or other agreement and this Order.

(c) With respect to store number 1137 located at 4716 E. Ray Road, Phoenix, AZ (the "**Baker Lane Store**"), the first sentence of Paragraph 4 of the Ground Lease for the Baker

Lane Store (all initially capitalized terms used herein shall have the same meaning assigned therein) entitled "Permitted Use" is modified as follows:

> 4. Permitted Use. Lessee shall use the Leased Premises for the operation of a "7 Brew" quickserve coffee and blended drink sales location with drive-through service (which may include multiple drive through lanes) and walk up service, selling coffee and blended drink items that do not conflict with any restrictions in the OEA on a to-go basis, and with no on-premises dining (the "Permitted Use"), and for no other use; and Landlord consents and agrees that 7 Brew's operation of the lease for a prototypical 7 Brew complies with the lease use and OEA.[7]

46. **Survival**. The terms and provisions of this Bulk Sale Order and the terms and provisions of the APA and any actions taken pursuant hereto or thereto as of the date of the entry of this Bulk Sale Order shall survive the entry of any order that may be entered, including, without limitation, converting these Chapter 11 Cases from chapter 11 to chapter 7 or dismissing these Chapter 11 Cases, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Bulk Sale Order and the APA shall continue in these or any superseding cases and shall be binding upon the Debtors and all other parties and their respective successors and permitted assigns, including any trustee (including one appointed under the plan), administrator, examiner, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in these cases (including a chapter 7 trustee, if applicable) shall be and hereby is authorized and directed to operate the business of the Debtors to the fullest extent necessary to permit compliance with the APA and the terms of this Bulk Sale Order.

47. **Calculation of Time**. All time periods set forth in this Bulk Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

---

[7] The remaining sentences of paragraph 4 of the Ground Lease for the Baker Lane Store shall remain unchanged. All use restrictions in the Lease and OEA shall remain in full force and effect.

48. **Further Assurances**. From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions, and assurances), and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the transactions contemplated by the APA, including such actions as may be necessary to vest, perfect, or confirm, of record or otherwise, in the Buyer its right, title, and interest in and to the Purchased Assets.

49. **Automatic Stay**. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies or exercise any of its rights under the APA or any other Sale-related document, including to give any notice under the APA or to terminate the APA pursuant to the terms thereof. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence; *provided, however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

50. **Retention of Jurisdiction**. This Court retains jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Bulk Sale Order and the APA, all amendments to any of the foregoing, and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by the Debtors to the Buyer in accordance with the APA; to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Bulk Sale, including, without limitation, adjudicate any and all disputes concerning or relating to the Sale, including any and all disputes with any counterparty to any executory contract or unexpired lease of the Debtors and any party

that has, or asserts, possession, control, or other rights in respect of any of the Purchased Assets; to protect the Buyer against any claims, liens, encumbrances, or other interests in the Debtors or the Purchased Assets of any kind or nature whatsoever attaching to the proceeds of the Sale; and to enter any orders under sections 105, 363, or 365 of the Bankruptcy Code with respect to the Assumed Contracts/Leases.

51. The requirements set forth in Bankruptcy Rules 4001, 6004(a), 6004(h), and 6006, and applicable Local Rules, are hereby waived.

52. Notwithstanding entry of this Bulk Sale Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

53. The Debtors are authorized to take all actions necessary or appropriate to implement the relief granted in this Bulk Sale Order.

Signed: September 29, 2026

Alfredo R Pérez
United States Bankruptcy Judge

# Exhibit A

## Asset Purchase Agreement

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("***Agreement***") is made, entered into and effective as of August 25, 2026 (the "***Effective Date***"), by and among Brew Culture, LLC, a Wyoming limited liability company ("***Buyer***"), and And Go Concepts, LLC, an Arizona limited liability company ("***Seller***"). Buyer and Seller are collectively referred to as the "***Parties***" and each, a "***Party***."

## RECITALS:

**WHEREAS**, Seller currently operates certain "Salad and Go" outlets (the "***Business***") (each Salad and Go location referred to individually as a "***Site***" and collectively as the "***Sites***") listed in Schedule A ("***Group A Sites***") and Schedule B ("***Group B Sites***") attached hereto;

**WHEREAS**, the Seller filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, §§ 101, et seq. (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") on August 4, 2026 (the "***Petition Date***");

**WHEREAS**, upon the terms and subject to the conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Buyer desires to purchase and assume from Seller, and Seller desires to sell and assign to Buyer, certain assets used or held for use by Seller in connection with the Business at the Sites free and clear of all Liens, Claims, Encumbrances and Interests, subject to the terms and conditions set forth herein;

**WHEREAS**, the Seller intends to market the assets through a public bid auction process (the "Auction," as defined further below) conducted by the Bankruptcy Court, and Buyer intends to participate in such Auction and acquire the Purchased Assets as the Successful Bidder; and

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants, agreements, conditions, representations and warranties set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to become legally bound, agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

**Section 1.1 Purchase and Sale of Assets**. At the Closing, subject to the terms and conditions set forth in this Agreement and pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, Seller shall sell, convey, assign, transfer, contribute, and deliver to Buyer, and Buyer shall acquire and purchase from Seller, Seller's right, title, and interest in and to all assets used in connection with the Sites (collectively, the "***Purchased Assets***"), free and clear of all Liens, Claims, Encumbrances and Interests to the fullest extent permitted by Section 363(f) of the Bankruptcy Code; provided, that the Purchased Assets shall not include the Excluded Assets. The Purchased Assets shall include all right, title and interest of Seller in, to and under:

(a) Seller's right, title, and interest in all the Real Property Leases pertaining to the Sites (as may be adjusted pursuant to Section 6.3(c) and Section 7.3, collectively, the "***Assumed Leases***");

(b) all furniture, fixtures and equipment utilized in connection with the operation of the Sites, vehicles, machinery, computers, point of sale systems, leasehold improvements, customer lists (to the extent available on a per-Site basis), and any other fixed assets, together with, to the

extent assignable at de minimis cost to Seller, any express or implied warranty by the manufacturers, sellers, or lessors of any item or component of any item, and any other rights of Seller relating to these items;

(c) all security or similar deposits under the Assumed Leases;

(d) solely to the extent assignable pursuant to their terms, all utility contracts pertaining to the Sites of the Assumed Leases, including any security or similar deposits under such contracts;

(e) all causes of action of the Seller related to the Purchased Assets;

(f) Seller's claims for refunds of any Taxes paid in connection with the Purchased Assets; and

(g) all Licenses to the extent transferable.

**Section 1.2 Excluded Assets**. Notwithstanding anything herein to the contrary, Seller shall not sell, transfer, assign, convey, or deliver to Buyer, and Buyer shall not purchase from Seller any of the following assets (collectively, the "***Excluded Assets***"):

(a) Seller's corporate minute books, seal, and stock transfer books, and other documents relating to the organization, maintenance and existence of Seller as a limited liability company, and any Tax Returns, Tax Information and Tax records of Seller (other than copies of personal property Tax Returns and any supporting work papers) (the "***Corporate Records***");

(b) Seller's bank accounts, money market funds, cash or cash equivalents, or any other forms of investment, including investment securities and adequate assurance deposits as of the Closing Date;

(c) Seller's accounts receivable as of the Closing Date;

(d) Seller's insurance policies and the right to any rebate or refund or return of any prepaid insurance premiums related to such insurance policies;

(e) all Intellectual Property and all other intangible assets owned or purported to be owned by or licensed to Seller or any of its Affiliates or used or held for use in the operation of the Business as it is currently conducted or necessary to operate the Purchased Assets and all tangible embodiments thereof (collectively, the "***IP***");

(f) Seller's claims for, and rights with respect to, Tax refunds, rebates, credits, deposits, overpayments or similar items of any related to Taxes, other than Tax refunds included in the Purchased Assets pursuant to Section 1.1(f);

(g) all Inventory and all rebates (including vendor rebates), prepayments (including vendor prepayments), deposits and refunds that are attributable to, arise from, or relate to the purchase of Inventory of Seller prior to the Closing;

(h) all perishable inventory and food and beverage products;

(i) all causes of action of the Seller related to the Excluded Assets;

(j) all Contracts of Seller other than the Assumed Leases and assignable utility agreements; and

(k) any of the other assets identified on Schedule 1.2(k).

**Section 1.3 Assumed Liabilities**. At the Closing, subject to the terms and conditions set forth in this Agreement and the Sale Order, Buyer shall assume and agree to pay, discharge or perform, as appropriate, only the following liabilities and obligations of Seller (collectively, the "***Assumed Liabilities***"): (a) all liabilities and obligations under the Assumed Leases, and then only to the extent such obligations (i) are to be performed after the Closing Date, (ii) accrue and relate to the operation of the Sites subsequent to the Closing Date, and (iii) do not relate to an uncured breach of any Assumed Lease that occurred on or prior to the Closing Date; and (b) all liabilities for, and in respect of, Property Taxes that are the responsibility of Buyer under Section 6.4(b). For the avoidance of doubt, (x) except for the Assumed Liabilities described in the foregoing sentence, Buyer shall not and Buyer does not assume any liabilities of Seller or its Affiliates whether or not arising out of or relating to the Purchased Assets or the Business or any other business of Seller, all of which liabilities shall, at and after the Closing, remain the exclusive responsibility of Seller, and (y) any and all liabilities and obligations with respect to the Purchased Assets arising out of or relating to any event, matter or circumstance occurring from and after the Closing, or which otherwise arise or are asserted or incurred by reason of events, acts, or transactions occurring, or the operation of the Sites, from and after the Closing, shall be the exclusive responsibility of Buyer.

**Section 1.4 Excluded Liabilities**. Notwithstanding anything to the contrary contained herein, except for the Assumed Liabilities, Buyer shall not assume, perform, discharge, or agree to become liable for (including any successor liability related thereto) any other liability or obligation of Seller (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, asserted or unasserted or otherwise) (collectively, the "***Excluded Liabilities***"), including, but not limited to:

(a) any liabilities or obligations incident to, arising out of, or incurred with respect to the Excluded Assets;

(b) any accounts payable of Seller or otherwise related to the Business;

(c) any Excluded Taxes;

(d) any liabilities or obligations with respect to Seller, the Business, or the Purchased Assets arising out of or relating to any event, matter or circumstance occurring prior to the Closing or which otherwise arise or are asserted or incurred by reason of events, acts, or transactions occurring, or the operation of the Sites, prior to or on the Closing Date;

(e) any Indebtedness of Seller;

(f) any liabilities of Seller with respect to Transaction Expenses and Lease Expenses;

(g) any liabilities or obligations arising out of or relating to any claim or Proceeding against Seller as of the Closing Date, or arising out of or relating to matters or events occurring prior to the Closing;

(h) any liabilities or obligations to any equity holder of Seller, in such Person's capacity as an equity holder;

(i) any liabilities or obligations arising out of or relating to a warranty obligation under any Material Contract for any breach by Seller of any provision of any of such Material Contract;

(j) any liabilities or obligations of Seller arising out of or relating to Hazardous Materials or violations of any Environmental Law, together with any interest or penalties thereon or related thereto, that arise or accrue on or prior to the Closing Date; provided, for the avoidance of doubt, that a liability or obligation will have accrued on or prior to the Closing Date with respect to Hazardous Materials or the violation of any Environmental Law if such Hazardous Materials or violations of Environmental Law are attributable to conditions existing on or during periods prior to the Closing Date;

(k) any liabilities or obligations to or relating to any employees of the Business, independent contractors, consultants, officers, directors, or other services providers or agents of the Business that is accrued or incurred on or prior to the Closing Date or relates to a period prior to the Closing Date, including any and all liabilities or obligations relating to (i) accrued wages, (ii) accrued but unused vacation, (iii) paid-time-off, (iv) retention payments and any equity incentive or other profit or revenue sharing arrangements, in each case, owed to employees of the Business, independent contractors, consultants, officers, directors, or other services providers or agents of the Business pursuant to arrangements (written or oral) entered into prior to the Closing Date, (v) any Plan, and (vi) requirements by the WARN Act or by any other Law relating to employee separations that are required to be provided as a result of Seller's acts or omissions on or prior to the Closing Date or the termination of employment of any employee of Seller;

(l) any liabilities or obligations arising out of or relating to the Business's loyalty program or the Business's gift card program; and

(m) any Required Cure Costs.

## ARTICLE II
## PURCHASE PRICE

**Section 2.1 Purchase Price**. The aggregate consideration for the sale and transfer by Seller of the Purchased Assets to Buyer pursuant to this Agreement, in addition to the assumption of the Assumed Liabilities, shall be comprised of (i) an aggregate amount of $124,777,777.77 in cash with respect to the Group A Leases (the "***Group A Purchase Price***") and (ii) an aggregate amount of $18,400,000.00 in cash with respect to the Group B Leases (the "***Group B Purchase Price***," collectively, in aggregate, $143,177,777.77), comprised of (x) the Deposit in the amount of $14,317,777.77 to be paid into escrow in accordance with this Agreement and (y) $128,860,000.00 (the "***Base Purchase Price***"), plus any Deposit Adjustment, minus any Site Adjustment Amount, plus any Rejection Fees, subject to adjustment as set forth in this Agreement (the Base Purchase Price, as adjusted above, the "***Purchase Price***").

**Section 2.2 Closing Payment**. Upon the terms and subject to the conditions of this Agreement, at the Closing, in consideration for the purchase of the Purchased Assets, Buyer shall pay to Seller, by wire transfer of immediately available funds to the account(s) designated by Seller, an aggregate amount equal to: the Base Purchase Price, minus the amount required at Closing to discharge in full all Required Cure Costs and Lease Expenses of Seller to the extent not paid by Seller prior to or as of the Closing, if any, as set forth on the Lease Expense Statement, minus the Deposit which shall be released to Seller from the Escrow Agent at Closing (the "***Closing Payment***").

**Section 2.3 Lease Expenses and Required Cure Costs.** At the Closing, Buyer shall pay, on behalf of Seller, by wire transfer of immediately available funds in accordance with the wire instructions

set forth in the Lease Expense Statement, the amount of Required Cure Costs and Lease Expenses due and owing from Seller to such third parties as set forth in the Lease Expense Statement.

**Section 2.4 Allocation of Purchase Price**. The Closing Payment and any other items properly treated as consideration for U.S. federal income tax purposes, including the Assumed Liabilities (the "***Tax Purchase Price***") shall be allocated among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and with the methodology attached hereto as Exhibit A (the "***Allocation***"). Within ninety (90) days following the Closing Date, Buyer shall prepare a draft Allocation and deliver a copy thereof to Seller. If Seller notifies Buyer in writing within fifteen (15) days of such delivery that Seller objects to one or more items reflected in the draft Allocation, Seller and Buyer shall negotiate in good faith to resolve such dispute and shall make such revisions as are mutually agreed; provided, however, that if Seller and Buyer are unable to resolve any dispute with respect to the draft Allocation within fifteen (15) days of delivery of such notice to Seller, such dispute shall be resolved by a mutually acceptable accounting firm and such resolution by the accounting firm shall be reflected in the Allocation. The fees and expenses of such accounting firm shall be borne equally by Seller and Buyer. If Seller does not notify Buyer of any objection within the fifteen (15) day notification period above, the draft allocation shall be considered final. If the Tax Purchase Price is subsequently adjusted, the Allocation shall be correspondingly adjusted in a manner consistent with the previous final Allocation. Buyer and Seller shall, and shall cause their respective Affiliates to, file all Tax Returns, including Internal Revenue Service ("***IRS***") Form 8594 and any supplemental or amended forms, consistently with the final Allocation and shall not take any position inconsistent therewith, except as otherwise required by a final determination within the meaning of Section 1313(a) of the Code or applicable state or local Law.

**Section 2.5 Withholding**. Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under the Code or under any other applicable Tax Law. To the extent such amounts are so deducted and withheld and paid to the applicable taxing authority, all such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to Seller or any other recipient of payment in respect of which such deduction and withholding was made; provided, however, Buyer shall use commercially reasonable efforts to notify Seller of its intent to withhold as soon as reasonably practicable prior to the applicable payment date and shall reasonably cooperate with Seller to reduce or eliminate such withholding to the extent such reduction or elimination is permitted under applicable Law. Buyer shall timely remit all such withheld amounts to the applicable Governmental Authority in accordance with applicable Law and shall provide Seller with evidence of such payment.

## ARTICLE III
## CLOSING

**Section 3.1 Closing**. Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "***Closing***") shall take place electronically by the mutual exchange of documents and signatures on the day the conditions set forth in Article VII have been satisfied or at such other date, time or place as may be agreed to in writing by the Parties (the date on which the Closing occurs, the "***Closing Date***"). For accounting and Tax purposes, the Closing shall be deemed to occur at 11:59 p.m. Eastern Time on the Closing Date.

**Section 3.2 Closing Deliverables.**

(a) At or prior to the Closing (unless a separate time period is otherwise specified below), Seller shall deliver, or cause to be delivered, to Buyer the following (collectively, the "***Seller Closing Deliverables***"):

(i) a counterpart signature page to a bill of sale and assignment and assumption agreement, in form and substance reasonably satisfactory to Buyer and Seller (each a "***Bill of Sale and Assignment and Assumption Agreement***"), duly executed by Seller with respect to the Purchased Assets and the Assumed Liabilities;

(ii) a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 7.1(a) has been satisfied;

(iii) a good standing certificate for Seller from the jurisdiction of its organization;

(iv) evidence reasonably suitable to Buyer of the receipt of all Consents for each of the Assumed Leases (collectively, the "***Required Consents***"), to the extent such Consents are not rendered unnecessary by the Sale Order and by operation of Sections 363 or 365 of the Bankruptcy Code;

(v) unless exempt under applicable law, assignment and assumption agreements, in form and substance reasonably satisfactory to Buyer and Seller (each an "***Assignment and Assumption of Lease***"), of Seller's right, title, and interest in and to and obligations with respect to all Assumed Leases inclusive of all renewal options under the Assumed Leases, together with any amendments to any such Assumed Leases (each a "***Lease Amendment***") required to operate Buyer's business of the drive through sale of coffee, non-coffee beverages and food items, as of Closing without any Use Restrictions, in form and substance reasonably satisfactory to both Buyer and Seller or in the form required under the applicable Assumed Lease, duly executed by Seller;

(vi) a certificate of a duly authorized officer of Seller, in form and substance reasonably satisfactory to Buyer, attaching and certifying (A) the resolutions adopted by the board of directors of Seller authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (B) the incumbency and signatures of the Persons signing this Agreement and the agreements and documents delivered pursuant hereto (collectively, the "***Ancillary Agreements***") to which Seller is a party;

(vii) an IRS Form W-9, duly executed by Seller;

(viii) the Sale Order; and

(ix) such other documents as Buyer may reasonably require to evidence compliance with the conditions set forth in this Agreement, in each case to the extent within Seller's possession or control and consistent with Seller's express obligations under this Agreement; provided, that Seller shall have no obligation to deliver any document that conflicts with or is inconsistent with the Sale Order or the Bankruptcy Code.

(b) At or prior to the Closing (unless a separate time period is otherwise specified below), Buyer shall deliver, or cause to be delivered, to Seller the following (collectively, the "***Buyer Closing Deliverables***"):

(i) a counterpart signature page to each Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii) a counterpart signature page to each Assignment and Assumption of Lease and any Lease Amendment (if any), duly executed by Buyer;

(iii) a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.2(a) has been satisfied;

(iv) a certificate of the secretary or other duly authorized officer of Buyer, in form and substance reasonably satisfactory to Seller, attaching and certifying (A) the resolutions of the governing body of Buyer, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (B) the incumbency and signatures of the Persons signing this Agreement and the Ancillary Agreements to which Buyer is a party; and

(v) payment of the amounts set forth in Section 2.2, and Section 2.3 (to the extent paid by Seller) in accordance with and to the Persons set forth in such Sections.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as set forth in the disclosure schedules (the "***Disclosure Schedules***") and except as may be limited by the provisions of the Bankruptcy Code or orders of the Bankruptcy Court, the statements contained in this Article IV are true and correct in all material respects as of the date hereof and as of the Closing Date. The Parties acknowledge that Seller is (or will become) a debtor-in-possession under the Bankruptcy Code and that the representations and warranties set forth herein shall be subject to the limitations and qualifications inherent in such status. Notwithstanding anything in this Agreement to the contrary, if any inaccuracy in or breach of a representation or warranty set forth in this Article IV is attributable solely to a particular Site or its related Real Property Lease, then such inaccuracy or breach shall constitute a Site-Specific Failure (as defined in Section 7.3) and shall be addressed exclusively in accordance with Section 7.3. The foregoing shall not limit the consequences of any inaccuracy in or breach of a representation or warranty that is not reasonably attributable to a single Site or that otherwise has a transaction-wide effect.

**Section 4.1 Organization; Authority; Binding Effect**. Seller is duly organized, validly existing and in good standing under the laws of the state of its organization. Seller is duly qualified and authorized to conduct business and is in good standing under the laws of all jurisdictions in which qualification and authorization are required. Seller has full power and authority to enter into this Agreement and the Ancillary Agreements to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, acknowledgement, and delivery of this Agreement by Seller and of each Ancillary Agreement by Seller that will be a party to such agreement, and the performance by Seller of the transactions contemplated by this Agreement and the Ancillary Agreements have been duly and validly authorized by all necessary

action. This Agreement is, and the Ancillary Agreements will be, duly executed and delivered by Seller and shall constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, subject to the availability of equitable remedies and the enforcement of creditors' rights generally.

**Section 4.2 Legal Compliance**. Seller is, and has been in the past three (3) years, solely with regard to the Assumed Leases, in compliance in all material respects with all applicable Laws and outstanding orders, writs, judgments, injunctions, decrees, stipulations, determinations, awards, or penalties entered by or with any Governmental Authority (each, a "***Governmental Order***"). There are no claims pending, or, to Seller's Knowledge, threatened, nor has Seller received any written notice, regarding any violations of any Laws or Governmental Orders enforced by any Governmental Authority claiming jurisdiction over the Purchased Assets or the Sites.

**Section 4.3 Litigation**. There is no Proceeding of any nature pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Sites, or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. To Seller's Knowledge, no event has occurred, or circumstances exist that would reasonably be expected to give rise to any such Proceeding.

**Section 4.4 Title of Assets**. Seller owns and has good and valid title to, or a valid leasehold interest in, the Purchased Assets, in each case subject to the Permitted Liens.

**Section 4.5 Tax Matters**.

(a) None of the Purchased Assets is properly treated as owned by persons other than Seller for income Tax purposes. None of the Purchased Assets is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(b) Except as may result from the commencement of the Bankruptcy Case and any orders of the Bankruptcy Court, Seller has timely filed (taking into account any applicable extensions of time for such filings) all Tax Returns required to be filed with respect to the Purchased Assets. All such Tax Returns are complete and accurate in all material respects.

(c) Except as may result from the commencement of the Bankruptcy Case and any orders of the Bankruptcy Court, all Taxes owed and due by Seller with respect to the Purchased Assets (whether or not shown on any Tax Return) have been paid.

(d) Seller has not received written notification of any audits or other Proceedings relating to Taxes with respect to the Purchased Assets that are ongoing or pending.

(e) There are no Liens for Taxes on any of the Purchased Assets (other than the Permitted Liens).

(f) None of the Purchased Assets is treated, or required to be treated, as held under an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code.

**Section 4.6 Material Contracts.**

(a) Section 4.6(a) of the Disclosure Schedules sets forth all of the following agreements, contracts, commitments, instruments, documents, leases, certificates or other binding

arrangements or understandings, whether written or oral (each a "***Contract***"), (x) by which any of the Purchased Assets are bound or affected, or (y) to which Seller is a party or by which it is bound in connection with the Purchased Assets (collectively, the "***Material Contracts***"):

(i) all Real Property Leases; and

(ii) all Contracts relating to the creation of any Lien (other than a Permitted Lien) with respect to any Purchased Assets.

(b) Each Material Contract is in full force and effect, and valid and enforceable by and against Seller and, to Seller's Knowledge, the other parties thereto in accordance with its respective terms, in each case subject to the effects of bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting creditors' rights generally and to general equitable principles. Except as set forth on Section 4.6(b) of the Disclosure Schedules, Seller has performed in all material respects all obligations required to be performed by it and is not in receipt of any written claim of breach under any Material Contract.

(c) Seller has provided to Buyer true, correct, and complete copies in all material respects of all Material Contracts disclosed on Section 4.6(a) of the Disclosure Schedules.

(d) No counterparty to any Material Contract has, within the twelve (12) months preceding the date hereof, given Seller written notice repudiating any provision thereof, or indicating an intention to exercise any right of cancellation, termination, or non-renewal thereof.

**Section 4.7 Real Property.**

(a) Section 4.7(a) of the Disclosure Schedules sets forth an accurate and complete list of all real property owned, leased, subleased or licensed by Seller as owner, lessee, sublessee or licensee for the Sites (the "***Real Property***"), setting forth for each (i) whether owned or leased, (ii) the address for such Real Property, and (iii) an accurate and complete list of all leases or subleases and any amendments, guarantees, and subordination, non-disturbance and attornment agreements related thereto, pursuant to which the Real Property is used or occupied, as well as corporate office space and storage space leases or other Contracts. The Real Property Leases consist of (x) the Group A Leases set forth on Schedule A attached hereto and (y) the Group B Leases set forth on Schedule B attached hereto (collectively, the "***Real Property Leases***"). Seller has provided Buyer with true and complete copies of all Real Property Leases in Seller's possession or reasonable control.

(b) With respect to each parcel of Real Property: (i) Seller has not received written notice of any eminent domain, condemnation, or other similar Proceedings that are pending, and, to Seller's Knowledge, there are no such Proceedings threatened in writing, affecting any portion of the Real Property; (ii) Seller has not received written notice that the operation of the Real Property by the Seller in the manner in which it is now operated does not comply in material respects with zoning, building, use, safety, or other similar statutes, ordinances, or regulations of any Governmental Authority; (iii) all Improvements on any such parcel are in working condition, ordinary wear and tear and casualty excepted; (iv) Seller has not received any notice of any special Tax, levy, or assessment for benefits or betterments that materially adversely affect any parcel of Real Property and, to Seller's Knowledge, no such special Taxes, levies, or assessments are pending or contemplated; (v) other than Permitted Liens, there are no written Contracts granting to any third-party the right of use or occupancy of any such parcel, and there are no third-parties (other than Seller) in possession of any such parcel; and (vi) no payments that are owed or due to the

landlords under any Real Property Lease are past due beyond applicable notice and cure periods, except as set forth on Section 4.7(b)(vi) of the Disclosure Schedules.

(c) With respect to each parcel of Real Property leased by Seller pursuant to a Real Property Lease ("***Leased Real Property***"): (i) Seller enjoys peaceful and quiet possession thereof; (ii) no security deposit or portion thereof deposited with respect to any of the Real Property Leases has been used or applied in respect of a breach or default under any of the Real Property Leases which has not been redeposited in full; and (iii) Seller does not owe, nor, pursuant to an executed Contract related to such Real Property Leases, will it owe in the future, any brokerage commissions or finder's fees with respect to the Real Property Leases.

(d) Each Real Property Lease is in full force and effect and is valid, binding, and enforceable against Seller and, to the Seller's Knowledge, each other party thereto, except to the extent limited by bankruptcy, insolvency or similar laws and general equitable principles affecting the rights of creditors generally. Subject to the respective terms and conditions in the Real Property Leases, Seller is the legal and equitable owner of the leasehold interest in the Real Property and possesses a good and valid leasehold interest therein, free and clear of all Liens (other than Permitted Liens).

**Section 4.8 Environmental**. Except as set forth on Schedule 4.8(e), the Seller is in compliance in all material respects with all applicable Environmental Laws, and there are no written or, to the Knowledge of the Seller, verbal claims pursuant to any Environmental Laws pending or, to the Knowledge of the Seller, threatened, against the Seller in connection with the conduct or operation of the Business or the ownership or use of the Purchased Assets. Except as set forth on Schedule 4.8(e), there are no material Liabilities under any Environmental Law with respect to the properties subject to the Purchased Assets or operation of the Business. Except as set forth on Schedule 4.8(e), neither the Seller nor, to the Knowledge of the Seller, any other Person has used the properties subject to the Purchased Assets or the Business for the manufacture, handling, transportation, treatment, storage or disposal of Hazardous Substances except in the ordinary course of business in material compliance with Environmental Law. Except as set forth on Schedule 4.8(e), to the Knowledge of the Seller, the Seller does not own and/or operate nor has the Seller owned and/or operated underground or aboveground storage tanks that store or have stored any Hazardous Substance on any of the properties subject to the Purchased Assets, there have been no releases of any Hazardous Substances on or from, nor are there any Hazardous Substances on, at, or under any of the properties subject to the Purchased Assets or related to Seller's operation of the Business that violates any applicable Environmental Law, including violations that require notification to any Governmental Authority or require any response action pursuant to any applicable Environmental Law.

**Section 4.9 Solvency.** Seller is not entering into this Agreement or the transactions contemplated hereby with the intent to hinder, delay, or defraud any present or future creditor. Immediately after giving effect to the transactions contemplated by this Agreement, Seller anticipates that the Purchase Price will be sufficient to pay all allowed Claims against Seller.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date.

**Section 5.1 Organization; Authority; Binding Effect**. Buyer is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Wyoming. Buyer has full power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party,

to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, acknowledgement, and delivery of this Agreement by Buyer and each Ancillary Agreement to which Buyer is a party, and the performance by Buyer of the transactions contemplated by this Agreement and each such Ancillary Agreement have been duly and validly authorized by all necessary action. This Agreement is, and the Ancillary Agreements to which Buyer is a party will be, duly executed and delivered by Buyer, as applicable, and shall constitute legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, subject to the availability of equitable remedies and the enforcement of creditors' rights generally.

**Section 5.2 Legal Proceedings.** There is no Proceeding of any nature pending or, to Buyer's actual or constructive knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Proceeding.

**Section 5.3 Sufficiency of Funds.** Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement. Buyer's obligation to consummate the transactions contemplated by this Agreement is not, and as of the Closing will not be, subject to any financing condition or contingency, and Buyer shall maintain funds sufficient to pay the Purchase Price in full through the Closing.

**Section 5.4 No Conflicts.** The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not (a) violate or conflict with the organizational documents of Buyer, (b) violate or conflict with any Law or Governmental Order applicable to Buyer, or (c) require any consent, approval, authorization of, or notice to, any Governmental Authority or other Person, except for those that have been, or prior to the Closing will be, obtained or made.

**Section 5.5 Solvency.** Buyer is not entering into this Agreement or the transactions contemplated hereby with the intent to hinder, delay, or defraud any present or future creditor. Immediately after giving effect to the transactions contemplated by this Agreement, Buyer will be solvent and will be able to pay its debts as they become due.

**Section 5.6 Diligence on Use Restrictions**. Based on Buyer's due diligence conducted up until the Effective Date, to the knowledge of Buyer, there are no documented Use Restrictions in the Real Property Leases that expressly prohibit Buyer from operating Buyer's standard business of the drive through sale of coffee, non-coffee beverages and food items in its ordinary course of business ("***Buyer's Required Use***").

## ARTICLE VI
## COVENANTS; ADDITIONAL AGREEMENTS

**Section 6.1 Public Announcements**. Unless otherwise required by applicable Law or as part of public company filings, no Party shall make, or cause to be made, any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties (which consent shall not be unreasonably withheld). In the event any Party is required by applicable Law to make any such disclosure, such Party must first provide to the other Parties hereto in writing the reason that such disclosure is required by applicable Law, and the time, place and manner in which the disclosure will be made, and, to the extent reasonably practicable, shall (i) afford the other Parties a reasonable opportunity to review and comment on the form and content of such disclosure prior to its being made and (ii) consider in good faith any comments timely proposed by the other Parties.

**Section 6.2 Bulk Sales Laws**. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of the state of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer ("***Bulk Sales Laws***"); provided, however, that such waiver shall not otherwise limit a Party's rights under this Agreement.

**Section 6.3 Cooperation; Consent and Audit; Termination Agreement; Reasonable Efforts**.

(a) From the date hereof until the Closing Date, Seller shall (i) cooperate with Buyer to obtain all Consents necessary for the consummation of the transactions contemplated in this Agreement and the operation of the Sites by Buyer after Closing, and (ii) upon reasonable request, cooperate with and provide reasonable access to Buyer and its legal, accounting, insurance, and financial advisors to allow them to timely apply for any Licenses and Consents for the operation of the Sites, conduct or cause to be conducted governmental inspections, and conduct additional due diligence investigation with respect to the Sites and Purchased Assets as are commercially reasonable, including an examination of Records, Real Property, the Purchased Assets, and the operating facilities used in the Sites, including providing access to conduct such inspections of the Real Property as are commercially reasonable, permitting them to participate in the negotiations for the consents. Any access provided under this Section shall be conducted upon reasonable advance notice, during normal business hours, and in a manner that does not unreasonably interfere with the operation of the Business, and Seller shall not be required to provide access that would jeopardize any legal privilege or violate any Law or confidentiality obligation.

(b) Each of the Parties shall reasonably cooperate with the other Parties and use commercially reasonable efforts to take, or cause to be taken, all actions reasonably necessary to satisfy the conditions set forth in Section 6.4.

(c) Up until Closing, Buyer shall have the right to reject any Real Property Lease included within the Assumed Leases solely for the reasons set forth in subsections (i)-(iii) below, and in connection with the rejection of any Real Property Lease, the Purchase Price shall be reduced by the applicable "Site Adjustment Amount," such amount being $2,546,485.26 per rejected Group A Lease (the "***Group A Site Adjustment Amount***") or $766,666.67 per rejected Group B Lease (the "***Group B Site Adjustment Amount***", collectively, the "***Site Adjustment Amount***")). With respect to all Real Property Leases, Buyer shall only have a rejection right in the event (i) the Parties are not able to assign such Real Property Lease to Buyer for Buyer's Required Use pursuant to the Sale Order or Section 365 of the Bankruptcy Code, (ii) the Bankruptcy Court determines that a Use Restriction applicable to such Real Property Lease is enforceable and the applicable landlord will not consent to a waiver or modification thereof on terms reasonably satisfactory to Buyer for Buyer's Required Use or (iii) if the Bankruptcy Court determines that Buyer will not be able to utilize any lease renewal provisions and the applicable landlord will not consent to a waiver or modification thereof on terms reasonably satisfactory to Buyer. Provided, for each Group A Lease rejected by Buyer in excess of three (3), Buyer will pay Seller rejection fees in the amount of $100,000.77 for each such rejected Group A Lease ("***Rejection Fees***"). By way of example, if Buyer rejects eight (8) Group A Leases, the Rejection Fees shall be $500,003.85 (the first three (3) rejected leases would result in no Rejection Fees, but the next five (5) would each result in $100,000.77 of Rejection Fees). To the extent there are Rejection Fees payable, the Purchase Price shall be increased by such Rejection Fees. For purposes of clarity, no fee of any kind shall be payable to Seller in connection with Buyer's rejection of any Group B Lease. *Provided further*, that Buyer shall not, and shall cause its Affiliates not to, at any time during the eight (8)-month period following the Closing Date, directly or indirectly, solicit, negotiate, enter into or otherwise acquire any lease, sublease, license, occupancy agreement or other right to use or occupy all or any

portion of the premises demised under any such Real Property Lease so rejected by Buyer, with the landlord (or any successor, assignee or Affiliate thereof) under such rejected Real Property Lease. In the event Buyer or any of its Affiliates breaches the foregoing covenant with respect to any rejected Real Property Lease, Buyer shall promptly (and in any event within ten (10) Business Days) pay to Seller in cash an amount equal to the Site Adjustment Amount (net of any associated Rejection Fees) previously credited to Buyer in respect of such rejected Real Property Lease.

(d) Buyer Efforts; Landlord Credit Support. From the date hereof until the Closing Date, Buyer shall use its commercially reasonable efforts to obtain, and to cooperate with Seller and the applicable landlords in obtaining, all landlord consents, estoppels, lease assignments, Lease Amendments, waivers and other approvals necessary or reasonably required to effect the assumption and assignment to Buyer of the Assumed Leases and Buyer's operation of the Sites following the Closing.

**Section 6.4 Tax Matters.**

(a) Buyer and Seller agree to furnish or cause to be furnished to the other, upon reasonable request, as promptly as practicable, such information and assistance relating to the Purchased Assets as is reasonably necessary for the filing of all Tax Returns by Buyer or Seller, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any Proceeding relating to any Tax, and the winddown of Seller. Each of Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for the applicable statute of limitations period. Buyer and Seller shall cooperate reasonably with each other in the conduct of any Proceeding relating to Taxes involving the Purchased Assets or the Allocation.

(b) All Property Taxes levied with respect to the Purchased Assets for any Straddle Period shall be apportioned between Buyer, on one hand, and Seller, on the other hand, based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. To the extent the actual amount of any Property Tax is not known at the Closing, the Parties shall utilize the most recent information available in estimating the amount of such Tax for purposes of such determination. To the extent the actual amount of any Property Tax (or the amount thereof paid or economically borne by a Party) is ultimately determined to be different than the amount (if any) that was taken into account in the Purchase Price, timely payments will be made from one Party to the other to the extent necessary to cause each Party to bear the amount of such Tax that is allocable to such Party under this Section 6.4(b). The applicable Party shall present to the other Party any bill for Property Taxes or other statement setting forth the amount allocable to each Party under this Section 6.4 together with such supporting information, if any, as is reasonably necessary to calculate the proration amount.

(c) To the extent not exempt under the Sale Order or Section 1146 of the Bankruptcy Code, all transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder ("***Transfer Taxes***") shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such taxes or fees (and Buyer shall cooperate with respect thereto as necessary). The Parties further agree, upon request, to use commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate,

reduce or eliminate any Tax that could be imposed in connection with the transactions contemplated by this Agreement. Seller shall promptly provide Buyer with copies of any transfer, sales, or other tax records or notices received by Seller in addition to any notices or other documents evidencing the availability of any sales tax exemptions.

(d) Seller shall promptly notify Buyer in writing upon receipt by Seller of notice of any pending or threatened Tax audits or assessments relating to the income, properties, or operations of Seller that reasonably may be expected to relate to or give rise to Lien on the Purchased Assets. Buyer and Seller shall promptly notify the other in writing upon receipt of notice of any pending or threatened Tax audit or assessment challenging the Allocation.

(e) Any payments made to any party pursuant to this Section 6.4 shall constitute an adjustment of the Purchase Price (including the Tax Purchase Price) and shall be treated as such by Buyer and Seller on their Tax Returns, except as otherwise required by applicable Law.

**Section 6.5 Bankruptcy Court Approval.**

(a) This Agreement and the transactions contemplated hereby shall constitute a public Auction sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "***Sale***"), subject to higher and better offers at Auction.

(b) Seller has filed the Bankruptcy Case in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") and shall file a motion or motions (the "***Sale Motion***") with the Bankruptcy Court, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, seeking entry of an order (i) approving bidding procedures for a public Auction of the Purchased Assets, (ii) approving this Agreement as a stalking horse bid and the terms hereof, (iii) authorizing the Sale of the Purchased Assets free and clear of all Liens, Claims, Encumbrances and Interests (other than Assumed Liabilities) to the Successful Bidder at Auction, and (iv) authorizing the assumption and assignment of the Assumed Leases to Buyer or the Successful Bidder (the "***Sale Order***"). The Sale Order shall be in form and substance acceptable to Buyer and Seller in their respective sole discretion. Buyer shall provide Seller with a copy of the Sale Motion within two (2) calendar days of execution of this Agreement and provide Seller with a reasonable time to provide any comments thereto before the Sale Motion and other pleadings are filed with the Bankruptcy Court. The Sale Motion shall be in form and substance reasonably acceptable to Buyer and Seller.

(c) Seller shall obtain entry of the Bidding Procedures Order on or before the date that is five (5) business days following entry into this Agreement (subject to court availability). The Bankruptcy Court shall enter the Sale Order on or before the date that is thirty (30) days (subject to court availability) after entry into this Agreement. Buyer shall cooperate with Seller and promptly provide any information reasonably requested by the Bankruptcy Court or any party in interest in connection with the Sale Motion, including information sufficient to demonstrate adequate assurance of future performance under the Assumed Leases pursuant to Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

(d) The Sale Order shall provide, among other things, that: (i) the Sale is authorized pursuant to Sections 105, 363, and 365 of the Bankruptcy Code; (ii) the Purchased Assets shall be transferred to Buyer or the Successful Bidder at Auction free and clear of all Liens, Claims, Encumbrances and Interests (other than Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code; (iii) Buyer (together with its Affiliates) is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (iv) the assumption and assignment of the Assumed Leases to Buyer or the Successful Bidder is authorized pursuant to Section 365 of the

Bankruptcy Code inclusive of lease renewals and without Use Restrictions to the maximum extent permitted by applicable law; and (v) all defaults under the Assumed Leases shall be deemed cured upon payment of the Required Cure Costs.

(e) Required Cure Costs. Seller shall promptly pay or cause to be paid all amounts necessary to cure any defaults under the Assumed Leases that are required to be cured as a condition to the assumption and assignment of such Assumed Leases and other assigned contracts pursuant to Section 365(b)(1) of the Bankruptcy Code (the "***Required Cure Costs***").

(f) Assignment of Real Property Leases Notwithstanding Use Restrictions. The Parties acknowledge and agree that (i) the assignment of the Real Property Leases pursuant to this Agreement and the Sale Order shall be made pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (ii) Section 365(f)(1) of the Bankruptcy Code permits the trustee or debtor-in-possession to assign an executory contract or unexpired lease notwithstanding a provision in such contract or lease, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, and (iii) to the extent any Real Property Lease contains a provision restricting, conditioning, or prohibiting the use of the leased premises to a specific business purpose or type of operation, or otherwise limiting the permitted uses of the leased premises, in each case such that Buyer cannot use the leased premises for Buyer's Required Use (each, a "***Use Restriction***"), such Use Restriction shall, to the maximum extent permitted by applicable law and the Sale Order, be deemed an unenforceable restriction on assignment under Section 365(f) of the Bankruptcy Code, and the applicable Real Property Lease shall be assumed and assigned to Buyer free and clear of any such Use Restriction. To the extent the Bankruptcy Court determines that any Use Restriction does not constitute an anti-assignment provision subject to Section 365(f), Seller and Buyer shall negotiate with the applicable landlord for a waiver or modification of such Use Restriction, and Buyer shall have the right to exclude any Real Property Lease subject to such Use Restriction from the Purchased Assets and reduce the Purchase Price by the applicable Site Adjustment Amount.

**Section 6.6 Transaction Expenses; Lease Expenses.** All Transaction Expenses incurred by Seller in connection with this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby shall be the responsibility of Seller. All Lease Expenses and Required Cure Costs incurred prior to Closing shall be the responsibility of Seller and to the extent not paid by Seller prior to Closing shall be deducted from the Base Purchase Price and paid by Buyer at the Closing in accordance with Section 2.3. At least three (3) Business Days prior to the anticipated Closing Date, Seller shall have provided Buyer with a statement executed by an authorized officer of Seller (the "***Lease Expense Statement***") listing all Lease Expenses and Required Cure Costs, together with the payees, amounts and wire instructions therefor, to be deducted from the Base Purchase Price and paid by Buyer at the Closing in accordance with Section 2.3.

**Section 6.7 Deposit Adjustment Statement**. Prior to the Closing, Seller and Buyer shall work in good faith to prepare and agree to a statement (the "***Deposit Adjustment Statement***") setting forth the Deposit Adjustment and the items that constitute the Deposit Adjustment. Each Party shall provide the other Party with reasonable access to all books and records reasonably requested in connection with the preparation of the Deposit Adjustment Statement.

**Section 6.8 Escrow Deposit.** Upon execution of this Agreement, Buyer shall make an aggregate deposit to Kroll, as escrow agent (the "***Escrow Agent***"), in an amount equal to ten percent (10%) of the aggregate of the Group A Purchase Price and the Group B Purchase Price (the "***Deposit***"). The Deposit shall be held and disbursed by the Escrow Agent in accordance with this Agreement and the Escrow Agreement. The Escrow Agreement shall be substantially the same form as set forth in Exhibit B attached hereto. The Deposit shall be fully refunded to Buyer if this Agreement is terminated pursuant to Sections

9.1(a), (b), (d) (e),(f), (g) and (h). The Deposit shall be forfeited to Seller if Seller terminates this Agreement pursuant to Section 9.1(c).

**Section 6.9 Fiduciary Out; Alternative Transactions; Solicitation of Competing Bids.** Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge that (a) Seller is the debtor and debtor in possession in the Bankruptcy Case and, in that capacity, is subject to fiduciary obligations to its bankruptcy estate and creditors, (b) this Agreement and the Transaction remain subject to approval by the Bankruptcy Court pursuant to the Sale Motion and the Sale Order, and (c) this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. Accordingly, nothing in this Agreement shall restrict or be construed to restrict Seller's right to the exercise of its fiduciary duties, upon the written advice of counsel, to (i) consider, respond to, solicit, and negotiate the terms of any inquiry, proposal or offer relating to an Alternative Transaction, (ii) take reasonable steps to demonstrate that Seller has sought to obtain the highest or otherwise best price for the Purchased Assets, and (iii) accept, seek approval of, and consummate, an Alternative Transaction pursuant to a Final Order of the Bankruptcy Court. Buyer acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Purchased Assets, and that Seller, including through its representatives, may continue soliciting inquiries, proposals, or offers from third parties in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Seller's exercise of any of the foregoing rights, including its determination to pursue and consummate an Alternative Transaction in lieu of the transactions contemplated by this Agreement, shall not constitute a breach or default by Seller of any provision of this Agreement, and Buyer's sole and exclusive remedy in connection with any termination of this Agreement as a result thereof shall be a return of the Deposit and payment of the Termination Fee as set forth in Section 9.2 as an administrative expense claim.

**Section 6.10 Further Assurances**. Following the Closing, each Party shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder. Any action taken by a Party at the request of the other Party pursuant to this Section shall be at the requesting Party's sole cost and expense. If, following the Closing, Buyer discovers that Seller possesses any Purchased Asset, Seller shall, within five (5) Business Days of receipt of notice from Buyer, transfer or cause to be transferred such Purchased Asset to Buyer, and Buyer shall accept and assume any such Purchased Asset, for no additional consideration other than as previously paid as provided in this Agreement. If, following the Closing, a Party receives any payments due to the other Party in respect of the rights, assets, or liabilities allocated to the other Party pursuant to this Agreement, then such Party shall promptly remit (or cause to be promptly remitted) or deliver (or cause to be delivered), such payments to the other Party within five (5) Business Days of receipt of such payment.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.1 Conditions to Obligations of Buyer to Close**. The obligation of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of all of the following conditions, any of which may be waived by Buyer in writing at or prior to the Closing.

(a) Representations, Warranties and Covenants. The representations and warranties of Seller contained in this Agreement and any certificate delivered pursuant hereto shall be true and correct in all material respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date); provided, however, that any representation or warranty of Seller in this Agreement or in any certificate delivered pursuant hereto that is qualified by

materiality, material adverse effect, Material Adverse Effect, or similar qualification shall be true and correct in all respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date). Seller shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each Ancillary Agreement to be performed or complied with by it prior to or on the Closing Date.

(b) No Proceedings; No Governmental Orders. There shall not have been instituted and be pending any Proceeding by a Governmental Authority seeking to restrict or prohibit the consummation of the transactions contemplated by this Agreement. No Governmental Order shall have been issued by a Governmental Authority and be in effect, which restrains or prohibits any transaction contemplated hereby.

(c) Delivery of Closing Deliverables. Seller shall have delivered to Buyer the Seller Closing Deliverables.

(d) Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court in a form and substance satisfactory to Buyer and Seller in their respective sole discretion, and shall be a Final Order and shall authorize the sale of the Purchased Assets and the assumption and assignment of the Assumed Leases in accordance with this Agreement and the Bankruptcy Code.

**Section 7.2 Conditions to Obligations of Seller to Close.** The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction of all of the following conditions, any of which may be waived by Seller in writing at or prior to the Closing.

(a) Representations, Warranties and Covenants. The representations and warranties of Buyer contained in this Agreement, the Ancillary Agreements, and any certificate or other writing delivered pursuant hereto shall be true and correct in all material respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date); provided, however, that any representation or warranty of Buyer in this Agreement, the Ancillary Agreements, or in any certificate or other writing delivered pursuant hereto that is qualified by materiality, material adverse effect, Material Adverse Effect, or similar qualification shall be true and correct in all respects on and as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date). Buyer shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement and each Ancillary Agreement to be performed or complied with by it prior to or on the Closing Date.

(b) No Proceedings; No Governmental Orders. There shall not have been instituted and be pending any Proceeding to restrict or prohibit the transactions contemplated by this Agreement. No Governmental Order shall have been issued by a Governmental Authority and be in effect, which restrains or prohibits any transaction contemplated hereby.

(c) Delivery of Documents. Buyer shall have delivered to Seller the Buyer Closing Deliverables.

(d) Entry of Sale Order. The Sale Order shall have been entered by the Bankruptcy Court in form and substance acceptable to Seller and Buyer in their respective sole discretion and shall be a Final Order.

**Section 7.3** Site-Specific Failures. Notwithstanding anything to the contrary in Section 7.1 or elsewhere in this Agreement, if any condition set forth in Section 7.1 (including any condition relating to the accuracy of a representation or warranty in Article IV or the performance of a covenant) is not satisfied at Closing solely as a result of a matter that is attributable solely to a particular Site or its related Real Property Lease and that does not have a transaction-wide effect and does not affect any other Site (each, a "***Site-Specific Failure***"), then such Site-Specific Failure shall not relieve Buyer of its obligation to consummate the Closing with respect to, or entitle Buyer to terminate this Agreement as to, the remaining Sites and Assumed Leases. In such event: (i) the affected Site, its related Real Property Lease, and the Purchased Assets and Assumed Liabilities uniquely associated with such Site shall be excluded from the transactions contemplated by this Agreement, and such Real Property Lease shall be treated as a rejected Real Property Lease for purposes of Section 6.3(c); (ii) the Purchase Price shall be reduced by the applicable Site Adjustment Amount; and (iii) the Closing shall proceed with respect to the remaining Sites, Assumed Leases, Purchased Assets and Assumed Liabilities; provided, notwithstanding the foregoing, Seller and Buyer may agree following Closing to continue working in good faith to satisfy the outstanding conditions set forth in Section 7.1 with respect to any such affected Site such that upon such satisfaction or waiver of such conditions, Buyer and Seller shall consummate delayed closings for any such affected Site (each, a "***Delayed Closing***"). To the extent there is a Delayed Closing, the purchase price for any affected Site shall be equal to: (A) the applicable Site Adjustment Amount with respect to such Site, (B) plus any Deposit Adjustment for such Site, minus any Rejection Fees already paid in connection with such Site. At the Delayed Closing, Buyer shall pay to Seller, by wire transfer of immediately available funds to the account(s) designated by Seller, an aggregate amount equal to the amount in the foregoing sentence minus the amount required at the Delayed Closing to discharge in full all Required Cure Costs and Lease Expenses of Seller related to such Site to the extent not paid by Seller prior to or as of the Delayed Closing. For the avoidance of doubt, this Section 7.3 shall not apply to, and the remaining provisions of this Agreement shall continue to govern, any failure, breach or inaccuracy that is not reasonably attributable to a single Site or that otherwise has a transaction-wide effect.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.1** **Notices**. All notices, requests, demands, claims, and other communications hereunder will be in writing and shall be deemed duly given (a) when delivered personally to the recipient, (b) when sent by electronic mail, on the date of transmission to such recipient (unless the sender received an automatic message that the e-mail was not received), (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (d) two (2) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

**To Buyer:**

Brew Culture, LLC
2710 S 48th St.
Springdale, AR 72762
Attention: John Davidson, CEO
Conner McNair, Chief Legal Officer
Telephone: (479) 871-4686
Email: john@7brew.com
conner.mcnair@7brew.com

| | |
|---|---|
| ***With a copy to:*** | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn: Ross J. Fiedler<br>Telephone: (212) 390 4351<br>Email: ross.fiedler@kirkland.com |
| | Friday Eldredge & Clark, LLP<br>3350 S. Pinnacle Hills Parkway, Suite 301<br>Rogers, AR 72758<br>Attn: Matthew D. Mitchell<br>Robert T. Smith<br>Telephone: (479) 695-6053<br>Email: mmitchell@fridayfirm.com<br>rsmith@fridayfirm.com |
| **To Seller:** | And Go Concepts, LLC<br>909 E. Broadway Rd.<br>Tempe, AZ 85282<br>Attention: Doug Brickley, Chief Restructuring Officer<br>Telephone: (713) 955-8406<br>Email: dbrickley@stout.com |
| ***With a copy to:*** | Reed Smith LLP<br>2850 N. Harwood St., Suite 1500<br>Dallas, TX 75230<br>Attention: Omar J. Alaniz, Esq.<br>Jocelyne E. Kelly<br>Telephone: (469) 680-4200<br>Email: oalaniz@reedsmith.com<br>jocelyne.kelly@reedsmith.com |

**Section 8.2 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction); provided, that any matters relating to (a) the Bankruptcy Case, (b) the interpretation or application of the Bankruptcy Code, (c) the rights, powers, and duties of Seller as a debtor-in-possession, or (d) the Sale Order, shall be governed by the Bankruptcy Code and the applicable orders of the Bankruptcy Court.

**Section 8.3 Severability.** If any provision or term of this Agreement is held by a court of competent jurisdiction to be contrary to law, unenforceable, or invalid in any situation, the remaining provisions and terms of this Agreement will remain in full force and the validity or enforceability of the offending term or provision shall not be affected in any other situation or in any other jurisdiction.

**Section 8.4 Non-Waiver.** The failure of any Party to this Agreement to enforce the provisions of this Agreement or the rights granted hereunder on any occasion shall not operate as a waiver of such provisions or rights for future occasions. No waiver by any Party of any default, misrepresentation, condition, or breach of representation, warranty, or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, condition, or breach of

representation, warranty, or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving.

**Section 8.5 Section Headings.** The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. The Exhibits, Schedules, and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The word "including" shall mean including without limitation and no exclusion of unlisted items shall be inferred from their absence.

**Section 8.6 Entire Agreement and Amendments.** This Agreement and the Ancillary Agreements constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Ancillary Agreements, the Exhibits, the Schedules, and Disclosure Schedules (other than an exception expressly set forth or reasonably apparent as such in the Disclosure Schedules), the statements in the body of this Agreement will control. This Agreement may not be amended except by a written agreement signed by each Party.

**Section 8.7 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. Counterpart signatures need not be on the same page and shall be deemed effective upon receipt. Delivery of an executed counterpart of a signature page to this Agreement by means of electronically transmitted portable document format (PDF) or other electronic means (in each case, complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com)) shall be as effective as delivery of a manually executed counterpart of this Agreement.

**Section 8.8 No Third-Party Beneficiaries.** Except as expressly set forth herein, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 8.9 Succession and Assignment.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, including any chapter 7 trustee, chapter 11 trustee, or other estate representative appointed in the Bankruptcy Case or any subsequent or converted case (and any liquidating trust or other entity appointed as a successor to Seller pursuant to a confirmed plan under the Bankruptcy Code). No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties, provided that (a) Buyer may assign any or all of its rights and interests hereunder to one or more of its Affiliates or designate one or more of its Affiliates to perform its obligations hereunder or designate one or more Affiliates to take title to the Real Property, further provided that upon any assignment, Buyer shall remain primarily liable under this Agreement notwithstanding such assignment, and (b) Seller may assign its rights under this Agreement to a chapter 7 trustee or any successor estate representative without the consent of Buyer or one or more of its Affiliates.

**Section 8.10 Expenses.** Except as otherwise provided in this Agreement, each of the Parties shall bear its own respective expenses, including attorneys' and accountants' fees, incurred in connection

with the preparation and negotiation of this Agreement and all Ancillary agreements, and the consummation of the transactions contemplated by this Agreement.

**Section 8.11 Injunctive Relief; Submission to Jurisdiction; Waiver of Jury Trial.**

(a) The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with the specific terms or were otherwise breached, and that monetary damages, even if available, would not be an adequate remedy therefor. Accordingly, the Parties acknowledge and agree that, prior to the valid termination of this Agreement in accordance with Section 9, each Party shall be entitled to specific performance of the terms and provisions of this Agreement (including the obligations of the Parties to consummate the transaction contemplated hereby and to effect the Closing in accordance with Section 3.1), and to an injunction or injunctions or any other appropriate form of equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, in each case without proof of actual damages, this being in addition to any other remedy to which such Party is entitled at law or in equity.

(b) Any Proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the Bankruptcy Court; provided, that if the Bankruptcy Case has been closed, any such Proceeding may be instituted in the U.S. District Court for the District of Delaware or the courts of the State of Delaware located in New Castle County. Each Party irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or, if the Bankruptcy Case has been closed, such courts) in any such Proceeding.

(c) Each of the Parties waives their respective rights to a trial by jury of any claim or cause of action based upon or arising out or related to this Agreement in any Proceeding of any type brought by any of the Parties against any other Party or any Affiliate of any other such Party, whether with respect to contract claims, tort claims, or otherwise. The Parties agree that any such claim or cause of action shall be tried by a court trial without a jury. Without limiting the foregoing, the Parties further agree that their respective right to a trial by jury is waived by operation of this Section 8.11 as to any action, counterclaim, or other proceeding which seeks, in whole or in part, to challenge the validity or enforceability of this Agreement or any provision hereof. This waiver shall apply to any subsequent amendments, renewals, supplements, or modifications to this Agreement.

**Section 8.12 No Recourse**. Except to the extent otherwise expressly set forth in this Agreement, this Agreement may only be enforced against, and any claim or cause of action (at law or in equity, in contract, tort or otherwise) based upon, arising out of, or related to this Agreement or the contemplated transactions (including any representations and warranties set forth herein, made in connection herewith or as an inducement to enter into this Agreement, whether written or oral) may only be brought against the Parties. Except to the extent a named party to this Agreement (and then only to the extent of the specific obligations undertaken by such party in this Agreement), no Affiliates or former, current or future officers, directors, employees, direct or indirect equity holders, general or limited partners, managers, attorneys, representatives, or successors or assignees of the foregoing of any Party hereto shall have any liability for any obligations or liabilities of any Party under this Agreement or for any claim based on, in respect of, or by reason of, the contemplated transactions.

## ARTICLE IX
## TERMINATION

**Section 9.1 Termination.** This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as follows:

(a) by the mutual written consent of Buyer and Seller;

(b) by Seller or Buyer, if any permanent injunction or other order of a Governmental Authority preventing the consummation of the transactions contemplated hereby in any material respect shall have become final and non-appealable;

(c) by Seller, if Buyer shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure of the conditions set forth in Section 7.2(a); and, if capable of being cured, shall not have been cured within thirty (30) days following receipt of written notice from Seller of such breach; provided, however, that Seller is not then in material breach of this Agreement so as to cause any of the conditions set forth in Section 7.1(a) not to be satisfied;

(d) by Buyer, if Seller shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure of the conditions set forth in Section 7.1(a); and, if capable of being cured, shall not have been cured within thirty (30) days following receipt of written notice from Buyer of such breach; provided, however, that Buyer is not then in material breach of this Agreement so as to cause any of the conditions set forth in Section 7.2(a) not to be satisfied; *provided, further*, that Buyer shall not be entitled to terminate this Agreement pursuant to this Section 9.1(d) on account of any breach or inaccuracy that constitutes a Site-Specific Failure addressed in accordance with Section 7.3;

(e) by either Buyer or Seller, upon written notice to the other Party, if the Closing shall not have occurred on or before December 31, 2026 (the "***Outside Date***"); provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to any Party whose breach of, or failure to perform any of its covenants or obligations under, this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Outside Date;

(f) by Buyer upon the occurrence of a Material Adverse Effect;

(g) by Buyer upon receiving notice from Seller that Seller intends to pursue an Alternative Transaction;

(h) automatically, upon the consummation of an Alternative Transaction in accordance with Section 6.9; or

(i) by written notice of either Buyer or Seller, if Buyer is not the Successful Bidder at the Auction.

**Section 9.2 Termination Fee.**

(a) (1) In the event this Agreement is terminated pursuant to Sections 9.1(g), (h), and (i) and (2) in the event there is an Auction, more than two (2) bidders participated at the Auction, then Seller shall pay to Buyer as liquidated damages an amount equal to $4,295,333.33 plus Buyer's reasonable and documented out of pocket expenses (including reasonable attorney fees) incurred in connection with entering into this Agreement (the "***Termination Fee***"), which Termination Fee shall be payable to Buyer as an administrative expense within five (5) days of the closing of an

Alternative Transaction. The Termination Fee, when payable, shall constitute liquidated damages and the sole and exclusive remedy of Buyer against Seller for any and all losses arising out of or relating to this Agreement or the termination hereof, and upon payment of the Termination Fee neither Buyer nor any other Person shall have any other remedy against Seller or the estate of Seller. For the avoidance of doubt, Buyer shall receive a full refund of the Deposit in addition to the Termination Fee. Seller agrees that it shall hold an amount of sale proceeds from any Alternative Transaction equal to the Termination Fee in escrow for the Buyer and that such funds shall not be deemed property of Seller's bankruptcy estate. The claim of Buyer in respect of the Termination Fee is and shall constitute an allowed super-priority administrative expense claim against Seller under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of Seller.

(b) If this Agreement is terminated pursuant to Section 9.1(c), then the Escrow Agent shall pay the Deposit (or such portion thereof paid to the Escrow Agent) to Seller as liquidated damages. If this Agreement is terminated for any reason other than pursuant to Section 9.1(c), then the Escrow Agent shall return the Deposit to Buyer. Notwithstanding the foregoing to the contrary, the receipt of any amounts by Buyer pursuant to this Section 9.2(b) shall be the sole and exclusive remedy of Buyer, and Buyer shall not be entitled to any other amounts for damages, losses, or payment from Seller, and Seller shall have no further obligations or Liability of any kind to Buyer, any of Buyer's Affiliates, or any third party on account of this Agreement. If this Agreement is terminated pursuant to Sections 9.1(g), (h), and (i), then (i) the Escrow Agent shall return the Deposit to Buyer and (ii) Seller shall pay to Buyer the Termination Fee in accordance with Section 9.2(a). The Deposit and the Termination Fee shall constitute the sole and exclusive remedy of Buyer in connection with such termination, and Buyer shall not be entitled to any other amounts for damages, losses, or payment from Seller, and Seller shall have no further obligations or Liability of any kind to Buyer, any of Buyer's Affiliates, or any third party on account of this Agreement.

**Section 9.3 Effect of Termination**. In the event of the termination of this Agreement as provided in Section 9.1, written notice thereof shall forthwith be given to the other Parties specifying the provision hereof pursuant to which such termination is made, and this Agreement shall forthwith become null and void, and there shall be no liability on the part of Seller or Buyer or the estate of Seller; provided, however, that except for and subject in all cases to Section 9.2, nothing herein shall relieve Seller or Buyer from liability for any willful and material breach hereof or Fraud prior to such termination; provided, further, that Section 6.1 (Public Announcements), Section 6.8 (Escrow Deposit), Section 8.1 (Notices), Section 8.2 (Governing Law), Section 8.8 (No Third-Party Beneficiaries), Section 8.10 (Expenses), Section 8.11 (Injunctive Relief; Submission to Jurisdiction; Waiver of Jury Trial), Section 8.12 (No Recourse), Section 9.2 (Termination Fee), this Section 9.3 (Effect of Termination), Article X and any related definitional provisions throughout this Agreement, shall survive any termination of this Agreement. The representations and warranties of Seller contained in Article IV shall not survive the Closing. All covenants and agreements of the Parties contained in this Agreement that by their terms are to be performed after the Closing shall survive the Closing; provided, however, that Seller's post-Closing covenants shall terminate upon the closing of the Bankruptcy Case or confirmation of a plan of reorganization or liquidation thereunder.

## ARTICLE X
## DEFINITIONS

As used in this Agreement, the following capitalized terms shall have the following meanings:

"***Affiliate***" means of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person (the term

"control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise).

"***Alternative Transaction***" means any transaction (or series of related transactions), other than the Sale to Buyer, providing for the direct or indirect sale, transfer, assignment, or other disposition of all or a substantial portion of the Purchased Assets, to any Person other than Buyer or one or more of its Affiliates or designees, whether effected pursuant to Section 363 of the Bankruptcy Code, a plan of reorganization or liquidation under the Bankruptcy Code, or otherwise; provided, that no sale, transfer, or other disposition of assets in the ordinary course of business shall constitute an Alternative Transaction.

"***Auction***" shall have the meaning ascribed to such term in the Bidding Procedures Order.

"***Bankruptcy Case***" means the chapter 11 case to be filed by Seller in the Bankruptcy Court.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., and applicable federal rules of bankruptcy procedure thereunder.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas or such other court having jurisdiction over the Bankruptcy Case.

"***Bidding Procedures Order***" means the order entered by the Bankruptcy Court governing the auction process for the Purchased Assets, which shall be in form and substance acceptable to the Buyer and the Seller.

"***Business Day***" means any day other than a Saturday, a Sunday, or other day on which banking institutions in the State of Delaware, are not required to be open.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Claims***" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"***Consent***" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or exemption by such Person.

"***Deposit Adjustment***" means, without duplication, a positive adjustment for the amount of any security or similar deposits under any Assumed Leases, rebates, prepayments, and prepaid expenses that constitute Purchased Assets that remain available to Buyer under the Real Property Leases following the Closing.

"***Environmental Law***" means any Law, statute, regulation, or ordinance relating to contamination, pollution, the protection or preservation of the environment, occupational safety and health, or the use, handling, generation, storage, treatment, disposal arrangement for disposal, Release of, or exposure to Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq.

"***Group A Leases***" means those Real Property Leases set forth on Schedule A attached hereto.

"***Group A Purchase Price***" has the meaning set forth in Section 2.1.

"***Group A Site Adjustment Amount***" has the meaning set forth in Section 6.3(c).

"***Group A Sites***" means those Sites subject to the Group A Leases.

"***Group B Leases***" means those Real Property Leases set forth on Schedule B attached hereto.

"***Group B Purchase Price***" has the meaning set forth in Section 2.1.

"***Group B Site Adjustment Amount***" has the meaning set forth in Section 6.3(c).

"***Group B Sites***" means those Sites subject to the Group B Leases.

"***Excluded Taxes***" means (i) any liability or obligation of Taxes of Seller, (ii) any liability of Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise, (iii) any liability or obligation for Taxes with respect to the Business or the Purchased Assets with respect to any Pre-Closing Tax Period, (iv) any Transfer Taxes allocable to Seller under Section 6.4(a), and (v) any liabilities for Taxes attributable to Seller's failure to comply with any Bulk Sales Laws or to obtain any applicable Tax clearance certificates in connection with the purchase of the Purchased Assets hereunder; provided however, that notwithstanding the foregoing, Excluded Taxes shall not include any Assumed Liabilities.

"***Encumbrances***" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or otherwise), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, signage, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"***Final Order***" means an order which (i) has not been reversed, vacated or stayed, (ii) is non-appealable and not subject to a stay, and (iii) as to which no appeal or motion to vacate, reconsider, alter, stay, or amend shall be pending.

"***Fraud***" means, with respect to any party, common law Fraud under Delaware Law with respect to the making of such party's representations, warranties and covenants expressly set forth in this Agreement.

"***GAAP***" means generally accepted accounting principles in effect from time to time in the United States.

"***Governmental Authority***" means any: (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (d) multi-national organization or body; (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature; or (f) any agency of a Governmental Authority.

"***Hazardous Material***" means any material, substance, or waste that is listed, designated, classified, defined, or regulated as hazardous or toxic, or as a pollutant or contaminant, pursuant to any Environmental Law, including petroleum or any fraction or derivative thereof, lead-based paint, radon, toxic mold, and asbestos or asbestos-containing materials.

"***Improvements***" means all buildings, structures, fixtures, building systems and equipment, installations, fittings, betterments and additions, and all material components thereof (including the roof, foundation, and structural elements), included in the Real Property.

"***Interests***" means all liens, claims, encumbrances, rights, interests, Use Restrictions, and other interests of any kind or nature whatsoever, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, known or unknown, including rights or claims based on any successor or transferee liability.

"***Indebtedness***" means any (a) obligations relating to indebtedness for borrowed money, (b) obligations evidenced by bonds, notes, debentures, or similar instruments, (c) obligations in respect of capitalized leases (calculated in accordance with GAAP), (d) the principal or face amount of banker's acceptances, surety bonds, performance bonds, or letters of credit (in each case whether or not drawn), (e) obligations for the deferred purchase price of property or services including the maximum potential amount payable with respect to earnouts, purchase price adjustments, or other payments related to acquisitions, (f) obligations for underfunded pension plan liabilities or any other employee benefit plan liabilities, (g) indebtedness or obligations of the types referred to in the preceding clauses (a) through (f) of any other corporation, partnership, joint venture, limited liability company, organization, entity, Governmental Authority (as defined below), or natural person (each a "***Person***") secured by any Lien on any assets of Seller, even though Seller has not assumed or otherwise become liable for the payment thereof, (h) any accounts payable that have not been paid within sixty (60) days of their due date and are not being contested in good faith, and (i) obligations in the nature of guarantees of obligations of the type described in clauses (a) through (h) above of any other Person, in each case together with all accrued interest thereon and any applicable prepayment, redemption, breakage, make-whole, or other premiums, fees, or penalties.

"***Intellectual Property***" means all intellectual property rights and related priority rights protected, created or arising under the Laws of the United States or any other jurisdiction or under any international convention, including all: (a) copyrights and other rights associated with works of authorship (including Software), and all registrations, applications, extensions, and renewals in connection therewith ("***Copyrights***"); (b) legal names, assumed fictional business names, franchises, domain names, social media accounts, trade names, corporate names, trademarks, service marks, trade dress, logos, and slogans and all applications, registrations, and renewals in connection therewith, together with all goodwill associated with any of the foregoing ("***Trademarks***"); (c) patents and patent applications (including provisional and non-provisional applications), together with all reissues, continuations, continuations-in-part, divisionals, revisions, extensions, or reexaminations thereof, inventions, discoveries and know-how that may or may not be patentable ("***Patents***"); (d) trade secrets, know-how, and confidential and proprietary information, including ideas, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, customer lists, supplier lists, mailing lists, business plans, and techniques that, in each case, derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others ("***Trade Secrets***"); (e) rights in Software and databases; and (f) other proprietary rights relating to any of the foregoing subsections (a) through (e), including all claims, causes of action, remedies, and rights to sue for and collect damages for past, present, or future infringement, misappropriation, or other violation thereof and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect thereof.

"***Inventory***" means all inventories, materials, supplies, and products held by Seller and used in the conduct and operation of the Business, including all packaging, food and beverage products, operating supplies, paper goods, uniforms, and similar inventory goods.

"***Knowledge Person***" means each of Florian van Rappard and Wessel Meijdam.

"***Law***" or "***Laws***" means any national, federal, state, local, or other law, statute, rule, regulation, ordinance, code, plan, policy, Governmental Order, decree, judgment, injunction, ruling, charges, consent, settlement agreement, or other governmental requirement enacted, promulgated, entered into, agreed to, or imposed by any Governmental Authority.

"***Lease Expenses***" means, without duplication, any outstanding rent or fees due under any Assumed Leases due and payable as of Closing. Notwithstanding the foregoing, and for the avoidance of doubt, Lease Expenses shall not include amounts taken into account and included in any Required Cure Costs.

"***License***" means licenses, franchises, approvals, permits, orders, registrations, certifications, variances, and other foreign, federal, state or local governmental approvals, certifications, or permits pursuant to which Seller or the Purchased Assets are bound for use or operation of any Site.

"***Lien***" or "***Liens***" shall mean any mortgage, covenant, lien (statutory or otherwise), deed of trust, pledge, option, charge, lease, adverse claim, security interest, encumbrance, easement, encroachment, title defect, conditional sales agreement, demand, restriction, right of a third party, or other interest of any kind or character whatsoever.

"***Material Adverse Effect***" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the Purchased Assets, or (b) the ability of the Seller to consummate the transactions contemplated hereby; *provided, however*, that for purposes of the foregoing clause (a) only "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any changes in applicable Laws or accounting rules (including GAAP); (vii) the public announcement of the entry into this Agreement or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationship with the Business; (viii) any natural or man-made disaster or acts of God; (ix) any epidemics, pandemics, disease outbreaks, or other public health emergencies; or (x) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); *provided, further,* that the items set forth in clauses (i) – (iv), (vi), (viii) and (ix) shall not be excluded from determining whether a Material Adverse Effect has occurred, to the extent such items have had a disproportionate effect on the Business relative to other participants in the industries in which the Business operates.

"***Permitted Liens***" means (a) Liens for Taxes that arise solely by operation of law but are not yet due and payable, (b) zoning, building codes, other restrictions, variances, covenants of record, rights of way, and easements of record, and other land use laws regulating the use or occupancy of real property or the activities conducted thereon which do not materially impair or limit the use or operation of the Real Property for their uses as currently conducted, (c) mechanics', carriers', workers', repairers', landlords' and similar statutory Liens arising or incurred in the ordinary course of business for amounts which are not delinquent, or the amount or validity of which is being contested in good faith by appropriate proceedings by or on behalf of Seller, (d) covenants, conditions, reservations, restrictions, rights-of-way, easements and other similar matters of record, title or survey exceptions and other similar restrictions or Liens affecting title to the fee interest of the Real Property which do not materially impair the occupancy or use of the Real Property for the purposes for which it is currently operated or used or contemplated, (e) with respect to any

Leased Real Property, (i) the interests and rights of the respective lessors (or any tier) with respect thereto under the applicable lease agreement and (ii) Liens not created by the Company or any of its Subsidiaries that affect the underlying fee interest of such Leased Real Property, and (f) Liens incurred pursuant to actions of Buyer or any of Buyer's Affiliates.

"***Plan***" means any employee benefit plan, program, policy, agreement, or arrangement, including any pension, retirement, savings, deferred compensation, bonus, incentive, equity, health, welfare, severance, or other fringe benefit plan, whether or not subject to ERISA, that is sponsored, maintained, or contributed to by Seller for the benefit of any current or former employee, officer, director, or independent contractor of the Business.

"***Post-Closing Tax Period***" means any Tax Period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"***Pre-Closing Tax Period***" means any Tax Period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"***Proceeding***" means action, claim, suit, complaint, investigation, petition, subpoena, inquiry, audit, lawsuit, litigation, investigation, arbitration, or other proceeding (in each case, whether civil, criminal, or administrative) pending by or before any Governmental Authority or arbitrator.

"***Property Taxes***" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"***Registered Intellectual Property***" means all Copyrights, Trademarks, and Patents that could be or are required to be registered with the United States Patent and Trademark Office or similar international body.

"***Release***" or "***Released***" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, depositing, injecting, escaping, leaching, migrating, dumping, or disposing into the environment.

"***Seller's Knowledge***," "***knowledge of Seller***" and word of similar import shall mean, with respect to any fact or matter, the actual knowledge of any Knowledge Person and the knowledge that such Knowledge Person would reasonably be expected to have after reasonable inquiry.

"***Software***" means computer programs (in source code, object code, or other form), databases and compilations, related development work product, and associated documentation.

"***Straddle Period***" means any Tax Period beginning before or on and ending after the Closing Date.

"***Successful Bidder***" means the prevailing party at the conclusion of the Auction.

"***Tax***" means any federal, state, local, or foreign income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative, or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Period***" means any period prescribed by any Governmental Authority for which a Tax Return is required to be filed, or a Tax is required to be paid.

"***Tax Returns***" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes required to be filed with a taxing authority, including any schedule or attachment thereto, and including any amendment thereof.

"***Transaction Expenses***" means any and all (a) legal, accounting, tax, financial advisory, environmental consultants, and other professional or transaction related costs, fees, and expenses incurred by Seller in connection with this Agreement or in investigating, pursuing, or completing the transactions contemplated hereby (including any amounts owed to any consultants, auditors, accountants, attorneys, brokers, or investment bankers), (b) payments, bonuses, or severance which become due or are otherwise required to be made as a result of or in connection with the Closing, and (c) fees or costs imposed by any other Person, related to the conveyance, transfer, or assignment of the Purchased Assets (including any fee or costs in connection with the assignment of the Real Property Leases).

* * *

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first set forth above.

**BUYER**:

BREW CULTURE, LLC

By:____________________________
Name: Brian Cornyn
Title: CFO

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first set forth above.

**SELLER**:

AND GO CONCEPTS, LLC

Signed by:

By: Douglas J. Brickley

F5A357648B9B4BB...

Name: Doug Brickley
Title: Chief Restructuring Officer

# EXHIBIT A

## Allocation Methodology

| Asset | Allocation |
|---|---|
| Class I: Cash and Cash Equivalents | Equal to $0.00. |
| Class II: Marketable Securities | Equal to $0.00. |
| Class III: Accounts Receivable | Equal to $0.00. |
| Class IV: Inventory | Equal to $0.00. |
| Class V: Tangible Assets | Equal to the fair market value of any Purchased Assets properly classified as Class V assets, as of the Closing Date as agreed to by the Parties pursuant to Section 2.4 of the Agreement, including FF&E, leasehold improvements and the leasehold interests under the Assumed Leases. |
| Classes VI: Section 197 Intangibles Other Than Goodwill and Going Concern Value | Equal to the fair market value of any Purchased Assets properly classified as Class VI assets. |
| Classes VII: Goodwill and Going Concern Value | Remainder. |

# EXHIBIT B

## KROLL ESCROW AGREEMENT

# SCHEDULE A

## Group A Sites

1 10002 Marsh Ln, Dallas, TX 75229
2 10031 E. Southern Ave., Mesa, AZ 85209
3 1040 W. Southern Ave., Mesa, AZ 85210
4 11360 East 96th Street N, Owasso, OK 74055
5 1180 E Silverado Ranch Blvd, Las Vegas, NV 89123
6 12601 N. Paradise Village Pkwy, Phoenix, AZ 85032
7 1302 S Kolb Rd, Tucson, AZ 85710
8 1322 E Florence Blvd, Casa Grande, AZ 85122
9 13838 N. Scottsdale Rd, Scottsdale, AZ 85254
10 1460 S Ferguson Pkwy, Anna, TX 75409
11 1585 N. Dysart Rd, Avondale, AZ 85392
12 17155 N Tatum Blvd, Phoenix, AZ 85032
13 1754 W Hunt Highway, San Tan Valley, AZ 85143
14 1804 E. Elliot Rd., Tempe, AZ 85284
15 18830 Noble Seven Ln, Sugar Land, TX 77479
16 1902 W. Northern Ave., Phoenix, AZ 85021
17 1956 S Country Club Dr, Mesa, AZ 85210
18 2020 W. Chandler Blvd., Chandler, AZ 85224
19 2080 W River Rd, Tucson, AZ 85704
20 21021 Highland Knolls Dr, Katy, TX 77450
21 21060 N. Cave Creek Rd., Phoenix, AZ 85024
22 2301 N 44th St, Phoenix, AZ 85008
23 2323 N. Scottsdale Rd., Scottsdale, AZ 85257
24 2323 S. Decatur Blvd, Las Vegas, NV 89102
25 251 S. Power Rd., Mesa, AZ 85206
26 2814 S. Signal Butte Rd., Mesa, AZ 85212
27 3064 N Goliad St, Rockwall, TX 75087
28 3201 Lakeview Parkway, Rowlett, TX 75088
29 3233 E. Indian School Rd., Phoenix, AZ 85018
30 3333 W. Peoria Ave., Phoenix, AZ 85029
31 3385 S Durango Dr, Las Vegas, NV 89117
32 3425 W. Greenway Rd., Phoenix, AZ 85053
33 3505 W Baseline Rd, Laveen Village, AZ 85339
34 355 Lebanon Road, Frisco, TX 75036
35 3940 W 15th St, Plano, TX 75075
36 4601 Diaz Ave / 3400 Hulen St., Fort Worth, TX
37 4716 E. Ray Road, Phoenix, AZ 85044
38 5275 S Fort Apache Rd., Las Vegas, NV 89148
39 5501 E. Speedway Blvd., Tucson, AZ 85712
40 710 E. Dunlap Ave., Phoenix, AZ 85020
41 7480 S Power Rd, Gilbert, AZ 85260
42 7560 W Lower Buckeye Rd, Phoenix, AZ 85043
43 7980 E Speedway Blvd, Tucson, AZ 85710
44 8268 W. Deer Valley Road, Peoria, AZ 85382
45 909 E. Broadway Rd., Tempe, AZ 85282

46 910 S. Cooper Rd., Gilbert, AZ 85233
47 9121 W Glendale Ave, Glendale, AZ 85305
48 938 N Cooper St, Arlington, TX 76011
49 9875 W. Lower Buckeye Rd., Tolleson, AZ 85353

# SCHEDULE B

## Group B Sites

50 10071 E Old Vail Rd., Tucson, AZ 85747
51 15305 N 87th St, Scottsdale, AZ 85260
52 16450 N Western Ave, Oklahoma City, OK 73013
53 1660 E. Pecos Rd., Gilbert, AZ 85295
54 16885 W Bell Rd, Surprise, AZ 85374
55 1930 W League City Pkwy, League City, TX 77573
56 1950 Town E Blvd, Mesquite, TX 75150
57 2219 Spring Stuebner Rd, Spring, TX 77389
58 2400 N Pennsylvania Ave, Oklahoma City, OK 73107
59 2525 N Kelly Avenue, Edmond, OK 73003
60 2590 E League City Pkwy, League City, TX 77573
61 3095 E. Queen Creek Rd., Chandler, AZ 85286
62 3220 North Campbell Avenue, Tucson, AZ 85719
63 4551 W Bailey Boswell Rd, Fort Worth, TX 76179
64 4828 S Cooper St, Arlington, TX 76017
65 5540 SE 15th St, Del City, OK 73115
66 6501 May Ave, Oklahoma City, OK 73142
67 8220 W Thunderbird Rd, Peoria, AZ 85381
68 850 E Campbell Rd, Richardson, TX 75081
69 4620 W University DR, Prosper, TX 75078
70 5010 TX -78N, Sachse, TX 75048
71 524 S Central Expy, McKinney, TX 75072
72 845 E Lake Mead Pkwy Henderson, NV 89011
73 6121 W Craig Rd, Las Vegas, NV 89130

# <u>SCHEDULE 1.2(j)</u>

## Other Excluded Assets

None.

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This First Amendment to Asset Purchase Agreement (this "**Amendment**") is made, entered into and effective as of September 29, 2026 (the "**Amendment Effective Date**"), by and among Brew Culture, LLC, a Wyoming limited liability company ("**Buyer**"), and And Go Concepts, LLC, an Arizona limited liability company ("**Seller**"). Buyer and Seller are collectively referred to as the "**Parties**" and each, a "**Party**."

## RECITALS

WHEREAS, Buyer and Seller are parties to that certain Asset Purchase Agreement, dated as of August 25, 2026 (the "**Agreement**"), pursuant to which Seller agreed to sell, convey, assign, transfer, contribute, and deliver to Buyer, and Buyer agreed to acquire and purchase from Seller, the Purchased Assets, upon the terms and subject to the conditions set forth therein;

WHEREAS, Section 8.6 of the Agreement provides that the Agreement may be amended by a written agreement signed by each Party;

WHEREAS, the Parties desire to amend the Agreement to (i) establish an updated date by which the Bankruptcy Court shall enter the Sale Order, (ii) identify Sites removed from the Agreement as set forth on **Exhibit A** to this Amendment, and (iii) provide for a modified Purchase Price as a result of the removal of Sites pursuant to Section 6.3(c) of the Agreement; and

WHEREAS, capitalized terms used but not otherwise defined in this Amendment shall have the meanings ascribed to such terms in the Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, agreements, conditions, representations and warranties set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to become legally bound, agree as follows:

1. Updated Sale Order Date. Notwithstanding anything in Section 6.5(c) to the contrary, the Buyer and Seller agree to extend the deadline for the entry of the Sale Order to October 5, 2026 or an alternative date mutually acceptable to Buyer and Seller (which may be agreed by e-mail).

2. Updated List of Sites. Notwithstanding anything in Schedule A or Schedule B of the Agreement to the contrary, the Sites listed on **Exhibit A** attached hereto are hereby removed as Sites under the Agreement, and the Assumed Leases and Purchased Assets associated with such Sites shall be excluded from the transactions contemplated by the Agreement.

3. Rejection Fee Acknowledgment and Calculation. As of the Amendment Effective Date, Buyer has rejected seven (7) Group A Sites, as set forth on **Exhibit A**. Pursuant to Section 6.3(c) of the Agreement, the first three (3) rejected Group A Leases did not trigger any Rejection Fees. The remaining four (4) rejected Group A Leases each triggered a Rejection Fee of $100,000.77, resulting in aggregate Rejection Fees of $400,003.08. Buyer and Seller further

acknowledge that three (3) Group B Sites were rejected, and no Rejection Fees are payable for any Group B Lease rejection pursuant to Section 6.3(c) of the Agreement.

4. Exhaustion of Free Rejection Allowance. The Parties acknowledge and agree that Buyer's three (3) Group A Lease rejection allowance under Section 6.3(c) of the Agreement has been fully exhausted as of the Amendment Effective Date. Any subsequent rejection by Buyer of a Group A Lease, whether before or after the Closing, shall trigger a Rejection Fee of $100,000.77 per rejected Group A Lease, commencing with the first such additional rejection, without any further free rejection allowance. The cumulative count of rejected Group A Leases shall carry forward from the Amendment Effective Date for purposes of calculating Rejection Fees.

5. Modified Purchase Price. Pursuant to Section 2.1 and Section 6.3(c) of the Agreement and Sections 2 through 4 of this Amendment, as of the Amendment Effective Date, the Purchase Price equals $123,452,384.02, subject to further adjustment and modification as set forth in the Agreement.

6. Non-Solicitation Covenant. The restrictions set forth in Section 6.3(c) of the Agreement prohibiting Buyer and its Affiliates from soliciting, negotiating, entering into, or otherwise acquiring any lease, sublease, license, occupancy agreement, or other right to use or occupy the premises of any rejected Real Property Lease during the eight (8)-month period following the Closing Date shall apply to each of the Sites removed pursuant to this Amendment.

7. Miscellaneous.

(a) Ratification; Continuing Effect. Except as expressly amended by this Amendment, the Agreement remains in full force and effect in accordance with its terms, and the Parties hereby ratify and confirm the Agreement as amended by this Amendment. From and after the Amendment Effective Date, all references to the "Agreement" in the Agreement or in any other document shall mean the Agreement as amended by this Amendment.

(b) Conflicts. In the event of any conflict or inconsistency between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment shall control.

(c) Counterparts. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by electronic means shall be as effective as delivery of a manually executed counterpart of this Amendment.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have executed this Amendment on the date first set forth above.

**BUYER:**

BREW CULTURE, LLC

By: ________________________________

Name: Brian Cornyn

Title: CFO

**SELLER:**

AND GO CONCEPTS, LLC

By: ________________________________

Name: Douglas J. Brickley

Title: Chief Restructuring Officer

IN WITNESS WHEREOF, the Parties have executed this Amendment on the date first set forth above.

**BUYER:**

BREW CULTURE, LLC

By: ________________________________

Name: ______________________________

Title:_______________________________

**SELLER:**

AND GO CONCEPTS, LLC

Signed by:

By: Douglas J. Brickley

F5A357648B9B4BB...

Name: Douglas J. Brickley

Title: Chief Restructuring Officer

# EXHIBIT A

## Rejected Real Property Leases and Sites

***Schedule A (Group A Sites)***

1. **Site 1107**: 1040 W. Southern Ave. Mesa AZ 85210
2. **Site 1121**: 3425 W. Greenway Rd. Phoenix AZ 85053
3. **Site 1134**: 1322 E. Florence Blvd. Casa Grande AZ 85122
4. **Site 1157**: 3505 W Baseline Rd Laveen AZ 85339
5. **Site 1704**: 11360 East 96th Street N Owasso OK 74055
6. **Site 1903**: 2323 S. Decatur Blvd Las Vegas NV 89102
7. **Site 1917**: 1180 E Silverado Ranch Blvd Las Vegas NV 89123

***Schedule B (Group B Sites)***

1. **Site 1152**: 16885 W Bell Rd Surprise AZ 85374
2. **Site 1437**: 1950 Town E Blvd Mesquite TX 75150
3. **Site 1921**: 845 E Lake Mead Pkwy Henderson NV 89011

**Exhibit B**

**Cure Schedule**

# Exhibit B (Cure Schedule)

| No. | Store # | Store Name / Location | Address | Market | Total Cure |
|---|---|---|---|---|---|
| **Arizona & Nevada — 38 Leases** | | | | | |
| ***Arizona — Phoenix Metro*** | | | | | |
| 1 | 1102 | Cooper & Warner | 910 S. Cooper Rd., Gilbert, AZ 85233 | PHX | $9,436.15 |
| 2 | 1105 | Lower Buckeye & 99th Ave | 9875 West Lower Buckeye Road, Tolleson, AZ 85353 | PHX | $22,353.83 |
| 3 | 1111 | Power & Broadway | 251 South Power Road, Mesa, AZ 85206 | PHX | $9,248.05 |
| 4 | 1112 | Scottsdale & Oak | 2323 N. Scottsdale Road, Scottsdale, AZ 85257 | PHX | $12,707.64 |
| 5 | 1114 | Cave Creek & 101 | 21060 N. Cave Creek Rd., Phoenix, AZ 85024 | PHX | $8,848.48 |
| 6 | 1115 | Tatum & Cactus | 12601 N Paradise Village Pkwy W, Phoenix, AZ 85032 | PHX | $20,355.18 |
| 7 | 1116 | Dunlap & 7th St | 710 East Dunlap Avenue, Phoenix, AZ 85020 | PHX | $4,640.92 |
| 8 | 1117 | Northern & 19th Ave | 1902 W Northern Avenue, Phoenix, AZ 85021 | PHX | $10,867.34 |
| 9 | 1118 | Queen Creek & Gilbert | 3095 East Queen Creek Road, Chandler, AZ 85286 | PHX | $13,132.06 |
| 10 | 1119 | Indian School & 32nd St | 3233 E. Indian School Rd, Phoenix, AZ 85018 | PHX | $13,291.25 |
| 11 | 1120 | Broadway & Rural | 909 East Broadway Road, Tempe, AZ 85282 | PHX | $24,664.76 |
| 12 | 1123 | Elliot & McClintock | 1804 East Elliot Road, Tempe, AZ 85284 | PHX | $12,960.72 |
| 13 | 1125 | Peoria & 35th Ave | 3333 West Peoria Avenue, Phoenix, AZ 85029 | PHX | $6,730.30 |
| 14 | 1126 | Dobson & Chandler | 2020 West Chandler Boulevard, The Boulevard Shopping Center, Chandler, AZ 85224 | PHX | $17,903.08 |
| 15 | 1128 | Signal Butte & Guadalupe | 2814 S. Signal Butte Rd., Mesa, AZ 85212 | PHX | $7,396.62 |
| 16 | 1129 | Val Vista & Pecos | 1660 E Pecos, Gilbert, AZ 85295 | PHX | $24,270.68 |
| 17 | 1132 | 83rd Ave & Deer Valley | 8268 West Deer Valley Road, Peoria, AZ 85382 | PHX | $12,491.00 |
| 18 | 1133 | Crismon & Southern | 10031 E. Southern Ave, Mesa, AZ 85209 | PHX | $13,292.41 |
| 19 | 1135 | Scottsdale & Thunderbird | 13838 North Scottsdale Road, Scottsdale, AZ 85254 | PHX | $16,078.70 |
| 20 | 1137 | 48th St & Ray | 4716 E. Ray Rd., Ahwatukee Foothills Towne Center, Phoenix, AZ 85044 | PHX | $25,011.46 |
| 21 | 1138 | Tatum & Bell | 17155 N Tatum Blvd., Phoenix, AZ 85254 | PHX | $9,909.16 |
| 22 | 1141 | Thunderbird & 83rd Ave | 83rd Avenue and Thunderbird Road in Peoria, Arizona<br>(8220 W Thunderbird Rd, Peoria, AZ 85381) | PHX | $12,491.00 |
| 23 | 1143 | Dysart & McDowell | 1585 North Dysart Road, Avondale, AZ 85392 | PHX | $11,372.91 |
| 24 | 1147 | Pima & Arriba | 15305 North 87th Street, Scottsdale, AZ 85260 | PHX | $12,781.25 |
| 25 | 1150 | Gary & Hunt Hwy | 1754 W Hunt Highway, San Tan Valley, AZ 85143 | PHX | $38,638.41 |
| 26 | 1151 | Oak & 44th St | 44th St & Oak St, Phoenix, AZ 85008<br>(2301 N 44th St, Phoenix, AZ 85008) | PHX | $14,335.84 |
| 27 | 1158 | 91st Ave & Glendale | 9121 W Glendale Avenue Shops at Westgate, Glendale, AZ 85305 | PHX | $9,727.30 |
| 28 | 1161 | Power & Germann | 7480 South Power Road, Gilbert, AZ 85297 | PHX | $6,406.25 |
| 29 | 1175 | 75th & Lower Buckeye | 75th Avenue and Lower Buckeye Road, Phoenix, AZ 85043 | PHX | $8,422.24 |
| 30 | 1176 | Country Club & Baseline | 1956, South Country Club Drive, Mesa, AZ 85210 | PHX | $16,083.83 |
| ***Arizona — Tucson*** | | | | | |
| 31 | 1131 | Speedway & Craycroft | 5501 E. Speedway Blvd., Tucson, AZ 85712 | TUC | $9,067.82 |
| 32 | 1154 | Fort Lowell & Campell | 3220 North Campbell Avenue, Tucson, AZ 85719 | TUC | $12,358.60 |
| 33 | 1155 | Kolb & 22nd | 1302 South Kolb Road, Tucson, AZ 85710 | TUC | $11,237.74 |
| 34 | 1159 | River & La Cholla | 2080 West River Road, Tucson, AZ 85704 | TUC | $7,370.00 |
| 35 | 1165 | Speedway & Patano | 7980 E Speedway Blvd., Tucson, AZ 85710 | TUC | $5,917.08 |
| 36 | 1184 | Houghton & Old Vail | 10071 Old Vail Road, Tucson, AZ 85747 | TUC | $8,257.99 |
| ***Nevada — Las Vegas*** | | | | | |
| 37 | 1915 | Durango & Desert | 3385 S Durango Dr, Las Vegas, NV 89117 | LAS | $9,932.72 |
| 38 | 1920 | Craig & Rancho (pipeline) | Southeast Corner of Craig Road and Rancho Drive, Las Vegas, NV 89130<br>(6121 W Craig Rd, Las Vegas, NV 89130) | LAS | $9,204.08 |
| **Subtotal — Arizona & Nevada** | | | | | **$499,194.85** |

# Exhibit B (Cure Schedule)

| No. | Store # | Store Name / Location | Address | Market | Total Cure |
|---|---|---|---|---|---|
| **Texas & Oklahoma — 24 Leases** | | | | | |
| ***Texas — Dallas/Fort Worth*** | | | | | |
| 39 | 1401 | Plano & Coit | 1400 Coit Road, Plano, TX 75075 | DAL | $7,437.50 |
| 40 | 1403 | Campbell & Greenville | 850 East Campbell Road, Richardson, TX 75081 | DAL | $8,708.33 |
| 41 | 1407 | Hulen & Diaz | 4601 Diaz Avenue, Ft. Worth, TX 76107 | DAL | $16,250.00 |
| 42 | 1419 | Rowlett | 3201 Lakeview Parkway, Rowlett, TX 75088 | DAL | $7,916.66 |
| 43 | 1421 | 1421 | N. Cooper Street & W. Randol Mill Road, Southwest Corner, Arlington, TX 76011 (938 N. Cooper St., Arlington, TX 76011) | DAL | $7,500.00 |
| 44 | 1424 | Prosper | 4620 W University Dr., Prosper, TX 75078 | DAL | $10,000.00 |
| 45 | 1425 | Cooper & Bardin | 4828 South Cooper Road, Arlington, TX 76017 | DAL | $20,977.77 |
| 46 | 1426 | Marsh & Walnut | 10002 Marsh Lane, Dallas, TX 75229 | DAL | $10,000.00 |
| 47 | 1428 | Bailey Boswell | W. Bailey Boswell Rd. and N. Old Decatur Rd., Fort Worth, TX 76179 | DAL | $10,416.67 |
| 48 | 1430 | 1430 | 5010 State Hwy 78, Sachse, TX 75048 | DAL | $8,333.33 |
| 49 | 1431 | Rockwall | Corner of Bordeaux Drive and North Goliad Street (SH 205) in Rockwall, TX (3064 N Goliad St, Rockwall, TX 75087) | DAL | $6,878.91 |
| 50 | 1435 | Frisco | 355 Lebanon Road, Frisco, TX 75036 | DAL | $11,250.00 |
| 51 | 1452 | Anna | 1460 S Ferguson Pkw, Anna, TX 75409 | DAL | $7,500.00 |
| 52 | 1460 | 1460 | Southwest corner of Virginia Parkway and US Highway 75, McKinney, TX 75071 (524 S. Central Expy, McKinney, TX 75072) | DAL | $16,666.67 |
| ***Texas — Houston*** | | | | | |
| 53 | 1504 | League City | 2590 E League City Pkwy, League, TX 77573 | HOU | $9,583.34 |
| 54 | 1508 | League City | 1930 W League City Parkway, League City, TX 77573 | HOU | $7,916.67 |
| 55 | 1509 | Spring | 2219 Spring Stuebner Road, Spring, TX 77389 | HOU | $36,856.49 |
| 56 | 1513 | Katy | 21021 Highland Knolls Dr, Katy, TX 77450 | HOU | $5,000.00 |
| 57 | 1517 | University & LJ | Land located in the William Little Survey, Abstract No. 54, Fort Bend County, TX (18830 Noble Seven Ln, Sugar Land, TX 77479 ) | HOU | $10,000.00 |
| ***Texas — Austin*** | | | | | |
| ***Texas — San Antonio*** | | | | | |
| ***Oklahoma — Oklahoma City*** | | | | | |
| 58 | 1602 | Western & 164th | 16450 N Western Ave., Oklahoma City, OK 73013 | OKC | $24,345.99 |
| 59 | 1603 | 1603 | 2400 N Pennsylvania Ave, Oklahoma City, OK 73107 | OKC | $10,000.00 |
| 60 | 1606 | 1606 | 5540 SE 15th St., Del City, OK 73115 | OKC | $5,833.33 |
| 61 | 1607 | Kelly & Covell | 2525 N Kelly Ave, Edmond, OK 73003 | OKC | $9,166.66 |
| 62 | 1609 | OKC | 6501 North May Avenue, Oklahoma City, OK 73116 | OKC | $6,250.00 |
| **Subtotal — Texas & Oklahoma** | | | | | **$274,788.32** |
| **California — 0 Leases** | | | | | |
| ***California — Southern California*** | | | | | |
| **Subtotal — California** | | | | | - |

| **GRAND TOTAL — ALL LEASES (62)** | **$773,983.17** |
|---|---|

**Notes:**

1. Cure amounts represent the Debtors' good faith estimate of, or agreed to, amounts necessary to cure all defaults under each Assumed Lease as of the day hereof.

2. Total Cure Amount includes Base Rent, Common Area Maintenance (CAM), Property Tax, Insurance, and Other occupancy charges as applicable by lease.

3. The inclusion of any lease on this Cure Amount Schedule does not constitute a commitment by the Debtors to assume such lease. The Debtors reserve all rights to determine, in their business judgment, which leases will ultimately be assumed and assigned to the Buyer pursuant to the APA and the Sale Order.

4. Unit 1906 (Fort Apache & Hacienda, 5275 S. Fort Apache Rd., Las Vegas, Nevada 89148) was excluded from the Cure Schedule because the related cure dispute is addressed separately in the Order.