**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **And Go Concepts, LLC, *et al.*,** | § | **Case No. 26-90753 (ARP)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER (I) APPROVING THE SALE OF THE NON-BULK ASSETS TO THE SUCCESSFUL BIDDERS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") submit this memorandum of law (the "**Memorandum**") in support of the *Debtors' Motion for Entry of an Order (I) Approving the Sale of the Non-Bulk Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (II) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief* [Dkt. No. 196] (the "**Sale Motion**"). In further support of the Sale Motion, the Debtors filed the *Declaration of Douglas J. Brickley in Support of Entry of an Order (I) Approving the Sale of the Non-Bulk Assets to the Successful Bidders Free and Clear of Liens, Claims, Encumbrances, and Interests, (II) Authorizing and Approving the Assumption and Assignment of Certain*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); Garland New Market LLC (6838); AGC Topco, LLC (6845); and AGC Holdco, LLC (0294). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts/.

*Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* (the "**Brickley Declaration**" or "**Brickley Decl.**"). Capitalized terms used but not defined in this Memorandum have the meanings given to them in the Sale Motion, the Brickley Declaration, or the Bidding Procedures (defined below), as applicable.

## I. PRELIMINARY STATEMENT

The Debtors seek approval of the sale of certain leases that were not included in the Debtors' earlier bulk sale (the "**Non-Bulk Assets**") as identified in the *Notice of Auction Results, Successful Bidders for Non-Bulk Sale* [Dkt. No. 490] (the "**Notice of Auction Results**") and that were not sold under the Court's order entered on October 16, 2026 [Dkt. No. 599]. The Non-Bulk Assets were sold, subject to Court approval, to the successful bidders (each, a "**Successful Bidder**") identified in the Notice of Auction Results. The Successful Bidders prevailed at the auction held on September 30, 2026 (the "**Non-Bulk Auction**") under the *Order Approving Bidding Procedures, Auctions, and Related Relief* [Dkt. No. 240] (the "**Bidding Procedures Order**") and the Non-Bulk Bidding Procedures approved by that order and as amended from time to time in accordance with their terms (the "**Bidding Procedures**"). The sale of the remaining Non-Bulk Assets to the Successful Bidders (the "**Sale**") converts eight leases into $430,002.00 in aggregate purchase price, transfers ongoing lease obligations to operating purchasers, and avoids rejection damages claims that would otherwise dilute stakeholder recoveries. Brickley Decl. ¶¶ 24–25, 32. Those avoided claims are substantial: the Debtors estimate that rejection of these eight leases would give rise to approximately $2,009,289.88 in landlord claims allowable under section 502(b)(6) of the Bankruptcy Code. Taken together, the purchase price and the avoided claims make the Sale worth approximately $2.44 million to the estates. Because the Debtors face continuing administrative costs on the leases and have limited liquidity, prompt approval and closing are essential to preserve the value the Non-Bulk Auction produced. *Id.* ¶ 33.

That value is the product of a broad and competitive marketing process. The Debtors and their advisor, Stout Risius Ross, LLC ("**Stout**"), contacted at least 294 individuals across at least 227 companies. Twenty-seven bidder parties executed non-disclosure agreements and received data room access, and nine bidders submitted bids. Brickley Decl. ¶¶ 11–15. The Debtors designated stalking horse bids for three parcels of leases to lock in a committed floor value, then ran a six-round, transcribed auction attended by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") and certain landlords. *Id.* ¶¶ 16–17, 19, 22. The auction increased gross value from $14,634,201.00 to $15,888,719.00 and net value to the estates from $8,268,780.81 to $12,083,072.86. *Id.* ¶ 23.

The Sale satisfies the business-judgment standard under section 363 of the Bankruptcy Code. That standard does not require the Court to select the proposal with the largest headline purchase price viewed in isolation. The debtor must show that the selected transaction is the highest and best offer, and the Court may accept a lower nominal bid where sound business reasons support it. *See In re VCR I, L.L.C.*, 922 F.3d 323, 327 (5th Cir. 2019). Consistent with that standard and the Bidding Procedures, the Debtors evaluated each bid using a bid model that measured net value to the estates. The model accounted for cure costs, estimated section 502(b)(6) claims for leases that did not receive a bid, and termination fees, and it allowed the Debtors to combine bids across properties to maximize aggregate value. Brickley Decl. ¶¶ 20–21.

The Debtors also seek authority to assume and assign the leases included in the Sale notwithstanding certain use restrictions and exclusivity provisions in those leases. A limited number of landlords filed formal objections raising use-restriction, exclusivity, cure, and adequate assurance issues.

The Debtors address assignability because, if the Court finds it necessary to reach the issue, section 365(f)(1) and the case law applying it provide a sound basis for permitting assignment notwithstanding restrictions that operate as anti-assignment provisions. A provision need not be labeled an "anti-assignment" clause to fall within section 365(f)(1); the relevant inquiry is whether the provision operates in practice to prevent assignment. *See, e.g.*, *In re U.L. Radio Corp.*, 19 B.R. 537, 543–44 (Bankr. S.D.N.Y. 1982); *In re Rickel Home Ctrs., Inc.*, 240 B.R. 826, 831–32 (D. Del. 1999). A lease provision that restricts operations to a single brand presents the same practical problem recognized in *Rickel*: once the Debtors cease operating the Salad and Go brand, no conforming operator remains to whom the affected leases can be assigned. Enforcing such restrictions would deprive the estates of substantial value.

The Debtors therefore respectfully request that the Court approve the Sale to the Successful Bidders, authorize the assumption and assignment of the applicable leases, overrule the remaining landlord objections, find that the Successful Bidders provide adequate assurance of future performance, and grant the related relief requested in the Sale Motion.

## II. <u>BACKGROUND</u>

### A. *The Chapter 11 Cases and Liquidity Crisis*

On August 4 and 5, 2026 (collectively, the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. The Creditors' Committee has been appointed.

The Debtors operated a quick-service, drive-thru restaurant chain under the "Salad and Go" brand. Their restaurant footprint is compact, with no kitchen, hood, grill, or fry equipment, and features single- or double-lane drive-thrus. Before the Petition Date, the Debtors' lease portfolio

consisted of approximately 148 locations across Arizona, Texas, Nevada, Oklahoma, and California. Brickley Decl. ¶ 6.

The Debtors pursued a two-track sale process. The first track was a bulk sale of a large portfolio of leases, which culminated in an auction on August 31, 2026, at which Brew Culture, LLC ("**7 Brew**") was designated the successful bidder (the "**Bulk Sale**"). The second track is the sale of the Non-Bulk Assets under the Bidding Procedures Order and the Bidding Procedures. Brickley Decl. ¶ 7. The Debtors continue to face administrative costs for the leases and have limited liquidity. *Id.* ¶ 33.

**B. The Non-Bulk Marketing Process and Non-Bulk Auction**

Under the Bidding Procedures, the Non-Bulk Assets include the Debtors' leasehold interests and associated assets in Arizona and Nevada and in Texas and Oklahoma, together with associated personal property and intellectual property, all of which were offered at a single, unified Non-Bulk Auction. Brickley Decl. ¶ 8. Ten leases that 7 Brew removed from the Bulk Sale were added to the pool of available leases, and Stout posted each to the data room and notified all parties with data room access. *Id.* ¶ 9.

With Stout's assistance, the Debtors were in contact with at least 294 individuals across at least 227 companies. Outreach began on September 4, 2026, with an initial contact to 251 individuals across 197 companies, and continued with follow-up communications, data room updates, and bid deadline reminders through the September 24, 2026, bid deadline. Brickley Decl. ¶¶ 11–13. Twenty-seven bidder parties executed NDAs and received access to a data room containing the form asset purchase agreement, the cure schedule, and lease summaries. *Id.* ¶ 14. Nine bidders submitted bids: eight on leases and one on the Debtors' intellectual property only. *Id.* ¶ 15.

The Debtors designated stalking horse bids from 7 Brew [Dkt. No. 452], Swig Stores, LLC ("**Swig**") [Dkt. No. 453], and Boersma Bros. LLC d/b/a Dutch Bros ("**Dutch Bros**") [Dkt. No. 469], each covering a defined parcel of leases. Brickley Decl. ¶ 16. The stalking horse bids locked in a committed floor value for each parcel, reduced execution risk, and set a competitive benchmark for the higher-value leases while preserving bidding flexibility for the remaining assets. *Id.* ¶ 17. Bid protections were capped at three percent of the cash purchase price, consistent with paragraph 12 of the Bidding Procedures Order, and no other bidder is entitled to any break-up fee, termination fee, or expense reimbursement. *Id.* ¶ 18.

At the direction of the Debtors' Chief Restructuring Officer, Stout prepared a bid model that the Debtors used before and throughout the Non-Bulk Auction to (a) confirm that bids on stalking horse parcels exceeded the two percent minimum overbid increment plus any applicable termination fee; (b) confirm that bids on individual leases and the intellectual property exceeded the two percent minimum overbid increment; (c) calculate gross purchase price across all leases that received bids; (d) calculate net value to the estates, after deducting cure costs for which the Debtors would be responsible, the estimated section 502(b)(6) claim for each lease that did not receive a bid, and any termination fees; and (e) track all lead bids and the bidding history for each lease. Brickley Decl. ¶ 20. Using the bid model, the Debtors, in consultation with the Consultation Parties, determined the lead bids and compared competing bids, including combinations of bids under the "Mix and Match" provisions of the Bidding Procedures, based on their net economic effect on the estates. *Id.* ¶ 21.

The Non-Bulk Auction took place on September 30, 2026, at the Houston office of Reed Smith LLP and was transcribed. Nine bidder companies registered, and forty-six individuals registered in total, including the Creditors' Committee, certain landlords, and the court reporter.

Brickley Decl. ¶ 19. The auction lasted six rounds, followed by a best-and-final round between Swig and Dutch Bros on a lease on which each had bid the same price. *Id.* ¶ 22. At its conclusion, the Debtors, in consultation with the Consultation Parties, designated the Successful Bidders and Back-Up Bidders, and on October 1, 2026, they filed the Notice of Auction Results. *Id.* ¶ 24. Key results include:

- **Increased Value.** Gross value increased from $14,634,201.00, based on lead bids going into the auction, to $15,888,719.00 at its conclusion, and net value to the estates increased from $8,268,780.81 to $12,083,072.86. Brickley Decl. ¶ 23. The aggregate purchase prices of the Successful Bids total $15,888,719.00. *Id.* ¶ 25.
- **Stalking Horse Parcels.** Swig acquired every lease in its stalking horse parcel, so no bid protection is payable to it. *Id.* ¶ 26.
- **Back-Up Bids.** The Back-Up Bids remain open for thirty days after the Non-Bulk Auction. If a Successful Bidder fails to close within that period, the applicable Back-Up Bidder becomes the Successful Bidder upon twenty-four hours' notice, subject to an affected counterparty's right to object within five days. *Id.* ¶ 27.

## C. The Notice of Auction Results and Landlord Objections

The Notice of Auction Results identified the Successful Bidders and Back-Up Bidders, scheduled the hearing to consider approval of the Sale for October 14, 2026, at 10:00 a.m. (Central Time), and set October 6, 2026, at 5:00 p.m. (Central Time) as the deadline for objections relating to adequate assurance by the Successful Bidders (the "**Post-Auction Objection Deadline**"). Notice of Auction Results at 3–4. The Debtors obtained adequate assurance information from the Successful Bidders and provided it to affected landlords upon request. Brickley Decl. ¶ 29.

The cure amounts for the leases to be assumed and assigned are reflected in the Revised Cure Schedule attached to the proposed order approving the Sale. Brickley Decl. ¶ 32.

The Creditors' Committee served as a Consultation Party throughout the sale process, was consulted in the evaluation of bids and the designation of the Successful Bidders and Back-Up Bidders, and attended the Non-Bulk Auction. Brickley Decl. ¶¶ 19, 21, 24.

Certain landlords filed formal objections to the assumption and assignment of their leases, which are addressed in Part III.D below. For the reasons set forth below, the Sale to the Successful Bidders should be approved.

## III. ARGUMENT

### A. The Sale Should Be Approved as a Sound Exercise of the Debtors' Business Judgment Under Section 363(b).

#### 1. Legal Standard

Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession, "after notice and a hearing," to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Fifth Circuit requires "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

Once the debtor articulates a valid business justification, the business judgment rule protects the debtor's informed, good-faith decision. *See In re 9 Houston LLC*, 578 B.R. 600, 619 (Bankr. S.D. Tex. 2017). Courts will not disturb that judgment unless the decision is "so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *Id.* (citation omitted); *accord In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005) (applying the standard to a debtor's use of estate property outside the ordinary

course under section 363(b)(1)) (quoting *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)).

Courts in this Circuit have applied a four-factor test, asking whether (1) a sound business justification supports the sale; (2) adequate and reasonable notice was provided; (3) the sale was proposed in good faith; and (4) the price is fair and reasonable. *See In re Condere Corp.*, 228 B.R. 615, 630 (Bankr. S.D. Miss. 1998). The standard is not simply the highest price. The estate fiduciary "must demonstrate that the proposed sale price is the highest and best offer, though a bankruptcy court may accept a lower bid in the presence of sound business reasons." *VCR I*, 922 F.3d at 327 (quoting *In re Moore*, 608 F.3d 253, 257 (5th Cir. 2010)) (footnote omitted). The inquiry therefore looks to the full value of a bid to the estates, not merely its headline number.

**2. The Sale Satisfies the Business Judgment Standard**

The business reasons supporting the Sale are compelling. The Debtors face continuing administrative costs for the leases and limited liquidity, and prompt approval and closing are essential to preserving the value obtained at the Non-Bulk Auction. Brickley Decl. ¶ 33. The Sale converts the Non-Bulk Assets into $430,002.00 of aggregate consideration, transfers ongoing lease obligations to operating purchasers, avoids rejection damages claims, and resolves cure obligations as reflected in the Revised Cure Schedule. *Id.* ¶¶ 25, 32. The rejection damages claims avoided are estimated at approximately $2,009,289.88 in the aggregate under section 502(b)(6). Without a sale, the Debtors would continue to incur administrative expense on the leases, and the estates would face those additional rejection damages claims. *Id.* ¶ 28(e).

**Informed, Good-Faith Process.** The marketing process was broad and tailored to the assets. The Debtors contacted at least 227 companies, provided data room access to twenty-seven bidder parties, designated stalking horse bids to set committed floor values, and evaluated every

bid using a bid model that measured net value to the estates, all in consultation with the Consultation Parties, including the Creditors' Committee. Brickley Decl. ¶¶ 11–21.

**Competitive Tension Produced Value.** The Non-Bulk Auction lasted six rounds plus a tie-breaking best-and-final round, and multiple bidders competed for many of the same leases. Brickley Decl. ¶¶ 22, 30(a). The auction increased gross value by approximately $1.25 million and net value to the estates by approximately $3.8 million, including an increase in the price of the intellectual property from an opening bid of $10,000.00 to $180,000.00. *Id.* ¶¶ 23, 26, 28(b).

**Fair and Reasonable Price.** The price for each of the Non-Bulk Assets was set through a broad marketing process and an open, competitive auction, which is the best evidence of value. Each Successful Bid is a Qualified Bid under the Bidding Procedures and was evaluated on a net basis that accounted for cure costs, rejection damages claims avoided, and termination fees. Brickley Decl. ¶ 28(c)–(d). The Debtors are not aware of any other transaction that would provide greater value for the Non-Bulk Assets. *Id.* ¶ 28(e).

**Good Faith.** The Sale was negotiated at arm's length between sophisticated parties represented by their own counsel. To the best of the Debtors' knowledge, there was no collusion, fraud, or attempt to take unfair advantage; each Successful Bid included the representation of no collusion that the Bidding Procedures require; and none of the Successful Bidders is an insider or affiliate of the Debtors. Brickley Decl. ¶ 30. The Non-Bulk Auction was conducted openly and transcribed, and the Creditors' Committee and landlords were able to observe it. *Id.* ¶ 30(b). Each Successful Bidder is therefore entitled to the protections of section 363(m) of the Bankruptcy Code.

**3. Section 502(b)(6) and the Measurement of Net Value**

Section 502(b)(6) of the Bankruptcy Code imposes a mandatory cap on a landlord's allowable claim for damages resulting from lease rejection. The cap is not merely a payment-

priority rule. It is a statutory limitation on the amount of the allowed claim. *See Kuehner v. Irving Trust Co.*, 299 U.S. 445, 454–55 (1937) (recognizing that Congress intended a strict limit on a landlord's allowable claim); *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 204 (3d Cir. 2003) (describing the section 502(b)(6) limitation as "absolute" (quoting 4 Collier on Bankruptcy § 502.03 (15th ed. 2002))); *In re Chrome Holding Co.*, No. 25-40976, 2025 WL 3301036, at *5 (Bankr. E.D. Mo. Nov. 26, 2025) (rejecting argument that landlords are entitled to compensation above the section 502(b)(6) cap).

The cap matters here for a simple reason: the value of a bid to the estates is not its headline price alone, but the price net of the claims and costs the estates will bear. The Debtors' bid model therefore calculated net value by reducing gross value by the cure costs for which the Debtors would be responsible, the estimated section 502(b)(6) claim for each lease that did not receive a bid, and any termination fees. Brickley Decl. ¶ 20(d). Measured that way, the Non-Bulk Auction increased net value to the estates by approximately $3.8 million. *Id.* ¶ 23.

#### 4. The Court Should Evaluate the Highest or Otherwise Best Offer Under the Totality of the Circumstances

Fifth Circuit law permits a court to approve a bid that is not the highest headline number when sound business reasons support it. The Fifth Circuit applied that principle in *VCR I*, explaining that the trustee's fiduciary duty to maximize estate assets "trumps any contractual obligation" and that a bankruptcy court may accept a lower bid for sound business reasons, "such as substantial doubt that the higher bidder can raise the cash necessary to complete the deal." 922 F.3d at 327–28 (internal quotation marks and citations omitted).

Courts applying that principle have approved sales based on the debtor's reasoned assessment of overall value. In *Condere*, the court approved a section 363 sale to the only party that had put an offer "on the table," even though another party (Pensler) had expressed interest and

attached a proposed plan to its objection. *See* 228 B.R. at 630–32 (approving sale where the debtor's only option was to accept the bid or liquidate). The court emphasized that the debtor was "rapidly exhausting the available funds" and needed capital to remain operational. *Id.* at 630. The creditors' committee, composed of sophisticated companies, supported the sale. *Id.* at 632–33 (crediting committee's support as evidence the sale was in the best interest of the estate). The court found the price "fair and reasonable," even though the debtor's own consultant candidly acknowledged that the purchaser was paying more than the assets were worth in isolation, because the sale preserved jobs and paid 65% of unsecured claims. *See id.* at 633–34. So too here: the Debtors' selection of the Successful Bids based on net value to the estates, in consultation with the Creditors' Committee, is the kind of reasoned judgment that courts routinely uphold.

For example, in *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714–15 (Bankr. W.D. Tex. 1989), the court approved section 363 sales of real estate, reasoning that in a "soft and flat" market, the proposed sales were "birds in the hand which prudent business judgment dictates be preferred to the two in the bush on the other side of confirmation." And in *9 Houston*, this Court approved a private sale of real estate over the objection of a secured creditor that demanded a public auction. The Court found that the debtor had articulated a sound business justification: stopping significant daily interest accrual, securing a well-qualified purchaser that the debtor "does not want to risk losing," and closing faster than an auction would allow. 578 B.R. at 606–07, 618–19. The parallels are direct. The Debtors' continuing administrative costs for the leases make prompt closing paramount, and the Successful Bidders are operating purchasers ready to assume the leases.

These cases confirm that a debtor acting in good faith may rationally select bids based on overall value, certainty, and net benefit to the estates. The Court-approved Bidding Procedures

embody this principle by establishing evaluation criteria that go well beyond headline price. They permit the Debtors, in consultation with the Consultation Parties, to consider, among other factors, the total consideration offered; the likelihood of closing; the net economic effect on the estates; tax consequences; the impact on landlords and the adequacy of assurance of future performance; the aggregate portfolio value of a bid or combination of bids; and any other factors the Debtors deem relevant. Bidding Procedures ¶ 21 [Dkt. No. 240]. The Bidding Procedures also authorize the Debtors to combine bids from different Qualified Bidders across different properties to maximize aggregate estate value. *Id.* ¶ 22.

The Debtors applied those criteria through the bid model. The model confirmed that each overbid on a stalking horse parcel exceeded the two percent minimum increment plus any applicable termination fee, measured against the entire parcel, and that each bid on an individual lease or the intellectual property exceeded the minimum increment. Brickley Decl. ¶ 20(a)–(b). It allowed the Debtors to compare competing bids and combinations of bids based on their net economic effect on the estates, and to identify the Successful Bids and Back-Up Bids. *Id.* ¶ 21. These are precisely the considerations the Bidding Procedures' multi-factor framework is designed to capture.

For all of these reasons, each Successful Bid is the highest or otherwise best offer for the applicable Non-Bulk Assets and is in the best interests of the Debtors' estates, their creditors, and other parties in interest. Brickley Decl. ¶ 28.

### B. The Assumed Leases Should Be Assigned Notwithstanding Use Restrictions Under Section 365(f).

The Sale is the second of two sale processes for the Debtors' leasehold portfolio, following the Bulk Sale to 7 Brew. The Debtors have moved swiftly to place operating purchasers into these locations and to minimize vacancy periods for landlords. Assumption and assignment of the leases

to the Successful Bidders transfers ongoing lease obligations to operating purchasers and avoids rejection damages claims. Brickley Decl. ¶ 32.

Many landlords have consented to or not opposed the assignment, recognizing the value of securing an operating purchaser on an expedited timeline. Of the landlords noticed of the Sale, only a limited number filed formal objections. The objections addressed in Part III.D below raise use-restriction, exclusivity, cure, or adequate assurance issues; the remaining objections are limited objections, or relate solely to cure or adequate assurance, and are being resolved consensually or through the Revised Cure Schedule. The overwhelming majority of landlords have either consented, engaged in cooperative cure negotiations, or not objected.

**1. Statutory Framework**

Section 365(f)(1) of the Bankruptcy Code provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1). This broad anti-forfeiture provision reflects Congress's judgment that restrictive provisions negotiated prepetition should not defeat the estate's ability to realize value from its executory contracts and unexpired leases.

Assignment under section 365(f)(2) requires that the trustee first assume the lease under section 365(b)(1), including by curing defaults and providing adequate assurance of future performance, and that adequate assurance of future performance by the assignee be provided. 11 U.S.C. § 365(f)(2).

**2. Brand-Name Use Restrictions Are De Facto Anti-Assignment Provisions**

Section 365(f)(1) is not limited to provisions expressly labeled as anti-assignment clauses. It reaches provisions whose practical effect is to prevent assignment. *See Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 316 B.R. 772, 794–96 (Bankr. S.D.N.Y.

2004) (recognizing that use restrictions can operate as *de facto* anti-assignment provisions subject to section 365(f)(1)). As the court explained in *U.L. Radio*, "[a]ny lease provision, not merely one entitled 'anti-assignment clause', would be subject to the court's scrutiny regarding its anti-assignment effect." 19 B.R. at 543; *accord In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1993) ("Section 365(f)(1) was designed to prevent anti-alienation or other clauses in leases . . . from defeating his or her ability to realize the full value of the debtor's assets in a bankruptcy case." (footnote omitted)).

The seminal decision on use restrictions as *de facto* anti-assignment provisions is *Rickel*. There, the court confronted leases restricting use to "home improvement centers." *Rickel*, 240 B.R. at 832. The court explained:

> [i]n interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute *de facto* anti-assignment provisions. . . . [In that case, g]iven that the market for [home improvement] centers is either non-existent or in dire straits, such use restrictions would make it impossible for the Debtor to assign . . . .

*Id.* at 831–32 (citations omitted). Because market conditions meant that the use restrictions would make assignment impossible, the court treated them as tantamount to an anti-assignment clause and concluded it was appropriate to permanently strike them. *Id.* at 832.

These chapter 11 cases present an *a fortiori* application of *Rickel*. Certain leases here restrict use "solely for operation of a Salad and Go restaurant." That is not a restriction to a category of use; it is a restriction to a single brand. The Debtors, the only operator of the Salad and Go concept, are ceasing operations. For any assignee that does not own the brand, the restriction does not merely narrow the field of potential assignees; it eliminates it. Under section 365(f)(1) and the reasoning of *Rickel*, such restrictions must be struck.

The Debtors' argument rests on the face of the restriction and the absence of any conforming assignee. A restriction to the "Salad and Go" brand is not a use category, like "family entertainment," for which some universe of conforming operators might exist. It is a restriction to a single, specific brand whose only operator is ceasing to exist. The argument is not that the Debtors are in financial distress and lease provisions therefore should not apply. The argument is that this restriction, by its terms, prevents assignment to any buyer and therefore operates as a *de facto* anti-assignment provision under section 365(f)(1).

**3. Landlords Must Demonstrate Actual and Substantial Detriment**

Where the Debtors establish that a use restriction operates as a *de facto* anti-assignment provision, the burden shifts to the objecting landlord to show "actual and substantial detriment" from the proposed assignment. *See U.L. Radio*, 19 B.R. at 544; *accord In re Toys "R" Us, Inc.*, No. 17-34665, 2018 WL 2676680, at *3 (Bankr. E.D. Va. May 31, 2018). No such detriment exists here, because the Successful Bidders will operate quick-service concepts compatible with the Debtors' compact, drive-thru sites. The Debtors' footprint is compact, with no kitchen, hood, grill, or fry equipment, and features single- or double-lane drive-thrus. Brickley Decl. ¶ 6. Assignment to an operating purchaser returns each location to active use, avoids a vacancy, and preserves rent payments to the landlord.

**4. The Shopping Center Exception Does Not Apply to Most Leases**

Section 365(b)(3) provides that, for leases in "shopping centers," adequate assurance of future performance includes assurance that assignment "will not disrupt any tenant mix or balance" and is "subject to all the provisions thereof, including . . . radius, location, use, or exclusivity." 11 U.S.C. § 365(b)(3)(C)–(D). The Debtors operated small-footprint, drive-thru-only locations that required minimal square footage, and their restaurants have no kitchen, hood, grill, or fry equipment and feature single- or double-lane drive-thrus. Brickley Decl. ¶ 6. Consistent with that

model, the leases at issue here include standalone drive-thru pads and ground-leased parcels. *See, e.g.*, Dkt. No. 513 ¶ 5 (conceding that the Waco premises is "a standalone drive-thru pad"); Owasso Lease at 1 (ground-leased parcel within "a larger commercial development"). The objecting landlord bears the burden of showing that its premises are in a shopping center, and where it does not, the heightened protections of section 365(b)(3) do not apply.

Even for leases that may be within shopping centers, the Third Circuit has recognized that, "[e]ven under the tightly drawn definition of 'adequate assurance' in the shopping center context, Congress did not envision literal compliance with all lease provisions; insubstantial disruptions in, *inter alia*, tenant mix, and insubstantial breaches in other leases or agreements were contemplated and allowed." *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1090 (3d Cir. 1991) (footnote omitted). A quick-service drive-thru beverage and food concept replacing another quick-service drive-thru food concept represents, at most, an insubstantial tenant-mix deviation. *See generally Ames*, 316 B.R. 772 (recognizing that assignment from department store to discount retailer represented insubstantial tenant-mix deviation where both were large-format retail operations).

**5. Recorded Covenants Running with the Land**

To the extent any landlord asserts that use restrictions are embodied in recorded covenants running with the land rather than in the lease alone, the analysis is governed by the controlling Fifth Circuit authority, *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215 (5th Cir. 2013). Under Texas law, a covenant runs with the land only when it (1) touches and concerns the land, (2) relates to a thing in existence or specifically binds the parties and their assigns, (3) was intended to run with the land, and (4) the successor has notice. *Id.* at 221; *see also Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, 631 B.R. 847, 863–66 (Bankr. S.D. Tex. 2021) (applying *Energytec* in the Southern District of Texas). Texas law disfavors restrictions on the free use of property. *Simon Prop. Grp. (Texas) L.P. v. May Dep't*

*Stores Co.*, 943 S.W.2d 64, 71 (Tex. App. 1997) ("Restrictions [on land] giving rise to ambiguity or substantial doubt as to interpretation should be resolved in a manner that favors 'free use of land.'" (citation omitted)).

A "runs with the land" label is not dispositive. *See In re Chesapeake Energy Corp.*, 622 B.R. 274, 281–85 (Bankr. S.D. Tex. 2020). The objecting landlord bears the burden of demonstrating an independent recorded instrument, such as a CC&R, REA, or OEA, that satisfies *Energytec*'s requirements. Absent that showing, the restrictions are in-lease provisions subject to section 365(f)(1). Here, the vast majority of the Debtors' use restrictions are contained in leases, not in separately recorded instruments.

## C. The Successful Bidders Provide Adequate Assurance of Future Performance.

### 1. Legal Standard

Section 365(f)(2)(B) of the Bankruptcy Code permits the Debtors to assign an unexpired lease if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B); *see also* 11 U.S.C. § 365(b)(1)(C). In the assignment context, the inquiry therefore focuses on the assignee's prospective performance, not on the Debtors' financial condition. The phrase "adequate assurance of future performance" is not a term of art. Courts in this Circuit give it "a practical, pragmatic construction" based on the facts and circumstances of each case. *Richmond Leasing Co. v. Capital Bank*, *N.A.*, 762 F.2d 1303, 1309–10 (5th Cir. 1985) (internal quotation marks omitted); *In re Tex. Health Enters., Inc.*, 72 F. App'x 122, 126 (5th Cir. 2003); *In re PRK Enters.*, *Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999). The Fifth Circuit has explained that the language was borrowed from section 2-609 of the Uniform Commercial Code, under which adequate assurance "is to be 'defined by commercial rather than legal standards.'" *Richmond Leasing*, 762 F.2d at 1310 (citation omitted).

The required showing is modest. Assurance of future performance is adequate "if performance is likely (i.e. more probable than not)," and the degree of assurance required "falls considerably short of an absolute guaranty." *PRK Enters.*, 235 B.R. at 603 (citation omitted); *In re Tex. Health Enters., Inc.*, 246 B.R. 832, 835 (Bankr. E.D. Tex. 2000) (quoting *PRK Enters.*, 235 B.R. at 603). The movant need not show that the assignee "will thrive, make a profit or provide a guarantee of performance"; it need only show that the rent and other lease obligations can be met. *In re Senior Care Ctrs., LLC*, 607 B.R. 580, 596 (Bankr. N.D. Tex. 2019) (citing *In re Patriot Place, Ltd.*, 486 B.R. 773, 801 (Bankr. W.D. Tex. 2013)); *accord In re M. Fine Lumber Co.*, 383 B.R. 565, 572–73 (Bankr. E.D.N.Y. 2008) (it must "simply 'appear[ ] that the rent will be paid and other lease obligations met'" (citation omitted)). The movant bears the burden of proof, *Patriot Place*, 486 B.R. at 795, and carries it by showing that future performance is more probable than not, *id.* at 804; *PRK Enters.*, 235 B.R. at 603.

In applying that standard, courts in this Circuit consider "whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee." *Richmond Leasing*, 762 F.2d at 1310; *Senior Care*, 607 B.R. at 596. Courts also consider, among other things, payment history, the presence of a security deposit, evidence of profitability, and whether the lease is at or below the prevailing market rate. *Senior Care*, 607 B.R. at 596; *M. Fine Lumber*, 383 B.R. at 573. The inquiry turns on the facts and circumstances of each case, and no single factor is required. *See M. Fine Lumber*, 383 B.R. at 573 ("Nothing in § 365(b), or in the case law interpreting it, so restricts the evidence which may be considered in this regard."). Courts have found adequate assurance on a wide range of showings, including operating projections and a principal's willingness to reduce compensation, *PRK Enters.*, 235 B.R. at 602–03, and projected earnings

combined with a satisfactory payment history and existing security deposits, *Senior Care*, 607 B.R. at 596–98.

A landlord may not use the adequate assurance requirement to improve its bargain. The Fifth Circuit has held that the counterparty's satisfaction "must be based upon reason and must not be arbitrary or capricious," and that the counterparty "cannot hold out for concessions from the debtor beyond those required to provide adequate assurance." *Richmond Leasing*, 762 F.2d at 1307–11. Congress likewise made clear that it did not intend "that any non-debtor party should acquire greater rights in a case under the act than he has outside the act." *Id.* at 1310 (quoting Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt. II, at 156–57 (1973)). As one court put it, "[t]he emphasis is on protection. Section 365 gives no indication that a landlord . . . is to improve its position upon the bankruptcy of a tenant." *M. Fine Lumber*, 383 B.R. at 573 (quoting *In re Natco Indus., Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985)). Consistent with these principles, courts in this Circuit have declined to require enhanced security that goes beyond the lease bargain. *See Senior Care*, 607 B.R. at 596–97 (finding it unreasonable for landlord to demand an enhanced security deposit of approximately six times rent in connection with adequate assurance). Demands for new guaranties, multi-month security deposits, or other credit enhancement the lease does not require are the type of concessions that *Richmond Leasing* cautions against.

Where the movant offers credible, unrebutted evidence of the assignee's capacity to perform, speculation by the objecting landlord does not defeat a finding of adequate assurance. *See PRK Enters.*, 235 B.R. at 602–03 (granting assumption where financial projections "were not rebutted nor even seriously contested"); *Richmond Leasing*, 762 F.2d at 1309–10 (affirming finding of adequate assurance where bankruptcy court credited the debtor's witnesses' projections

over those of objecting creditors); *Senior Care*, 607 B.R. at 597 (finding adequate assurance despite landlord's concerns regarding declining earnings and possible covenant defaults, because the court was "not convinced that this is so great a risk"). Because the determination turns on the facts, the Court's factual findings on adequate assurance are reviewed only for clear error. *Richmond Leasing*, 762 F.2d at 1307–08, 1310.

The cases in which courts denied or conditioned a finding of adequate assurance are readily distinguishable. In each, the party seeking to assume was itself the performing party and had a demonstrated record of nonperformance, or its proposed performance depended on contingencies that had not occurred. *See Tex. Health Enters.*, 246 B.R. at 835–37 (debtor had history of monetary and non-monetary defaults, regulatory violations, and bad faith toward counterparty); *Matter of Silent Partner, Inc.*, 119 B.R. 95, 98–99 (E.D. La. 1990) (debtor had already defaulted on government supply contract, and its performance depended on unapproved suppliers, uncertain progress payments, and an uncompleted asset sale); *M. Fine Lumber*, 383 B.R. at 568, 574–75 (conditioning assumption on an additional security deposit where debtor conceded its payment history would not support adequate assurance and its proffered guaranty and financing were unproven or subject to unmet conditions). Here, by contrast, the leases are being assigned to third-party operators that were vetted through a competitive process and are not burdened by the Debtors' history. Upon assignment, the Successful Bidders, not the Debtors, will be responsible for future performance. *See* 11 U.S.C. § 365(k).

**2. The Successful Bidders Satisfy the Standard**

Each Qualified Bid was required to include the legal name of the proposed assignee, financial statements for fiscal years 2024 and 2025 or similar information, a description of the proposed assignee's restaurant or retail operating experience, and the intended use of the leased premises. Bidding Procedures ¶ 15(h). The Debtors obtained that information from the Successful

Bidders and provided it to affected landlords upon request. Brickley Decl. ¶ 29. The Post-Auction Objection Deadline for adequate assurance objections was October 6, 2026, at 5:00 p.m. (Central Time). *Id.*

Each Successful Bidder has demonstrated the ability to perform. Swig, a multi-unit beverage operator, reported 2025 net revenue of approximately $98.5 million, adjusted EBITDA of approximately $8.5 million, and $9.8 million in cash, and its lender, Bank of America, N.A., confirms a $35 million secured credit facility with $27 million of remaining availability. Debtors' Ex. 3. Beyond Salt and Pepper, LLC ("**BSP**"), which acquired Stores #1103 and #1107 together with the Debtors' intellectual property, has provided bank statements and its principal's investment and retirement account balances of approximately $989,000. Debtors' Ex. 6. Sipside's financial capacity is addressed in Part III.D.2, *infra*. *See* Debtors' Ex. 4; Bailey Decl. ¶¶ 3–12.

By any measure, each Successful Bidder provides adequate assurance of future performance under the leases to be assigned to it.

## D. The Specific Landlord Objections Should Be Overruled

The following landlords filed formal objections that raise use-restriction, exclusivity, cure, or adequate assurance issues.

### 1. Stores #1107 (Mesa, AZ) and #1134 (Casa Grande, AZ) – HH-Poca Fiesta, LLC and HH-Casa Grande, LLC [Dkt. Nos. 384, 516].

HH-Poca Fiesta, LLC (the "**Mesa Landlord**") and HH-Casa Grande, LLC (the "**Casa Grande Landlord**" and, together, the "**HH Landlords**") filed two objections. The first, filed September 16, 2026, in connection with the Bulk Sale [Dkt. No. 384] (the "**First Objection**"), objects only to assignment "to 7 Brew." The second, filed October 6, 2026 [Dkt. No. 516] (the "**Second Objection**"), objects to the Sale on the theories that a $1.00 assignment provides no benefit to a solvent estate, that the HH Landlords lacked a meaningful opportunity to participate

in the Non-Bulk Auction, and that cure must include October rent and attorneys' fees. The Debtors respectfully submit that these concerns, while understandable, do not warrant denial of the assignment.

***(a) The First Objection is moot.*** The First Objection is directed entirely at a proposed assignment to 7 Brew. It argues that assignment "to 7 Brew" would violate the coffee exclusives held by BeanChain at the Mesa center and First Cup d/b/a Dunkin' at the Casa Grande center, and alternatively asks that 7 Brew indemnify the HH Landlords against exclusive-use claims. Dkt. No. 384 ¶¶ 7–8, 15–17. Neither lease is being assigned to 7 Brew. Store #1107 is being assigned to BSP, and Store #1134 to Swig. Notice of Auction Results at 1, 3. Although the First Objection was never withdrawn, nothing in it remains for the Court to decide. Its cure objections are likewise resolved: the HH Landlords concede that the Debtors paid the noticed cure amounts of $10,911.89 for Store #1107 and $6,905.73 for Store #1134. Dkt. No. 384 ¶¶ 9–10, 18–19. Any remaining reservation concerning unknown indemnity obligations is addressed by the Sale Order, under which the assignee assumes the lease obligations going forward.

***(b) The Second Objection does not challenge BSP or Swig on use, exclusivity, or adequate assurance grounds.*** The Second Objection does not argue that assignment to BSP or Swig violates any use restriction, exclusive, or tenant-mix protection, or that either assignee fails to provide adequate assurance of future performance. *See generally* Dkt. No. 516. The Debtors understand this to reflect that those points are not in dispute. As to Store #1107, the Mesa lease limits use to "the retail operation of a typical Salad and Go corporate concept restaurant." Dkt. No. 384 ¶ 6. The Mesa Landlord itself acknowledges that BSP "has also acquired the Salad and Go trademarks and apparently intends to resume operations under the Salad and Go brand." Dkt. No. 516 at 2. BSP purchased the Debtors' intellectual property at the Non-Bulk Auction for

$180,000.00. Brickley Decl. ¶ 26. This Court approved the sale of the Debtors' intellectual property to BSP. Dkt. No. 599. An assignee that owns the Salad and Go brand and will operate a Salad and Go concept is the one assignee that complies with the use clause on its face, and a salad concept does not implicate BeanChain's coffee exclusive. As to Store #1134, the Casa Grande Landlord admits that Swig "was already in discussion with the Landlord about a potential new lease several weeks ago." Dkt. No. 516 at 2. Respectfully, a landlord that was itself negotiating to lease the premises to Swig is not well positioned to contend that Swig is an unacceptable tenant, that Swig disrupts its tenant mix, or that Swig cannot perform. To the extent the HH Landlords still seek to raise any such objection, they bear the burden of demonstrating actual and substantial detriment, and they have not made that showing. *See* Part III.B.3, *supra*.

***(c) The Debtors' business judgment is not measured lease by lease at $1.00.*** The HH Landlords concede that the business-judgment inquiry "focuses primarily on benefit to the estate rather than prejudice to the nondebtor contracting party." Dkt. No. 516 at 6 (citing *In re J.C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532 (5th Cir. 2022)). The benefit to the estates here is not confined to the nominal price allocated to each lease. BSP acquired Stores #1103 and #1107, together with the Debtors' intellectual property, for aggregate consideration of $180,002.00, and its competitive bidding increased the price of the intellectual property from an opening bid of $10,000.00 to $180,000.00. Brickley Decl. ¶¶ 24, 26. Swig acquired thirteen leases for aggregate consideration of $7,305,001.00, including its stalking horse parcel. *Id.* ¶ 24. The Bidding Procedures expressly authorized the Debtors to evaluate bids on an aggregate and combined basis to maximize estate value, Bidding Procedures ¶¶ 21(f), 22, and the Debtors did so through a bid model that measured net value across all leases and the intellectual property. Brickley Decl. ¶¶ 20–

21. Severing a single lease from a Successful Bidder's package after the auction would disturb the very bids that produced the $3.8 million increase in net value. *Id.* ¶ 23.

Nor does *National Gypsum* help the HH Landlords. That case requires a debtor to "take full account of the cost to cure." Dkt. No. 516 at 7 (quoting *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000)). The cure here has already been paid. Dkt. No. 384 ¶¶ 10, 19. Assignment therefore imposes no further cure cost on the estates, while transferring all future lease obligations to BSP and Swig and relieving the estates of further administrative exposure. Brickley Decl. ¶¶ 32–33.

***(d) The post-auction waiver offer does not change the analysis.*** The HH Landlords' offer to waive section 502(b)(6) claims is conditioned on "immediate rejection and surrender" and preserves their administrative claims for postpetition rent. Dkt. No. 516 at 2, 3, 8. The offer came only after the HH Landlords declined to bid and after the auction closed. A conditional, unilateral offer from a single counterparty is not a basis to unwind a completed, Court-approved auction. Respectfully, accepting it could encourage landlords to sit out an auction and then seek to outbid the successful bidder after the fact, undermining the finality and integrity of the sale process that the Bidding Procedures are designed to protect. And even taken at face value, the offer removes only one component of value: it does nothing to replace BSP's $180,000.00 package bid or the value of Swig's thirteen-lease purchase, and it would leave the estates bearing postpetition rent until surrender.

***(e) The HH Landlords had a meaningful opportunity to bid and chose not to.*** The HH Landlords' complaint that they had only "two days" to participate is respectfully not borne out by the record. Stores #1107 and #1134 were both listed on Schedule 1 to the Bidding Procedures, which the Debtors served on September 3, 2026, and the Bidding Procedures disclosed that leases

removed from the Bulk Sale could be added to the Non-Bulk Assets. Bidding Procedures ¶¶ 3, 7 & Sched. 1. The HH Landlords admit they were advised by September 21 and 22 that their leases would be offered in the Non-Bulk Auction, Dkt. No. 516 at 5, more than a week before the September 30 auction. Most importantly, the Bidding Procedures created a streamlined path designed specifically for landlords. A landlord could submit a "Landlord Bid" for its own lease, using a form of lease termination agreement, with a purchase price that could include a credit for unpaid amounts due under the lease. A Landlord Bid was exempt from most of the qualification requirements imposed on other bidders, including the requirements for transaction documents, closing conditions, adequate assurance information, identity disclosure, regulatory approvals, and the deposit (except as to any cash component). Bidding Procedures ¶ 24. The Bidding Procedures also permitted the Debtors to extend the Bid Deadline. *Id.* ¶ 20. The HH Landlords never asked for an extension and never submitted a Landlord Bid. Instead, they sent rejection proposals on September 27, after the Bid Deadline. Dkt. No. 516 at 5. Having elected not to bid, the HH Landlords are not well positioned to contend that the auction failed to capture value they could have offered.

***(f) BSP is not an insider, and the solvency argument is misplaced.*** The Second Objection asserts that BSP is "affiliated with or controlled by Daniel Patino, an insider and founder of Salad and Go." Dkt. No. 516 at 2. The HH Landlords offer no evidence that Mr. Patino is currently a director, officer, or person in control of any Debtor within the meaning of section 101(31) of the Bankruptcy Code, and none of the Successful Bidders is an insider or affiliate of the Debtors. Brickley Decl. ¶ 30(d). In any event, BSP prevailed in an open, transcribed auction attended by the Creditors' Committee and landlords, and each Successful Bid included a no-collusion representation. *Id.* ¶ 30(b)–(c). The HH Landlords' reliance on the Debtors' solvency is

likewise respectfully misplaced. As the HH Landlords concede, *In re Ultra Petroleum Corp.*, 51 F.4th 138 (5th Cir. 2022), addressed creditors' entitlement to contractual and postpetition interest, not the business-judgment standard under section 365. *See* Dkt. No. 516 at 11. The Debtors' fiduciary duty to maximize estate value runs to all stakeholders, including equity, and does not diminish as recoveries improve.

***(g) October rent and attorneys' fees are not cure.*** October rent is a postpetition obligation payable under section 365(d)(3) whether or not the leases are assumed, as the HH Landlords acknowledge. Dkt. No. 516 at 2. It is not a prepetition default to be cured. As to fees, a landlord may recover attorneys' fees as cure only to the extent the lease provides, and fees incurred litigating bankruptcy issues such as adequate assurance are generally not recoverable as contract-enforcement costs. *See M. Fine Lumber*, 383 B.R. at 569–70. The HH Landlords identify no lease provision supporting the requested fees. They rely instead on Arizona's discretionary prevailing-party statute, A.R.S. § 12-341.01, which by its terms awards fees only to a "successful party." Dkt. No. 516 at 12–13. The HH Landlords have not yet prevailed on any issue, and the fees they seek were incurred opposing a 7 Brew assignment that never occurred. The objections to the Sale and to the assumption and assignment of Stores #1107 and #1134 should be overruled.

**2. Stores #1413 (Hurst, TX), #1468 (Waco, TX), and #1451 (Allen, TX) – Singel Property One LLC, Andi and Chopin Property, LLC, and CNR Texas Ventures LLC [Dkt. Nos. 357, 513, 515, 529, 535].**

Sipside 1 LLC ("**Sipside**") was the Successful Bidder for four Texas stores: Hurst ($180,000), Prosper ($20,000), Waco ($20,000), and Allen ($10,000). Notice of Auction Results at 2. The landlords for Hurst ("**Singel**"), Waco ("**ACP**"), and Allen ("**CNR**" and, together with Singel and ACP, the "**Sipside Landlords**") object. The Prosper landlord has neither objected nor asked for more assurance. Declaration of Matthew Bailey (the "**Bailey Declaration**" or "**Bailey Decl.**") ¶ 25. Singel adopts ACP's objection outright, Dkt. No. 529 ¶ 4, and the three objections

raise the same core arguments: (i) Sipside is newly formed and has no operating history of its own; (ii) the adequate assurance package did not identify the actual assignee; (iii) Sipside cannot fund four acquisitions and build-outs; and (iv) the Court should require full guaranties from the principals (and, for Singel, from their spouses and affiliates), plus security deposits of six to twelve months' rent and taxes. CNR separately contends that Sipside's beverage concept would violate a recorded beverage restriction at the Allen development. The Debtors appreciate the Sipside Landlords' concerns and have worked with Sipside to address them, but respectfully submit that the requested conditions go beyond what section 365 requires and that the objections should be overruled.

***(a) The governing standard is practical, not absolute.*** The Sipside Landlords cite the correct authorities, but their requested conditions would effectively require a guaranty, audited financial statements, and a proven operating record. Section 365 does not. Adequate assurance takes "a practical, pragmatic construction" and is "defined by commercial rather than legal standards." *Richmond Leasing*, 762 F.2d at 1309–10 (internal quotation marks omitted) (quoted in Dkt. No. 513 ¶ 10). The assurance required "falls considerably short of an absolute guaranty." *PRK Enters.*, 235 B.R. at 603 (quoted in Dkt. No. 529 ¶ 18). And the movant "does not need to show that [the assignee] will thrive, make a profit or provide a guarantee of performance"; it must show only that the assignee "can meet its rental and other lease obligations." *Senior Care*, 607 B.R. at 596 (quoted in Dkt. No. 513 ¶ 12). The *Richmond Leasing* factors are guideposts, and no single factor, including a guaranty or a security deposit, is required. *See* Part III.C.1, *supra*. Nothing in section 365 bars assignment to a new entity. What matters is whether the evidence shows that rent will more likely than not be paid. The record here makes that showing.

***(b) The "actual assignee" objection has been resolved.*** The Sipside Landlords complain that the package identified a different store and an entity other than Sipside. Dkt. No. 513 ¶ 11; Dkt. No. 529 ¶ 24; Dkt. No. 535 ¶ 26(a). Sipside has now identified, under oath, a wholly owned single-store Texas subsidiary for each lease (each, a "**Designated Assignee**"): TX Sipside 3 LLC (Hurst), TX Sipside 6 LLC (Waco), and TX Sipside 7 LLC (Allen). Bailey Decl. ¶ 6. Under section 8.3 of each APA, Sipside remains liable for all of its obligations notwithstanding the designation, and Sipside and its principals have offered to guarantee each Designated Assignee's lease obligations. *Id.* ¶¶ 7, 23–24. The financial support described below therefore stands behind each assignee. An inadvertent labeling issue in a preliminary package, since corrected, is not a basis to deny assignment.

***(c) Sipside has the resources to perform all four leases.*** The record shows that Sipside can pay the rent. Sipside's adequate assurance package (Debtors' Ex. 4, the "**Sipside Package**") includes Sipside's own bank statement, which showed $322,000.44 on hand as of August 31, 2026, more than the $230,000 aggregate purchase price for all four leases. Sipside Package, Items E-3, E-6. Sipside has since paid its deposits and had approximately $249,000 in cash on hand as of October 1, 2026, enough to pay the remaining $207,000 of the four purchase prices. Bailey Decl. ¶¶ 3, 8. Closing is not conditioned on financing. *Id.* ¶ 8. Sipside also has a fully available, undrawn $150,000 line of credit and an approval letter from Newtek for an $850,000 SBA-guaranteed loan, approved primarily for working capital. *Id.* ¶ 9 & Exs. 4, 6. Sipside has prepared a store-by-store start-up budget of approximately $778,706 covering purchase prices, two months of pre-opening rent and taxes, equipment, signage, permits, inventory, training, and opening marketing. *Id.* ¶ 10 & Ex. 5. After funding that budget in full, Sipside will retain approximately $470,000 in cash and available credit, more than eleven months of the

roughly $40,350 in combined monthly rent and taxes for all four stores, before any operating revenue. *Id.* ¶ 11. The obligations at issue are modest: base rent of $100,000 a year at Hurst, about $95,000 at Waco, and $105,000 at Allen. Dkt. No. 529 ¶ 9; Dkt. No. 513 ¶ 5; Dkt. No. 535 ¶ 7. Behind Sipside stand two principals with combined net worth of approximately $4.48 million, Bailey Decl. ¶ 12; Sipside Package, Items E-1, E-2 (personal financial statements reflecting net worth of $2,262,295 and $2,220,001), and approximately $1.87 million of commercial real estate equity, Bailey Decl. Ex. 4. The principals' established restaurant group separately held approximately $338,000 in its operating accounts as of September 24, 2026. Although those funds are not part of Sipside's transaction funding, they confirm that the principals' core business is stable. Sipside Package, Item E-4. This is the "non-speculative and sufficiently substantive" foundation that Singel says is required. Dkt. No. 529 ¶ 20 (quoting *PRK Enters.*, 235 B.R. at 602).

***(d) Lack of operating history at the entity level is not disqualifying.*** Every single-purpose acquisition vehicle is newly formed. The relevant question is whether the people running it can operate the business, and here they can. Mr. Bailey was Vice President of Operations at Edible Arrangements International while it grew from 85 to more than 1,050 units. He later ran an eight-restaurant group with $28 million in revenue and more than 475 employees, and since 2015 he has owned and operated restaurants and a catering company generating over $8 million in annual sales with more than 150 employees. Bailey Decl. ¶¶ 15–16. Mr. Brennan has led the principals' culinary and bar programs since 2015 and previously ran a restaurant kitchen generating more than $4 million in food sales. *Id.* ¶ 17. The principals currently operate three restaurants and a catering company in Connecticut. *Id.* ¶ 18. Sipside's first location, in The Colony, Texas, is scheduled to open on October 16, 2026. *Id.* ¶ 15. Sipside will reuse the existing building footprint, equipment, and drive-thru lane and expects to open each store within approximately

sixty days of closing. *Id.* ¶ 19. It selected each site based on its own diligence. *Id.* ¶ 20. Singel's assertion that there is no evidence the principals "have run a comparable restaurant," Dkt. No. 529 ¶ 15(e), is understandable in light of the preliminary package, but the supplemented record now addresses it, and no Sipside Landlord has designated a witness to the contrary. *See* Dkt. Nos. 544, 549. Unrebutted evidence of capacity to perform carries the burden. *See PRK Enters.*, 235 B.R. at 602–03.

***(e) The landlords' authorities are distinguishable.*** ACP relies on *Texas Health*, in which the court denied assumption because the landlord had "no assurance that it would be paid going forward" and the movant's testimony about future funds "appeared dubious." Dkt. No. 513 ¶ 14. That debtor had a history of monetary and non-monetary defaults and regulatory violations. *See* Part III.C.1, *supra*. Sipside has none. Its funding is documented by bank records, a line of credit, and a lender approval, and it is supported by a sworn declaration. Singel's reliance on *M. Fine Lumber*, Dkt. No. 529 ¶ 20, is likewise distinguishable. There, the debtor conceded that its own payment history would not support adequate assurance, and the court permitted assumption only on the condition of additional security. Here, by contrast, Sipside's cash and line of credit alone exceed the remaining purchase prices and several months of rent, and closing does not depend on any financing. Bailey Decl. ¶¶ 8–9. Finally, the authorities on which ACP and Singel rely show only that courts have accepted letters of credit and deposits as sufficient; they do not hold that such security is required. Dkt. No. 529 ¶ 23; Dkt. No. 513 ¶ 17.

***(f) The demands for full guaranties and year-long deposits seek a better bargain than the leases provide.*** Neither the Waco lease nor the Allen lease requires a guarantor or a security deposit. The Waco lease conditions assignment only on the landlord's consent, "which shall not be unreasonably withheld," and on the assignee's written assumption of the lease; it

contains no guaranty or deposit requirement. Waco Lease § 23. The Allen lease likewise requires only consent "not [to] be unreasonably withheld," and its deposit provision is limited to the return of "any deposits and prepaid amounts" upon termination during the contingency period. Allen Lease §§ 1(f), 20. The Hurst lease is to the same effect. It conditions a transfer on consent "which shall not be unreasonably withheld" where the transferee is creditworthy, reputable, and will use the premises for a permitted use, and it requires only a $3,000 processing fee for a consent request, with no guaranty or security deposit. Hurst Lease § 20(a). The Sipside Landlords nonetheless ask for unlimited joint and several guaranties from both principals, from the principals' operating restaurant affiliate, and, in Singel's case, from the principals' spouses, together with deposits of six to twelve months' rent and taxes ($112,000 at Hurst and $115,000 at Waco). Dkt. No. 529 ¶¶ 3, 26; Dkt. No. 513 ¶¶ 16–17; Dkt. No. 535 ¶ 27. The landlords did not have that credit support from the Debtor. They "cannot hold out for concessions . . . beyond those required to provide adequate assurance." *Richmond Leasing*, 762 F.2d at 1307–11; *see Senior Care*, 607 B.R. at 596–97 (rejecting as unreasonable a landlord's demand for an enhanced security deposit of approximately six times rent). The Debtors respectfully submit that the request for spousal guaranties extends furthest beyond the parties' bargain. The Connecticut restaurant affiliate, Fork Hospitality, has other owners who are not involved in Sipside and is not a party to the APAs. Bailey Decl. ¶ 18. Although none of this is required, Sipside has voluntarily offered substantial additional protection: (i) a guaranty by both principals, joined by Sipside, capped at eighteen months of lease obligations at Hurst and Waco and twelve months at Allen; (ii) termination of the guaranty only after five years of timely payments; and (iii) a security deposit of one month's rent at each store. *Id.* ¶¶ 23–24, 26. These offers go well beyond what the leases or section 365 require,

and the Debtors respectfully submit that, with these offers in place, further conditions would exceed what is contemplated by *Richmond Leasing*, 762 F.2d at 1307–11.

***(g) CNR's "loss of tenant credit" concern does not change the analysis.*** CNR expresses concern that it will trade "an established, multi-unit operator" for a start-up. Dkt. No. 535 ¶ 26(e). The "established" operator is a chapter 11 debtor that has closed all of its restaurants and is selling its assets. The Debtors' credit is not the benchmark. Congress deliberately provided that assignment relieves the estate of post-assignment liability. 11 U.S.C. § 365(k). And CNR concedes that the lease's $50 million net-worth threshold for releasing the tenant is an anti-assignment-type provision that does not govern here. Dkt. No. 535 ¶ 26(e).

***(h) Sipside will comply with the Allen beverage restriction, and the Debtors do not seek to override it.*** CNR's only non-financial argument is that section 5.2 of the recorded REA bars any tenant on the Allen tract that derives "twenty (20%) or more of its gross revenues" from coffee, blended drinks, smoothies, or energy drinks, for so long as the adjacent tract is operated as a Dutch Bros. Dkt. No. 535 ¶ 9. The Debtors do not ask the Court to strip or modify that restriction. The Allen lease permits any lawful use that complies with the REA. *Id.* ¶ 10. Sipside will take the lease subject to the REA and has committed, under oath, to comply with it. Bailey Decl. ¶ 29. Mr. Bailey has reviewed the restriction and testifies that at the Allen store Sipside will sell no blended drinks or smoothies, its only coffee product will be cold brew, and energy drinks will be limited to two of fifteen drink categories, with a menu built on more than seventy cold drinks and snacks. Bailey Decl. ¶¶ 27–28. Based on its planned menu mix and pricing, Sipside expects restricted-category sales to be well below 20% of gross revenue, and it will track sales by category and adjust the menu if necessary. *Id.* ¶¶ 28–29. A tenant's sworn plan to operate within a percentage-of-revenue restriction, backed by monitoring, is adequate assurance of compliance. CNR offers no

witness or other evidence to the contrary. If a breach ever occurred, the REA's remedies against the breaching party would remain fully available. Dkt. No. 535 ¶ 9.

CNR's reliance on the Sunfly concept deck, Dkt. No. 535 ¶¶ 18, 23, does not change the analysis, for two independent reasons. First, the deck, read as a whole, does not support CNR's reading. The page CNR relies on is titled "The Competitive Landscape: Three national chains – and one open gap," and its point is that Sunfly is different from Dutch Bros. Sipside Package, Item E-5 at 3. The deck describes Dutch Bros as "[d]rive-thru only – no walk-up," with a food program that "was an afterthought," and then identifies "The Gap Sunfly Fills": no existing operator "has combined drive-thru speed, walk-up warmth, a genuine food program, and mid-market pricing." *Id.* at 3–4. Sunfly is built around a walk-up window, a chef-built food program served from 6:00 a.m. to 8:00 p.m., and a target average ticket of more than $9.00 driven by food and add-ins. *Id.* at 1, 6. The menu confirms the point. Of fifteen drink families, one ("Java Clouds") is coffee-based and two ("Energized Elixirs" and "Charged Energy") are energy drinks; the rest are sparkling sodas, citrus-ades, coconut-water and aloe refreshers, tea-based punches, matcha, boba refreshers, lemonades, and kids' drinks, and none is a blended drink or smoothie. *Id.* at 5. Indeed, in describing the competitive set, the deck notes that "[h]alf of sales are non-coffee refreshers." *Id.* at 4. A concept that defines itself by what Dutch Bros does not offer is not evidence of a coffee or energy-drink business.

Second, and in any event, whether Sunfly and Dutch Bros compete for customers does not answer the question the REA poses. Section 5.2 is not a non-compete and does not bar "competitors" of Dutch Bros. It is a percentage-of-revenue test that applies only to a tenant deriving 20% or more of its gross revenues from four defined product categories. Dkt. No. 535 ¶ 9. Tea, matcha, lemonade, non-energy refreshers, and food are not restricted at all. Respectfully, a

revenue-based restriction should not be converted into a categorical bar on any beverage concept that a marketing deck places in the same market. *See Simon Prop. Grp.*, 943 S.W.2d at 71 (restrictions resolved in favor of free use of land). The only question is whether restricted-category sales at Allen will stay below 20%, and the only evidence on that question is Mr. Bailey's unrebutted testimony that they will. Bailey Decl. ¶¶ 27–29.

The Debtors therefore do not oppose the order language CNR requests: that the assignee takes subject to the REA and the lease's use provisions, that it will not use the premises in violation of section 5.2 of the REA, and that nothing in the Sale Order modifies the REA. Dkt. No. 535 ¶ 25. With that language, the Debtors believe CNR's use concern is fully addressed. CNR's fallback contention that section 365(b)(3) may apply, raised only "[t]o the extent the Development constitutes a 'shopping center,'" is not supported by evidence in the record. *Id.* ¶ 20 n.5. Even if section 365(b)(3) applied, the same compliance commitment would satisfy it.

***(i) The remaining requests are addressed by the Sale Order.*** ACP concedes that the Waco premises is "a standalone drive-thru pad," Dkt. No. 513 ¶ 5, so the heightened shopping-center protections of section 365(b)(3) do not apply. The Debtors agree that each lease will be assigned *cum onere*, subject to its terms, other than those provisions unenforceable under sections 365(b)(2) and 365(f), and subject to any recorded declaration that runs with the land, including the Waco Declaration of Easements and Restrictions. Upon a post-assignment default, each Sipside Landlord will have the same remedies against the assignee that it had against the Debtor. Accrued but unbilled taxes and other Additional Rent will be addressed through the cure reconciliation process under the Sale Order. Singel's demand for attorneys' fees as part of cure is addressed below.

***(j) Singel's attorneys' fees are not a condition to assumption.*** The only default Singel identifies at Hurst is $8,333.33 in outstanding base rent, and the only respect in which Singel contends the cure amount is incorrect is that it omits Singel's attorneys' fees. Dkt. No. 357 ¶¶ 6, 8–9. The Debtors will pay the $8,333.33, which cures the default under section 365(b)(1)(A). The remaining question under section 365(b)(1)(B) is whether Singel has suffered an additional "actual pecuniary loss" "resulting from such default." 11 U.S.C. § 365(b)(1)(B). It has not, and the lease does not entitle it to the fees in any event.

*First*, the fees did not result from the rent default. Singel seeks fees "incurred in connection with the bankruptcy case." Dkt. No. 357 ¶ 9. Singel's counsel's prebill (the "**Prebill**") confirms that the work concerns the sale process: calls and emails regarding Hilco's offer to pay Singel to accept rejection; review of the auction, the amended auction procedures, and the stalking horse notices; several days of review and negotiation over Sipside's adequate assurance information; and preparation of an adequate assurance objection and an emergency motion to seal. Prebill at 1–5. None of that work flows directly from the rent default, as the interest at issue in *In re Eagle Bus Mfg., Inc.*, 148 B.R. 481, 483 (Bankr. S.D. Tex. 1992), did. Had the Debtors paid the $8,333.33 on time, Singel would have incurred the same fees: the Debtors would still have filed these cases and marketed the lease, Hilco would still have made its offer, and Singel would still have followed the auction and reviewed the proposed assignee. A cost that would have arisen without the default is not a loss "resulting from such default." 11 U.S.C. § 365(b)(1)(B).

The adequate assurance fees fail for an additional reason. Adequate assurance of future performance is a separate condition under section 365(b)(1)(C), distinct from cure and compensation under subsections (A) and (B). The amended Non-Bulk auction procedures order keeps those issues on separate tracks, carving adequate assurance out of the cure deadline, Dkt.

No. 357 ¶ 7, and Singel itself reserves its adequate assurance objections separately from its cure objection, *id.* (Joinder and Reservation of Rights). Charging the cost of a landlord's diligence on a bidder to cure would merge subsection (C) into subsection (B). Nor are the fees for preparing the cure objection itself compensable. Those entries record the cost of demanding fees and contesting the cure amount, not a loss caused by the rent default. Prebill at 2–3. If the cost of asserting a fee claim could itself become cure, every cure objection would pay for itself, whatever its merit.

*Second*, the Hurst Lease does not authorize the fees. Singel cites no lease provision. Dkt. No. 357 ¶ 9. The only provision that shifts fees between the parties is section 28(d), which provides that if either party fails to comply with the lease "and the other party takes action to enforce such provisions or to enforce any payment stipulated to in this Lease the losing party will pay to the prevailing party reasonable costs and expenses, including attorneys' fees . . . as determined by the court or arbitrator." Hurst Lease § 28(d). None of its conditions has occurred. Singel has brought no action to enforce the lease. Monitoring the docket, negotiating with Hilco, following the auction, and reviewing the proposed assignee's finances are Singel's commercial participation in the sale, not actions to enforce the lease. No party has lost or prevailed, and no court or arbitrator has determined any fees. Even if the cure objection were treated as an enforcement action, section 28(d) would reach only fees incurred in that action, and only if Singel prevails; it would not reach the August and early September fees incurred before the objection was filed. Prebill at 1–2. Section 16(b)(v), which covers reletting costs after the lessor retakes possession, does not apply because Singel has not terminated the Debtors' possession, re-entered, or relet the premises. Hurst Lease § 16(b). And section 17 is an indemnity directed to claims brought by third parties, which Singel invokes only prospectively for unknown future claims. *Id.* § 17; Dkt. No. 357 ¶ 11.

*Third*, the authorities do not support Singel's demand. *Travelers* held that a contractual fee claim is allowable to the extent it is "enforceable under substantive, nonbankruptcy law," but it did not create a right to fees, and the Court "express[ed] no opinion" on whether other provisions of the Bankruptcy Code limit such claims. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448–49, 456 (2007). Section 365(b)(1)(B) is one of those limits: even an enforceable fee claim becomes a condition to assumption only if it is an actual pecuniary loss resulting from the default. *See Eagle Bus*, 148 B.R. at 482–83. *Bourbon Saloon, Inc. v. Absinthe Bar, L.L.C.*, 647 F. App'x 342 (5th Cir. 2016) (unpublished), is not to the contrary. There, fees arose from litigation over identified defaults left uncured after a deadline set in an agreed order, and the Fifth Circuit dismissed the fee challenges as premature without deciding entitlement or amount. *Id.* at 343. Here, there is no agreed order, no missed cure deadline, and no litigation to compel cure. The Debtors listed the default in the Cure Notice and will pay it.

*Finally*, Singel bears the burden of proving "all elements of compensation and damages for pecuniary loss." *Eagle Bus*, 148 B.R. at 482 (citation omitted). Its objection states no amount. Dkt. No. 357 ¶ 9. The Prebill is an unsworn summary of counsel's time totaling $21,780.00. On its face, approximately $8,140.00 concerns Sipside's adequate assurance, the related objection, and the motion to seal; $4,895.00 concerns preparing objections and pro hac vice admission; $4,730.00 concerns the Hilco rejection offer and general monitoring of the auction and docket; and $3,300.00 is an unincurred estimate for October 12 and 13. Prebill at 1–5. Only $715.00, for September 2 and 3, is mainly about the Cure Notice, and even those entries combine cure correspondence with auction review and other work. *Id.* at 2. None of this time is shown to be a loss resulting from the $8,333.33 rent default.

Even if some portion of the fees were otherwise recoverable, Singel would still have to prove that the amount is reasonable, and it has not done so. The Fifth Circuit uses a two-step process to determine the reasonableness of fees. The court first calculates the lodestar, which is "the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work," and only then considers adjustments. *See In re Cahill*, 428 F.3d 536, 539–40 (5th Cir. 2005); *In re Digerati Techs., Inc.*, 537 B.R. 317, 331–32 (Bankr. S.D. Tex. 2015). The burden on each part of the lodestar belongs to the party seeking fees. The Fifth Circuit has long treated a fee claim like any other claim for money: "the plaintiff has the burden of proving his entitlement to an award for attorney's fees just as he would bear the burden of proving a claim for any other money judgment." *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974).

As to hours, courts in this Circuit "customarily require the applicant to produce contemporaneous billing records or other sufficient documentation so that the district court can fulfill its duty to examine the application for noncompensable hours." *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324–26 (5th Cir. 1995). The applicant must also prove billing judgment, which "requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799–800 (5th Cir. 2006) (per curiam). As to rate, "the burden is on the fee applicant to produce satisfactory evidence," which must be "in addition to the attorney's own affidavits," "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). And because both inputs are findings of fact, the Court must explain how it reached any award. "It is essential that the judge provide a reasonably specific explanation for all aspects of a fee

determination." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010); *see Kellstrom*, 50 F.3d at 329. A bankruptcy court "must explain the weight given to each factor that it considers and how each factor affects its award." *Cahill*, 428 F.3d at 539–40.

Singel has not submitted the evidence these findings require. Its objection asks for "the attorneys' fees Singel has incurred in connection with the bankruptcy case," but it states no amount and attaches no time records, declaration, or other proof of fees. Dkt. No. 357 ¶ 9. The only fee document in the record is the Prebill, an unsworn summary of counsel's time that no witness has authenticated or explained. Prebill at 1–5. Singel has not submitted a declaration or an exhibit offering testimony about the hours, the rate, or the necessity of the work. The Prebill bills every hour by a single timekeeper, identified only by the initials "JZJ," at $550.00 per hour. *Id.* Nothing in the record describes that timekeeper's experience, skill, or reputation, or the rates charged in this community by lawyers of comparable skill for comparable work. The Prebill lists hours claimed. It does not prove "the reasonable amount of time required to perform the services." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 498 (Tex. 2019). No witness has explained why any of this time was reasonable or necessary to cure the $8,333.33 rent default. The objections to the assumption and assignment of Stores #1413, #1468, and #1451 to Sipside and its Designated Assignees should be overruled.

**3. Store #1704 (Owasso, OK) – Srikarvichu OK LLC [Dkt. No. 508].**

Srikarvichu OK LLC (the "**Owasso Landlord**") filed a limited objection and reservation of rights. Dkt. No. 508. The Owasso Landlord does not contend that Swig lacks the ability to perform, and it acknowledges that it has received adequate assurance information concerning Swig. *Id.* ¶ 10. Its concerns are that (i) it has not received financial information for Swig's Permitted Franchisee, Quench Unlimited, LLC ("**Quench**"); (ii) section 8.3 of the Swig APA permits Swig to assign to undisclosed affiliates; (iii) cure should be $11,250.00 rather than the

noticed $6,250.00 and should account for accrued but unbilled charges; and (iv) the Sale Order should not convey the lease "free and clear" of the lease terms or recorded easements. *Id.* ¶¶ 8, 10–12, 18–25. The Owasso Landlord has also requested a $100,000.00 security deposit as a condition to assignment. The Debtors appreciate the limited nature of the objection and believe each concern is addressed below.

***(a) Quench is an established, profitable operator, and Swig stands behind the system.*** The Owasso Landlord's understanding that Quench is a newly formed entity with no operating history or financial information, Dkt. No. 508 ¶¶ 8, 10, is not borne out by the record. The Debtors have provided Quench's profit and loss statement for January through September 2026, which reflects total income of $1,963,824.33, gross profit of $1,354,323.74, net operating income of $422,464.33, and net income of $422,465.81, after rent expense of $132,317.28 and royalties and fees paid to the franchisor. Debtors' Ex. 3. By comparison, annual base rent under the Owasso lease is $75,000.00, or $6,250.00 per month. Owasso Lease § 1(c); Tenant Estoppel ¶ 2. Quench's net income for the first nine months of 2026 alone exceeds five and one-half years of base rent. Behind Quench stands Swig, which reported 2025 net revenue of approximately $98.5 million, adjusted EBITDA of approximately $8.5 million, and $9.8 million in cash, and which has $27 million of remaining availability under a $35 million secured credit facility with Bank of America, N.A. Debtors' Ex. 3.

***(b) The $100,000.00 security deposit exceeds the parties' bargain.*** The Owasso lease does not require a security deposit, and the Debtor never posted one. In its estoppel certificate, the Debtor confirmed that it "has not deposited . . . a security deposit with Lessor." Tenant Estoppel ¶ 8. A $100,000.00 deposit equals sixteen months of base rent. That is well beyond the deposit of approximately six times rent that the court in *Senior Care* found unreasonable to demand in

connection with adequate assurance. 607 B.R. at 596–97. Nor does the Owasso Landlord identify any lease provision requiring a guaranty or other credit enhancement. A landlord "cannot hold out for concessions from the debtor beyond those required to provide adequate assurance," *Richmond Leasing*, 762 F.2d at 1307–11, and section 365 does not permit a landlord to improve its position upon the tenant's bankruptcy. *M. Fine Lumber*, 383 B.R. at 573; *see* Part III.C.1, *supra*. Given Quench's operating results and Swig's resources, no additional security is required.

***(c) The lease itself governs affiliate transfers and the tenant's release.*** The Owasso Landlord asks that Swig be barred from assigning to an affiliate without its consent and that Swig remain liable if the lease is transferred. Dkt. No. 508 ¶¶ 12–13, 25. The lease already addresses both points. Section 20 permits the tenant, "without Lessor's consent," to assign to "any parent, subsidiary or affiliated entity," subject to a net-worth test, and otherwise requires consent that "shall not be unreasonably withheld." Owasso Lease § 20. Section 20 further provides that, upon an approved assignment, the assigning tenant "shall no longer be obligated under this Lease." *Id.* The Owasso Landlord's requests would therefore give it more protection than it bargained for. The Debtors do not object to order language confirming that any post-closing transfer by the assignee remains subject to section 20 of the lease.

***(d) Section 365(b)(3) is not established, and in any event is satisfied.*** The Owasso Landlord asserts that the premises are in a shopping center. Dkt. No. 508 ¶ 9. The lease describes the premises as an approximately 28,000-square-foot ground-leased parcel that is "part of a larger commercial development." Owasso Lease at 1. The Owasso Landlord offers no evidence that the development bears the characteristics of a shopping center. Even if section 365(b)(3) applies, the Owasso Landlord does not identify any radius, location, use, exclusivity, or tenant-mix provision

that assignment would breach, and the financial condition and operating performance of Quench and Swig, described above, support assignment.

***(e) Cure.*** The Owasso Landlord concedes that the noticed cure amount of $6,250.00, representing August 2026 rent, was correct, and it did not timely object to it. Dkt. No. 508 ¶ 18. The asserted $11,250.00 appears to consist of that amount plus $5,000.00 in estimated attorneys' fees. *Id.* ¶¶ 19, 25. Estimated fees are not a liquidated default, and the Owasso Landlord does not quote any lease language that shifts fees incurred in bankruptcy proceedings. Fees incurred litigating bankruptcy issues such as adequate assurance are generally not recoverable as cure. *See M. Fine Lumber*, 383 B.R. at 569–70. Postpetition rent is payable under section 365(d)(3) and is not cure. As with the other leases, accrued but unbilled taxes and year-end adjustments will be addressed through the cure reconciliation process under the Sale Order.

***(f) The remaining requests are addressed by the Sale Order.*** The Debtors agree that the lease will be assigned subject to its terms, other than those provisions unenforceable under sections 365(b)(2) and 365(f), and that nothing in the Sale Order strips recorded easements benefiting or burdening the premises. Dkt. No. 508 ¶ 22. The objection to the assumption and assignment of Store #1704 should be overruled.

**4. Store #1702 (Broken Arrow, OK) – Beyond Good, LLC [Dkt. No. 510].**

Beyond Good, LLC ("**Beyond**") objects on a single ground: that the Swig franchisee proposed to operate the premises failed to perform under two prior leases with Beyond, which Beyond resolved through negotiated terminations, and that one of those properties is next to Store #1702. Dkt. No. 510 ¶¶ 5–7. The Debtors take Beyond's experience seriously, but respectfully submit that it does not defeat a finding of adequate assurance on this record.

***(a) The objection is not supported by evidence.*** Beyond does not identify the prior leases, the nature or amount of any default, when it occurred, or the circumstances of the negotiated

terminations, and it attaches no declaration or documents. *See generally* Dkt. No. 510. A negotiated termination is a consensual resolution, not an adjudicated default, and it may reflect any number of site-specific considerations. Beyond's own authority holds that adequate assurance is determined case by case with due regard to "past dealings" and "present commercial realities." *Id.* ¶ 7 (quoting *In re Gen. Oil Distribs., Inc.*, 18 B.R. 654, 658 (E.D.N.Y. 1982)). Unspecified prior dealings on different leases do not outweigh documented present financial capacity. *See PRK Enters.*, 235 B.R. at 602–03.

***(b) Present commercial realities show that performance is likely.*** Base rent under the Broken Arrow lease is $90,000.00 per year, or $7,500.00 per month. Broken Arrow Lease § 3(a). Quench reported net income of $422,465.81 for January through September 2026 on total income of $1,963,824.33, which alone exceeds four and one-half years of base rent. Debtors' Ex. 3. Swig, with approximately $98.5 million in 2025 net revenue, $9.8 million in cash, and $27 million of available credit, stands behind its franchise system. *Id.* Unlike *Texas Health*, on which Beyond relies, this is not a case in which the party seeking to assume has a history of defaults under the very contract at issue. *See* 246 B.R. at 835–37; Part III.C.1, *supra*.

***(c) Denial is disproportionate to the concern raised.*** The Broken Arrow lease contains no security deposit provision. *See generally* Broken Arrow Lease. It permits assignment to affiliates without consent, subject to a net-worth test and the transferee's written assumption of the lease. *Id.* § 25. Beyond does not seek tailored relief; it asks the Court to deny the assignment outright. Dkt. No. 510 at 3. Denial would likely leave Beyond with a vacant pad and a claim subject to the section 502(b)(6) cap, while depriving the estates of the value of Swig's bid. Beyond also asks, in the alternative, that the property be excluded from the "Bulk Sale," but Store #1702 is a Non-Bulk Asset. *Id.* Although the lease describes the premises as part of the County Line Shopping Center,

Broken Arrow Lease at 1, Beyond does not invoke section 365(b)(3) or identify any use, exclusivity, or tenant-mix concern. The objection to the assumption and assignment of Store #1702 should be overruled.

## IV. CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court:

1. Approve the Sale of the Non-Bulk Assets to the Successful Bidders, free and clear of all liens, claims, encumbrances, and interests, under sections 105, 363, and 365 of the Bankruptcy Code;

2. Authorize and approve the assumption and assignment of the assumed leases to the Successful Bidders notwithstanding use restrictions, inclusive of all renewal options, under section 365(f) of the Bankruptcy Code, and overrule the remaining landlord objections;

3. Find that each Successful Bidder provides adequate assurance of future performance under the assumed leases; and

4. Grant such other and further relief as the Court deems just and proper.

Dated: October 19, 2026
Houston, Texas

Respectfully submitted,

*<u>/s/ Omar J. Alaniz</u>*
**REED SMITH LLP**
Omar J. Alaniz (24040402)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: 469.680.4200
Fax: 469.680.4299
E-mail: oalaniz@reedsmith.com

*Counsel for Debtors and Debtors in Possession*

**REED SMITH LLP**
Amalia Y. Sax-Bolder (admitted *pro hac vice*)
1900 Lawrence Street, Suite 2800
Denver, CO 80202
Telephone: 303.552.3800
Fax: 303.552.3799
E-mail: asaxbolder@reedsmith.com