*Reed Smith 10/26*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **And Go Concepts, LLC, *et al.*,** | § | **Case No. 26-90753 (ARP)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE NON-BULK SALE ORDER AND (II) COMPELLING SWIG STORES, LLC TO CLOSE THE SALE OF STORE NOS. 1124 AND 1127**
**[Relates to Dkt. Nos. 453 and 599]**

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER AT 8:30 A.M. (CENTRAL TIME) ON OCTOBER 30, 2026, IN COURTROOM 400, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE PÉREZ'S CONFERENCE ROOM NUMBER IS 282694. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE PÉREZ'S HOME PAGE. THE MEETING CODE IS "JUDGEPEREZ."**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); Garland New Market LLC (6838); AGC Topco, LLC (6845); and AGC Holdco, LLC (0294). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts.

**CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE PÉREZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

And Go Concepts, LLC, and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this emergency motion (the "**Motion**"):

## Preliminary Statement

1. On October 16, 2026, after a hearing, the Court entered an order approving the sale of, among other things, Store No. 1124 (777 W. Indian School Rd., Phoenix) and Store No. 1127 (3229 S. 48th St., Tempe) to Swig Stores, LLC ("**Swig**") for $700,000 and $780,000, respectively. The Court found that Swig's consideration was the highest or otherwise best offer, that time is of the essence, and that closing should proceed without regard to any stay. The Court also ordered that "the Buyer and the Debtors shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable law to consummate and make effective the transactions contemplated by the APA." Swig now refuses to close on Store Nos. 1124 and 1127. No closing condition has failed, no landlord objection is pending, and the Debtors are not in default. Swig simply no longer wants those two stores.

2. Swig's only justification is Section 1.6(a) of its asset purchase agreement, which permits the Buyer, up to three days before the Closing Date, to "determine not to 'assume' any Contract previously designated as an Assumed Contract," in which case "such contract shall be removed from the Executory Contract Schedule." Section 1.6 is a contract-schedule and cure-cost provision. It does not mention Sites, Purchased Assets, or the Purchase Price. The leases for Store

Nos. 1124 and 1127 are not merely scheduled contracts; they are "Assumed Leases," a separately defined category of Purchased Assets that Swig "shall purchase and acquire" at Closing under Section 1.1(a). The agreement separately and specifically tells the parties how a Site may come out of the deal and when the price may be reduced: Section 2.1 ties any adjustment to Section 1.1 (Additional Sites), Section 6.5 (Disputed Leases), and Section 7.1(d)(iii) (a Seller's inability to satisfy closing conditions as to a Site), each of which is subject to conditions that are not met here. Swig's reading would convert a court-approved, irrevocable, non-contingent stalking horse bid into a free option, render the agreement's conditional exit provisions meaningless, and leave the estates holding two leases for which no other party bid.

3. Swig agreed that a breach of its agreement would cause irreparable harm, that the Debtors are entitled to specific performance "to cause each Party to consummate the Closing and to make the payments and Transfer contemplated by this Agreement," and that it would not object to that remedy. Under Section 2.3, Closing is to occur on October 30, 2026, the same day the Termination Date under Section 7.1(d)(iii) arrives. Emergency relief is therefore necessary to enforce the Sale Order, to confirm that Section 1.6(a) does not permit Swig to drop Store Nos. 1124 and 1127, to compel Swig to close, and to prevent Swig from using the passage of a deadline that its own refusal to close will have caused as a basis to terminate the entire transaction.

## Relief Requested

4. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto (the "**Proposed Order**"): (a) enforcing the *Order (I) Approving the Non-Bulk Sale of Assets to the Successful Bidders Under Their Respective Final Purchase Agreements, (II) Authorizing the Assumption and Assignment of Contracts and Leases Free and Clear of Liens, Claims, Interests, and Encumbrances, and (III) Granting Related Relief* [Dkt. No. 599] (the "**Sale**

**Order**") and the Asset Purchase Agreement dated as of October 2, 2026, between And Go Concepts, LLC ("**Seller**") and Swig, attached to the Sale Order as Exhibit A-6 (the "**APA**"); (b) determining that Section 1.6(a) of the APA does not authorize Swig to exclude Store Nos. 1124 and 1127, or any other Site approved under the Sale Order, from the Purchased Assets or to reduce the Purchase Price on account of any such exclusion; (c) directing Swig to consummate the Closing with respect to all Approved Leases assigned to Swig under the Sale Order, including Store Nos. 1124 and 1127, and the related Purchased Assets, within three (3) Business Days after entry of the Proposed Order; (d) enjoining Swig from terminating the APA under Section 7.1(d)(iii), or otherwise relying on the failure of the Closing to occur by the Termination Date, to the extent such failure is attributable to Swig's refusal to close; and (e) granting related relief. Capitalized terms used but not defined in this Motion have the meanings given to them in the Sale Order or the APA, as applicable.

**Jurisdiction and Venue**

5. The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Order of Reference to Bankruptcy Judges* from the United States District Court for the Southern District of Texas, entered May 24, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory and other bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), Rules 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Procedures for Complex Cases in the Southern District of Texas, and paragraphs 23 and 55 of the Sale Order.

## Background

### *A. The Chapter 11 Cases*

8. On August 4 and 5, 2026, the Debtors commenced these chapter 11 cases. The Debtors continue to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On August 24, 2026, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**"). *See* Dkt. No. 154.

### *B. The Bidding Procedures and Swig's Stalking Horse Bid*

9. On September 1, 2026, the Court entered the *Order Approving Bidding Procedures, Auctions, and Related Relief* [Dkt. No. 240], which approved the Non-Bulk Bidding Procedures (the "**Bidding Procedures**"). The Bidding Procedures required that every Qualified Bid include "fully executed, non-contingent transaction documents," not be "subject to any contingency, including any financing contingency or due diligence condition," and "be irrevocable until the consummation of the sale transaction." Bidding Procedures ¶ 15(d), (e), (p). By submitting a bid, each bidder consented to the exclusive jurisdiction of the Court "for the resolution of all disputes arising under or related to its Bid, the Non-Bulk Bidding Procedures, the Non-Bulk Auction, or any sale transaction." *Id.* ¶ 37.

10. Pursuant to the Bidding Procedures, the Debtors designated Swig as a stalking horse bidder under the asset purchase agreement filed at Docket No. 453, covering Store Nos. 1108, 1124, 1127, 1140, 1144, 1145, 1146, 1163, 1702, 1704, and 1912. Sale Order ¶ M. Following the auction, Swig and Seller executed the final APA, dated as of October 2, 2026, which added Store Nos. 1113 and 1134, set a total Purchase Price of $7,305,001, and confirmed that Swig had delivered a Deposit of $825,000 to the Escrow Agent. APA §§ 2.1, 2.2 & Ex. C. In exchange for serving as stalking horse, Swig received bid protections that the parties agreed were "fair and

reasonable in light of . . . the Buyer's agreement to act as stalking horse purchaser with respect to the Purchased Assets." APA § 7.3.

***C. The Relevant Terms of the APA***

11. Purchased Assets. Under Section 1.1, "at the Closing, Seller shall Transfer to Buyer, and Buyer shall purchase and acquire from Seller" the Purchased Assets, including "(a) Seller's right, title, and interest in all the Real Property Leases pertaining to the Sites (collectively, the 'Assumed Leases')"; (b) the furniture, fixtures, equipment, leasehold improvements, and other fixed assets used at the Sites; (c) security deposits under the Assumed Leases; (d) assignable utility contracts for the Sites; (e) related causes of action; and (f) transferable Licenses. APA § 1.1. "Real Property Leases" are defined by reference to "the Sites set forth on Exhibit C." APA Ex. A. Exhibit C lists thirteen Sites with a per-Site purchase price, including Store No. 1124 ($700,000) and Store No. 1127 ($780,000). APA Ex. C.

12. Purchase Price and Adjustments. Section 2.1 provides that the Purchase Price is $7,305,001, "as such amount may be adjusted pursuant to the terms hereof, including pursuant to Section 1.1 with respect to any Additional Site, pursuant to Section 6.5 with respect to any Disputed Lease, or pursuant to Section 7.1(d)(iii)," allocated per Site as set forth on Exhibit C. APA § 2.1. "If any Sites are removed from the Purchased Assets prior to Closing in accordance with this Agreement or pursuant to the Sale Order, the Purchase Price shall be reduced by the per-Site allocation for each such removed Site." *Id.*

13. Closing. The Closing "shall take place remotely, via electronic exchange of documents, on October 30, 2026, but in no event later than three (3) Business Days following the date on which the last of the conditions set forth in Article VI . . . has been satisfied or waived." APA § 2.3. Swig represented that it "has sufficient funds available to it in cash to pay or cause to

be paid the Purchase Price." APA § 4.5. The parties agreed to use commercially reasonable efforts to consummate the transactions "as promptly as reasonably practicable," not to take any action that would "prevent, materially impair or materially delay" consummation, and to "cause the fulfillment at the earliest practicable date" of the closing conditions. APA § 5.3(a). Neither party may rely on the failure of a closing condition caused by its own failure to use commercially reasonable efforts or its own breach. APA § 6.4.

14. Irrevocable Offer. Swig agreed that its "bid and this Agreement constitute an irrevocable offer to purchase the Purchased Assets and assume the Assumed Liabilities on the terms set forth herein, and shall remain irrevocable and in full force and effect until the consummation of the sale transaction contemplated by the Bid Procedures, subject only to termination of this Agreement in accordance with Section 7.1 or modification pursuant to the terms hereof (including Section 6.5)." APA § 4.9.

15. Specific Performance and Jurisdiction. The parties agreed that "irreparable damages would occur" if the APA were not performed according to its terms and that each party "will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security . . . or proving damages, including without limitation specific performance . . . (including to cause each Party to consummate the Closing and to make the payments and Transfer contemplated by this Agreement)." APA § 8.6(a). The parties further agreed "not to raise any objections to the availability of the equitable remedy of specific performance." APA § 8.6(b). The Court retains "exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement." APA § 8.7(a).

### *D. The Sale Order*

16. On October 16, 2026, the Court entered the Sale Order. The Sale Order approved "[t]he Non-Bulk Sale to each Buyer of the Non-Bulk Sale Assets set forth opposite its name on Exhibit B . . . for the Purchase Price set forth therein." Sale Order ¶ 2. It identified the leases for Store Nos. 1124 and 1127 as "Approved Leases" to be sold to the Buyer listed on Exhibit B. *Id.* ¶ 3. Exhibit B lists Swig as the Successful Bidder for Store No. 1124 at $700,000 and Store No. 1127 at $780,000, with no Back-Up Bidder for either store. *Id.* Ex. B. The Revised Cure Schedule sets the Cure Amounts for those leases at $9,965.74 and $9,565.05, respectively. *Id.* Ex. C.

17. The Sale Order approved the APA "in all respects" and directed the Debtors to consummate the sale and to assume and assign the Approved Leases to the Buyer. *Id.* ¶¶ 8, 31. It is "binding in all respects upon . . . the Buyer." *Id.* ¶ 9. And it imposes a direct obligation on the Buyer: "the Buyer and the Debtors shall use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable law to consummate and make effective the transactions contemplated by the APA." *Id.* ¶ 23; *see also id.* ¶ 53 (further assurances).

18. The Court found that the consideration provided by the Buyer "is the highest or otherwise best offer for the Non-Bulk Sale Assets" and that "[t]ime is of the essence in consummating the transactions contemplated by the APA." *Id.* ¶¶ I, DD. The Court waived the stays under Bankruptcy Rules 6004(h) and 6006(d) and "authorize[d] the closing of all transactions contemplated hereby and in the APA without regard to any stay or delay in its implementation." *Id.* ¶ D; *see also id.* ¶ 56. The Court retained jurisdiction to "interpret, implement, and enforce the terms and provisions of this Non-Bulk Sale Order and the APA" and to "adjudicate . . . any and all disputes concerning or relating in any way to the Non-Bulk Sale." *Id.* ¶ 55.

19. Objections to the assignment of the leases for Store Nos. 1702, 1704, and 1134 to Swig were reserved for a later hearing. *Id.* ¶ 4. This Motion does not seek relief with respect to those Reserved Leases, and the Debtors reserve all rights with respect to them.

***E. Swig's Refusal to Close on Store Nos. 1124 and 1127***

20. After entry of the Sale Order, Swig, through counsel, informed the Debtors that it intends to exclude Store Nos. 1124 and 1127 from the transaction and to reduce the Purchase Price by their combined allocation of $1,480,000, relying on Section 1.6(a) of the APA. Swig has not asserted that any closing condition has failed, that Seller has breached the APA, that a Material Adverse Effect has occurred, or that any landlord objection to the assignment of either lease remains pending. The landlord for Store No. 1124 filed an objection, which was resolved before entry of the Sale Order, and no landlord objected to the assignment of the lease for Store No. 1127. No objection to either assignment is pending.

21. As of the filing of this Motion, Seller has not received any notice delivered in accordance with Section 8.1 of the APA stating that Swig has determined not to assume the leases for Store Nos. 1124 or 1127.

## <u>Basis for Relief</u>

**I. The Court Has Authority to Enforce the Sale Order Against Swig by Motion.**

22. A bankruptcy court has jurisdiction to interpret and enforce its own prior orders. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *SR Constr., Inc. v. RE Palm Springs II, L.L.C. (In re RE Palm Springs II, L.L.C.)*, 106 F.4th 406, 413 (5th Cir. 2024) (order that "merely interpreted and enforced the Sale Order" was within bankruptcy court's jurisdiction). Section 105(a) of the Bankruptcy Code further authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §

105(a). The Court expressly retained jurisdiction to "interpret, implement, and enforce the terms and provisions of this Non-Bulk Sale Order and the APA," to adjudicate "any and all disputes concerning or relating in any way to the Non-Bulk Sale," and to "enter any orders under sections 105, 363, or 365 of the Bankruptcy Code with respect to the Assumed Contracts/Leases." Sale Order ¶ 55.

23. Swig is bound by the Sale Order and has submitted to this Court's jurisdiction three times over. The Sale Order is "binding in all respects upon . . . the Buyer" and directs that "the Buyer and the Debtors shall use their reasonable best efforts" to consummate the transactions contemplated by the APA. Sale Order ¶¶ 9, 23. Swig agreed in the APA that this Court has "exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise" from it. APA § 8.7(a). And by bidding, Swig consented to the Court's exclusive jurisdiction over "all disputes arising under or related to its Bid . . . or any sale transaction." Bidding Procedures ¶ 37.

24. This Motion is properly brought as a contested matter under Bankruptcy Rule 9014. The Debtors do not assert a new cause of action against Swig. They ask the Court to enforce an existing order that already approved the sale of these specific stores to Swig at specific prices, already directed Swig to use reasonable best efforts to consummate that sale, and already retained jurisdiction to implement it. Sale Order ¶¶ 2, 3, 23, 55 & Ex. B. Specific performance is likewise properly sought by motion here. Swig agreed that the Debtors may specifically enforce its obligation "to consummate the Closing," and it agreed "not to raise any objections to the availability of the equitable remedy of specific performance." APA § 8.6(a)–(b). Swig also agreed that this Court has exclusive jurisdiction over any dispute arising under the APA. APA § 8.7(a).

## II. Swig Is Obligated to Close on Store Nos. 1124 and 1127.

25. The Court approved the sale of Store Nos. 1124 and 1127 to Swig, identified their leases as Approved Leases, fixed their prices at $700,000 and $780,000, and directed their assumption and assignment to Swig. Sale Order ¶¶ 2, 3, 31 & Ex. B. Under the APA, Swig "shall purchase and acquire" the Purchased Assets at the Closing, including the leases and related assets for every Site listed on Exhibit C. APA § 1.1 & Ex. C. Swig's bid is irrevocable, APA § 4.9, and Swig represented that it has the cash to pay the full Purchase Price, APA § 4.5.

26. No closing condition stands in the way. The Sale Order has been entered, is in full force and effect, and is not stayed. APA § 6.1; Sale Order ¶ D. The only remaining element of Section 6.1(b), the Sale Order becoming a Final Order, may be waived by Swig and will be satisfied by the expiration of the appeal period in any event. APA § 6.1(b). Swig has not identified any breach by Seller, any Material Adverse Effect, or any other failed condition under Section 6.2. And Swig may not rely on the failure of any condition caused by its own failure to use commercially reasonable efforts or its own breach. APA § 6.4. Swig's refusal to close is therefore a breach of the APA and a failure to comply with paragraph 23 of the Sale Order. *See In re Oyster Bay Cove, Ltd.*, 161 B.R. 338, 342 (Bankr. E.D.N.Y. 1993) ("successful bidders at judicial sales of debtor's assets pursuant to section 363 of the Bankruptcy Code are bound and obligated to consummate the sale when it is authorized by the Bankruptcy Court.").

## III. Section 1.6(a) Does Not Permit Swig to Remove Sites From the Transaction.

27. The APA is governed by Delaware law. APA § 8.5. Under Delaware law, a court reads a contract as a whole and gives effect to each provision, avoiding interpretations that render any term meaningless or illusory, and specific provisions control over general ones. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole

and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one"). Applying those principles, Section 1.6(a) does not give Swig the right to walk away from Sites the Court has approved.

***A. Section 1.6(a) governs Executory Contract Schedule, not the Purchased Assets.***

28. Section 1.6(a) provides that "[n]o later than three (3) days prior to the Closing Date, Buyer may, in its sole discretion, determine not to 'assume' any Contract previously designated as an Assumed Contract, in which case such contract shall be removed from the Executory Contract Schedule." APA § 1.6(a). By its terms, the only consequence of an election under Section 1.6(a) is that a contract is "removed from the Executory Contract Schedule." *Id.* Section 1.6(a) says nothing about removing a Site, removing assets from the Purchased Assets, or reducing the Purchase Price.

29. The leases for Store Nos. 1124 and 1127 are Purchased Assets not because they appear on the Executory Contract Schedule, but because Section 1.1(a) makes "all the Real Property Leases pertaining to the Sites" Purchased Assets and separately defines them, collectively, as the "Assumed Leases." APA § 1.1(a). "Real Property Leases" are in turn defined by reference to "the Sites set forth on Exhibit C." APA Ex. A. The APA keeps these concepts distinct. "Assumed Leases" has its own definition in Section 1.1(a), while "Assumed Contract" is defined in Section 1.6(a) and merely "includes" the Assumed Leases along with the utility contracts conveyed under Section 1.1(d). APA Ex. A. The Sale Order likewise provides that the term "Assumed Leases," as it relates to unexpired leases, refers to the Approved Leases, which include the leases for Store Nos. 1124 and 1127. Sale Order ¶ 3. Removing a contract from the

Executory Contract Schedule under Section 1.6(a) therefore does not remove an Assumed Lease from the Purchased Assets that Swig is obligated to buy under Section 1.1(a). Moreover, a Site is not merely a lease. Swig agreed to buy, for each Site, the furniture, fixtures, equipment, leasehold improvements, lease deposits, utility contracts, causes of action, and Licenses associated with that Site. APA § 1.1(b)–(f). Section 1.6(a) contains no mechanism for excluding any of those assets. Swig's reading would leave it obligated to purchase the equipment and improvements at a store whose lease it has declined, which confirms that Section 1.6(a) was never intended as a tool for removing Sites.

### *B. Section 1.6 is a cure-cost provision designed for ancillary contracts.*

30. The structure of Section 1.6 confirms its limited purpose. Section 1.6(a) allows the Buyer to request "additional detailed information as to the Liabilities under the Contracts sufficient for Buyer to make an informed assessment regarding whether to accept an assignment and assumption of such Assumed Contract." APA § 1.6(a). Sections 1.6(b) through (d) then address Cure Notices, the establishment of "Cure Costs," and objections to them. APA § 1.6(b)–(d). But "Cure Costs" are defined to cover Assumed Contracts "other than an Assumed Lease." APA Ex. A. Cure amounts for the Real Property Leases are a separate defined term, "Required Cure Costs," which the Buyer must pay at or before Closing. APA § 2.1 & Ex. A. Section 1.6 is thus a mechanism for the Buyer to evaluate and shed ancillary contracts, such as the utility contracts conveyed under Section 1.1(d), once it learns their cure liabilities. It is not a mechanism for abandoning the real estate at the heart of the transaction.

### *C. The APA specifies when a Site may be removed and the Purchase Price reduced, and none of those provisions applies.*

31. Section 2.1 identifies the provisions under which the Purchase Price may be adjusted: "Section 1.1 with respect to any Additional Site, . . . Section 6.5 with respect to any

Disputed Lease, or . . . Section 7.1(d)(iii)." APA § 2.1. It then provides that the Purchase Price is reduced only if Sites are "removed from the Purchased Assets prior to Closing in accordance with this Agreement or pursuant to the Sale Order." *Id.* Section 1.6 is conspicuously absent from that list. Each provision that is listed permits removal of a Site only on specific conditions:

(a) Disputed Leases (Section 6.5). The Buyer may terminate as to a Disputed Lease, defined as a lease to whose assignment a third party has objected, only if the objection or an appeal remains pending on December 14, 2026, and not if the "Buyer has caused such delay through its action or inaction." APA § 6.5 & Ex. A. No objection to the assignment of the leases for Store Nos. 1124 or 1127 is pending; the landlord objection as to Store No. 1124 was resolved, and the Court approved both as Approved Leases. Sale Order ¶ 3.

(b) Seller's Inability to Close a Site (Section 7.1(d)(iii)). The Buyer may terminate "solely with respect to such Site or Sites" only "if the Seller is unable to satisfy one or more conditions precedent to Closing only with respect to a Site or subset of Sites." APA § 7.1(d)(iii). Seller is ready, willing, and able to close Store Nos. 1124 and 1127.

(c) Unresolved Assignment Objections (Section 1.5). A Seller Contract ceases to be an Assumed Contract if it is the subject of an assignment objection or requires a third-party consent that remains unresolved 90 days after Closing, or if it is terminated by a party other than Seller. APA § 1.5. None of those circumstances exists here.

32. Another purchase agreement approved by the same Sale Order provides that, if the lease for a Site is not assumed and assigned at Closing, "if Buyer elects in writing to proceed with fewer than all of the Sites, the Purchase Price shall be reduced by the per-Site allocation for each Site not acquired." *See* Sale Order Ex. A-4 § 1.5. Swig's APA contains no comparable provision tied to Section 1.6.

### *D. Swig's reading would nullify the APA's conditional exit provisions.*

33. If Section 1.6(a) allowed Swig to drop any Site at will and reduce the price accordingly, the conditions in Sections 6.5, 7.1(d)(iii), and 1.5 would serve no purpose. Swig would never need to show that a landlord objected, that the objection remained pending on December 14, that Swig did not cause the delay, or that Seller could not satisfy a closing condition.

It would simply remove the Site. That reading would render those carefully negotiated limitations meaningless, contrary to settled Delaware law. The specific provisions governing when a Site may come out of the transaction control over Swig's expansive reading of a general contract-schedule provision. Although the APA provides that "including" means "without limitation," APA § 8.8(b)(iv), that rule of construction cannot be used to read in an unconditional removal right that would swallow the conditional ones the parties expressly listed.

***E. Swig's reading cannot be reconciled with its irrevocable stalking horse bid.***

34. Swig agreed that its bid is "an irrevocable offer to purchase the Purchased Assets . . . subject only to termination of this Agreement in accordance with Section 7.1 or modification pursuant to the terms hereof (including Section 6.5)." APA § 4.9. The Bidding Procedures required that its bid be non-contingent and irrevocable. Bidding Procedures ¶ 15(d), (e), (p). The APA treats the sale of any Site to another purchaser as a sale of "a material portion of the Purchased Assets." APA Ex. A (definition of "Competing Transaction"). And Swig received bid protections precisely because of its "agreement to act as stalking horse purchaser with respect to the Purchased Assets." APA § 7.3. A stalking horse bid that the bidder may shed Site by Site, at will, after the Court has approved it, is not an irrevocable or non-contingent bid. Had Swig's bid been understood that way, it would have provided no reliable floor for the auction. Notably, no Back-Up Bidder exists for either Store No. 1124 or Store No. 1127. Sale Order Ex. B.

***F. Paragraph 8 of the Sale Order does not create a removal right.***

35. Swig may point to paragraph 8 of the Sale Order, which provides that "the Buyer's rights under the APA, including any rights thereunder to exclude leases from the Assumed Contracts/Leases and to make corresponding adjustments to the Purchase Price, are approved." Sale Order ¶ 8. Paragraph 8 approves only the rights that exist "under the APA"; it does not create

new ones. The APA does contain rights to exclude leases with a corresponding price adjustment, namely Sections 6.5, 7.1(d)(iii), and 1.5, and paragraph 8 preserves those conditional rights. It does not convert Section 1.6(a) into something it is not.

36. Reading paragraph 8 otherwise would put it at odds with the rest of the Sale Order. The same order identifies Store Nos. 1124 and 1127 as Approved Leases to be sold to Swig at fixed prices, directs the Buyer to use reasonable best efforts to consummate the sale, finds that time is of the essence, and finds that Swig's consideration was the highest or otherwise best offer. Sale Order ¶¶ 3, 23, DD, I & Ex. B. The Court could not have made those findings, or directed consummation, if it understood paragraph 8 to give Swig an option to abandon the approved stores days later.

### *G. Even under Swig's reading, Swig has not validly exercised any right under Section 1.6(a).*

37. Section 1.6(a) requires any determination not to assume to be made "[n]o later than three (3) days prior to the Closing Date." APA § 1.6(a). Section 2.3 sets the Closing for October 30, 2026. APA § 2.3. Any election was therefore required by October 27, 2026. Notices and communications "to be given or made hereunder" must be in writing and delivered to Seller at the address specified in Section 8.1, and email notice is effective only if confirmed by the recipient. APA § 8.1. Copies to outside counsel "are for convenience only" and do "not constitute notice." *Id.* Seller has received no notice in compliance with Section 8.1.

38. In any event, a contractual grant of "sole discretion" does not permit a party to use that discretion to defeat the fundamental bargain or to evade obligations it undertook elsewhere in the agreement. Delaware's implied covenant of good faith and fair dealing constrains the exercise of such discretion. *See Calumet Capital Partners LLC v. Victory Park Capital Advisors LLC*, C.A. No. 2025-0036-JTL, slip op. at 59 (Del. Ch. Jan. 29, 2026) ("terms that attempt to enhance the

breadth of discretion, such as 'sole discretion,' do not displace the implied covenant"); *Am. Healthcare Admin. Servs., Inc. v. Aizen*, C.A. No. 2019-0793-JTL, slip op. at 22 (Del. Ch. Nov. 18, 2022) ("the use of the term 'sole discretion,' does not eliminate the implied duty and grant a party carte blanche to exercise discretion however it might wish"); *id.* at 19 (rejecting reading under which a grant of "sole and absolute discretion" would permit a party to ignore a mandatory provision of the same agreement, because "[i]t would create an internal contradiction"); *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021) ("The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party."). The Debtors do not ask the Court to imply a term that negates a right the APA grants. *Cf. id.* (the covenant "should not be used to imply terms that modify or negate an unrestricted contractual right authorized by an agreement"). As shown above, Section 1.6(a) confers no right to remove a Site, so invoking it to exit two court-approved stores is the kind of use of discretion to evade the bargain that the covenant polices. Swig also agreed not to "take any action prior to the Closing that would reasonably be expected to prevent, materially impair or materially delay the consummation of the transactions contemplated hereby." APA § 5.3(a)(iv). Using Section 1.6(a) to abandon two court-approved stores violates that covenant and paragraph 23 of the Sale Order.

## IV. Specific Performance and Related Injunctive Relief Are Warranted.

39. The parties stipulated that "irreparable damages would occur" in the event of breach, that damages may be an inadequate remedy, and that each party is entitled to specific performance, "including to cause each Party to consummate the Closing and to make the payments and Transfer contemplated by this Agreement," without posting a bond or proving damages. APA § 8.6(a). Delaware courts give effect to such stipulations. *See Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1145 (Del. Ch. 2012) ("parties can agree contractually on

the existence of requisite elements of a compulsory remedy, such as the existence of irreparable harm in the event of a party's breach," and "such a stipulation is typically sufficient to demonstrate irreparable harm") (injunctive relief), *aff'd*, 68 A.3d 1208 (Del. 2012). Swig agreed "not to raise any objections to the availability of the equitable remedy of specific performance." APA § 8.6(b). Where a party has agreed to such a clause, it "must establish a persuasive case-specific [reason] why the clause should not be respected." *Aizen*, slip op. at 51–52 (granting specific performance under a materially identical clause and noting that "Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach . . . must be respected" (citation omitted)). The Court has already found that time is of the essence. Sale Order ¶ DD. In reliance on Swig's commitment to purchase Store Nos. 1124 and 1127, the Debtors did not reject those leases and continue to incur administrative expenses under them every day the Closing is delayed. There is no Back-Up Bidder to step in. Sale Order Ex. B.

40. The Court should also prevent Swig from profiting from the passage of time that its own breach will have caused. Under Section 7.1(d)(iii), Swig may terminate the APA if the Closing has not occurred by 5:00 p.m. (prevailing Eastern time) on the Termination Date, fourteen days after entry of the Sale Order, which is October 30, 2026. APA § 7.1(d)(iii). That is the same day the Closing is scheduled to occur. APA § 2.3. Section 8.6(a) entitles the Debtors to an order "enjoining a Party from any threatened, or from the continuation of any actual, breach." APA § 8.6(a). Section 6.4 bars a party from relying on a failed condition that it caused. APA § 6.4. Consistent with those provisions and section 105(a), the Debtors request that the Court enjoin Swig from terminating the APA under Section 7.1(d)(iii), or otherwise relying on the failure of the Closing to occur by the Termination Date, to the extent that failure is attributable to Swig's refusal to close.

## V. Emergency Consideration Is Warranted.

41. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1. The Closing under the APA is scheduled for October 30, 2026, and the Termination Date falls on the same day. APA §§ 2.3, 7.1(d)(iii). Absent prompt relief, Swig may contend that it is entitled to terminate the entire APA, putting at risk a Court-approved sale with a total Purchase Price of $7,305,001 and leaving the estates with two stores for which no other party submitted a bid. APA § 2.1; Sale Order Ex. B. In the meantime, the estates continue to incur administrative expenses on leases the Debtors have not rejected because of Swig's promise to purchase them. The Debtors therefore request a hearing on or before October 30, 2026.

## Reservation of Rights

42. The Debtors expressly reserve all rights, claims, and remedies under the APA, the Sale Order, and applicable law, including (a) the right to forfeiture of the $825,000 Deposit as liquidated damages under Section 2.2 of the APA, (b) the right to recover damages for Swig's breach, including any willful breach preserved by Section 7.2, (c) the right to terminate the APA under Section 7.1(e), (d) all rights with respect to the Reserved Leases, including the leases for Store Nos. 1702, 1704, and 1134, and (e) the right to commence an adversary proceeding. Nothing in this Motion is an election of remedies or a waiver of any right.

## Notice

43. Notice of this Motion will be provided to: (a) Swig, at the notice address set forth in Section 8.1 of the APA, with copies to its counsel, Mayer Brown LLP; (b) the Office of the United States Trustee for the Southern District of Texas; (c) counsel for the Committee; (d) counsel for the DIP Lender; (e) the landlords for Store Nos. 1124 and 1127; and (f) all parties on the master

service list. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto, granting the relief requested in this Motion and such other and further relief as the Court deems just and proper.

Dated: October 27, 2026
Houston, Texas

Respectfully submitted,

*/s/ Omar J. Alaniz*

**REED SMITH LLP**
Omar J. Alaniz (24040402)
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: 469.680.4200
Fax: 469.680.4299
E-mail: oalaniz@reedsmith.com

**REED SMITH LLP**
Amalia Sax-Bolder (admitted *pro hac vice*)
1900 Lawrence Street, Suite 2800
Denver, CO 80202
Telephone: 303.552.3800
Fax: 303.552.3799
E-mail: asaxbolder@reedsmith.com

*Counsel for Debtors and Debtors in Possession*

**Certificate of Accuracy**

In accordance with Bankruptcy Local Rule 9013-1(i), I hereby certify that the foregoing statements are true and accurate to the best of my knowledge.

*/s/ Omar J. Alaniz*
Omar J. Alaniz

**Certificate of Service**

I certify that on October 27, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.

*/s/ Omar J. Alaniz*
Omar J. Alaniz

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **And Go Concepts, LLC, *et al.*,** | § | **Case No. 26-90753 (ARP)** |
| | § | |
| **Debtors.** [2] | § | **(Jointly Administered)** |
| | § | |

**ORDER (I) ENFORCING THE NON-BULK SALE ORDER AND (II) COMPELLING SWIG STORES, LLC TO CLOSE THE SALE OF STORE NOS. 1124 AND 1127**
[Relates to Dkt. Nos. 453, 599 & __ ]

Upon the emergency motion (the "**Motion**")[3] of And Go Concepts, LLC, and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (this "**Order**") enforcing the Sale Order [Dkt. No. 599] and compelling Swig Stores, LLC ("**Swig**") to close the sale of Store Nos. 1124 and 1127 under the APA; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and paragraph 55 of the Sale Order; and this being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given; and the Court having reviewed the Motion and the record and having heard the statements of counsel at the hearing on the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); Garland New Market LLC (6838); AGC Topco, LLC (6845); and AGC Holdco, LLC (0294). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts.
[3] Capitalized terms that are used but not defined herein shall have the meanings given to them in the Motion.

2. The Sale Order and the APA are enforced in accordance with their terms. Swig is bound by the Sale Order, including paragraph 23 thereof.

3. Section 1.6(a) of the APA does not authorize Swig to exclude Store No. 1124, Store No. 1127, or any other Site approved under the Sale Order from the Purchased Assets, or to reduce the Purchase Price on account of any such exclusion. Paragraph 8 of the Sale Order does not grant Swig any such right.

4. Swig is directed to consummate the Closing under the APA with respect to all Approved Leases assigned to Swig under the Sale Order, including the leases for Store Nos. 1124 and 1127, and the related Purchased Assets, and to deliver the Closing Payment and all other Buyer deliveries required by Section 2.4 of the APA, no later than three (3) Business Days after entry of this Order.

5. Swig is enjoined from terminating the APA pursuant to Section 7.1(d)(iii) thereof, or otherwise relying on the failure of the Closing to occur on or before the Termination Date, to the extent such failure is attributable to Swig's refusal to close the sale of Store Nos. 1124 and 1127, pending Swig's compliance with this Order.

6. Nothing in this Order shall affect (a) the Reserved Leases, including the leases for Store Nos. 1702, 1704, and 1134, or (b) any right, claim, or remedy of the Debtors under the APA, the Sale Order, or applicable law, including with respect to the Deposit and any damages, all of which are expressly preserved.

7. The Debtors are authorized to take all actions necessary or appropriate to implement the relief granted in this Order.

8. This Order is effective and enforceable immediately upon entry.

9. The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, the Sale Order, and the APA.

Signed: ____________________, 2026

______________________________________
Alfredo R. Pérez
UNITED STATES BANKRUPTCY JUDGE