**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| AND GO CONCEPTS, LLC, *et al.*, | : | Case No. 26-90753 (ARP) |
| Debtors.[1] | : | (Jointly Administered) |

# OBJECTION OF SWIG STORES, LLC TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE NON-BULK SALE ORDER AND (II) COMPELLING SWIG STORES, LLC TO CLOSE THE SALE OF STORE NOS. 1124 AND 1127

Swig Stores, LLC ("Swig"), by and through its undersigned counsel, files this objection to the *Debtors' Emergency Motion For Entry of an Order (I) Enforcing the Non-Bulk Sale Order and (II) Compelling Swig Stores, LLC to Close the Sale of Store Nos. 1124 And 1127* [Dkt. No. 647] (the "Emergency Motion")[2] and in support thereof states as follows:

## PRELIMINARY STATEMENT

1. The Debtors filed their Emergency Motion to compel Swig to acquire the Excluded Sites (as defined below). As detailed herein, the Emergency Motion should be denied for numerous reasons. First, there is no basis for emergency relief, particularly on essentially 48 hours' notice. Swig remains ready, willing and able to close on all but the two Excluded Sites (as defined below). That said, because the Sale Order is not a final order, the conditions precedent to closing under the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are And Go Concepts, LLC (4415); SAG Corporate Services LLC (0810); AGC-Arizona Facilities, LLC (7507); AGC-North Texas Facilities, LLC (7091); Garland New Market LLC (6838); AGC Topco, LLC (6845); and AGC Holdco, LLC (0294). The location of the Debtors' service address for purposes of these chapter 11 cases is 909 E. Broadway Road, Tempe, AZ 85282. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/AndGoConcepts/.

[2] Capitalized terms used but not defined herein have the meanings given in the Emergency Motion.

APA are not yet satisfied for any of the Sites. And even with respect to those Excluded Sites (as to which the Debtors raise, at most, a colorable dispute), the Debtors will not suffer irreparable harm as a result of any delay in closing as to the Excluded Sites; the Court can fashion an adequate remedy, at an appropriate time consistent with due process, if it were to determine Swig is obligated to close on such Excluded Sites. In addition, the Emergency Motion is procedurally improper, as the relief sought – essentially a mandatory injunction – would require the filing of an adversary proceeding and all the procedural protections mandated by Bankruptcy Rule 7001.

2. More substantively, notwithstanding their premature and procedurally improper request for relief, the Debtors are not entitled to any relief under the plain meaning of the contract. By its express terms, the APA allows Swig to remove the Excluded Sites, resulting in a corresponding adjustment to the purchase price. To be clear, Swig remains ready, willing and able to close with respect to 11 of 13 Sites. But because Swig has timely exercised its rights under the APA to remove the two Excluded Sites through delivery of the Site Removal Notice to the Debtors, there is no breach of the APA (anticipatory or otherwise), and therefore no remedy.

3. Finally, even if the Court were to consider the relief sought in a procedurally proper manner after the filing of an adversary complaint and appropriate motion practice (and potentially discovery), Swig submits that the Debtors' attempt to seek specific performance rather than damages is not supported by Delaware law, which governs the contract at issue.

## FACTUAL BACKGROUND

4. Following negotiation of various stalking horse and other bids, Swig executed the APA, which provides for the purchase of 13 "Sites" that are drive-through restaurant locations previously operated by the Debtors. Acquisition of the Sites, as a practical matter, will be achieved

by assumption and assignment of certain of the Debtors' unexpired leases for developed real property, together with rights arising under or related to the leases.

5. Because the Debtors' virtual data room contained limited useful information about the Sites beyond copies of the lease documents themselves, Swig elected to submit bids and execute the APA in reliance on certain of the terms set forth in the Debtors' own form purchase agreement that the Debtors required be used for any purchase offers. Notably, the Debtors' form of purchase agreement, as well as the final submitted version of the APA, provides in Section 1.6(a) that Swig would have "sole" and unfettered discretion to remove leases from the APA, which, if exercised, would result in corresponding purchase price adjustments.

6. Swig has determined that it no longer seeks to acquire the leases relating to Store Nos. 1124 and 1127 (the "Excluded Sites") or any related assets. Accordingly, on October 26, 2026, Swig timely exercised its express contractual right under the APA to remove the Excluded Sites from the APA by sending to the Debtors, via overnight delivery, a notice (the "Site Removal Notice"), a copy of which is attached hereto as **Exhibit A**, with respect to such removal. Swig then provided a copy of the Site Removal Notice via email to the Debtors on October 27, 2026, and a representative of the Debtors confirmed receipt almost immediately thereafter.

7. In short, Swig has fully complied with the APA, is not in breach of the terms of the APA and has not threatened to breach the APA, notwithstanding any statements in the Emergency Motion to the contrary. The Court should deny the Emergency Motion.

## ARGUMENT

### A. Emergency Relief is Not Warranted and an Adversary Proceeding is Required

7. As a threshold matter, the Court should decline to grant emergency relief because there is no emergency. Nothing in the APA requires Swig to close on October 30 with respect to

any of the Sites. Section 6.1(b) of the APA provides that, as a condition precedent to the parties' obligation to consummate the sale transactions, "the Bankruptcy Court shall have entered the Sale Order . . . which shall have become a Final Order[.]" APA § 6.1(b). The APA defines the term "Final Order" as an order of the Bankruptcy Court "in respect of which the time period for instituting or filing an appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion for reconsideration, motion to alter or amend judgment, motion for rehearing or motion for new trial shall have expired[.]" APA Ex. A. The inclusion of the October 30 date in Section 2.3 of the APA is subject to the satisfaction of the "Final Order" requirement and the other conditions precedent to closing in the APA which, once satisfied, commence a three-business-day window during which closing must occur.

8. Pursuant to Rule 8002 of the Federal Rules of Bankruptcy Procedure, "a notice of appeal must be filed with the bankruptcy clerk within 14 days after the judgment, order, or decree to be appealed is entered." Fed. R. Bankr. P. 8002(a)(1). Because the Sale Order was entered on October 16, 2026, the related appeal period under Rule 8002 will remain outstanding until the end of day on October 30, 2026. And because the APA, in turn, requires closing to occur "in no event later than three (3) Business Days following the date on which the last of the conditions set forth in Article VI . . . has been satisfied or waived," any obligation of Swig to close the APA is not enforceable until November 4 at the earliest.

9. Because Swig's closing obligations do not arise until at least November 4, the Debtors' claims regarding the need for emergency relief to avoid paying November rent are without merit. The Debtors will be responsible for payment of November rent regardless of whether the Court grants the Emergency Motion, unless Swig exercises its discretion to waive the finality requirement (which Swig would be willing to do absent this dispute but does not intend to

do given the ongoing dispute with the Debtors). Moreover, the amount of potential incremental rent as to the Excluded Sites is less than $20,000. Given that the Debtors have now closed on the "bulk sale" of dozens of the Debtors' properties, which Swig understands has generated in excess of $120 million of cash proceeds to the Debtors' estates, such rent obligations do not in any way warrant the extraordinary relief the Debtors seek; certainly there is no risk of looming administrative insolvency or inability to satisfy their November rent obligations.

10. The relief sought by the Emergency Motion is also procedurally improper. Bankruptcy Rule 7001 provides that "a proceeding to obtain an injunction or other equitable relief" is an adversary proceeding. Fed. R. Bankr. P. 7001(g). Seeking declaratory judgment related to a request for an injunction or equitable relief, such as specific performance as sought here, likewise requires an adversary proceeding. Fed. R. Bankr. P. 7001(i). Compliance with Bankruptcy Rule 7001 is not optional. In *Zale*, for example, the Fifth Circuit held that, because the issuance of an injunction or granting of other equitable relief is covered by Rule 7001, that relief could not be sought by motion and, instead, must be brought by adversary proceeding. *Matter of Zale Corp.*, 62 F.3d 746, 763 (5th Cir. 1995); *see also In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*, 626 B.R. 278, 290 (Bankr. S.D. Tex. 2021) ("This Court will not entertain a request for injunctive relief in a contested matter, as Debtors urge it should, because contested matters, as opposed to adversary proceedings, 'require fewer procedural protections' and 'are generally designed for the adjudication of simple issues.'").

11. Specific performance is exactly the sort of remedy that requires an adversary proceeding under Bankruptcy Rule 7001. The Debtors by their motion seek declaratory relief as to the meaning of the APA and specific performance of certain payment obligations and assumption of leases, which is plainly injunctive relief. As detailed below, there is ***at minimum*** a

colorable legal and factual dispute between the Debtors and Swig regarding the meaning of numerous provisions of the APA. While Swig believes its interpretation of the APA is grounded in the plain meaning of the contract text, the Court could conclude that there are legal issues that need to be briefed or factual issues that may need to be resolved through briefing and a more thorough evidentiary record, including discovery and witness testimony. On just three days' notice, however, there is simply no opportunity to develop the legal and factual record that may be necessary for resolving the dispute presented in the Emergency Motion. The requirement that the Debtors proceed through an adversary proceeding protects Swig's fundamental due process rights, including its ability to mount a proper defense to the claims asserted against it, and ensures that the matters for determination are properly and comprehensively before the Court.

12. The Debtors try to evade this clear requirement by mischaracterizing the relief as a request to enforce the Sale Order. Emergency Motion ¶ 24. Specifically, the Debtors assert that paragraphs 2, 3, 23, and 55 of the Sale Order and Exhibit B to the Sale Order "directed Swig" to consummate the sale. But these provisions do not direct Swig to do anything beyond what the APA itself provides. Paragraph 2 of the Sale Order approves the sale transactions contemplated by the six purchase agreements subject to the order and clarifies that each of the six purchase agreements is an independent transaction. Paragraph 3 provides that the Sale Order applies only to the leases identified on Exhibit B (which likewise does no more than identify the leases subject to the order, the approved assignee of each lease, the approved purchase price for each lease, and any back-up bid for each lease). Paragraph 23 includes a "reasonable best efforts" requirement but does not impose an independent obligation on Swig or any other buyer and, in any event, does not supersede the provisions of the APA itself, including Sections 1.6 and 2.3. Paragraph 55 is a customary retention of jurisdiction provision that, likewise, imposes no substantive obligations on any party.

13. Even if the Emergency Motion were properly characterized as a motion to enforce the Sale Order, which it is not, the Fifth Circuit has made clear that "[i]ncluding a matter governed by Rule 7001 in another matter already before the court . . . does not satisfy the procedural rules required by Rule 7001." *Zale*, 62 F.3d at 763. In short, because the relief requested in the Emergency Motion is squarely covered by Bankruptcy Rule 7001, an adversary proceeding is required irrespective of whether there is some arguable basis for relief under the Sale Order itself (which there is not).

**B. Removal of the Excluded Sites is Permitted Under the APA and the Sale Order**

14. The Debtors' rhetoric notwithstanding, Swig has not repudiated any of its obligations under the APA. Instead, Swig has acted in accordance with the clear language of Section 1.6 of the APA, which gives Swig the complete discretion to remove leases and related assets. Under Section 1.6, the Debtors are required to provide Swig with an "Executory Contract Schedule" that "sets forth a list of the executory contracts and unexpired leases relating to the Purchased Assets, to which Seller is a party, that Buyer wishes to 'assume' (each such contract or lease designated by Buyer, an 'Assumed Contract')[.]" APA § 1.6(a). The term "Assumed Contract" expressly includes the "Assumed Leases," which are defined as "all the Real Property Leases pertaining to the Sites." APA § 1.1(a); *id.* Ex. A. The Executory Contract Schedule under ***the plain language of*** the APA includes the leases that are the subject of the APA, including the leases for the Excluded Sites. Indeed, on October 23, 2026, the Debtors delivered a draft Executory Contract Schedule, a copy of which is attached hereto as **<u>Exhibit B</u>**, which listed only real property leases, including the leases for the Excluded Sites, and no other executory contracts or unexpired leases. This admission alone should be viewed as dispositive.[3]

[3] Realizing after the fact the consequences of this own goal, the Debtors' counsel sent an email earlier this afternoon stating that the draft Executory Contract Schedule had been "mislabeled" and purporting to provide a new Executory

15. Section 1.6 of the APA then provides, in two places, that Swig may add or remove leases. First, it says that the Executory Contract Schedule "may be updated from time to time after the date hereof by Buyer to add or remove executory contracts or unexpired leases." APA § 1.6(a). Then, it provides that "[n]o later than three (3) days prior to the Closing Date, Buyer may, ***in its sole discretion***, determine not to 'assume' any Contract previously designated as an Assumed Contract, in which case such contract shall be removed from the Executory Contract Schedule." APA § 1.6(a) (emphasis added). The "sole discretion" standard in Section 1.6(a) gives Swig broad latitude to determine what contracts—including leases—to assume and what to leave behind. Swig in fact exercised that discretion on October 26 and 27 by delivering the Site Removal Notice, which had the effect of removing the Excluded Sites from the APA.

16. Section 1.6(a) of the APA would be rendered meaningless surplusage if Swig lacked the ability to remove leases from its purchase obligations. As a result, and as the Emergency Motion notes, this Court should follow Delaware courts in applying the canon against surplusage, to "not read a contract to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (citation and internal

---

Contract Schedule with no contracts or leases whatsoever, and attempting instead to provide a new Exhibit C that would substitute the Site list with a list of the Real Property Leases. This pretextual attempt to walk back their admission belies the language of the contract:

(1) The APA defined the Sites as a static list of address locations where Salad and Go operated. See APA preamble ("Seller currently owns and operates certain "Salad and Go" outlets (the "***Business***") (each Salad and Go location referred to individually as a "***Site***" and collectively as the "***Sites***") listed in <u>Exhibit C</u>").

(2) The APA clearly distinguishes, as makes sense, between the Sites – which are physical locations – and the underlying Real Property Leases, which are the contracts governing the occupancy of the Sites. *See* APA Ex. A-7 ("“***Real Property Leases***" means those leases and subleases, and any amendments, guarantees, and subordination, non-disturbance and attornment agreements related thereto, pursuant to which real property is used or occupied by the Business, as well as corporate office space and storage space leases or other Contracts, for the Sites set forth on <u>Exhibit C</u> attached hereto."); *see also* APA § 1.1(d) ("***Purchased Assets***" include "Seller's right, title, and interest in all the Real Property Leases pertaining to the Sites (collectively, the "***Assumed Leases***")").

(3) Most significantly, there is no contractual mechanism for the Seller supplementing or amending Exhibit C, unlike Section 1.6's provisions for the Executory Contract Schedule or the definition of the Seller Disclosure Schedule. *See* APA § 1.6(a); *id.* Ex. A-8.

quotation marks omitted). The only way to not render Section 1.6(a) meaningless is to give force to Swig's reasonable and proper interpretation. Swig understood that the executory contracts it was acquiring under the APA were exclusively the Leases related to the Sites. And because the Debtors never included in the APA or Schedules any other contracts that were potentially subject to inclusion in the APA, and instead the draft Executory Contract Schedule provided under the APA includes only the real property Leases related to the Sites, the Debtors' own conduct confirms that interpretation.

17. The Debtors' arguments to the contrary are unavailing. For example, the Emergency Motion states that Section 1.6 is purely a "cure-cost provision" that only allows Swig to "evaluate and shed ancillary contracts." Emergency Motion ¶ 30. But nothing in Section 1.6(a) includes any such limitation to so-called "ancillary" contracts; rather, on its face, it applies to all contracts on the Executory Contract Schedule, which only includes the "Real Property Leases." The Debtors try to bolster this argument by distinguishing between "Cure Costs" that apply to contracts other than leases, and "Required Cure Costs" that apply to leases. This argument, however, in actuality cuts against the Debtors, because it demonstrates that the parties to the APA knew how to distinguish where relevant between leases and other types of contracts, but the Debtors elected not to do so in Section 1.6(a), which election needs to be given meaning. Further, the fact that subsequent subparts of Section 1.6 deal solely with contracts other than the "Real Property Leases" does not somehow limit Section 1.6(a), which the Debtors agree applies to those leases (as evidenced by the schedule attached hereto as **Exhibit B**).

18. Likewise, the Sale Order expressly contemplates the removal of sites from the APA. Paragraph 8 of the Sale Order states that "notwithstanding anything to the contrary in this Sale Order, the Buyer's rights under the APA, including any rights thereunder to exclude leases

from the Assumed Contracts/Leases and to make corresponding adjustments to the Purchase Price, are approved." Sale Order ¶ 8. The Debtors seek to change that provision's meaning by arguing that it applies only to Swig's rights under Sections 6.5, 7.1(d)(iii), and 1.5 of the APA. Emergency Motion ¶ 35. But Paragraph 8 is not on its face in any way so limited, and it cannot even apply to Section 6.5, which applies to "Disputed Leases" (leases for which there is a pending landlord dispute regarding assignment and assumption). Because the Sale Order applies only to the "Approved Leases" and not to any "Reserved Lease," and the only leases under the APA that could qualify as Disputed Leases are Reserved Leases, *see* Sale Order ¶¶ 3-5, Paragraph 8 cannot apply. And the fact that there may be circumstances in which Paragraph 8 could apply to Sections 7.1 and 1.5 (the former of which is a termination provision and the latter of which operates post-closing) says nothing about whether it also applies to Section 1.6.

19. The binding and irrevocable nature of Swig's bid is also irrelevant to the contractual analysis. Swig's offer was to purchase the Sites and other assets subject to and on the terms set forth in the APA. Swig does not assert that it is not bound to the terms of the APA or the results of the auction; it merely disagrees with the Debtors as to the consequences therefrom, as detailed above. Section 4.9 of the APA, the irrevocability provision, is of no avail to the Debtors, as it is a typical and boilerplate provision in bankruptcy APAs that is meant to provide that an APA is enforceable against the purchaser notwithstanding the fact that its debtor counterparties lacked the authorization to countersign at the time of submission. Section 4.9 is also expressly subject to "the terms set forth" in the APA as well as "the receipt of the exhibits and schedules [to the APA] in form and substance reasonably acceptable to Buyer" and "modification pursuant to the terms" of the APA. APA § 4.9.[4]

[4] If the mere fact of submitting a bid irrevocably bound the bidder to purchase assets without regard to the terms of the APA, then the language quoted in the Emergency Motion from the Debtors' purchase agreement with Just Salad

20. In addition, the Debtors are wrong that removal of the Excluded Sites from the APA pursuant to Swig's rights under Section 1.6(a) does not result in a corresponding reduction to the purchase price. Section 2.1 provides that the purchase price "may be adjusted pursuant to the terms hereof, ***including*** pursuant to Section 1.1 with respect to any Additional Site, pursuant to Section 6.5 with respect to any Excluded Site, or pursuant to Section 7.1(d)(iii)[.]" APA § 2.1. The use of "including" in the APA means "including without limitation," which means that the enumerated adjustments are not the exclusive bases for purchase price adjustment. *See* APA § 8.8(b).

21. Section 2.1 further provides: "If any Sites are removed from the Purchased Assets prior to Closing in accordance with this Agreement **or** pursuant to the Sale Order, the Purchase Price shall be reduced by the per-Site allocation for each such removed Site." APA § 2.1 (emphasis added). "Purchased Assets" includes the "Real Property Leases pertaining to the Sites[.]" APA § 1.1. Swig's delivery of the Site Removal Notice means that Swig is no longer acquiring the "Sites" related to the Excluded Sites, as it is a practical impossibility for the Debtors to convey the "Sites" to Swig without conveying the leases. Section 1.5 of the APA supports this interpretation, as it provides "in no event shall the failure to assign to Buyer any Seller Contract due to the termination of such Seller Contract (***other than [a] Real Property Lease***) . . . reduce the Purchase Price payable to Seller[.]" APA § 1.5 (emphasis added). This demonstrates the parties' understanding that the principal value subject to the APA is the leases themselves, and not any ancillary contracts or property, justifying purchase price reductions for the removal of the Excluded Sites and related Leases from Schedule 1.6.

New York LLC would similarly be unenforceable. See Emergency Motion ¶ 32 (noting that the Just Salad purchase agreement includes a purchase price adjustment "if Buyer elects in writing to proceed with fewer than all of the Sites"). It cannot be the case that Just Salad has an unqualified right to remove leases, as the Emergency Motion implies, while Swig does not, particularly given that both purchase agreements include the same Section 1.6(a) discretionary lease-removal mechanism.

**C. Specific Performance is Not an Appropriate Remedy**

22. Finally, if the Court were to determine in a procedurally appropriate and final manner that Swig is wrong (which it submits it is not), specific performance is not the appropriate remedy. The APA already provides a specific remedy, deposit forfeiture, for any failure to close here. The harm to the Debtors is purely monetary, and the extent of damages has already been fixed by contract as liquidated damages.

23. Under Delaware law, specific performance is an atypical remedy that is only available where the ordinary remedy, monetary damages, does not provide adequate relief. *26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 464 (Del. Ch. 2023). Parties seeking specific performance must demonstrate that those prerequisites are met, but "whether to issue the decree is always a matter of equity" and "its application must be warranted on the facts and consistent with equitable principles." *Id.* This remains the case "even if a contract provides for specific performance." *Id.* at 465. The existence of any such contractual provision can "support a decree of specific performance but does not mandate its issuance." *Id.*

24. The balance of harms weighs strongly against specific performance. If Swig is forced to assume the Excluded Sites, in addition to paying the related purchase price to the Debtors, it would be obligated to perform for the remaining term of the leases, which run through 2040 and 2041. Swig would likewise undertake the non-monetary obligations under the leases for the Excluded Sites, including regarding maintenance of the premises and any applicable continuous operation covenants. The burdens of assuming the Excluded Sites could also adversely affect Swig as an operating business, as well as its employees.

25. On the other hand, if Swig is not forced to assume the Excluded Sites, the Debtors can either find an alternative buyer for the properties or reject the leases for the Excluded Sites.

Swig understands that another bidder previously placed a purchase offer on one of the Excluded Sites (although the Debtors did not designate it as a back-up bidder for such lease) and may still be interested in the property. In either case, the Debtors' actual damages would be limited to, at most, the costs of rejection (subject to the Section 502(b)(6) cap) and unpaid prepetition amounts due, which are more than covered by the consideration to be provided by Swig through its purchase of the remaining properties subject to the APA. And, as the Debtors are liquidating, there is no broader harm to their business that could result from removing the Excluded Sites from the APA. The significantly disproportionate potential harm to Swig weighs strongly against specific performance.

26. Moreover, the Debtors, in drafting the APA, also already fixed the monetary damages for exactly this type of asserted breach of contract. Section 2.2 of the APA required Swig to deliver to the Debtors a deposit in the amount of 10% of the purchase price under the APA. Under that provision, if the APA "is terminated by Seller pursuant to Section 7.1(e)(i) or if Buyer otherwise fails to consummate the Closing when required, the Deposit shall be forfeited to Seller as liquidated damages." APA § 2.2. If deposit forfeiture were not the appropriate remedy in the exact circumstance presented here, it is not clear when it could possibly be invoked. And, to the extent that the APA is ambiguous, it would be inequitable to resolve that ambiguity in favor of highly burdensome specific performance.

27. As Delaware courts have noted, liquidated damages clauses reflect "a sum to which the parties to a contract have agreed, at the time of entering into the contract, as being payable to satisfy any loss or injury flowing from a breach of their contract." *Delaware Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) (citation omitted). A liquidated damages provision is "enforced according to its terms" unless the damages specified are disproportionately in excess

of actual damages such that the provision constitutes an unenforceable penalty. *Id.* To the extent the Court finds, following a proceeding that complies with the Bankruptcy Rules, that any relief should be granted in favor of the Debtors, either actual damages or liquidated damages under Section 2.2 of the APA, not specific performance, would provide the appropriate relief. But again, that determination, to the extent the Court does not deny the Emergency Motion with prejudice, is a question for another day in a procedurally proper proceeding.

## **CONCLUSION**

Swig and the Debtors disagree about the meaning and interpretation of numerous terms of the APA. Swig submits that it has a plain and express contractual right, pursuant to Section 1.6(a) of the APA, to remove the Excluded Sites from its transaction with the Debtors. Rather than follow the requirements of the Bankruptcy Rules, the Debtors have rushed to court with a premature and procedurally improper motion seeking to adjudicate this contractual dispute on just three days' notice, which if heard would deprive Swig of its due process protections that the Bankruptcy Code and Bankruptcy Rules mandate. Putting that aside, there is also no emergency, as the damages from a November closing are nonexistent and, with respect to the Excluded Sites, are marginal at only about $20,000 per month thereafter. Finally, even if the Debtors were to prevail in an adversary proceeding as to Swig's inability to remove the Excluded Sites, their proposed remedy of specific performance is unjustified and inequitable, as damages would be an adequate remedy. For all these reasons, the Emergency Motion should be denied.

WHEREFORE, Swig respectfully requests that the Court deny the Emergency Motion and grant such other and further relief as is appropriate under the circumstances.

Dated: October 29, 2026

**MAYER BROWN LLP**
/s/ *Charles S. Kelley*
Charles S. Kelley
TX State Bar No. 11199580
700 Louisiana St., Suite 3400
Houston, TX 77002
Telephone: (713) 238-2634
Email: ckelley@mayerbrown.com

Sean T. Scott (admitted *pro hac vice*)
IL Bar No. 6273516
Joshua R. Gross (admitted *pro hac vice*)
IL Bar No. 6320712
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Email: stscott@mayerbrown.com
jgross@mayerbrown.com

*Counsel to Swig Stores, LLC*

## CERTIFICATE OF SERVICE

I certify that on October [29], 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notification of such filing to all attorneys of record.

*/s/ Charles S. Kelley*
Charles S. Kelley